FILED

2022 Nov-15 AM 09:47
U.S. DISTRICT COURT
N.D. OF ALABAMA



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| NATIONAL SMALL BUSINESS UNITED d/b/a/ the NATIONAL SMALL BUSINESS ASSOCIATION and | ) ) ) | |
| ISAAC WINKLES, | ) | Case No. _____ |
| Plaintiffs, | ) | |
| vs. | ) | |
| JANET YELLEN, in her official capacity as the Secretary of the United States Department of the Treasury, | ) ) | |
| UNITED STATES DEPARTMENT OF THE TREASURY, and | ) ) | **COMPLAINT** |
| HIMAMAULI DAS, in his official capacity as Acting Director of the Financial Crimes Enforcement Network, | ) ) ) | |
| Defendants. | ) ) | |
|  | ) | |

Plaintiffs National Small Business United, d/b/a/ the National Small Business Association ("NSBA"), and Isaac Winkles, major shareholder of an NSBA member ("Winkles"), bring this civil action for declaratory and injunctive relief against Janet Yellen, in her official capacity as the Secretary of the United States Department of the Treasury ("Yellen"), the United States Department of the Treasury (the "Treasury"), and Himamauli Das, in his official capacity as Acting Director of the

Financial Crimes Enforcement Network ("Das"), and allege as follows:

## PRELIMINARY STATEMENT

1.     Justice Louis Brandeis once warned—in a dissenting opinion that would later become law—that the "greatest dangers to liberty lurk in the insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 471, 479 (1928) (Brandeis, J., dissenting) (objecting against warrantless wiretap of bootleggers' private phone calls by federal agents). The Corporate Transparency Act, Pub. L. No. 116-283, 134 Stat. 4604, *codified at* 31 U.S.C. § 5336 (the "CTA" or the "Act")—a federal statute enacted on January 1, 2021, mandating that persons forming entities under State law report "sensitive information," *id.* § 5336 note (6), to the federal Financial Crimes Enforcement Network ("FinCEN"), or face monetary penalties, imprisonment, or both—is just such an "insidious encroachment."

2.     The CTA's reporting requirements will apply to approximately 32.6 million "reporting companies" in 2024 and to an estimated 5 million additional companies per year thereafter, including the vast majority of NSBA's members, located on every main street in America and in every corner of every State in the Union. *See* Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. 59498, 59549 (Sept. 30, 2022) (to be codified at 31 C.F.R. pt. 1010). These "reporting companies"

include mom-and-pop businesses, franchisees, manufacturers, on-line retailers, plumbers, restaurateurs, electricians, mechanics, lawyers, architects, dentists, doctors, fitness studios, landscapers, and any other privately owned enterprise or business with 20 or fewer full-time employees **or** less than $5 million in annual gross receipts or sales.  *See* 31 U.S.C. § 5336(a)(11)(B)(xxi).  But the CTA goes further. It also covers entities that are not engaged in any commercial activity at all, including (i) not-for-profit entities that do not have a federal 501(c) tax-exempt designation, (ii) entities formed by U.S. persons solely to hold private property in the State (*e.g.*, a family residence), and (iii) local, private social clubs that have formed entities with no intent to apply for federal 501(c) tax-exempt status.

3.      The primary stated purpose of the CTA is to enhance measures to combat financial crimes, such as money laundering and terrorism financing.  Those are admirable and important aims.  However, while attempting to fight crime, the CTA imposes its heaviest burdens on law-abiding U.S. citizens and permanent residents.  The CTA's obligations to report sensitive personal information are imposed on a "reporting company" even though:

> (i)      the federal government does not know in what activities the reporting company[1] is engaged or will engage;

---

[1] Although we use the term "reporting company," which is used in the statute, the word "company" implies that the only entities affected by the CTA are those that engage in commerce when, in fact, State laws explicitly authorize entity formation for lawful, non-commercial purposes.  Accordingly, Plaintiffs do not concede that "reporting company," as vaguely defined in the CTA, is limited to companies that engage in commerce.

(ii)   the federal government does not know whether the activities engaged in, or to be engaged in, by the reporting company constitute "commerce with foreign Nations, and among the several States, and with the Indian Tribes" such that they are subject to Congress's authority under Article I of the United States Constitution;

(iii)   the federal government does not know or suspect that the reporting company is engaging in, or will engage in, any illegal activity or any activity that is subject to federal regulation; and

(iv)   the federal government has no suspicion of wrongdoing, probable cause, or any other basis justifying the imposition of an obligation to divulge sensitive personal information to FinCEN for law enforcement purposes.

4.     Thus, the CTA is a law enforcement dragnet of sweeping proportions imposed by Congress on law-abiding U.S. citizens and permanent residents who own or control small businesses in the United States (as well as upon non-business entities), where neither Congress nor any other branch of the federal government has established any legal or regulatory predicate to justify this demand for personal information.  The statute compels self-identification of private individuals seeking to engage in—or to continue engaging in—lawful, federally unregulated commercial and non-commercial activity under State laws allowing them to form an entity, whether or not such activity affects interstate, foreign, or Indian commerce.

5.     Compounding the error of this jurisdictional overreach, the CTA will likely weaken—rather than strengthen—the existing federal framework for collecting beneficial ownership information from economic actors in the U.S. financial system.  The CTA will supplant the existing beneficial ownership reporting

requirements under the Customer Due Diligence Requirements for Financial Institutions (the "CDD Rule"), which requires financial institutions to obtain beneficial ownership information from persons or entities that voluntarily avail themselves of the U.S. financial system by opening a financial account with a federally regulated financial institution.  Under the CDD Rule, financial institution customers provide detailed and verifiable documentation demonstrating beneficial ownership information, subject to vetting and reporting of suspicious activity by the relevant financial institution.  The CTA, on the other hand, requires no verifiable documentation, no review of the information submitted, and no monitoring or reporting to FinCEN by a disinterested third party.  Making matters worse, the CTA will likely reduce the role of financial institutions—the very actors most likely to be used for improper financial activity and most equipped to detect and prevent such activity—in combatting financial crimes.  Money laundering and terrorism funding are important U.S. national security problems, but the logical cure is to establish laws that follow the money, not to build a Big-Brother database of predominantly U.S. citizens and permanent residents who are simply engaging in lawful activities. The Framers of the Constitution "conferred, as against the government, the right to be let alone – the most comprehensive of rights and the right most valued by civilized men." *Olmstead,* 277 U.S. at 478 (Brandeis, J., dissenting).  The CTA turns this bedrock principle of American freedom from governmental intrusion on its head.

6.      The Act also claims to "set a clear, Federal standard for incorporation practices" for "entities formed under the laws of the States," 31 U.S.C. § 5336 note (5)(A), and prohibits any State from authorizing any "corporation, limited liability company, or other similar entity" formed under its laws from issuing "a certificate in bearer form evidencing either a whole or fractional interest in the entity," *id.* § 5336(f).  These are unprecedented federal intrusions into the States' sovereign powers to charter and regulate the formation of entities under State law.  For more than two centuries, the States have had independent, plenary authority to regulate the formation and internal structuring of corporate entities under State law, subject only to the constraint set forth in Article I, Section 10 of the U.S. Constitution that "no State shall make any Law impairing the Obligation of Contracts," which the Supreme Court has held to encompass corporate charters vested by the British Crown before the United States was established.  *See Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819).  The federal government does not have the constitutional authority to impose additional requirements on the formation of entities under State laws nor to prescribe the conditions under which an entity charter may be granted under State laws.  This includes banning one or more indicia of ownership such as bearer shares, notwithstanding the power Congress possesses to regulate entities after formation **if** the entities, once formed, engage in foreign, interstate, or Indian commerce.

7.      The Constitution does not grant unlimited authority to Congress. Rather, the Constitution limits Congress's authority to the specific powers enumerated in Article I and the Civil War Amendments and reserves to the States and to the People "powers not delegated to the United States by the Constitution." U.S. Const. amend. X.  Consequently, the Constitution's enumeration of specific rights "shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX.  The CTA violates these constitutional principles:

(i)      The CTA infringes on the States' sovereign powers over the formation and governance of entities under State law.

(ii)     The CTA does not regulate commerce.  Rather, it imposes obligations on the States and State entity filers at the moment of entity formation, which is an entirely ministerial act, not a "commercial activity" over which Congress can assert its power to "regulate Commerce." U.S. Const. art. I, § 8, cl. 3.  In fact, many States permit entities to be formed for purposes other than commerce or business.  *See, e.g.*, Ala. Code § 10A-1-2.01 ("A domestic entity may have *any lawful purpose or purposes*, unless otherwise provided by this title.") (emphasis added).[2]

(iii)    The CTA's application to all entities formed under State law sweeps in entities engaged solely in activities confined to the territory of the State in which they are formed and entities that do not engage in any commercial activity at all.  The CTA's indiscriminate regulation of entity formations therefore exceeds Congress's power to regulate interstate, foreign, and Indian commerce.

---

[2] *See* also Ala. Code § 10A-1-2.11 ("[a] domestic entity has the same powers as an individual to take action necessary or convenient to carry out its business *and affairs*") (emphasis added).  Delaware law is more explicit in making a distinction between business and other purposes. *See* Del. G. Corp. L. § 101 (b) ("[a] corporation may be incorporated or organized under this chapter to conduct or promote any lawful business *or purposes*") (emphasis added).

(iv)   The CTA infringes upon individuals' rights to apply for, form, own, and provide for the self-governance of entities under State law.  By compelling individuals who apply for, form, own, or control entities formed under State law to identify themselves to the federal government where the federal government has no basis for regulatory power, the CTA violates these individuals' constitutional rights to free speech and free association.

(v)   By compelling the disclosure of "sensitive" personal information for law enforcement purposes under penalty of criminal sanctions for non-compliance, and, in certain cases, allowing federal and foreign government agencies to access such sensitive information regarding U.S. persons without U.S. court authorization, the CTA enables "unreasonable searches and seizures" of the "right of the people to be secure in their persons, houses, papers, and effects" with no prior suspicion of wrongdoing, in violation of the Fourth Amendment.  *See* U.S. Const. amend. IV.  These aspects of the CTA also violate the privilege against self-incrimination and privacy rights protected by the Fifth and Ninth Amendments.  *See* U.S. Const. amends. V & IX.

(vi)   The CTA is unconstitutionally vague because its definitions of "applicant" and "beneficial owner" have no evident analogues in relevant State entity laws, provide insufficient notice of who is subject to its criminal sanctions for noncompliance, and vest too much interpretive discretion in the federal government.

8.      Therefore, Plaintiffs seek declaratory and injunctive relief against the CTA's implementation to avoid an unconstitutional intrusion by the federal government into the rights of U.S. persons seeking to form corporate entities under State law and to protect the sovereignty of the States.  The Act directs the Secretary of the Treasury to promulgate regulations to implement the statute.  On September 29, 2022, FinCEN issued a final rule (the "Final Rule") implementing the CTA's beneficial ownership reporting requirements to take effect on January 1, 2024 for

newly-formed entities and January 1, 2025 for existing entities. Consequently, immediate action by this Court to enjoin the Act and to declare it unconstitutional is necessary.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States and has jurisdiction to render declaratory relief because an "actual controversy" exists between the parties within the meaning of 28 U.S.C. § 2201(a).

10.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(3) because no real property is involved, Plaintiff Winkles resides in this District as do other officers and major shareholders of companies that are members of Plaintiff NSBA, and Defendants are agencies or officers of the United States sued in their official capacities.

## PARTIES

11.      The National Small Business Association, an Ohio nonprofit mutual benefit corporation, is one of the leading and oldest associations of small businesses in the United States, with members in all fifty States and the District of Columbia. The predecessor entity of the NSBA was formed in the 1930s to represent the interests of small-business operators struggling to survive in the face of increased federal and state government taxes and regulations triggered by the Great

Depression.  Today, NSBA's mission is to represent and protect the rights of its members who operate their small businesses in compliance with lawfully enacted government regulation.

12.    NSBA's members include numerous reporting companies owned or operated by U.S. persons who object to forced compliance with the CTA's unconstitutional command that they turn over "sensitive" personal information to the federal government to form or continue to operate entities formed under State law, requiring a diversion of resources from their businesses.  NSBA joins in those objections on behalf of its members across the nation, including:

    (i)    A small software company that has developed a mobile-phone application, with no employees and less than $5,000,000 in gross receipts or sales  in 2021;

    (ii)    A company formed to operate a retail food franchise with less than twenty full-time employees and less than $5,000,000 in gross receipts or sales in 2021;

    (iii)    A single-owner business consulting company with no employees and less than $5,000,000 in gross receipts or sales in 2021;

    (iv)    A private, family-owned real estate development company, some of whose owners hold their private residences inside a limited liability company formed under State law in the State where the residences are located; and

    (v)    A construction, electrical, and plumbing services company with less than twenty full-time employees and less than $5,000,000 in gross receipts or sales in 2021.

13.    Moreover, because a primary mission of NSBA is to provide its members with information and advice regarding legal and regulatory issues faced by

small businesses, NSBA has already incurred and will continue to incur substantial costs in assisting its members in understanding how the Act applies to them and affects their businesses. These costs and efforts will only increase now that the Final Rule has been issued.

14.    Plaintiff Isaac Winkles is a citizen of the State of Alabama and of the United States and a resident of Huntsville, Alabama. Winkles and his wife are the sole shareholders of Alabama Property Management, Inc., an Alabama domestic corporation that owns and operates a business managing real estate properties in northern Alabama. Alabama Property Management, Inc., is a member of NSBA, and Winkles will be subject to the Act's reporting requirements to give his sensitive personal information to FinCEN. He objects to being forced to comply with the Act as a violation of his constitutional rights and an encroachment on the sovereignty of the State of Alabama to regulate entity formation. The Supreme Court has held that individual citizens of a State have standing to raise claims that the federal government has infringed on a State's sovereignty. *See Bond v. United States*, 564 U.S. 211, 222 (2011) ("An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable. Fidelity to principles of federalism is not for the States alone to vindicate.").

15.     Defendant United States Department of the Treasury is an executive-branch department of the federal government headquartered in Washington, D.C. responsible for the administration and enforcement of the CTA, through FinCEN.

16.     Defendant Yellen is the Secretary of the United States Treasury and is named as a party in her official capacity.

17.     Defendant Das is Acting Director of FinCEN and is named as a party in his official capacity.

## FACTUAL ALLEGATIONS

### The Requirements of the CTA

18.     The CTA was enacted on January 1, 2021, as part of the omnibus National Defense Authorization Act for Fiscal Year 2021.[3]  The stated purpose of the CTA is to combat money laundering, the financing of terrorism, and other illicit activity by cracking down on the use of anonymous "shell companies."  To that end, the CTA requires most U.S. corporate entities to provide extensive personal ownership information to FinCEN.

19.     **Reporting Obligations**.  Specifically, the Act requires "reporting companies" to provide to FinCEN data regarding each "beneficial owner" and "applicant."  Each of those terms is broadly and ambiguously defined:

- A "reporting company" is defined as a "corporation, limited

---

[3] William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388.

liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A).

- A "beneficial owner" is defined as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity;" or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." *Id*. § 5336(a)(3)(A).

- An "applicant" is defined as any individual who files an application to form a reporting company or "registers or files an application to register" a non-U.S. company to do business in the United States. *Id*. § 5336(a)(2).

20.   For each of the covered individuals, the reporting company must provide to FinCEN their full legal name, date of birth, current residential or business street address, and "unique identifying number from an acceptable identification document," such as an unexpired passport or State-issued identification card or driver's license, or FinCEN-issued identifier number.  31 U.S.C. § 5336(b)(2)(A). This personal information must be reported upon formation or registration of the reporting company, or, in the case of existing reporting companies, in a "timely manner," and not later than two years after the effective date of the regulations that FinCEN is directed to promulgate. *Id*. § 5336(b)(1)(B), (C).  If there are any changes to the reported data—such as if a "beneficial owner" or "applicant" moves their personal residence or gets a new driver's license—the entity must provide updated

information to FinCEN no more than one year after the change.  *Id*. § 5336(b)(1)(D).

21.     Reporting companies that "willfully" fail to comply with the CTA's reporting requirements are subject to a civil penalty of up to $500 per day up to $10,000, two years' imprisonment, or both a fine and confinement.  *Id*. § 5336(h)(1), (3).

22.     **Database of Personal Information**.  The disclosures required by the CTA will be used to create a vast database of personal information regarding "beneficial owners" and "applicants."

23.     The CTA requires FinCEN to keep the personal data of a reporting company's beneficial owners and applicants for at least five years after the date on which the reporting company is wound down.  31 U.S.C. § 5336(c)(1).  For the duration of FinCEN's possession of the required personal information—which, given the lifespan of many companies, is likely to far exceed five years—FinCEN may share the reported personal data of reporting companies with federal, State, local, and tribal law enforcement agencies; with financial institutions for customer due diligence (with the reporting company's consent); and with "a Federal functional regulator or other appropriate regulatory agency," including foreign governmental agencies.  *Id*. § 5336(c)(2)(B).

24.     If the request for personal data comes from a State, local, or tribal law enforcement agency, the statute requires that it come through "appropriate

protocols," and that "a court of competent jurisdiction . . . has authorized the law enforcement agency to seek the information in a criminal or civil investigation." *Id*. § 5336(c)(2)(B)(i)(II).  However, no court authorization is required if the request comes from a "Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity." *Id*. § 5336(c)(2)(B)(i)(I).  Likewise, if a federal agency makes a request for a beneficial owner or an applicant's personal data on behalf of a non-U.S. law enforcement agency, prosecutor, or judge, for instance, pursuant to an international treaty, then FinCEN appears to have no explicit authority to deny the request so long as the requested data is limited to the "investigation or national security or intelligence activity" that the foreign or international entity has in mind.[4] *Id*. § 5336(c)(2)(B)(ii).

25.    Thus, for example, if a foreign government, acting pursuant to a U.S.-ratified treaty like the United Nations Convention Against Corruption, requested certain beneficial owners' or applicants' personal data related to LLC-owned real property located in the United States, FinCEN is authorized to provide such data without any independent examination of the foreign country's need for the information.

---

[4] According to Defendant Das, FinCEN is "currently developing a second" Notice of Proposed Rulemaking regarding regulations to govern access by federal, State, tribal, and foreign agencies to the "beneficial ownership information," and intends to "publish this proposed rule this year."  Statement by Himamauli Das, Acting Director, Financial Crimes Enforcement Network, United States Department of the Treasury before the Committee on Financial Services, U.S. House of Representatives (April 28, 2022), at 5.

26.    **Burdens Imposed on States**.  The CTA requires that relevant federal, State, and tribal agencies, as determined by the Secretary of the Treasury, must "cooperate with and provide information requested by FinCEN" to create and maintain the intended database of "sensitive" personal information.  *Id*. § 5336(d)(2).

27.    While the Act contemplates that funds will be made available to States to alleviate the financial and other burdens imposed upon them by the CTA, upon information and belief, no such funds have yet been made available.  According to the CTA, as a condition of the supposed funds, "each State and Indian Tribe shall, not later than 2 years after the effective date of [FinCEN's reporting regulations]," notify reporting company filers of the personal-data reporting requirements and update relevant websites, instructions, and forms.  *See id*. § 5336(e)(2)(A). However, because the penalties for individual non-compliance with the CTA, including upon State citizens and permanent residents, are so severe and because the federal government itself has no ability to notify actual State-level filers of the CTA's requirements at the time of formation, the States will be compelled to notify their citizens and permanent residents of the CTA's requirements to save them from fines and imprisonment, whether or not federal funds are actually made available.

## The CTA's Injurious Impact on Plaintiffs

28.    According to FinCEN, the "reporting companies" subject to the CTA

will include approximately 32.6 million existing entities in 2024, plus roughly five million additional corporate entities created or registered under State law every year from 2025 to 2035, as well as foreign companies registered to do business in the United States. Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. at 59549 (2022). However, the CTA excludes two dozen categories of large business entities and companies, the broadest exclusion being for companies with (a) more than 20 full-time employees in the United States, (b) more than $5 million in gross receipts or sales, and (c) an operating presence at a physical office in the United States.  31 U.S.C. § 5336(a)(11)(B).  Banks, insurance companies, investment funds, public companies, broker dealers, public accounting firms, money-transmitting businesses and existing shell companies with no foreign owners, assets, or active business, are also excluded.  *Id.*

29.    Despite these broad carve-outs, the CTA does **not** exempt reporting companies formed solely by U.S. citizens or permanent residents, including small businesses with 20 or fewer full-time employees and less than $5 million in gross receipts or sales, as well as entities formed for strictly intrastate commerce or non-business purposes such as entities formed to hold a family residence (*e.g.*, a high-profile individual wanting privacy for personal security reasons), entities that are formed with the intent to seek 501(c) federal tax-exempt status but have not yet so

(*e.g.*, a small artists' collective), or non-profit entities such as local private social clubs that do not intend to seek 501(c) federal tax-exempt status.

30.     Nor does the Act contain any limitations that would restrict reporting obligations to individuals or entities that are suspected of a crime or wrongdoing.

31.     Therefore, the Act's burden will fall substantially and disproportionately on privately-owned small businesses and non-commercial organizations, regardless of whether there is any reason to believe that these small businesses and organizations have engaged in any misconduct whatsoever.

32.     The CTA will have a profound and injurious impact on NSBA's members and small business owners, including Plaintiff Winkles.   Among other burdens imposed by the CTA, business owners may have to consult lawyers to parse through nearly 100 pages of the Final Rule to determine whether the vague and confusing reporting requirements of the CTA apply or, alternatively, risk interpreting such terms on their own.   For example, the Act provides that an individual who "indirectly" by any "understanding" "exercises substantial control" over an entity must be reported as a "beneficial owner."   31 U.S.C. § 5336(a)(3)(A). Businesses cannot know the actual meaning of "beneficial ownership" when the Final Rule defines it using vague terms such as "understanding," "arrangement,"

"relationship," or "otherwise."[5]  Rather than sharpen or narrow the definitions of these protean terms that do not appear in State entity formation laws, the Final Rule only compounds the confusion.

33.     The reporting obligations of the CTA have no obvious analogues in the existing laws of all fifty States, none of which appear to require the disclosure of personal information regarding "applicants" and "beneficial owners."  For example, Alabama law requires only "the name and address of each organizer of the filing entity," Ala. Code § 10-A-1-3.05, not their birth dates or active personal-identification numbers as the CTA requires, and makes no reference to "beneficial owners" or "applicants."  And if the entity to be formed is a limited liability company, the name and address of organizers is not required at all.  Ala. Code § 10A-4A-2.01(a).  In fact, based on Plaintiffs' review of all fifty States' incorporation laws, no State appears to require birth dates or active passports, driver's licenses, or other such personal identification information for individuals who form an entity. The Act thus requires reporting of data to the federal government above and beyond what Alabama and most States currently require for entity formations in their respective jurisdictions, and without regard to whether the entity is engaging in

---

[5] In another instance, the Final Rule defines "substantial control" as including a circumstance where an individual, "[h]as **any other form of substantial control** over such reporting company."  87 Fed. Reg. at 59595 (emphasis added).  This definition is not only vague ("any other form"), it is also self-referential and thus virtually meaningless.

commercial activity or generating income such as the Internal Revenue Service requires for the reporting of such personal information for tax purposes.

34.     Many small businesses, including members of the NSBA, have tight profit margins, and the costs of compliance with the CTA's requirements will be considerable.   A small business owner or applicant, say a small retail-food franchisee, would first have to consult an attorney to see if he, she, or they qualify for a CTA exemption (e.g., by having the qualifying number of full-time employees and amount of gross receipts or sales).  If the answer is no, the relevant person or persons in charge of the "reporting company" would have to determine who its "beneficial owners" are.  Determining beneficial owners would be no easy feat with respect to many reporting companies, such as those formed to hold real estate (*e.g.*, a family vacation home held by a limited liability company), shares in the title to which may be dispersed among family members of multiple generations. Furthermore, because the necessary "sensitive" personal data regarding beneficial owners would have to be updated, affected small businesses, property-holders, and other persons may have to consult attorneys again when their circumstances change. In addition to the countless hours that millions of Americans operating small businesses or affiliated with non-commercial entities will have to expend to read and understand the CTA and its regulations, these Americans will likely have to pay hundreds or even thousands of dollars to attorneys to navigate the statute's

labyrinthine reporting requirements.  The threat of such crippling federal regulatory overhang on small businesses was the precise reason why NSBA was formed in the first place.

35.     The CTA contains no provisions to protect individuals who have formed or would form entities for associational or similar reasons, without seeking or having yet applied for 501(c) federal tax-exempt status, such as a local all-women's social club formed to discuss current health, reproduction rights, and sexual orientation issues in a confidential group setting.  In so doing, such persons are exercising their constitutionally protected free speech and association rights.  The prospect of reporting their sensitive personal information to FinCEN may deter or chill such persons from participating in the management of the entity in a significant way and thereby risk being classified as a "beneficial owner" or "applicant" because of fear of exposure of their beliefs or activities.  These concerns are substantial given the fact that the statute encompasses potential access to the personal information even by foreign governments, such as a Chinese government request for information about the "beneficial owners" of an entity established under State laws by U.S. persons to protest Chinese government policies.

36.     The burdens the CTA imposes upon entity formation in every State will have a direct, predictable impact on NSBA itself.  An important service  NSBA offers to its membership is the provision of information, education, and assistance

regarding legal and regulatory compliance issues faced by small businesses.  To serve faithfully the needs and interests of its membership, NSBA has already been— and will continue to be—forced to devote its own scarce resources to assisting members in understanding how the CTA applies to them, how it will affect their businesses, and what they must do to comply.

37.     The benefits of the CTA do not justify the burdens it imposes on small business owners.  To the contrary, the CTA does little to effectively combat financial crime and is inferior to the existing CDD Rule.

38.     The CTA was enacted to supplant existing beneficial ownership reporting requirements under the CDD Rule.[6]  The existing CDD Rule requires financial institutions to develop and update a risk profile (specifically for anti-money laundering and illicit transaction purposes) for every customer and obtain documentary and verifiable beneficial ownership information, including formation and governance documents, passports, driver's licenses, home addresses, trust agreements, or other information.  The information submitted under the CDD Rule is reviewed, vetted, and verified by compliance staff of covered financial institutions (*e.g.*, banks, credit unions, brokers, dealers, and registered investment advisors).  Furthermore, these financial institutions have an ongoing obligation to monitor their

---

[6] *See* 31 U.S.C § 5318(h) and 31 CFR § 1010.210 for anti-money laundering program requirements, and, as applied to specific financial institutions, in 31 C.F.R. §§ 1020.210, 1021.210, 1022.210, 1023.210, 1024.210, 1025.210, 1026.210, 1027.210, 1028.210, 1029.210, and 1030.210.

client relationships and report suspicious activities to FinCEN.

39.     The CTA, on the other hand, requires no supporting documentation, no review of the information, and no third-party monitoring or reporting to FinCEN about suspicious financial activity.  Without a disinterested intermediary to make sure that filers are making full and accurate disclosures, bad actors will manipulate or avoid disclosure requirements, undermining the purported purpose of the CTA. The likely result is that the CTA will simply create a database containing personal information about law-abiding reporting companies and their owners who will predominantly be U.S. persons, not the foreign individuals and entities engaging in money laundering and illegal activities that the statute was designed to target.

40.     The CTA is nothing more than a first salvo in a campaign to transfer responsibility from the very institutions (*i.e.*, big banks, financial institutions, and escrow agents, which are exempted from the CTA's coverage) that process the targeted illicit transactions to law-abiding, small business owners.  It is the quintessential example of the government prioritizing Wall Street to the detriment of Main Street.  Plaintiffs fully support Congress's desire to attack money laundering and terrorism financing, but passing an unconstitutional statute penalizing hard-working U.S. small business owners is not the answer.

## CAUSES OF ACTION

### COUNT ONE

### Unconstitutional Usurpation of the States' Power to Regulate Entity Formations in Excess of Congress's Constitutional Powers
### (U.S. Const. Art. I, amends. IX, X)

41.     Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in paragraphs 1 through 33 and 36, above.

42.     For more than two centuries, the States have had independent authority to charter corporations and otherwise regulate the formation and governance of corporations they have chartered.  This was a sovereign power of the British Crown that was commonly understood to have devolved to the original thirteen States through their charters after the adoption of the Declaration of Independence in 1776. The newly independent States began chartering corporations soon after independence for the purposes of creating financial and transportation infrastructure, forming subordinate municipal governments, and for charitable and other public purposes.  *See* Ronald E. Seavoy, *The Public Service Origins of the American Business Corporation*, 52 Bus. History R. 30, 33 (1978).

43.     The Constitution did not intrude on this power of the States to charter corporations.  At the Constitutional Convention, Virginia delegate James Madison introduced a proposal to give Congress the authority "to grant charters of incorporation where the interest of the U.S. might require & the legislative provisions of individual States may be incompetent."  2 *The Records of the Federal*

*Convention of 1787*, at 615 (Max Farrand, ed., 1911).  Madison's proposal reflected the settled understanding that the States possessed—and would continue to retain under the new Constitution—the primary sovereign powers for chartering corporate entities.  *See id*. at 616 (containing James Madison's notes documenting the defeat of his proposal for an explicit Congressional power of chartering corporations by a vote of 3 in favor and 8 against).

44.    As the Supreme Court made clear in 1819, other than ensuring that State legislatures did not impair vested colonial-era corporate charters, the Constitution does not vest the federal government—including Congress and the Treasury Department—with any authority to dictate to the States the terms under which they charter companies.  *See Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819).  This fundamental principle remains true today, as corporations formed for private business purposes have proliferated and now outnumber the public-purpose and non-commercial corporations prevalent in the Founding era.  The States remain the primary sovereigns for the creation of corporate entities and, pursuant to the well-established "internal affairs" doctrine, the internal functioning of such entities remains a matter of the law of the State of formation.  "It thus is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares."  *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 91,

(1987).[7]

45.     Despite this original constitutional meaning, history, and tradition, the CTA aims to establish "a clear, Federal standard for incorporation practices," 31 U.S.C. § 5336 note (5)(A), above and beyond what State entity laws require, imposing a penalty—mandatory disclosure of names, addresses, birth dates, and identification numbers of all beneficial owners and applicants—on persons who seek to form entities under State law.  As detailed above, failure to make these disclosures is punishable by fines and imprisonment.  In addition, the CTA also interferes with State authority to determine the permissible structures of corporate ownership by prohibiting any State from authorizing the issuance of "a certificate in bearer form evidencing either a whole or fractional interest" in an entity created and organized under that State's laws.  31 U.S.C. § 5336(f).  Upon information and belief, although many States authorized such bearer certificates through the early twenty-first century, no State currently does so.  Nevertheless, the Act's categorical prohibition is an unprecedented intrusion on the States' sole authority to regulate the formation and governance of State-entities' internal affairs.

46.     One of the enumerated powers of Congress—and perhaps the most heavily used of those powers in recent decades—is the power to regulate foreign,

---

[7] Although Congress has the ability to create federally chartered corporations, it has no authority to intervene in the internal affairs of entities organized under State law, except as noted above.

interstate, or Indian commerce.  Congress also can wield its taxing power to tax income earned by individuals through corporate entities as it currently does through federal income taxes on corporations.  However, Congress has no regulatory interest or constitutional authority over corporate **formation** because a reporting company has not yet engaged in any foreign, interstate, or Indian commerce at the moment of its inception.  The formation of an entity under State law is an entirely ministerial act and many entities will engage in no activity until some indeterminate time after they have been formed.

47.  Indeed, many of the "reporting companies" subject to the Act may **never** engage in any such foreign, interstate, or Indian commerce.  State law permits the formation of a corporate entity for numerous purposes unrelated to commerce, such as local property holding or associational entities like neighborhood organizations and residential housing associations.  For example, Section 10A-1-2.01 of the Alabama Business and Nonprofit Entities Code indicates that a "domestic entity may have **any lawful purpose or purposes**, unless otherwise provided by this title."  Ala. Code § 10A-1-2.01 (2014) (emphasis added).  Section 101(b) of the Delaware General Corporation Law provides that a "corporation may be incorporated or organized under this chapter to conduct or promote any lawful business **or purposes**, except as may otherwise be provided by the Constitution or other law of this State."  8 Del. Code § 101(b) (emphasis added).  Similarly, Section

18-106(a) of the Delaware Limited Liability Company Act provides that "[a] limited liability company may carry on any lawful business, purpose or activity, whether or not for profit . . . ."  6 Del. Code § 18-1101.  A large proportion of the CTA's coverage is thus likely to include entities that do not engage in commerce or business at all, or that engage in strictly intrastate commerce (such as residential real property holding) outside the reach of federal regulation.

48.    This fact exposes a fundamental flaw in the CTA's structure: it does not regulate any specifically identified **commercial** activity.  "The Constitution grants Congress the power to '*regulate* Commerce.'  The power to *regulate* commerce presupposes the existence of commercial activity to be regulated." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 520 (2012) (emphasis in original). As discussed above, there is no exercise of commerce inherent in the creation of a state-chartered entity; it is an entirely ministerial act, and many entities so formed do not engage in any commercial activity.  By imposing requirements on the mere act of entity formation without any inkling as to whether the formed entity will engage in commercial activity, the CTA clearly exceeds Congress's power to regulate interstate, foreign, and Indian commerce.

49.    The CTA commandeers State agencies by coercing States into giving notice to State filers of the CTA's reporting requirements and providing filers with a copy of the CTA filing form.  Because the States are the only agents capable of

providing notice to entity formation filers at the time of formation, States are likely to feel compelled to provide the notice and the FinCEN filing form to protect their citizens from the severe criminal penalties that would result from failure to comply with the CTA's filing requirements.

50.     Through these requirements, the CTA violates Plaintiffs' rights and the rights of all NSBA members by exceeding the enumerated powers of the federal government set forth in Article I, Section 8 of the Constitution of the United States, violating the Ninth and Tenth Amendments, and violating the constitutional principles of federalism and retained State sovereignty upon which this Nation was founded.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.     Declare the CTA to be unconstitutional;

B.     Declare that the CTA exceeds Congress's authority under Article I of the Constitution and encroaches upon the States' respective sovereignties in violation of the Ninth and Tenth Amendments and constitutional principles of federalism and retained State sovereignty;

C.     Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against Plaintiffs, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.     Award Plaintiffs their costs and grant such other relief as the Court may deem just and proper.

## COUNT TWO

### Unconstitutional Invasion of Privacy
### Unreasonable Search and Seizure Violation of the Fourth Amendment
### Compelled Self Incrimination Violation of the Fifth Amendment
### Right of Privacy Violation of the Ninth Amendment
### (U.S. Const. amends. IV, V, IX)

51.     Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in paragraphs 1-25, 28-31, 33, and 36-39 above.

52.     The CTA is a statute providing for criminal punishments enacted for the purpose of harvesting "sensitive" personal information from individuals to create a database for law enforcement purposes by FinCEN and other United States and foreign law-enforcement and intelligence agencies.  The stated purpose of the CTA is to provide the federal government with a supplemental means of enforcing federal criminal laws.  But no matter the degree of invasiveness, suspicionless searches and compelled disclosures are never allowed if their principal end is crime-solving.

53.     Privacy is often a key motivation in State entity formation.  No State has chosen to require the extent of disclosure of beneficial ownership and applicant information upon filing that the CTA mandates.  Upon information and belief, no State, for instance, appears to require birth dates and personal identification numbers of filers.   The States' entity-formation laws reflect the States' judgment that

individuals need not disclose sensitive information as a condition of forming corporate entities. Individuals who form an entity under such State laws have a reasonable expectation of privacy from the intrusion of the federal government as to that information. The CTA's requirements violate that expectation of privacy by compelling the disclosure of that information by individuals protected by the Fourth, Fifth, and Ninth Amendments.

54.     The CTA contains no limitations on the provision of the required personal information to situations where there is an articulable individualized suspicion of a crime or wrongdoing by such beneficial owners and applicants. The CTA also authorizes the provision of private, personal information to foreign governments, federal regulators, and regulatory agencies without any court authorization or specific requirements regarding those federal and foreign government agencies' need for the information.

55.     By requiring, under threat of criminal penalty, reporting companies to provide individuals' "sensitive" personal information for law enforcement purposes in the absence of specific prior indicia of wrongdoing, the CTA deprives Plaintiffs and the members of the NSBA of their privacy rights, and violates the Fourth Amendment, Fifth Amendment, and Ninth Amendment of the Constitution of the United States.

56.     By compelling disclosures and permitting the release of sensitive

personal data to federal and foreign government agencies without the reporting company's consent or authorization from a court of competent jurisdiction, *see* 31 U.S.C. § 5336(c)(2)(B) (requiring court authorization for requests from state, local, or tribal law enforcement agencies and consent from a financial institution, without imposing a similar requirement of court authorization for requests from federal or non-U.S. law enforcement agencies), the CTA violates the Fourth, Fifth, and Ninth Amendment rights of Plaintiffs and the members of the NSBA.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

      A.      Declare the CTA to be unconstitutional;

      B.      Declare that the CTA violates (i) the Fourth Amendment's reasonable expectation of privacy from unreasonable searches and seizures without probable cause or articulable suspicion; (ii) the Fifth Amendment's privilege against self-incrimination; and (iii) the Ninth Amendment's retention of unenumerated rights to the People;

      C.      Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against the Plaintiffs and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

      D.      Award Plaintiffs their costs and grant such other relief as the Court may deem just and proper.

## COUNT THREE

### Compelled Speech and Unreasonable Burdens on the Freedoms of
### Speech and Association
### (U.S. Const. amend. I)

57.     Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in paragraphs 1-25, 28-30, and 35-40 above.

58.     Under the CTA, the obligation to report personal information to the federal government arises at the time of formation of an entity under State law.  The CTA forces filers to disclose more personal information to the federal government than what is required to be disclosed under State entity-formation statutes; in most States, disclosure of "beneficial ownership" as expansively set forth in the CTA and "applicant" personal information is not required at all.  State laws providing for entity formation, however, reflect the States' respective judgments that the provision of such information is not a necessary or appropriate prerequisite of entity formation.

59.     Some U.S. persons form or seek to form entities under State law, without seeking 501(c) federal tax-exempt status, for social or other non-commercial reasons, such as to organize a private social club or to hold a family vacation property.  Many of these entities and the U.S. persons who would have to be registered under the CTA have a heightened reason to desire privacy.  The CTA compels such entities and individuals to publicly reveal their associations to the federal government, which may in turn transmit that information upon request to:

(i) federal and State law enforcement agencies, courts, and prosecutors; (ii) foreign governments and law enforcement authorities; (iii) financial institutions; and (iv) various federal regulators and regulatory agencies.  This forced disclosure will also deter such persons from exercising their rights of free speech and association and dissuade others from joining or assuming leadership positions in the entities (and thus arguably becoming "beneficial owners").

60.     The United States does not have a compelling, overriding interest in obtaining the information required by the CTA because less onerous alternatives are available to accomplish the stated goals of the CTA and the methods employed by the Act are not narrowly tailored for their stated purpose.  To wit, the most obvious and direct way to stem money laundering and international terrorism funding is to ramp up regulation and scrutiny of large cross-border money transfers, for instance, by banks, financial agents, and escrow agents.  Vacuuming up personal information about every American who sets up or has a significant stake in a corporate entity is overkill given the CTA's stated aims.  The requirements of the CTA are neither justified by nor necessary to promote the stated goals of the CTA.

61.     By requiring, under threat of criminal sanction, Plaintiffs and all members of NSBA to disclose information in the manner mandated by the CTA despite the availability of less onerous alternative methods to achieve the statute's stated goals, the CTA's disclosure requirements constitute compelled speech in

violation of the First Amendment to the Constitution of the United States.

62.     By requiring U.S. persons who have formed or wish to form a legal entity to engage in protected speech despite the availability of less onerous alternative methods to achieve the stated goals of the CTA, the CTA violates the First Amendment by burdening the right to speech and private association.  As the Supreme Court recently affirmed, "a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored.   This requirement makes sense.   Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'"  *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.     Declare the CTA to be unconstitutional;

B.     Declare that the CTA violates the First Amendment's right to speech and private association and prohibition on compelled speech;

C.     Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against Plaintiffs, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.     Award Plaintiffs their costs and grant such other relief as the Court

may deem just and proper.

## COUNT FOUR

### Unconstitutional Violation of Due Process
### (U.S. Const. amend. V)

63.     Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in paragraphs 1-25, 32-34, and 36 above.

64.     Both the CTA and the FinCEN rules relating to the CTA fail to provide definitions specific enough for Plaintiffs, members of the NSBA, or other ordinary small businesses or non-business entities to understand what conduct is required to avoid criminal sanctions including, but not limited to, failing to sufficiently define "beneficial owner," "understanding," "relationship," "substantial control," and "applicant." All these terms, most significantly "beneficial owner" and "applicant," have no obvious analogue in State entity formation laws, which typically address "organizers" and "incorporators." In addition, the CTA's overall framework for mandatory reporting, updating, access, and record-keeping is so vague and complex that Plaintiffs, members of the NSBA, or other ordinary small businesses or non-business entities cannot reasonably comply with these requirements.

65.     Should Plaintiffs, members of the NSBA, and other ordinary small businesses or non-business entities be forced to attempt to comply with the vague and complex requirements of the CTA to avoid criminal penalties, they will be forced to incur substantial costs and other burdens. The stated goals of the CTA do

not justify the enormous burden it places on small businesses and non-business entities and can be accomplished through less onerous alternative means.

66.     By subjecting Plaintiffs and all other individuals, including millions of U.S. persons, covered by the CTA to potential criminal sanctions without adequate notice of the actions required to avoid the sanctions, and, by the same token, expanding the federal government's discretion in enforcing the requirements, the CTA violates the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.     Declare the CTA to be unconstitutional;

B.     Declare that the CTA violates the due process requirements of the Fifth Amendment;

C.     Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against the Plaintiffs, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.     Award Plaintiffs their costs and grant such other relief as the Court may deem just and proper.

Dated: November 15, 2022                    Respectfully submitted,

                                            _/s/ John Neiman_____
                                            John Neiman
                                            MAYNARD COOPER & GALE
                                            1901 Sixth Avenue North
                                            Suite 1700
                                            Birmingham, AL 35203
                                            Telephone: (205) 254-1000
                                            jneiman@maynardcooper.com

                                            Kenyen Brown*
                                            HUGHES HUBBARD & REED LLP
                                            1775 I Street, N.W.
                                            Washington, D.C., 20006-2401
                                            Telephone: (202) 721-4600
                                            Fax: (202) 721-4646
                                            kenyen.brown@hugheshubbard.com

Thomas Lee*
thomas.lee@hugheshubbard.com
Terence Healy*
terence.healy@hugheshubbard.com
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Telephone:  (212) 837-6000
Fax:  (212) 422-4726
*pro hac vice motion forthcoming

ATTORNEYS FOR PLAINTIFF