

FILED
2023 Feb-15  PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL SMALL BUSINESS UNITED d/b/a/ the NATIONAL SMALL BUSINESS ASSOCIATION and | ) ) ) | |
| ISAAC WINKLES, | ) | Case No. <u>5:22-cv-01448</u> |
|              Plaintiffs, | ) | |
| vs. | ) | |
| JANET YELLEN, in her official capacity as the Secretary of the United States Department of the Treasury, | ) ) | |
| UNITED STATES DEPARTMENT OF THE TREASURY, and | ) ) | |
| HIMAMAULI DAS, in his official capacity as Acting Director of the Financial Crimes Enforcement Network, | ) ) ) | |
|              Defendants. | ) ) | |
| _____ | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

# <u>CONTENTS</u>

INTRODUCTION ..................................................................................1

STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS ..................3

ARGUMENT ...................................................................................11

I.      SUMMARY JUDGMENT STANDARD .....................................................11

II.     CONGRESS LACKS CONSTITUTIONAL POWER TO ENACT
        THE CTA...............................................................................11

        A.      Congress Can Only Legislate Pursuant to Its Enumerated
                Powers; the States Retain All Other Sovereign Powers......................12

        B.      Congress Has No Enumerated Authority To Interfere in the
                Formation of Corporate Entities Under State Law ............................13

        C.      The Commerce Clause Does Not Allow Congress To Infringe
                Upon the State Sovereign Power To Create Corporate Entities ........17

III.    THE CTA IS AN UNPRECEDENTED INTRUSION INTO
        INDIVIDUAL PRIVACY RIGHTS PROTECTED BY THE FIRST,
        FOURTH, FIFTH, AND NINTH AMENDMENTS....................................23

        A.      The Fourth Amendment ...................................................24

        B.      The Fifth Amendment ......................................................29

        C.      The First Amendment.......................................................32

                1.      Compelled Speech................................................32

                2.      Freedom of Association ..........................................34

IV.     THE CTA IS UNCONSITUTIONALLY VAGUE AND VIOLATES
        THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT ............36

CONCLUSION ...................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airbnb, Inc. v. City of New York*,
　373 F. Supp. 3d 467 (S.D.N.Y. 2019) .............................................................28

*Akron v. Akron Ctr. for Reprod. Health, Inc.*,
　462 U.S. 416 (1983) ......................................................................................36

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986) ......................................................................................11

*Bellis v. United States*,
　417 U.S. 85 (1974) ........................................................................................31

*Bond v. United States*,
　564 U.S. 211 (2011) ......................................................................................11

*Bond v. United States*,
　572 U.S. 844 (2014) ......................................................................................22

*Boyd v. United States*,
　116 U.S. 616 (1886) ...........................................................................30, 31, 32

*Boynton v. Virginia*,
　364 U.S 454 (1960) .......................................................................................18

*Braswell v. United States*,
　487 U.S. 99 (1988) ........................................................................................31

*Burger King Corp. v. E-Z Eating, 41 Corp.*,
　572 F.3d 1306 (11th Cir. 2009) .....................................................................11

*Carpenter v. United States*,
　138 S. Ct. 2206 (2018) ..................................................................................25

*Chicago v. Morales*,
　527 U.S. 41 (1999) ........................................................................................36

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015)...................................................................26, 27, 28

*CTS Corp. v. Dynamics Corp. of Am.*,
481 U.S. 69 (1987)...............................................................................15

*Fisher v. United States*,
425 U.S. 391 (1976)........................................................................30, 31

*Gibson v. Fla. Legislative Investigation Comm.*,
372 U.S. 539 (1963)..............................................................................34

*Gonzales v. Raich*,
545 U.S. 1 (2005)..................................................................................20

*Griswold v. Connecticut*,
381 U.S. 479 (1965)..............................................................................35

*Heart of Atlanta Motel, Inc. v. United States*,
379 U.S. 241 (1964)..............................................................................17

*Hodel v. Virginia Surface Mining*,
452 U.S. 264 (1981)..............................................................................20

*Katz v. United States*,
389 U.S. 347 (1967)..............................................................................24

*Kolender v. Lawson*,
461 U.S. 352 (1983)..............................................................................36

*Lefkowitz v. Turley*,
414 U.S. 70 (1973)................................................................................29

*Maryland v. Wirtz*,
392 U.S. 183 (1968)..............................................................................23

*Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*,
11 F.4th 345 (5th Cir. 2021) ................................................................11

*McCulloch v. Maryland*,
17 U.S. 316 (1819)..........................................................................15, 16

*Mid-Fla Coin Exch., Inc. v. Griffin*,
    529 F. Supp. 1006 (M.D. Fla. 1981)....................................................28

*Morgan v. Virginia*,
    328 U.S. 373 (1946)...........................................................................18

*NAACP v. Alabama*,
    357 U.S. 449 (1958)...........................................................................34

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018)......................................................................32

*New York v. United States*,
    505 U.S. 144 (1992)....................................................................12, 21

*NFIB v. Sibelius*,
    567 U.S. 519 (2012)............................................................12, 19, 23

*Olmstead v. United States*,
    277 U.S. 438 (1928)....................................................................25, 30

*Perez v. United States*,
    402 U.S. 146 (1971)....................................................................18, 20

*Planned Parenthood of Sw. & Cent. Fla. v. Philip*,
    194 F. Supp. 3d 1213 (N.D. Fla. 2016) ..........................................28

*Printz v. United States*,
    521 U.S. 898 (1997)...........................................................................22

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
    487 U.S. 781 (1988)...........................................................................33

*Santa Clara Country v. So. Pacific. RR.*,
    118 U.S. 394 (1886)...........................................................................18

*Scarborough v. United States*,
    431 U.S. 563 (1977)...........................................................................18

*Schmerber v. California*,
    384 U.S. 757 (1966)...........................................................................30

*Scott v. Harris*,
    550 U.S. 372 (2007) ........................................................................... 11

*Shreveport Rate Cases*,
    234 U.S. 342 (1914) ........................................................................... 20

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ........................................................................... 22

*Trustees of Dartmouth College v. Woodward*,
    17 U.S. 518 (1819) ............................................................................ 16

*United States v. Baltimore & Ohio R. Co.*,
    333 U.S. 169 (1948) ........................................................................... 18

*United States v. Comstock*,
    560 U.S. 126 (2010) ...................................................................... 20, 22

*United States v. Doe*,
    465 U.S. 605 (1984) ........................................................................... 31

*United States v. Hubbell*,
    530 U.S. 27 (2000) ....................................................................... 30, 31

*United States v. Lopez*,
    514 U.S. 549 (1995) ...................................................................... 17, 18

*United States v. Morrison*,
    529 U.S. 598 (2000) ...................................................................... 17, 18

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) ........................................................................... 24

*United States v. White*,
    322 U.S. 694 (1944) ........................................................................... 31

*United States v. Wrightwood Dairy Co.*,
    315 U.S. 110 (1942) ........................................................................... 20

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ........................................................................... 37

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ................................................................................32

*Wickard v. Filburn*,
   317 U.S. 111 (1942) ...............................................................................20

**Constitutional Provisions**

U.S. Const. amend. I ...................................................................................32

U.S. Const. amend. IV ................................................................................24

U.S. Const. amend. V .................................................................................29

U.S. Const. amend. IX ................................................................................35

U.S. Const. amend. X .................................................................................13

U.S. Const. art. I, § 8 .................................................................................17

U.S. Const. art. I, § 10 ...............................................................................16

**Statutes and Rules**

18 U.S.C. § 32 ...........................................................................................18

31 U.S.C. § 5318(h) ......................................................................................2

31 U.S.C. § 5336 ................................................................................*passim*

Ala. Code § 10A-1-2.01 (2022) .................................................................19

Ala. Code § 10A-1-3.05 (2022) .................................................................20

Ala. Code § 10A-5A-2.01(a) (2022) ..........................................................20

Fed. R. Civ. P. 56(c) ..................................................................................11

**Regulations**

31 C.F.R. pt. 1010 ........................................................................................1

31 C.F.R. § 1010.230 (2016) ...................................................................3, 9

87 Fed. Reg. 59498 et seq. (Sept. 30, 2022) ....................................*passim*

National Defense Authorization Act for Fiscal Year 2021, H.R. 6395,
    116th Cong. (2021) ...............................................................................4

**Others/ Miscellaneous**

Brian Phillips Murphy, *Building the Empire State: Political Economy
    in Early America* (2015) ....................................................................14

*The Federalist No. 45* (James Madison) (Jacob E. Cooke ed., 1961) ....................13

Gordon Wood, *Power and Liberty: Constitutionalism in the American
    Revolution* (2021) .............................................................................14

The Guardian (July 5, 2019), Oliver Bullough, *How Britain can help
    you get away with stealing millions: a five-step guide*
    https://www.theguardian.com/world/2019/jul/05/how-britain-can-
    help-you-get-away-with-stealing-millions-a-five-step-guide............................34

Impact Assessment, *Corporate Transparency and Companies House
    Register Reform* (Feb. 25, 2022),
    https://assets.publishing.service.gov.uk/government/uploads/syste
    m/uploads/attachment_data/file/1057767/corporate-transparency-
    and-register-reform-white-paper-impact-assessment.pdf.................................34

J. Story, *Commentaries on the Constitution of the United States*
    (1833).............................................................................................12

Jim Dunton, *Companies House to clamp down on identity fraud with
    verification tools and better data*, Civil Service World (Sept. 21,
    2020),
    https://www.civilserviceworld.com/professions/article/companies-
    house-unveils-clampdown-on-identity-fraud ........................................34

Joseph K. Angell & Samuel Ames, *A Treatise of Private Corporations
    Aggregate* (Charles C. Little & James Brown eds., 2d rev. ed.
    1843) .............................................................................................15

National Association of Secretaries of State, *Federal Legislation
    Calling on Treasury's Financial Crimes Enforcement Network
    (FinCEN) to Collect Beneficial Ownership Information*,
    https://www.nass.org/initiatives/state-incorporation-collection-
    company-ownership-info (last visited Feb. 14, 2023)........................................19

Pauline Maier, *The Revolutionary Origins of the American Corporation*, 50 Wm. & Mary Q. 51, 55-56 (1993)...........................................13

Randy E. Barnett, *Restoring the Lost Constitution: The Presumption of Liberty* (2004) .................................................................................35

2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ...............................................................................................15

1 Stewart Kyd, *A Treatise on the Law of Corporations* (Butterworth 1793) ................................................................................................14

William J. Stuntz, *The Substantive Origins of Criminal Procedure*, 105 Yale L.J. 393 (1995) ....................................................................25

**INTRODUCTION**

The Corporate Transparency Act (the "Act" or "CTA") is an unprecedented and unconstitutional intrusion upon the rights of citizens and the sovereign powers of the States within our federal system. It compels any person forming a corporation or other entity under State law to disgorge "sensitive" personal information (names, birthdates, addresses, and active identification numbers) to the Treasury's financial intelligence unit (the Financial Crimes Enforcement Network ("FinCEN")) absent any individualized suspicion of wrongdoing, any connection to interstate commerce, or any other enumerated power of Congress (such as the Taxing Power) under which it could require the disclosure of such information. The stated purposes of the CTA are to empower U.S. and foreign law enforcement and security agencies to fight money laundering, terrorism financing, and other crimes, and thereby bring the United States into compliance with "international" standards. *See* 31 U.S.C. § 5336 note (5); *id.* § 5336(c)(2)(B)(ii). The failure to report such information is punishable by fines, imprisonment, or both. *See id.* §§ 5336(h)(1), (3). FinCEN estimates that the CTA will apply to 36.2 million existing entities on January 1, 2024, and 5 million new entities formed each year thereafter. *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59549 (Sept. 30, 2022) (to be codified at 31 C.F.R. pt. 1010).

Since before the Founding, each State has exercised the sovereign power to charter corporations[1] under terms and conditions determined by each State. The Constitution does not grant Congress any authority to encroach upon this State power. Indeed, at the moment of formation, the Federal government cannot determine whether the formed entity will ***ever*** engage in ***any*** activity, let alone commercial activity that may be subject to the Commerce Clause.

The CTA is also unconstitutional because: (i) it compels disclosure of sensitive information from any person who is a "beneficial owner" or "applicant" of a "reporting company" without any suspicion of wrongdoing, in violation of the First, Fourth, Fifth, and Ninth Amendments; and (2) the definitions of "beneficial owner" and "applicant" are so vague that ordinary people cannot be expected to understand the CTA's requirements. Further, the CTA is not a rational means to achieve its stated goals because Congress has already empowered FinCEN via pre-existing law to take the obvious and rational means to combat money laundering and terrorism financing. *See* 31 U.S.C. § 5318(h) ("Anti-Money Laundering Programs"). Since 2016, FinCEN has overseen the implementation of the Customer Due Diligence Rule (the "CDD Rule") under which "covered financial institutions" must verify the name

---

[1] The use of "corporate" or "corporation" in this memorandum includes all forms of entities that can be formed under State law, including, without limitation, limited partnerships, limited liability companies, corporations, non-profit corporations, professional corporations and limited liability partnerships.

(including supporting documents and information), birthdate, identification number, and address information of beneficial owners of any account opened with the institution. *See* 31 C.F.R. § 1010.230 (2016). The CDD Rule enables FinCEN to ***follow the money*** by focusing on the bank accounts of those entities (and their affiliates) who voluntarily access the national banking system; the CTA, by contrast, creates a digital mugbook of tens of millions of innocent U.S. persons who have, or seek to, set up an entity irrespective of what the purpose or current or future activity of such entity is.

For these reasons, discussed more fully below, the CTA is an unconstitutional exercise of Congressional power and should be declared invalid and enjoined before its unconstitutional mandates go into effect on January 1, 2024.

## STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS

### Plaintiffs

1.   Plaintiff National Small Business Association ("NSBA") is an Ohio nonprofit corporation that represents and protects the rights of thousands of small business entities.  The NSBA's members include numerous entities owned or operated by U.S. persons that would be subject to the CTA's reporting requirements if they go into effect, as regulations currently provide, in January 2024 and 2025.  Compl. ¶¶ 11-13.

2.     Plaintiff Isaac Winkles ("Winkles") (together with NSBA, "Plaintiffs") is a U.S. citizen residing in Huntsville.  He and his wife are the sole shareholders of an Alabama corporation which is a member of NSBA and manages real estate properties in northern Alabama.  Winkles would be subject to the CTA's reporting requirements if the government is allowed to enforce them.  Compl. ¶ 14.

### The CTA's Reporting Requirements

3.     The CTA became law on January 1, 2021 following votes by the House of Representatives and the Senate, respectively, to override a presidential veto.  *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, H.R. 6395, 116th Cong. (2021).

4.     The CTA's stated purposes are to combat money laundering, the financing of terrorism, and other illicit activity in "compliance with international . . . standards," and to "set a clear, Federal standard for incorporation practices."  31 U.S.C. § 5336 note (5).

5.     To achieve those ends, the CTA requires "reporting companies," to provide FinCEN information regarding each "beneficial owner" and "applicant."  31 U.S.C. § 5336(b)(1)(A).  Each term is broadly defined:

- A "reporting company" is defined as a "corporation, limited liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* § 5336(a)(11)(A).

4

- A "beneficial owner" is defined as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity;" or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." *Id.* § 5336(a)(3)(A).

- An "applicant" is defined as any individual who files an application to form a reporting company or "registers or files an application to register" a non-U.S. company to do business in the United States. *Id.* § 5336(a)(2).

6.     For each of the covered individuals, the reporting company must provide to FinCEN their full legal name, date of birth, current residential or business street address, and "unique identifying number from an acceptable identification document." *Id.* § 5336(b)(2)(A).  The covered individuals must surrender their personal information when they form or register their reporting companies.

7.     For existing reporting companies, individuals must give their personal information to reporting companies to report to FinCEN not later than two years after FinCEN promulgates certain regulations.  *See id*. §§ 5336(b)(1)(B)-(C).

8.     On September 29, 2022, FinCEN issued a final rule (the "Final Rule") implementing the CTA's reporting requirements to take effect on January 1, 2024 for

newly-formed entities and January 1, 2025 for existing entities.  *See* Beneficial Own-ership Information Reporting Requirements, 87 Fed. Reg. 59498, 59549 (Sept. 30, 2022) (to be codified at 31 C.F.R. pt. 1010).[2]

9.      Any person who "willfully" fails to comply with the CTA's reporting require-ments is subject to a civil penalty of up to $500 per day up to $10,000, two years' imprisonment, or both a fine and imprisonment.  31 U.S.C. §§ 5336(h)(1), (3).

## The CTA Database of Personal Information

10.     The disclosures required by the CTA will be used to create a database of per-sonal information regarding "beneficial owners" and "applicants."

11.     The CTA requires FinCEN to keep the personal data of a reporting company's beneficial owners and applicants for the life of their companies, and then at least five years after the date, if any, on which they wind their companies down.  *Id.* § 5336(c)(1).

12.     For the duration of that time, FinCEN may share information in the database with federal, State, local, and tribal law enforcement agencies; with financial insti-tutions for customer due diligence (with the reporting company's consent); and with "a Federal functional regulator or other appropriate regulatory agency," including

---

[2] If there are any changes to the reported data—such as if a "beneficial owner" or "applicant" moves or gets a new driver's license—the entity must provide updated information to FinCEN no more than one year after the change (30 days under the Final Rule).  31 U.S.C. § 5336(b)(1)(D).

foreign governmental agencies. *Id.* § 5336(c)(2)(B).  The CTA also provides that information in the database "shall be accessible for inspection or disclosure to officers and employees of the Department of the Treasury" in the performance of their "official duties." *Id.* § 5336(c)(5).

13.     If the request for a person's information comes from a State, local, or tribal law enforcement agency, the statute requires that "a court of competent jurisdiction . . . has authorized the law enforcement agency to seek the information in a criminal or civil investigation." *Id*. § 5336(c)(2)(B)(i)(II).

14.     No court authorization is required if a request for a person's information comes from a "Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity." *Id*. § 5336(c)(2)(B)(i)(I).

15.     Likewise, if a federal agency makes a request for someone's personal data on behalf of a non-U.S. law enforcement agency, prosecutor, or judge—for instance, pursuant to an international treaty—FinCEN has no statutory authority to deny the request so long as the requested data is limited to the "investigation or national security or intelligence activity" that the foreign or international entity has in mind.[3] *Id*. § 5336(c)(2)(B)(ii).

---

[3] The Notice of Proposed Rulemaking regarding regulations to govern access by federal, State, tribal, and foreign agencies and banks to the beneficial ownership information was published on December 16, 2022.  *See* Federal Register: Beneficial Ownership Information Access and Safeguards, and Use of FinCEN Identifiers for Entities, 87 Fed. Reg. 77404 (Dec. 16, 2022) (to be codified at 31 C.F.R. pt. 1010).

16.    The CTA also gives Treasury Department employees carte blanche to access people's information when their "official duties" require it.  *Id.* § 5336(c)(5).

### The Burdens the CTA Imposes on States

17.    In passing the CTA, Congress acknowledged that "most or all States do not require" people to give "information about the beneficial owners" of entities formed under State laws each year.  *Id*. § 5336 note (2).  Nonetheless, the CTA requires State agencies to "cooperate with and provide information requested by FinCEN," so the federal government can create and maintain the new beneficial owner and applicant database.  *Id*. § 5336(d)(2).

18.    According to the CTA, as a condition of the funds, "each State and Indian Tribe shall, not later than 2 years after the effective date of [FinCEN's reporting regulations, i.e., by September 29, 2024]," notify reporting company filers of the personal-data reporting requirements and update relevant websites, instructions, and forms.  *Id*. § 5336(e)(2)(A).

19.    The Act mandates that notices to State filers "explicitly state that the notification is on behalf of the Department of the Treasury for the purpose of preventing money laundering, the financing of terrorism, proliferation financing, serious tax fraud, and other financial crime by requiring nonpublic registration of business entities formed or registered to do business in the United States."  *Id*. § 5336(e)(2)(B).

20.     The CTA also prohibits entities formed under State law from issuing "a certificate in bearer form"—*i.e.,* a certificate giving ownership rights to whoever holds the certificate—"evidencing either a whole or fractional interest in the entity."  *Id.* § 5336(f).

## The 2016 CDD Rule

21.     The primary existing mechanism for combating money laundering and terrorism financing is FinCEN's 2016 CDD Rule.  The CDD Rule requires "covered financial institutions" to establish and maintain written policies and procedures that are reasonably designed to: (i) identify and verify the identity of customers; (ii) identify and verify the identity of the beneficial owners of companies opening accounts; (iii) understand the nature and purpose of customer relationships to develop customer risk profiles; and conduct ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information. *See* 31 C.F.R. § 1010.230 (2016).

22.     The CTA requires the Secretary of the Treasury to "revise" the CDD Rule to bring it "into conformance" with the CTA within one year of the issuance of its beneficial ownership regulations and to "reduce any burdens on financial institutions" that would be rendered "unnecessary or duplicative" by the CTA.  31 U.S.C. § 5336(d)(1).

## The Entities Impacted by the CTA

23.     According to FinCEN, the "reporting companies" subject to the CTA will include approximately 32.6 million existing entities in 2024, plus roughly 5 million additional entities created or registered under State and Tribal laws every year from 2025 to 2035, as well as foreign companies registered to do business in the United States.  *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59549.

24.     The CTA exempts from its reporting requirements twenty-four categories of publicly traded companies, entities engaged in regulated industries (like banks, investment funds, broker-dealers, and other financial institutions), and 501(c) federal tax-exempt entities, among others.  *See* 31 U.S.C. § 5336(a)(11)(B).

25.     One CTA exemption is for private companies with (a) more than 20 full-time employees in the United States, (b) more than $5 million in gross receipts or sales, and (c) an operating presence at a physical office in the United States.  *See id.* § 5336(a)(11)(B)(xxi).

26.     Non-public companies with a U.S. operating presence but 20 or fewer full-time employees or less than $5 million in gross receipts or sales are not exempt.  *See id*.  The CTA also does not exempt entities created for non-business purposes, such as entities formed to hold a family residence, entities formed with the intent to seek

501(c) federal tax-exempt status but have not yet applied for it, or non-profit entities

not seeking 501(c) federal tax-exempt status.

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment if "there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." *An-*

*derson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P.

56(c)). Where, as here, there is no genuine issue of material fact and the only issues

before the Court are pure questions of law, disposition of the case by summary judg-

ment is particularly appropriate.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007);

*Burger King Corp. v. E-Z Eating, 41 Corp.*, 572 F.3d 1306, 1313 (11th Cir. 2009);

*Maxim Crane Works, L.P. v. Zurich Am. Ins. Co*., 11 F.4th 345, 350 (5th Cir. 2021).

## II.   CONGRESS LACKS CONSTITUTIONAL POWER TO ENACT THE CTA

The CTA encroaches on the sovereignty of the States[4] and the constitutional

rights of their citizens, and exceeds the enumerated powers bestowed upon Congress

by Article I of the Constitution.  The formation of corporations was a core sovereign

---

[4] The Supreme Court has held that individual citizens of a State have standing to raise claims that the federal government has infringed on a State's sovereignty.  *See Bond v. United States*, 564 U.S. 211, 222 (2011) ("An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable. Fidelity to principles of federalism is not for the States alone to vindicate.").

power of the States at the Founding which the States exercised to achieve public purposes such as building roads and canals, incorporating townships and villages, and pooling money to lend, in addition to chartering businesses and churches where citizens exercised their freedoms of association and religion.  Accordingly, no one imagined that Congress's power to "regulate commerce . . . among the several States" or any other Article I power encompassed authority to interfere with how States went about chartering and regulating their entities.  This early American history—notably the centrality to State sovereignty of the power to create entities under State law and the limited scope of federal constitutional constraint on that power to protect individual property rights from State disenfranchisement—importantly informs modern constitutional analysis.

### A.  Congress Can Only Legislate Pursuant to Its Enumerated Powers; the States Retain All Other Sovereign Powers

"In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder."  *NFIB v. Sibelius*, 567 U.S. 519, 533 (2012); *see also New York v. United States*, 505 U.S. 144, 156 (1992) ("Being an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to the state authorities.") (quoting J. Story, *Commentaries on the Constitution of the United States* 752 (1833)).  James Madison, in *The Federalist Papers*, emphasized that the "powers delegated by the proposed Constitution to the federal government are few and defined.  Those which are to

remain in the State governments are numerous and indefinite." *The Federalist No. 45*, at 312 (James Madison) (Jacob E. Cooke ed., 1961). Madison made the point an explicit part of the Constitution when he penned the Tenth Amendment, ratified as part of the Bill of Rights in 1791: "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

**B.  Congress Has No Enumerated Authority To Interfere in the Formation of Corporate Entities Under State Law**

Congress has never before tried to set rules touching upon corporate formation in the States because it has no power to do so. The Constitution nowhere grants Congress a power to nullify, expand upon, or relax the laws a State has established to create corporations or other entities because the power to create corporations and other entities is a core sovereign power retained by the States upon adoption of the Constitution. As Madison explained in *The Federalist*, the "powers reserved to the several States will extend to all the objects, which in the ordinary course of affairs, concern the lives, liberties, and properties of the people; and the internal order, improvement, and prosperity of the State." *The Federalist No. 45,* at 312 (James Madison) (Jacob E. Cooke ed., 1961).

Central to the "internal order, improvement, and prosperity of the State" in founding-era America were corporations, which were then viewed primarily as "agencies of government . . . for the furtherance of community purposes." Pauline

13

Maier, *The Revolutionary Origins of the American Corporation*, 50 Wm. & Mary

Q. 51, 55-56 (1993).  In the late eighteenth century, corporations were frequently

(but not exclusively) "established for the purpose of local government, such as the

corporations of cities and towns."  1 Stewart Kyd, *A Treatise on the Law of Corpo-*

*rations* 28 (Butterworth 1793).  After the Constitution was ratified, when the foot-

print of State governments was exceedingly small, corporations were used to both

organize municipal governments and to mobilize private capital into providing es-

sential public services such as "turnpikes, canals, banks, and colleges."  Gordon

Wood, *Power and Liberty: Constitutionalism in the American Revolution* 168

(2021).  By the mid-nineteenth century, an "institutional matrix of state-chartered

enterprises [was] responsible for igniting both transportation and financial 'revolu-

tions'" in the new nation.  Brian Phillips Murphy, *Building the Empire State: Polit-*

*ical Economy in Early America* 12 (2015).  Thus, a leading 1843 treatise observed

that the "competency of the legislative power of a State to create corporations . . . is

so clear, so generally admitted, and has been so long and so often claimed and exer-

cised, that it is unnecessary to offer any arguments or authorities for its support."

Joseph K. Angell & Samuel Ames, *A Treatise of Private Corporations Aggregate* 45-46 (Charles C. Little & James Brown eds., 2d rev. ed. 1843).[5]

In keeping with these principles, a proposal made by James Madison at the 1787 Constitutional Convention to grant Congress an enumerated power to charter federal corporations was decisively rejected because of the threat it posed to the States' inherent power to charter their own corporations.  On September 14, 1787, Madison proposed giving Congress a general power "to grant charters of incorporation where the interest of the U.S. might require & the legislative provisions of individual States may be incompetent."  2 *The Records of the Federal Convention of 1787* 615 (Max Farrand ed., 1911) (Madison's notes).  Rufus King of Massachusetts and George Mason of Virginia immediately protested that the States would not stand for it.  *See id.* at 615-16.  Madison's enlargement was rejected out of hand and did not even get a vote.  *See id.* at 616.

Notwithstanding the rejection of Madison's proposal, the Supreme Court recognized in *McCulloch v. Maryland*, 17 U.S. 316 (1819) that Congress had the power under the Necessary and Proper Clause to charter the second Bank of the United States in order to enable Congress to exercise its enumerated Article I powers to tax

---

[5] Nearly 150 years later, the Supreme Court confirmed that it "is an accepted part of the business landscape in this country for states to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares."  *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 91 (1987).  This is because a "State has an interest in promoting stable relationships among parties involved in the corporations it charters . . . ."  *Id.*

and spend.  In affirming this implied federal sovereign power, the *McCulloch* Court emphasized the States' corresponding sovereign powers to charter state entities, reasoning that incorporation was an inherent sovereign power of the States.  *See McCulloch*, 17 U.S. at 358 ("A state can create a corporation, in virtue of its sovereignty, without any specific authority for that purpose, conferred in the state constitutions.").  In *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518 (1819), decided the same year as *McCulloch,* the Supreme Court held that the New Hampshire legislature could not, however, "impair" the "obligation" of the pre-revolutionary British royal charter granted to Dartmouth College, which it held was a "contract" for purposes of the Contracts Clause.[6] *See* 17 U.S. at 650, 654.

*Dartmouth College* did not rely upon or even suggest a **constitutional** limit on State sovereign power to **create** an entity under State law, much less Congressional authority to compel the State citizens who created the entity to disgorge personal information to the federal executive; in fact, Dartmouth College had been established by the British crown before New Hampshire had even become a State.  Rather, the Court imposed a Contracts Clause constraint on the State legislature's power to unilaterally revise the royal charter.  Furthermore, the point of the Contracts Clause limitation was to protect the individual interests of donors who had relied

---

[6] No State "shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10.

upon the royal charter when they made their donations, not to advance the regulatory interests of the national government.  With respect to the CTA, that analysis cuts the other way: the CTA *imposes a burden* on beneficial owners and applicants in excess of what State law requires; it does not aim to *protect* them against State extinction or diminution of their rights in the corporation.

### C.  The Commerce Clause Does Not Allow Congress To Infringe Upon the State Sovereign Power To Create Corporate Entities

In light of the importance of the States' sovereign power to create State entities, the Commerce Clause cannot justify the CTA.  The Commerce Clause provides that Congress "shall have Power" to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8.  The Supreme Court has held that the interstate component of the Commerce Clause permits Congress to regulate "the channels of interstate commerce," "persons or things in interstate commerce," and "those activities that substantially affect interstate commerce."  *United States v. Morrison*, 529 U.S. 598, 609 (2000).  None of these categories apply to the CTA.

*First*, the CTA does not regulate "the channels of interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558 (1995).  It does not involve the regulation of modes of transportation across State borders or facilities serving interstate travelers—which are the types of activities that the Supreme Court has found implicate channels of interstate commerce.  *See Heart of Atlanta Motel, Inc. v. United States*,

17

379 U.S. 241 (1964) (motel with three-fourths of clientele consisting of interstate travelers); *Boynton v. Virginia*, 364 U.S 454 (1960) (bus terminal restaurant); *United States v. Baltimore & Ohio R. Co.*, 333 U.S. 169 (1948) (railroad tracks); *Morgan v. Virginia*, 328 U.S. 373 (1946) (interstate buses).

*Second*, a law requiring disclosures from persons creating a corporate entity under State law is not a law regulating a "person or thing in interstate commerce." Under well-established Supreme Court precedent, the regulated "person or thing" must cross or have crossed State lines to fall within this category. *See, e.g.*, *Scarborough v. United States*, 431 U.S. 563 (1977) (law penalizing felons possessing guns that have been transported across state lines); *Perez v. United States*, 402 U.S. 146, 150 (1971) (identifying 18 U.S.C. § 32, which prohibits the destruction of aircraft, as a regulation of "instrumentalities of interstate commerce"). A state-law entity may be a legal "person" with certain rights, *see Santa Clara Country v. So. Pacific. RR.*, 118 U.S. 394 (1886), but its formation occurs solely within the State where it is formed, not "in interstate commerce."

*Third*, the CTA does not regulate activities that, although purely intrastate, "substantially affect[] interstate commerce." *See Morrison*, 529 U.S. at 610. To fall within this category, the regulated activity must have a "commercial character" or be "economic in nature." *Id.* at 611-13; *see also United States v. Lopez*, 514 U.S. at 559. But the mere formation of an entity under state law does not substantially affect

18

interstate commerce; nor is entity formation an economic act or necessarily motivated by a commercial purpose. *See, e.g.*, Ala. Code § 10A-1-2.01 (2022) (under Alabama law, a "domestic entity may have any lawful purpose or purposes unless otherwise provided").

Creating a state-law entity is a clerical act to set up for future activities which may or may not be commercial. Many people create entities solely to exercise their freedom of association, to preserve their privacy, or to hold real property (including members of Plaintiff NSBA). Therefore, the presumption underlying the CTA— that all "reporting companies" are engaged in commercial activity—is incorrect. But even if a particular entity is formed with an eye to doing business, there is no economic or commercial activity at the moment of its formation, because "State business entity formation processes are ministerial in nature."[7] "The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *NFIB*, 567 U.S. at 557.

None of the Supreme Court precedents upholding Commerce Clause power based on the regulation of intrastate activity affecting interstate commerce apply to

---

[7] National Association of Secretaries of State, *Federal Legislation Calling on Treasury's Financial Crimes Enforcement Network (FinCEN) to Collect Beneficial Ownership Information*, https://www.nass.org/initiatives/state-incorporation-collection-company-ownership-info (last visited Feb. 14, 2023).

the mere creation of a corporate entity under State law.  No goods or services are involved when a person registers an entity as a first step to realizing a new family business idea with the State.  *See, e.g.*, *Shreveport Rate Cases*, 234 U.S. 342 (1914) (intrastate railroad rates); *Perez v. United States*, 402 U.S. 146 (1971) (intrastate loan sharking); *Hodel v. Virginia Surface Mining*, 452 U.S. 264 (1981) (intrastate coal mining); *United States v. Wrightwood Dairy Co.*, 315 U.S. 110 (1942) (intrastate milk sales).  Nothing is produced or grown when the Secretary of State issues the certificate of formation.  *See, e.g.*, *Wickard v. Filburn*, 317 U.S. 111 (1942) (wheat grown by a farmer to feed his own livestock); *Gonzales v. Raich*, 545 U.S. 1 (2005) (homegrown marijuana for personal medicinal consumption).  These precedents "require a tangible link to commerce, not a mere conceivable rational relation."  *United States v. Comstock*, 560 U.S. 126, 150, 152 (2010) (Kennedy, J., concurring in judgment).

In summary, the CTA intrudes into an area that has historically been the domain of the States rather than of the federal government.  Chartering entities is a core State government function—not a private act, much less a commercial one; and each State may choose its own requirements for persons to charter.[8]  Congress implicitly

---

[8] For example, Alabama requires only "the name and address of each organizer of the filing entity," Ala. Code § 10A-1-3.05 (2022)—not birthdates or active personal-identification numbers as the CTA requires—and makes no reference to "beneficial owners" or "applicants."  If the entity to be formed is a limited liability company, the name and address of organizers is not required at all. Ala. Code § 10A-5A-2.01(a) (2022).

acknowledged the States' primacy in this area in stating that the purpose of the law was to "set a clear, Federal standard for incorporation practices," while failing to actually set a uniform standard for incorporation practices, let alone a "clear" standard.  Nor does the CTA create a federal entity formation process.

Instead, the CTA creates a mechanism whereby the creation of an entity under State law triggers a separate federal reporting requirement that ultimately falls on the filers and owners of that entity—another implicit recognition that Congress lacks the authority to directly regulate State entity formation.  Congress is using this contingent requirement to circumvent the constitutional limits on its powers and counting on the States to inform filers of the CTA's disclosure requirements.  Furthermore, while the CTA envisions that States will receive funds for providing such notice to their citizens, the States will be compelled to give notice anyway because their citizens would be exposed to the CTA's criminal penalties if left unaware of the statute's reporting requirement.[9]  The Commerce Clause does not authorize this kind of workaround to a core State sovereign power.

_____

[9] For the same reason that the CTA gives the State no choice but to comply with the CTA's requirements to protect its citizens regardless whether federal funds are appropriated, it also constitutes unconstitutional commandeering in violation of the Tenth Amendment and constitutional principles of federalism.  The federal government "may not compel the States to enact or administer a federal regulatory program." *New York v. United States*, 505 U.S. 144, 188 (1992) (invalidating federal statute requiring States to enact legislation providing for the disposal of radioactive waste within State borders or take title and possession of the waste).  Thus, notwithstanding the CTA's language about "cooperat[ion]," 31 U.S.C. § 5336(d)(2), and its framing of the requirement that State agencies inform filers of its reporting requirements "[a]s a condition of the funds made

Because there is no "constitutionally enumerated power" to enact the CTA, the statute cannot be justified as a "rationally related" means to implement the missing power under the Necessary and Proper Clause. *United States v. Comstock*, 560 U.S. at 134. In enacting the CTA, Congress is imposing a penalty on millions of innocent State citizens' decisions to associate and form a collective entity under State laws when the States have chosen not to make such disclosures a condition of entity formation. This is tantamount to dictating a term of entity formation, which, as noted above, is a core sovereign power retained by the States. "It is of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause." *Id.* at 153 (Kennedy, J., concurring in judgment). "No law that flattens the principle of state sovereignty, whether or not 'necessary,' can be said to be 'proper.'" *Bond v. United States*, 572 U.S. 844, 879 (2014) (Scalia, J., concurring in the judgment).

The CTA is analogous to the provision in the Affordable Care Act requiring individuals to buy health insurance, which the Supreme Court held Congress did not

---

available under this section," the CTA improperly enlists the States to "administer a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 926 (1997). Nor would the CTA pass the coercive funding test of *South Dakota v. Dole*, 483 U.S. 203 (1987). *Dole* articulates four criteria for determining whether a funding condition is non-coercive: (1) the spending must advance the "general welfare;" (2) the spending conditions must be stated "unambiguously;" (3) the spending conditions must be germane to the federal interest for which moneys are expended; and (4) no provision of the Bill of Rights or other constitutional protection be violated. *See Dole*, 483 U.S. at 207-8. Even if the CTA meets the first three criteria, the CTA's reporting requirements violate individual constitutional rights as detailed in Section III below.

have authority to enact under the Commerce Clause. Newly formed State entities, like individuals who refuse to buy health insurance, are "doing nothing" at the moment of formation. *NFIB*, 567 U.S. at 551. Of course, the newly created entity *may*—or may not—in the future engage in economic or commercial activity, but there is no "existing commercial activity." *Id.* at 552. The beneficial owners of the entity may "[i]n some cases . . . decide not to do something; in others they simply fail to do it." *Id.* "But we have never permitted Congress to anticipate that activity itself in order to regulate individuals not currently engaged in commerce." *Id.* at 557.

"While Congress's authority under the Commerce Clause has of course expanded with the growth of the national economy, our cases have 'always recognized that the power to regulate commerce, though broad indeed, has limits.'" *NFIB*, 567 U.S. at 554 (quoting *Maryland v. Wirtz*, 392 U.S. 183, 196 (1968)). Congress has exceeded those limits here.

## III.   THE CTA IS AN UNPRECEDENTED INTRUSION INTO INDIVIDUAL PRIVACY RIGHTS PROTECTED BY THE FIRST, FOURTH, FIFTH, AND NINTH AMENDMENTS

The Act's reporting requirements will apply to approximately 32.6 million "reporting companies" in 2024 and to an estimated 5 million additional companies per year thereafter. *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59549. Each of these entities will have to provide to FinCEN "sen-

sitive" personal information about its owners (including closely-held private information such as passports and drivers' licenses) to be held indefinitely in a database easily accessible to federal and foreign law enforcement and security agencies—all without any suspicion of wrongdoing.

This is such an unprecedented intrusion by the federal government into the privacy of millions of Americans that the caselaw provides no precise analogs. While no precedent addresses the federal government's collection of sensitive personal information for law enforcement purposes from millions of innocent U.S. persons who seek to form State-law entities, the general principles embedded in Supreme Court precedents show that this statutory innovation violates people's rights under the First, Fourth, Fifth, and Ninth Amendments.

### A.    <u>The Fourth Amendment</u>

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  This protection "is not confined literally to searches and seizures as such but extends as well to the orderly taking under compulsion of process," including disclosures compelled by statute or regulation.  *United States v. Morton Salt Co.*, 338 U.S. 632, 651-52 (1950).  The Fourth Amendment applies when the government has invaded a person's reasonable expectation of privacy.  *See Katz v.*

*United States*, 389 U.S. 347, 351 (1967). "When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (internal quotation marks and citation omitted); *see also Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting) ("Every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment."). The centrality of "evaluating the privacy interest in . . . Fourth and Fifth Amendment law" reflects their primary role "as a shield against government information-gathering." William J. Stuntz, *The Substantive Origins of Criminal Procedure*, 105 Yale L.J. 393, 395 (1995).

The CTA requires a "reporting company" to disclose the personal information of its "beneficial owners" and "applicants," such as legal names, birthdates, current addresses, and identification numbers to FinCEN without ***any*** individualized suspicion of wrongdoing. *See* 31 U.S.C. §§ 5336(b)(1)-(2). The purpose of this data collection is solely to build a financial-intelligence database that U.S. and foreign government agencies may access to fight suspected financial crimes and money laundering; Treasury employees have carte blanche to access the database. *See id.* § 5336(c)(5).

Those realities render this law contrary to the Fourth Amendment.  The CTA itself concedes that this personal information is "sensitive." *Id.* § 5336 note (6). Yet this information must be reported to the government regardless of whether a company or its owners are suspected of wrongdoing.  The information must be reported even when the company has not previously collected it in the ordinary course.  In many instances, the reporting company would need to take affirmative steps to obtain personal information (*e.g.*, drivers' licenses and passports) about beneficial owners or applicants that it would not ordinarily possess or retain as a business record.  In other words, the information required to be disclosed is not composed solely of corporate records belonging to the reporting companies; it also includes non-business related ***personal*** information belonging to the reporting company's beneficial owners and applicants.

While no Supreme Court precedent addresses a law of this scope—because the federal government has not previously attempted to go so far—the Supreme Court's decision in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), marks the way.  The law at issue there was a Los Angeles ordinance that required hotels to

collect and make available to police officers on demand a "guest's name and address" and other sensitive information.[10]  576 U.S. at 412.  If guests did not have a previous reservation, the hotel also had to collect and provide to the police on demand information from a photographic identification document.  *See id.* at 413.  Failure to comply with the ordinance was a misdemeanor.  *See id.*

The Supreme Court held that the ordinance violated the Fourth Amendment. Emphasizing that "modern hotel registries contain sensitive information, such as driver's licenses and credit card numbers," 576 U.S. at 426, it found that "searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are per se unreasonable . . . subject to only a few specifically established and well-delineated exceptions." *Id.* at 419 (citation omitted).  The Supreme Court construed the ordinance as constituting an "administrative search" not in aid of ongoing criminal investigations but geared towards "ensur[ing] compliance with the recordkeeping requirement, which in turn deters criminals from operating on the hotels' premises." *Id.* at 420.  Yet even though the law was not directed at criminal activity itself, it was unconstitutional because "absent consent, exigent cir-

_____

[10] The other information included: "the number of people in the guest's party; the make, model, and license plate number of any guest's vehicle parked on hotel property; the guest's date and time of arrival and scheduled departure date; the room number assigned to the guest; the rate charged and amount collected for the room; and the method of payment."  *Patel,* 576 U.S. at 412-13.

cumstances, or the like," the subject of even an *administrative* search "must be af-forded an opportunity to obtain precompliance review before a neutral deci-sionmaker." *Id.*

The Fourth Amendment violation is even more blatant here. The CTA man-dates that reporting companies collect and disclose sensitive personal information about beneficial owners and applicants to the federal government. Under the CTA, any person who fails to turn over personal information (analogous to the hotel guest) may also be punished, not just the reporting company charged with collecting it (analogous to the hotel). It mandates such disclosure even when the government has no specific suspicion that the person is engaging in illegal activity (much less as part of an ongoing criminal investigation). It does so without a warrant or an opportunity for pre-compliance review before a neutral decision-maker.

Federal courts have held that the Fourth Amendment applies to similar dragnet laws authorizing officials to require personal information without individualized suspicion of wrongdoing. *See, e.g.*, *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 482-83 (S.D.N.Y. 2019) (ordinance requiring companies operating online rental-property marketplaces to turn over hosts' personal data to city officials); *Planned Parenthood of Sw. & Cent. Fla. v. Philip*, 194 F. Supp. 3d 1213, 1221 (N.D. Fla. 2016) (Florida law requiring abortion clinics to submit to annual inspections of

"at least 50 percent of patient records generated since the clinic's last license inspection"); *Mid-Fla Coin Exch., Inc. v. Griffin*, 529 F. Supp. 1006, 1026–27 (M.D. Fla. 1981) (ordinance requiring resellers of precious metals to keep records of transactions—including fingerprints and photos of sellers—and to turn those records over to law enforcement within 24 hours of the transaction).  Given these Fourth Amendment holdings as against State and local government information dragnets, it defies reason that the Constitution would authorize the federal government—whose intrusion into privacy rights the Fourth Amendment was specifically designed to prevent—to gather personal information of tens of millions of law-abiding Americans for law enforcement purposes without any suspicion of wrongdoing.

### B.     <u>The Fifth Amendment</u>

The CTA compels the production of personal information in violation of the Fifth Amendment's guarantee that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  The Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).  Furthermore, "[a] substantial body of evidence" also "suggests that the Fifth Amendment privilege protects against the

compelled production not just of incriminating testimony, but of any incriminating evidence." *United States v. Hubbell*, 530 U.S. 27, 49, 51 (2000) (Thomas, J., concurring).

In *Boyd v. United States*, 116 U.S. 616 (1886), the Supreme Court held that the federal government could not force certain companies to turn over invoices in civil-forfeiture proceedings. *Boyd*'s sweeping protection of individuals from federal government information-gathering to assess potential illegal activity—a governmental intrusion where "the Fourth and Fifth Amendments run almost into each other," *id.* at 630—was perceived for decades as one of "the greatest constitutional decisions" of the Supreme Court. *Schmerber v. California*, 384 U.S. 757, 776 (1966) (Black, J., dissenting); *see Olmstead*, 277 U.S. at 474 (Brandeis, J., dissenting) ("a case that will be remembered as long as civil liberty lives in the United States").

Subsequent precedent significantly narrowed the Supreme Court's original holding in *Boyd*. Most notably, in *Fisher v. United States*, 425 U.S. 391 (1976), the Supreme Court held that the Self Incrimination Clause was not implicated by subpoenas for tax preparation documents served on the attorneys of taxpayers. *See* 425

U.S. at 397.[11]  Unlike in *Fisher* and subsequent Supreme Court decisions where: i) the requested records were **business** records already in existence, and ii) the federal government had reason to suspect that the companies had engaged in wrongdoing, the CTA requires individuals to disgorge sensitive **personal** information regardless of whether they are suspected of wrongdoing. *See Fisher*, 425 U.S. 391 (suspected tax evasion); *United States v. Doe*, 465 U.S. 605 (1984) (fraud in public contracts); *Hubbell*, 530 U.S. 27 (mail fraud and tax evasion).

Even as revised by subsequent cases like *Fisher* and its progeny, *Boyd* still stands for the proposition that the Fifth Amendment, together with the Fourth Amendment, protects individuals from suspicionless information-gathering designed to detect potential criminal activity.  The scheme formulated by the CTA allows the federal government to collect sensitive personal information about countless millions of beneficial owners and applicants of State entities; warehouse that

---

[11] While Plaintiffs acknowledge that corporate entities are treated differently from individuals for Fifth Amendment purposes under the "collective entity" doctrine, *see, e.g.*, *Braswell v. United States*, 487 U.S. 99, 104 (1988); *Bellis v. United States*, 417 U.S. 85, 89-90 (1974) ("the privilege against compulsory self-incrimination should be 'limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records") (quoting *United States v. White*, 322 U.S. 694, 701 (1944)), the disclosure burden of the CTA falls on *individual* filers to disclose *personal* records. The CTA demands from filers and beneficial owners "sensitive" records that the collective entity would neither keep on its own nor necessarily have a right to demand from its members.  *See Bellis*, 417 U.S. at 93 ("[T]he records subpoenaed must in fact be organizational records held in a representative capacity. In other words, it must be fair to say that the records demanded are the records of the organization rather than those of the individual under *White*.").

information for years or even for decades (implicating real and continuing data privacy concerns); and then share it with Treasury employees (for any official reason) or state, local, federal, and foreign law enforcement agencies with an eye to prosecuting them for crimes.  This sort of governmental power "may suit the purposes of despotic power, but it cannot abide the . . . political liberty and personal freedom" that the Constitution protects in the United States.  *Boyd*, 166 U.S. at 632.

## C.   <u>The First Amendment</u>

The CTA also infringes on individual First Amendment rights of speech and free association by forcing persons subject to the reporting requirements to disclose sensitive personal information, thereby forcing them to speak and chilling their freedom to join in associations.  *See* U.S. Const. amend. I.

### 1.   <u>Compelled Speech</u>

The First Amendment protects persons from government attempts to force them to speak.  *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Even when the government seeks to compel disclosure of "factual, noncontroversial information," the mandated disclosure requirements cannot be "unjustified or unduly burdensome."  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2367-72 (2018).

The CTA is an unjustified and unduly burdensome means of achieving its stated ends of curtailing money laundering, terrorism financing, and other illicit activities.  *See* 31 U.S.C. § 5336 note (5).  The most logical way to achieve these goals would be to enhance the CDD rule or limit the CTA's reporting requirements to non-U.S. persons.  *Cf. e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 782 (1988) (invalidating State statute requiring charities to disclose the percentage of donor contributions given the alternative of detailed financial disclosure forms).

Instead of applying these less burdensome alternatives, however, the CTA engages in overkill by requiring tens of millions of individuals who wish to form entities to reveal personal information to FinCEN that the States do not require. The CTA mandates these disclosures despite the fact that individuals form State-law entities for lawful business and non-business purposes and often seek to protect their identities and privacy in so doing.  On the other hand, bad actors—the very people the CTA is supposed to target—will either manipulate the mandatory disclosures or shirk them altogether given the absence of an independent system of collection and validation.  To grasp what will happen if the CTA goes into effect, one need look no further than the Companies House Register in the United Kingdom, a precursor database of beneficial owner information ("persons with significant control"), which

was found to be utterly unreliable, subject to fraud, and subject to reporting compa-

nies "making stuff up."[12]

2.   Freedom of Association

The Supreme Court has long recognized that the First Amendment protects

individuals' rights to privately associate with one another, free from government

intrusion. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449, 460 (1958) ("It is beyond

debate that freedom to engage in association for the advancement of beliefs and ideas

is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the

Fourteenth Amendment, which embraces freedom of speech."). The government

may not compel the release of membership or associational information without a

convincing showing that there is a "substantial relation between the information

sought and a subject of overriding and compelling state interest." *Gibson v. Fla.

Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963). The government inter-

est in securing information must be weighed against association members' interest

in maintaining confidentiality. *See id.* at 545-46.

---

[12] Impact Assessment, *Corporate Transparency and Companies House Register Reform* (Feb. 25, 2022), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1057767/corporate-transparency-and-register-reform-white-paper-impact-assessment.pdf; Jim Dunton, *Companies House to clamp down on identity fraud with verification tools and better data*, Civil Service World (Sept. 21, 2020), https://www.civilserviceworld.com/professions/article/companies-house-unveils-clampdown-on-identity-fraud; Oliver Bullough, *How Britain can help you get away with stealing millions: a five-step guide*, The Guardian (July 5, 2019), https://www.theguardian.com/world/2019/jul/05/how-britain-can-help-you-get-away-with-stealing-millions-a-five-step-guide.

The CTA violates those rights by forcing individuals to disclose their personal information and involvement with entities to the federal government, which may subsequently allow access to that data to banks, Department of Treasury officials and employees, and state, federal, foreign intelligence and law-enforcement agencies and officials.  As explained above, State-charted entities were the principal means by which individuals exercised their freedom of association at the Founding. Even today, many persons create entities solely to exercise their freedom of association, rather than to engage in commercial activities.  Because the CTA contemplates that the database of beneficial ownership and applicant information that FinCEN will compile will be accessible to banks and intelligence and law-enforcement officials worldwide, persons seeking to form entities for public and private purposes will be chilled from doing so.  Furthermore, as explained above with respect to compelled speech, there is no "substantial relation" between the scale of the information the CTA requires from law-abiding U.S. persons and the statute's stated ends of deterring money laundering, terrorism financing, and illicit activities.[13]

---

[13] The Ninth Amendment states that the "enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."  U.S. Const. amend. IX. Given its framing as open-ended, interpretive guidance the Supreme Court has not often invoked the Amendment in its constitutional decisions, *see, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479 (1965). But as commentators have argued, it was designed, as part of the Bill of Rights, primarily to protect the people's individual rights against ***federal*** government intrusion.  *See generally* Randy E. Barnett, *Restoring the Lost Constitution: The Presumption of Liberty* (2004).  The Ninth Amendment confirms the unconstitutionality of the CTA's unprecedented intrusion into individual privacy rights by its demand for sensitive personal information absent suspicion of wrongdoing.

## IV.   THE CTA IS UNCONSITUTIONALLY VAGUE AND VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

The Due Process Clause of the Fifth Amendment requires the federal government to provide fair notice to persons who may face criminal fines and imprisonment for alleged violations.  A law must "define the criminal offense with sufficient definiteness that *ordinary people* can understand what conduct is prohibited" and also "establish minimal guidelines to govern law enforcement" officers.  *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (emphasis added).  *See, e.g.*, *Chicago v. Morales*, 527 U.S. 41, 56 (1999) (invalidating anti-loitering ordinance that proscribed "remain[ing] in any one place with no apparent purpose"); *Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 451 (1983), *overruled on other grounds* by *Planned Parenthood of SE Penn. v. Casey*, 505 U.S. 833 (1992) (striking down anti-abortion statute directing that "the remains of the unborn child are disposed of in a humane and sanitary manner").

The CTA violates due process because it threatens fines and imprisonment for ordinary people seeking to create entities under State law if they fail to provide personal information, without providing clear definitions.  Specifically:

- "Beneficial owner" is defined as an individual who, "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" exercises "substantial control" over a reporting company or "owns or controls not less than least 25 percent of the ownership interests" of the company.  31 U.S.C. § 5336(a)(3)(A).

- "Applicant" is defined as an "individual who files an application" to

36

form a corporation, LLC, or such entity under state or tribal law, or "registers or files an application to register" a non-U.S. company to conduct business in the United States.  31 U.S.C. § 5336(a)(2).

These definitions are too ambiguous for ordinary people to understand and are therefore unconstitutionally vague.  Many small businesses are family-owned and -operated concerns with informal structures and organizations.  Determining which family members "indirectly" through "a relationship" have "substantial control" of the entity formed for the business would be daunting.[14]  Trying to understand what the CTA requires in terms of whose information must be reported and updated will especially burden the smallest business owners who lack the resources to pay for legal assistance or advice.  The same plasticity of key words that will

---

[14] Although agency regulations may suffice to cure unconstitutional vagueness, FinCEN's regulations only compound the ambiguity of the key terms.  *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 492 & n.3 (1982).  For instance, in explaining how to assess "substantial control" to determine beneficial owners, FinCEN proposes consideration of: (1) service as a senior officer; (2) authority over the appointment or removal of any senior officer or dominant majority of the board of directors (or similar body); and (3) direction, determination, or substantial influence over important company matters.  *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59594 (Sept. 30, 2022).  Consequently, determining who has "substantial control" means determining who has "substantial influence" in the company.  An ordinary person would find little guidance in this agency "clarification."  The Final Rule elsewhere defines "substantial control" as including a circumstance where an individual "[h]as ***any other form of substantial control*** over such reporting company."  *Id.* at 59595 (emphasis added).  This definition is not only vague ("any other form"), it is also entirely self-referential and thus meaningless.  With respect to "applicant," FinCEN's rules expand the definition to include any person who "directs" or "controls" the formation filing or registering of an entity *See id.* at 59596.

confound good-faith compliance by ordinary people accrues to the enforcement dis-cretion of FinCEN in punishing those whom it determines should have reported or updated.

## **CONCLUSION**

Fighting money laundering and terrorism funding are important goals, but in our federal system, the States retain sovereign powers, and citizens have robust pri-vacy rights against federal government intrusion. These rights cannot be sacrificed in an attempt to realize international aspirations to have central governments collect entity ownership information.  For the foregoing reasons, the Court should grant summary judgment in favor of Plaintiffs, declare the CTA invalid, and enjoin its enforcement.

Dated: February 15, 2023 Respectfully submitted,

s/ John C. Neiman, Jr.

—————————————————

John C. Neiman, Jr.
MAYNARD COOPER & GALE
1901 Sixth Avenue North
Suite 1700
Birmingham, AL 35203
Telephone: (205) 254-1000
jneiman@maynardcooper.com

Kenyen Brown*
HUGHES HUBBARD & REED LLP
1775 I Street, N.W.
Washington, D.C., 20006-2401
Telephone: (202) 721-4600
Fax: (202) 721-4646
kenyen.brown@hugheshubbard.com

Thomas Lee*
thomas.lee@hugheshubbard.com
Terence Healy*
terence.healy@hugheshubbard.com
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 837-6000
Fax: (212) 422-4726
*admitted pro hac vice

*Attorneys for PLAINTIFFS*