

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

_____
|
NATIONAL SMALL BUSINESS )
UNITED d/b/a the NATIONAL SMALL )
BUSINESS ASSOCIATION, *et al.*, )
)
               Plaintiffs, )
)     Civil Action No.
        v. )     5:22-CV-1448-LCB
)
JANET YELLEN, in her official )
capacity as Secretary of the Treasury, )
*et al.*, )
)
           Defendants. )
_____ )

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE,
## CROSS-MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Dated:  March 29, 2023

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER           United States Department of Justice
Assistant Branch Director     Civil Division, Federal Programs Branch

STUART J. ROBINSON      450 Golden Gate Ave., Suite 7-5395
Senior Counsel            San Francisco, CA 94102
                        Tel: (415) 436-6635
TAYLOR N. PITZ         Fax: (415) 436-6632
Trial Attorney            Email: stuart.j.robinson@usdoj.gov

*Counsel for Defendants*

## **TABLE OF CONTENTS**

**INTRODUCTION**........................................................................1

**STATEMENT OF FACTS**.........................................................2

**I.**    **Defendants' Statement of Facts**.....................................2

**II.**   **Defendants' Response to Plaintiffs' Statement of Facts**............7

**BACKGROUND**.......................................................................8

**I.**    **Congress's Enactment of the CTA**...............................8

**II.**   **FinCEN's Rulemaking**..........................................13

**III.**  **Procedural History**.............................................14

**LEGAL STANDARDS**............................................................16

**DISCUSSION**.......................................................................17

**I.**    **Plaintiffs Cannot Demonstrate that the CTA Exceeds Congress's Enumerated Powers.**...............................................17

      A.  Plaintiffs Lack Standing to Assert their Claim. ....................17

      B.  Plaintiffs' Claim Fails on the Merits.............................25

             1.    The CTA is Authorized by the Government's Foreign Affairs and National Security Powers and the Necessary and Proper Clause. ..............................25

             2.    The CTA is Authorized by the Interstate Commerce Clause.....................................28

             3.    The CTA is Authorized by the Foreign Commerce Clause.....................................34

             4.    The CTA is Authorized by the Necessary and Proper Clause and the Government's Taxing Authority. ...............36

             5.    The CTA Does Not Violate the Tenth Amendment. ...............37

**II.**   **The CTA Does Not Invade Plaintiffs' Right to Privacy.**.........................40

   A.  Fourth Amendment .......................................................................40

       1.    Plaintiffs Lack Standing to Assert their Claim. .......................40

       2.    Plaintiffs' Fourth Amendment Claim Fails on the Merits. .......40

   B.  Fifth Amendment ..........................................................................47

       1.    Plaintiffs Lack Standing to Assert their Claim. .......................47

       2.    Plaintiffs' Claim Fails on the Merits.......................................48

**III.**   **The CTA Does Not Violate Plaintiffs' First Amendment Rights.**...........49

   A.  Plaintiffs Lack Standing to Assert their Claims. ..........................49

   B.  Plaintiffs' Claims Fail on the Merits.............................................49

**IV.**   **The CTA Accords with the Due Process Clause.**....................................56

   A.  Plaintiffs Lack Standing to Assert their Claim. ...........................56

   B.  Plaintiffs' Claim Fails on the Merits.............................................57

   C.  The FinCEN Rule Cures any Statutory Vagueness. ................59

**CONCLUSION**................................................................................................60

# TABLE OF AUTHORITIES

## Cases

*Airbnb, Inc. v. City of New York*,
373 F. Supp. 3d 467 (S.D.N.Y. 2019) ...................................................46

*Ala. State Fed'n of Tchrs., AFL-CIO v. James*,
656 F.2d 193 (5th Cir. 1981) ................................................................55

*Ala.-Tombigbee Rivers Coal. v. Kempthorne*,
477 F.3d 1250 (11th Cir. 2007) .................................................... 31, 32

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946) ....................................................................... 32, 33

*Amnesty Int'l, USA v. Battle*,
559 F.3d 1170 (11th Cir. 2009) ...........................................................49

*Ams. for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021)..........................................................................55

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................... 16, 17

*Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*,
19 F.3d 241 (5th Cir. 1994) ................................................................22

*Ass'n of Am. Physicians & Surgeons v. FDA*,
13 F.4th 531 (6th Cir. 2021) ...............................................................24

*Associated Gen. Contractors of N. Dakota v. Otter Tail Power Co.*,
457 F. Supp. 1207 (D.N.D. 1978), *aff'd*, 611 F.2d 684 (8th Cir. 1979) .............24

*Barenblatt v. United States*,
360 U.S. 109 (1959) ............................................................................34

*Battle v. Barton*,
970 F.2d 779 (11th Cir. 1992) .............................................................48

*Bellis v. United States*,
  417 U.S. 85 (1974) ............................................................47

*Benning v. Georgia*,
  391 F.3d 1299 (11th Cir. 2004) .........................................39

*Bivins v. Kellogg*,
  No. 1:18-cv-148, 2020 WL 7647791 (M.D. Ga. July 22, 2020)...........................7

*Bourgoin v. Sebelius*,
  296 F.R.D. 15 (D. Me. 2013) .............................................7

*Brown v. Regions Mortg. Corp.*,
  No. 1:11-cv-3716, 2012 WL 13013583 (N.D. Ga. Dec. 3, 2012),
  *report and recommendation adopted*, No. 1:11-cv-3716, 2012 WL 13013984
  (N.D. Ga. Dec. 31, 2012).................................................21

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ...........................................................51

*C.S. v. Thomas*,
  No. 5:14-cv-01022, 2016 WL 2605531 (N.D. Ala. Apr. 8, 2016), *report and
  recommendation adopted*, 2016 WL 1746015 (N.D. Ala. May 3, 2016) ...........60

*Cal. Bankers Ass'n v. Shultz*,
  416 U.S. 21 (1974) ............................................... *passim*

*Case v. Ivey*,
  542 F. Supp. 3d 1245 (M.D. Ala. 2021).............................57

*Cassidy v. Chertoff*,
  471 F.3d 67 (2d Cir. 2006) ...............................................45

*Chicago & S. Air Lines, Inc. v. Waterman S. S. Corp.*,
  333 U.S. 103 (1948) ................................................. 26, 28

*Circuit City Stores v. Adams*,
  532 U.S. 105 (2001) .......................................................60

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ................................................................................55

*City of Dallas v. Stanglin*,
  490 U.S. 19 (1989) ..................................................................................54

*City of Los Angeles v. Patel*,
  576 U.S. 409 (2015) ................................................................................46

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................................23

*DA Mortg., Inc. v. City of Miami Beach*,
  486 F.3d 1254 (11th Cir. 2007)...............................................................28

*Danos v. Jones*,
  652 F.3d 577 (5th Cir. 2011) ..................................................................24

*Diversified Numismatics, Inc. v. City of Orlando*,
  949 F.2d 382 (11th Cir. 1991) ................................................................57

*Doe v. Trump*,
  No. 8:20-cv-00858, 2020 WL 5492994 (C.D. Cal. Sept. 2, 2020) ......................50

*Edmondson v. Velvet Lifestyles, LLC*,
  No. 15-cv-24442, 2016 WL 7048363 (S.D. Fla. Dec. 5, 2016)...........................54

*Eknes-Tucker v. Marshall*,
  603 F. Supp. 3d 1131 (M.D. Ala. 2022)..................................................58

*Elec. Bond & Share Co. v. SEC*,
  303 U.S. 419 (1938) ......................................................................... 27, 37

*Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*,
  141 F.3d 71 (3d Cir. 1998) ......................................................................23

*Freedom Watch, Inc. v. McAleenan*,
  442 F. Supp. 3d 180 (D.D.C. 2020) ........................................................24

*Full Value Advisors, LLC v. SEC*,
  633 F.3d 1101 (D.C. Cir. 2011)...............................................................51

*Ga. Advoc. Off., Inc. v. Shelp*,
  No. 1:09-cv-2880, 2011 WL 13269436 n.3 (N.D. Ga. Mar. 9, 2011) ..................7

*Ga. Republican Party v. SEC*,
  888 F.3d 1198 (11th Cir. 2018) ............................................................... 19, 24, 57

*Gardner v. Mutz*,
  962 F.3d 1329 (11th Cir. 2020) ..........................................................................55

*Goldberg v. Truck Drivers Loc. Union No. 299*,
  293 F.2d 807 (6th Cir. 1961) ..............................................................................32

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ........................................................................ 28, 29, 31, 32

*Greater Atlanta Home Builders Ass'n, Inc. v. City of Atlanta*,
  149 F. App'x 846 (11th Cir. 2005)......................................................................19

*Griffin v. Wisconsin*,
  483 U.S. 868 (1987) ............................................................................................45

*Groome Res. Ltd., LLC v. Par. of Jefferson*,
  234 F.3d 192 (5th Cir. 2000) ..............................................................................31

*Haig v. Agee*,
  453 U.S. 280 (1981) ............................................................................................44

*Harris v. Mexican Specialty Foods, Inc.*,
  564 F.3d 1301 (11th Cir. 2009)..........................................................................58

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................................................22

*Hernandez v. Mesa*,
  140 S. Ct. 735 (2020).........................................................................................26

*Hightower by Dahler v. Olmstead*,
  959 F. Supp. 1549 (N.D. Ga. 1996), *aff'd*, 166 F.3d 351 (11th Cir. 1998) .........60

*Hodel v. Indiana*,
  452 U.S. 314 (1981) ............................................................................................30

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ................................................................. 28, 44, 59

*Jacobson v. Fla. Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020) ................................................... 18, 22

*Japan Line, Ltd. v. Cnty. of Los Angeles*,
   441 U.S. 434 (1979) .........................................................................35

*John Doe No. 1 v. Reed*,
   561 U.S. 186 (2010) .........................................................................56

*Jones v. Buckner*,
   963 F. Supp. 2d 1267 (N.D. Ala. 2013) .............................................42

*Jones v. King*,
   No. 1:06-cv-40, 2007 WL 1202720 (M.D. Ga. Apr. 23, 2007) ............7

*Jones v. Mnuchin*,
   529 F. Supp. 3d 1370 (S.D. Ga. 2021) ..............................................60

*Kahn v. United States*,
   753 F.2d 1208 (3d Cir. 1985) ...........................................................56

*Kamau v. Slate*,
   No. 4:21-cv-279, 2022 WL 511211 (N.D. Fla. Jan. 31, 2022) ...........16

*Kaspersky Lab, Inc. v. DHS*,
   311 F. Supp. 3d 187 (D.D.C. 2018), *aff'd*, 909 F.3d 446 (D.C. Cir. 2018) .........20

*Katz v. United States*,
   389 U.S. 347 (1967) .........................................................................41

*Keepers, Inc. v. City of Milford, Conn.*,
   944 F. Supp. 2d 129 (D. Conn. 2013), *aff'd in relevant part*,
   807 F.3d 24 (2d Cir. 2015). ..............................................................58

*Kennedy v. Mendoza-Martinez*,
   372 U.S. 144 (1963) .........................................................................26

*Klayman v. Obama*,
   805 F.3d 1148 (D.C. Cir. 2015)..........................................................45

*Knight v. Miami-Dade Cnty.*,
   856 F.3d 795 (11th Cir. 2017)............................................................48

*Knowledge Ecology Int'l v. NIH*,
   No. 18-cv-1130, 2019 WL 1585285 (D. Md. Apr. 11, 2019)..............22

*Lady J. Lingerie, Inc. v. City of Jacksonville*,
   176 F.3d 1358 (11th Cir. 1999)................................................... 49, 56

*Laird v. Tatum*,
   408 U.S. 1 (1972)...............................................................................55

*Lower E. Side People's Fed. Credit Union v. Trump*,
   289 F. Supp. 3d 568 (S.D.N.Y. 2018)................................................19

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)...........................................................................17

*MA LEG Partners 1 v. City of Dallas*,
   442 F. Supp. 3d 958 (N.D. Tex. 2020)........................... 41, 42, 50, 51

*Maryland v. King*,
   569 U.S. 435 (2013)...........................................................................45

*McCann v. Texas*,
   No. 3:16-cv-335, 2017 WL 2799867 (S.D. Tex. June 27, 2017).......50

*McClendon v. Long*,
   22 F.4th 1330 (11th Cir. 2022)...........................................................49

*Mid-Fla Coin Exch., Inc. v. Griffin*,
   529 F. Supp. 1006 (M.D. Fla. 1981)..................................................46

*Minor I Doe ex rel. Parent I Doe v. Sch. Bd. for Santa Rosa Cnty.*,
   264 F.R.D. 670 (N.D. Fla. 2010)........................................................49

*Morales v. Daley*,
   116 F. Supp. 2d 801 (S.D. Tex. 2000)......................................... 50, 51

*Movimiento Democracia, Inc. v. Johnson*,
    193 F. Supp. 3d 1353 (S.D. Fla. 2016)...............................................................22

*Murdock v. Birmingham Jefferson Cnty. Transit Auth.*,
    No. 2:18-cv-00808, 2020 WL 3470172 (N.D. Ala. June 25, 2020).....................16

*N. Am. Co. v. SEC*,
    327 U.S. 686 (1946) ................................................................................. 30, 32

*NAACP v. Alabama*,
    357 U.S. 449 (1958) ........................................................................................24

*Nat'l All. for Mentally Ill, St. Johns Inc. v. Bd. of Cnty. Comm'rs of St. Johns
    Cnty.*,
    376 F.3d 1292 (11th Cir. 2004) .......................................................................17

*Nat'l Fed'n of Ind. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................. 25, 34

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018)....................................................................................50

*Parker v. Levy*,
    417 U.S. 733 (1974) ........................................................................................57

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.*,
    619 F. Supp. 2d 1260 (M.D. Fla. 2009), *aff'd*, 451 F. App'x 862 (11th Cir.
    2012)...............................................................................................................38

*Planned Parenthood of Sw. & Cent. Fla. v. Philip*,
    194 F. Supp. 3d 1213 (N.D. Fla. 2016) ...........................................................46

*Powers v. CSX Transp., Inc.*,
    105 F. Supp. 2d 1295 (S.D. Ala. 2000) ...........................................................39

*Powers v. Ohio*,
    499 U.S. 400 (1991) ........................................................................................18

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................................................38

*Reno v. Condon*,
  528 U.S. 141 (2000) ...................................................................38

*Richardson v. Comm'r*,
  509 F.3d 736 (6th Cir. 2007) ......................................................36

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ............................................................. 49, 51

*Rivell v. Priv. Health Care Sys., Inc.*,
  887 F. Supp. 2d 1277 (S.D. Ga. 2012) ........................................40

*Rivers v. Campbell*,
  791 F.2d 837 (11th Cir. 1986) ................................................ 54, 55

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ...................................................................54

*S. Dakota v. Dole*,
  483 U.S. 203 (1987) ...................................................................39

*S.C. v. Huntsville City Sch.*,
  441 F. Supp. 3d 1228 (N.D. Ala. 2020) .....................................16

*Samuels v. Fed. Hous. Fin. Agency*,
  54 F. Supp. 3d 1328 (S.D. Fla. 2014) ........................................18

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .....................................................................18

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ...................................................................23

*Skinner v. Ry. Lab. Execs.' Ass'n*,
  489 U.S. 602 (1989) ...................................................................45

*Smith v. Maryland*,
  442 U.S. 735 (1979) ...................................................................41

*Stardust, 3007 LLC v. City of Brookhaven*,
  899 F.3d 1164 (11th Cir. 2018) ............................................................57

*Steel MMA, LLC v. Newsom*,
  No. 21-cv-49, 2021 WL 778654 (S.D. Cal. Mar. 1, 2021) ....................56

*Strategic Def. Int'l, Inc. v. United States*,
  745 F. Supp. 2d 1214 (M.D. Fla. 2010) ...............................................47

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..............................................................................17

*Swann v. Sec'y, Ga.*,
  668 F.3d 1285 (11th Cir. 2012) ............................................................20

*Tee & Bee, Inc. v. City of W. Allis*,
  936 F. Supp. 1479 (E.D. Wis. 1996) .....................................................56

*Town of Chester v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) ..............................................................................40

*Tsao v. Captiva MVP Rest. Partners, LLC*,
  986 F.3d 1332 (11th Cir. 2021) ............................................................21

*Turner Broad. Sys., Inc. v. FCC*,
  520 U.S. 180 (1997) ..............................................................................28

*U.S. Dep't of Labor v. Triplett*,
  494 U.S. 715 (1990) ..............................................................................18

*Ullmann v. United States*,
  350 U.S. 422 (1956) ..............................................................................26

*United States v. Ahmed*,
  94 F. Supp. 3d 394 (E.D.N.Y. 2015) ............................................. 26, 36

*United States v. Ballinger*,
  395 F.3d 1218 (11th Cir. 2005) ............................................................33

*United States v. Barry*,
   No. 2:08-cr-56, 2009 WL 139874 (M.D. Fla. Jan. 20, 2009), *aff'd*,
   371 F. App'x 3 (11th Cir. 2010)............................................................36

*United States v. Baston*,
   818 F.3d 651 (11th Cir. 2016) ............................................................36

*United States v. Belcher*,
   927 F.2d 1182 (11th Cir. 1991) ..........................................................42

*United States v. Benson*,
   561 F.3d 718 (7th Cir. 2009) ..............................................................55

*United States v. Boruff*,
   870 F.2d 316 (5th Cir. 1989) ..............................................................48

*United States v. Bramble*,
   103 F.3d 1475 (9th Cir. 1996) ............................................................25

*United States v. Camarena*,
   973 F.2d 427 (5th Cir. 1992) ..............................................................48

*United States v. Centennial Builders, Inc.*,
   747 F.2d 678 (11th Cir. 1984) ...................................................... 41, 47

*United States v. Comstock*,
   560 U.S. 126 (2010) ..........................................................................26

*United States v. Davila-Mendoza*,
   972 F.3d 1264 (11th Cir. 2020)..................................................... 25, 35

*United States v. DeCay*,
   620 F.3d 534 (5th Cir. 2010) ..............................................................37

*United States v. Goodwin*,
   141 F.3d 394 (2d Cir. 1997) ...............................................................31

*United States v. Gundy*,
   842 F.3d 1156 (11th Cir. 2016).............................................................60

*United States v. Hall*,
    47 F.3d 1091 (11th Cir. 1995) ................................................................42

*United States v. Maxwell*,
    446 F.3d 1210 (11th Cir. 2006) ...................................................... 30, 32

*United States v. Mazurie*,
    419 U.S. 544 (1975) ................................................................................57

*United States v. Mickens*,
    926 F.2d 1323 (2d Cir. 1991) ........................................................ 47, 48

*United States v. Miller*,
    425 U.S. 435 (1976) ................................................................................42

*United States v. Orito*,
    413 U.S. 139 (1973) ................................................................................33

*United States v. Parton*,
    749 F.3d 1329 (11th Cir. 2014) ..............................................................34

*United States v. Rivera*,
    613 F.3d 1046 (11th Cir. 2010) ..............................................................16

*United States v. Salerno*,
    481 U.S. 739 (1987) ................................................................................28

*United States v. Sanchez Vazquez*,
    585 F. Supp. 990 (N.D. Ga. 1984)..........................................................48

*United States v. Segura-Baltazar*,
    448 F.3d 1281 (11th Cir. 2006) ...................................................... 40, 41

*United States v. Sindel*,
    53 F.3d 874 (8th Cir. 1995) ....................................................................50

*United States v. Stevens*,
    559 U.S. 460 (2010) ................................................................................60

*United States v. Stover*,
    650 F.3d 1099 (8th Cir. 2011) ................................................................56

*United States v. Williams*,
  553 U.S. 285 (2008) ...................................................................... 58, 59

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982) ...................................................................... 58, 59

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ............................................................................50

*Wacko's Too, Inc. v. City of Jacksonville*,
  522 F. Supp. 3d 1132 (M.D. Fla. Mar. 1, 2021)...................................58

*Ward v. Thompson*,
  No. 22-16473, 2022 WL 14955000 (9th Cir. Oct. 22, 2022)...............55

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ...........................................................................54

*Watts v. City of Miami*,
  No. 15-cv-21271, 2016 WL 8939143 (S.D. Fla. Feb. 22, 2016) .........42

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ...........................................................................17

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ...........................................................................51

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ...........................................................................26

## Constitutional Provisions

U.S. Const. art. I § 8.................................................................. 26, 28, 36

U.S. Const. art. XVI.................................................................................36

## Statutes

12 U.S.C. § 1951 *et seq.*..........................................................................8

28 U.S.C. § 1391 ...............................................................................21

31 U.S.C. § 5331 ...............................................................................51

31 U.S.C. § 5336 ...................................................................... *passim*

Bank Secrecy Act ("BSA"),
   Pub. L. 91-508 § 121, 84 Stat. 1114 (Oct. 26, 1970), *codified at* 12 U.S.C. §
   1951 *et seq* ..................................................................................8

William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year
   2021 ("NDAA"),
   Pub. L. 116-283 § 6402, 134 Stat. 3388 (Jan. 1, 2021)............................... *passim*

## Rules

Fed. R. Civ. P. 56(a)..........................................................................17

Federal Rule of Civil Procedure 12 ............................................. 16, 21

## Regulations

31 C.F.R. § 1010.380 .................................................................. *passim*

86 Fed. Reg. 17,557 (Apr. 5, 2021) ......................................................13

86 Fed. Reg. 69,920 (Dec. 8, 2021) ................................................. 13, 33

87 Fed. Reg. 59,498 (Sept. 30, 2022) ............................................ *passim*

87 Fed. Reg. 77,404 (Dec. 16, 2022) ...................................................21

## Other Authorities

110th Cong. Rec. S2956 (Apr. 14, 2008) ...............................................8

166 Cong. Rec. H6919-03, 2020 WL 7248542 (Dec. 8, 2020) ...................... *passim*

166 Cong. Rec. S7289 (Dec. 9, 2020) ............................................. *passim*

Actions Overview H.R. 6395, https://perma.cc/CH4M-7DNV..............................13

*Beneficial Ownership: Fighting Illicit International Financial Networks Through Transparency: Hearing before the Senate Judiciary Comm.*, 115th Cong. (2018) .............................................................................35

Dep't of State, Application for a U.S. Passport, https://perma.cc/8BFM-XJKS.....20

H.R. Rep. No. 116-227 ..................................................................... *passim*

IRS, Form 1040, https://perma.cc/YR59-EBXP.......................................20

Presidential Veto Message to the House of Representatives for H.R. 6395, https://perma.cc/S7K3-XUXA ............................................................13

# INTRODUCTION

For decades, Congress has legislated to curb money laundering and terrorist financing. And, as illicit actors find new ways to circumvent those laws and evade detection, Congress has responded to ensure that the government possesses the information and authorities to counteract such evolving threats. Most recently, these threats come from the exploitation of legal entities such as corporations and limited liability companies to facilitate illicit activity that imperils the national security and foreign policy of the United States. Criminals, both domestic and international, can easily create these entities under State laws and may generally do so without disclosing their involvement. As a result, the United States has become a popular jurisdiction for such criminals to create legal entities that facilitate and further fraud, human smuggling, corruption, drug trafficking, and terrorist financing.

Seeking to disincentivize these bad actors from exploiting the U.S. financial system, Congress passed the Anti-Money Laundering Act of 2020 ("AMLA"), which includes the Corporate Transparency Act ("CTA"). This legislation requires certain companies to report information concerning their beneficial owners and those filing corporate registration forms to the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury. Congress assessed that this information—including a beneficial owner's name, address, date of birth, and a unique identifier such as a driver's license number—will prove highly useful to law enforcement and the intelligence community's efforts to counter the threat

posed by terrorists, proliferators, and others undermining U.S. interests.

Plaintiffs, an Ohio-based advocacy group and an individual business owner residing in Huntsville, Alabama, challenge the CTA's constitutionality.  Plaintiffs assert the CTA exceeds Congress's authority under the Commerce Clause and violates the rights protected by the First, Fourth, Fifth, Ninth, and Tenth Amendments to the Constitution.  Plaintiffs, however, have failed to address, let alone demonstrate as required under the summary judgment standard, their standing to assert these claims.  Their claims also fail on the merits, particularly as the CTA does not alter or amend any State incorporation law, and requires the disclosure of only limited information about ownership or control that, in the informed judgment of the political branches, will advance the nation's compelling interests.

For these reasons, discussed in greater detail below, the Court should deny Plaintiffs' motion for summary judgment and dismiss their Complaint or, in the alternative, grant summary judgment to Defendants.

## STATEMENT OF FACTS

### I.     Defendants' Statement of Facts

1.  Each year, individuals create more than two million corporations and limited liability companies pursuant to applicable State law.  William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), Pub. L. 116-283 § 6402(1), 134 Stat. 3388, 4604 (Jan. 1, 2021).

2.  These and similar entities can be created by disclosing, at most, minimal

information about their ownership or control. *Id.* § 6402(2), 134 Stat. at 4604; H.R. Rep. No. 116-227, at 10 (2019); Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498, 59,500 (Sept. 30, 2022).

3.   "This lack of transparency is considered by law enforcement, financial institutions, and anticorruption organizations to be a primary obstacle to tackling financial crime in the modern era."  H.R. Rep. No. 116-227, at 10; 87 Fed. Reg. at 59,500, 59,505.

4.   As Congress has explained, "malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate . . . money laundering, the financing of terrorism, proliferation financing, serious tax fraud, human and drug trafficking, counterfeiting, piracy, securities fraud, financial fraud, and acts of foreign corruption, harming the national security interests of the United States and allies of the United States."  Pub. L. 116-283 § 6402(3), 134 Stat. at 4604; *see also* 166 Cong. Rec. H6919-03, H6928, 2020 WL 7248542 (Dec. 8, 2020) (statement of Rep. Maloney); 87 Fed. Reg. at 59,503; Ex. A, Att. 5, 34, 49.

5.   Additionally, "money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection, and may layer such structures, much like Russian nesting 'Matryoshka' dolls, across various secretive jurisdictions such that each time an investigator obtains ownership records for a domestic or foreign entity, the newly

identified entity is yet another corporate entity, necessitating a repeat of the same process[.]" Pub. L. 116-283 § 6402(4), 134 Stat. at 4604.

6.  "For more than two decades, the U.S. Government has documented the use of legal entities by criminal actors to purchase real estate, conduct wire transfers, burnish the appearance of legitimacy when dealing with counterparties (including financial institutions), and control legitimate businesses for ultimately illicit ends[.]" 87 Fed. Reg. at 59,498; Ex. A, Att. 6.

7.   In 2006, the U.S. Government Accountability Office ("GAO") reported that "[l]aw enforcement officials [were] concerned about the use of shell companies in the United States that enable individuals to conceal their identities and conduct criminal activity . . . because they cannot determine the owners of the companies." Ex. A, Att. 20 at 5; *see also id.*, Att. 77 at 2.

8.  That activity involved the movement of billions of dollars.  Ex. A, Att. 20 at 5; *id.*, Att. 77 at 2.

9.   Foreign individuals and entities often use U.S. shell companies to facilitate illicit activity.  87 Fed. Reg. at 59,502-04; *see also* 166 Cong. Rec. S7289, S7310 (Dec. 9, 2020) (statement of Sen. Brown); Ex. A, Att. 8-10, 32, 35-38.

10.  For instance, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have attempted to use U.S. and non-U.S. shell companies to evade sanctions imposed on Russia."  87 Fed. Reg. at 59,498; Ex. A, Att. 8-10.

4

11.  Likewise, the government of Iran has used shell companies "to obfuscate the source of funds and hide its involvement in efforts to generate revenue."  87 Fed. Reg. at 59,502; *see id.* at 59,503-04 ("[I]n March 2021, the Department of Justice charged 10 Iranian nationals with running a nearly 20-year-old scheme to evade U.S. sanctions on the Government of Iran by disguising more than $300 million worth of transactions—including the purchase of two $25 million oil tankers—on Iran's behalf through front companies in California" and multiple countries abroad.); Ex. A, Att. 32 at 20, 47; Ex. A, Att. 38.

12.  U.S. persons have similarly exploited corporate entities to engage in a wide range of illicit activity.  87 Fed. Reg. at 59,505; Ex. A, Att. 11-12, 22, 39.

13.  For example, using shell companies to hide their identities, a "complex national criminal network . . . distributed oxycodone by flying young girls and other couriers carrying pills all over the United States."  87 Fed. Reg. at 59,505; Ex. A, Att. 39.

14.  A Florida man used synthetic identities and shell companies to steal $24 million in COVID-19 relief money.  87 Fed. Reg. at 59,499; Ex. A, Att. 11.

15.  "[S]hell and front companies in the United States were used to disguise the proceeds of Medicare and Medicaid fraud, trade-based money laundering, and drug trafficking."  87 Fed. Reg. at 59,502; Ex. A, Att. 22 at 28-30; *see* 166 Cong. at S7309 (statement of Sen. Brown).

16.  The United States is a founding member of the Financial Action Task

Force ("FATF"), which serves as "the international standard-setting body for anti-money laundering/combatting the financing of terrorism[.]" H.R. Rep. No. 116-227, at 11; 87 Fed. Reg. at 59,500 n.17; Ex. A, Att. 16-17.

17.   Based on a 2006 peer review, FATF raised concerns about the adequacy and accuracy of beneficial ownership information of entities formed under State laws.  Ex. A, Att. 83 at 229-37.

18.   Ten years later, another FATF review found that "'lack of timely access to adequate, accurate and current beneficial ownership (BO) information remains one of the fundamental gaps in the U.S. context.'"  H.R. Rep. No. 116-227, at 11 (quoting Ex. A, Att. 26 at 4); *see* 87 Fed. Reg. at 59,501.

19.   In the view of the political branches, collecting beneficial ownership and applicant information is necessary to confront the threats posed by malign actors who seek to conceal their illicit activity through corporate structures.  Pub. L. 116-283 § 6402, 134 Stat. at 4604; H.R. Rep. No. 116-227, at 10-12; 87 Fed. Reg. at 59,500-07, 59,547, 59,579; Ex. A, Att. 22, 25, 28-37, 39-43, 46, 49, 75.

20.   The political branches determined that the lack of beneficial ownership information jeopardized the country's foreign policy interests.  Pub. L. 116-283 § 6402(5)(E), 134 Stat. at 4604; *see also* 166 Cong. Reg. at S7310 (statement of Sen. Brown); 87 Fed. Reg. at 59,506; Ex. A, Att. 26, 78.

21.   Plaintiff Winkles has previously disclosed that he is the beneficial owner of Alabama Property Management, Inc.  Ex. A, Att. 85-86.

## II.  Defendants' Response to Plaintiffs' Statement of Facts

1-2.  Plaintiffs have not supported their assertions in these paragraphs with any evidentiary citations or Congressional findings, and instead improperly rely on the allegations in their Complaint. *See Bivins v. Kellogg*, No. 1:18-cv-148, 2020 WL 7647791, at *2 (M.D. Ga. July 22, 2020).

3-7, 9, 11-16, 19-26.  These paragraphs consist of statements of law or conclusions of law, not statements of fact, and thus "do not warrant the court's consideration[.]"  *Ga. Advoc. Off., Inc. v. Shelp*, No. 1:09-cv-2880, 2011 WL 13269436, at *10 n.3 (N.D. Ga. Mar. 9, 2011); *see Jones v. King*, No. 1:06-cv-40, 2007 WL 1202720, at *1 n.1 (M.D. Ga. Apr. 23, 2007).  Insofar as the Court considers these statements, it should deny them "to the extent [they are] inconsistent with the . . . statute" or regulation. *Bourgoin v. Sebelius*, 296 F.R.D. 15, 21-22 (D. Me. 2013).

8.  Admitted that FinCEN issued a final rule on September 29, 2022; otherwise, this paragraph consists of statements of law or conclusions of law.

10.  Admitted.

17.  The first sentence is admitted; otherwise, this paragraph consists of statements of law or conclusions of law.

18.  The first sentence is denied on the grounds that it misstates the effective date and does not account for the CTA.  Pub. L. 116-283 § 6001, 134 Stat. at 4547-48, 4604-05; 166 Cong. Rec. at H6928 (statements of Rep. Maloney and Rep.

7

Luetkemeyer); 87 Fed. Reg. at 59,502, 59,504-05, 59,509, 59,558-59.  Otherwise, this paragraph consists of statements of law or conclusions of law.

## BACKGROUND

### I.   Congress's Enactment of the CTA

For decades, Congress has enacted legislation to curb money laundering and terrorist financing.  *See, e.g.*, Bank Secrecy Act ("BSA"), Pub. L. 91-508 § 121, 84 Stat. 1114 (Oct. 26, 1970), *codified at* 12 U.S.C. § 1951 *et seq.*  As illicit actors attempt to circumvent these laws and evade detection, Congress has responded to ensure that the government is able to counteract such evolving threats.  166 Cong. Rec. at H6928 (statement of Rep. McHenry).  The misuse of shell and front companies by anonymous individuals is no exception; Congress has considered measures requiring corporations to disclose beneficial ownership information since at least 2008.  110th Cong. Rec. S2956 (Apr. 14, 2008).  The Executive Branch has supported those efforts.  87 Fed. Reg. at 59,502.

Congress passed the AMLA and the CTA as part of the NDAA of 2021.  Pub. L. 116-283 §§ 6001, 6401, 134 Stat. at 4547-48, 4604-05.  Congress explained that "Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed," among other purposes, to "protect vital Unite[d] States national security interests[,]" "protect interstate and foreign commerce[,]" and "better enable critical national security, intelligence, and law enforcement efforts to

counter money laundering, the financing of terrorism, and other illicit activity[.]"
*Id.* § 6402(5)(B)-(D), 134 Stat. at 4604.

Moreover, both political branches understood that the lack of beneficial
ownership information jeopardized the country's foreign policy interests.  The
United States' efforts to counter money laundering and terrorist financing should be
"a model of effectiveness and innovation[.]"  87 Fed. Reg. at 59,503; *see id.* at
59,506.  Yet, because it did not collect beneficial ownership information, the United
States fell out of "compliance with international anti-money laundering and
countering the financing of terrorism standards[.]"  Pub. L. 116-283 § 6402(5)(E),
134 Stat. at 4604; *see also* 166 Cong. Reg. at S7310 (statement of Sen. Brown); 87
Fed. Reg. at 59,506; Ex. A, Att. 26, 78.

Under the CTA, each "reporting company" must disclose to FinCEN
information about beneficial owners and applicants.  31 U.S.C. § 5336(b).  A
"reporting company" is "a corporation, limited liability company, or other similar
entity that is . . . (i) created by the filing of a document with a secretary of state or a
similar office under the law of a State or Indian Tribe; or (ii) formed under the law
of a foreign country and registered to do business in the United States by the filing
of a document with a secretary of state or a similar office under the laws of a State
or Indian Tribe[.]" *Id.* § 5336(a)(11)(A).  A "reporting company" does not, however,
include a variety of entities, including those with an operating presence in the United
States that have more than 20 full-time employees and more than $5 million in yearly

9

gross receipts or sales.  *Id.* § 5336(a)(11)(B).  The Executive Branch may also exempt "any entity or class of entities . . . by regulation[.]"  *Id.* § 5336(a)(11)(B)(xxiv); 87 Fed. Reg. at 59,508, 59,540.

Congress has additionally defined "beneficial owner" as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise . . . (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity[.]" 31 U.S.C. § 5336(a)(3)(A); *but see id.* § 5336(a)(3)(B) (providing exemptions from definition).  An "applicant" is the individual who files the requisite documents to register the corporate entity, either by directly filing the documents or being primarily responsible for directing or controlling such filing.  *Id.* § 5336(a)(2); 31 C.F.R. § 1010.380(e).  To comply with its statutory obligations, a reporting company must report only the beneficial owner's and applicant's legal name, date of birth, residential or business address, and "unique identifying number from an acceptable identification document[.]"  31 U.S.C. § 5336(b)(2)(A); *see id.* § 5336(a)(1) (defining "[a]cceptable identification document" to include a passport or State-issued driver's license).  Reporting companies formed prior to January 1, 2024, are not required to provide beneficial ownership information to FinCEN until January 1, 2025, and are not required to report applicant information.  *Id.* § 5336(b)(1)(B); 31 C.F.R. §§ 1010.380(a)(1)(iii), 1010.380(b)(2)(iv).  Those formed on or after January 1, 2024, must provide such information to FinCEN within 30 days of notice

of the entity's creation.  31 U.S.C. § 5336(b)(1)(C); 31 C.F.R. § 1010.380(a)(1)(i).
Reporting companies must also disclose changes to beneficial ownership or
applicant information within 30 days.   31 U.S.C. § 5336(b)(1)(D); 31 C.F.R.
§ 1010.380(a)(2).[1]   Willful reporting violations may lead to criminal or civil
penalties.  31 U.S.C. § 5336(h); 87 Fed. Reg. at 59,545-47.

    In imposing these reporting requirements, Congress was acutely aware of—
and took steps to minimize—the potential burden associated with compliance.  31
U.S.C. § 5336(b)(1)(E)(ii); *id.* § 5336(b)(1)(F)(iii); *id.* § 5336(b)(4)(B)(i); *see also*
166 Cong. Rec. at H6928 (statement of Rep. Luetkemeyer); *id.* at H6932 (statement
of Rep. McHenry); 166 Cong. Rec. at S7312 (statement of Sen. Brown).  Congress
likewise ensured that FinCEN would appropriately maintain the reported
information.  31 U.S.C. § 5336(c)(3), (8); 166 Cong. Rec. at H6933 (statement of
Rep. McHenry).  Such information is generally deemed "confidential and may not
be disclosed" except as authorized by the CTA.  31 U.S.C. § 5336(c)(2)(A).  For
instance, FinCEN may disclose beneficial ownership information after receiving a
request "from a Federal agency engaged in national security, intelligence, or law
enforcement activity, for use in furtherance of such activity[,]" or to "a State, local,
or Tribal law enforcement agency, if a court of competent jurisdiction . . . has

---

[1] Although Congress observed that legislation concerning the collection of beneficial ownership
information is needed to "set a clear, Federal standard for incorporation practices[,]" Pub. L. 116-
283 § 6402(5)(C), 134 Stat. at 4604, the CTA does not in fact establish such a standard nor require
any State to amend its requirements for incorporation, *see generally* 31 U.S.C. § 5336.

authorized the law enforcement agency to seek the information in a criminal or civil investigation[.]"  *Id.* § 5336(c)(2)(B)(i).  In more limited circumstances, FinCEN may also disclose beneficial ownership information to "a Federal agency on behalf of a law enforcement agency, prosecutor, or judge of another country," or to "a Federal functional regulator or other appropriate regulatory agency[.]"  *Id.* § 5336(c)(2)(B)(ii), (iv), (C).  FinCEN may nonetheless reject requests, including for "good cause[,]" *id.* § 5336(c)(6), and may suspend requesters from accessing the information as appropriate, *id.* § 5336(c)(7).

Both before and after passage of the CTA, Congress collectively, as well as a bipartisan set of legislators, advocated a requirement to report beneficial ownership information, particularly to protect and advance the law enforcement, national security, and foreign policy interests of the United States.  *E.g.*, Pub. L. 116-283 § 6001, 134 Stat. at 4547-48, 4604-05 (CTA was necessary "to modernize anti-money laundering and countering the financing of terrorism laws to adapt the government and private sector response to new and emerging threats[.]"); 166 Cong. Rec. at H6928 (statements of Rep. Maloney and Rep. Luetkemeyer); 166 Cong. at S7311 (statement of Sen. Brown); Ex. A, Att. 60 ("[I]ts passage represents perhaps the most important anti-money laundering reform in two decades.").  The Executive Branch agrees this legislation is "critical."  87 Fed. Reg. at 59,501, 59,505; *see id.* at 59,500-07, 59,547, 59,579; *see also, e.g.*, Ex. A, Att. 35 at 11, 20-21, 25 (collection of beneficial ownership information will advance the national security interest in

curbing corruption).[2]  Additionally, a "wide range of stakeholders," including "law enforcement associations," "the National District Attorneys Association," "national security experts," "financial service industry representatives," "real estate associations," and "human rights groups" support these provisions.  H.R. Rep. No. 116-227, at 11-12; *see* Ex. A, Att. 53-55, 63-71, 79-81.  Organizations representing the interests of small businesses have likewise noted the benefits of the CTA.  Ex. A, Att. 73 at 1 ("[S]mall business owners support the types of disclosure measures required by the Corporate Transparency Act, meant to give law enforcement better tools for investigations: not only to combat corrupt and criminal behavior, but also to protect legitimate businesses against the adverse impacts of anonymous structures."); Ex. A, Att. 82 at 4; *accord* 87 Fed. Reg. at 59,501.

## II.    FinCEN's Rulemaking

In accordance with the CTA, 31 U.S.C. § 5336(b)(1), FinCEN published an advance notice of proposed rulemaking and a notice of proposed rulemaking concerning the reporting of beneficial ownership information.  86 Fed. Reg. 17,557 (Apr. 5, 2021); 86 Fed. Reg. 69,920 (Dec. 8, 2021).  In response, FinCEN received hundreds of comments "from a broad array of individuals and organizations[.]"  87 Fed. Reg. at 59,509.  After "carefully review[ing] and consider[ing] each comment

---

[2] President Trump vetoed the NDAA on December 23, 2020.  Presidential Veto Message to the House of Representatives for H.R. 6395, https://perma.cc/S7K3-XUXA.  His objections did not pertain to the AMLA or CTA.  *See id.*  Congress later overrode the veto with overwhelming bipartisan support.  *See* Actions Overview H.R. 6395, https://perma.cc/CH4M-7DNV.

submitted"—"many" of which "expressed support for the CTA and the proposed regulations"—FinCEN issued its final rule in September 2022.  *Id.*

In relevant part, the final rule does not require that reporting companies disclose beneficial ownership information beyond what the CTA mandated.  *See id.* at 59,517-21.  FinCEN discussed the terms "beneficial owner," "substantial control," "ownership interests[,]" "company applicant," "domestic reporting company," and "foreign reporting company."  *Id.* at 59,525-33, 59,536-39; *see id.* at 59,561-62 (considering alternative definitions).  In the agency's assessment, "applying the beneficial owner rules will be a straightforward exercise for many reporting companies," as many "will have relatively small numbers of (or no) employees or simple management and ownership structures."  *Id.* at 59,529.  FinCEN additionally noted that it would continue to engage stakeholders "to ensure a clear understanding of the rule's requirements and timeframes[.]"  *Id.* at 59,509; *see id.* at 59,536-38, 59,546-48, 59,584.

### III.   Procedural History

On November 11, 2022, Plaintiffs National Small Business United, doing business as the National Small Business Association ("NSBA"), and Isaac Winkles, a resident of Huntsville, Alabama, sued to challenge the CTA's reporting requirements.  *See generally* Compl., ECF No. 1.  Plaintiffs allege that NSBA is "an Ohio nonprofit mutual benefit corporation" that represents and provides information to its members, who operate small businesses.  *Id.* ¶¶ 11, 13.  According to Plaintiffs,

14

"NSBA's members include numerous reporting companies owned or operated by U.S. persons who object" to the CTA's reporting requirements. *Id.* ¶ 12. Plaintiffs also assert that Mr. Winkles and his wife are sole shareholders of Alabama Property Management, Inc., which "owns and operates a business managing real estate properties in northern Alabama." *Id.* ¶ 14. Mr. Winkles objects to the CTA's mandate that he disclose his "sensitive personal information to FinCEN." *Id.* Defendants are Janet Yellen, in her official capacity as Secretary of the Treasury; the Department of the Treasury; and Himamauli Das, in his official capacity as Acting Director of FinCEN. *Id.* ¶¶ 15-17.

In their Complaint, Plaintiffs assert four causes of action. First, they claim that Congress has exceeded its constitutional powers by encroaching on States' authority to regulate corporate formation, in contravention of the Ninth Amendment, Tenth Amendment, and principles of federalism. *Id.* ¶¶ 41-50. Second, Plaintiffs allege that the requirement to disclose beneficial ownership information "deprives Plaintiffs and the members of the NSBA of their privacy rights" and thus violates the Fourth, Fifth, and Ninth Amendments. *Id.* ¶ 55. Third, Plaintiffs contend that the CTA "burden[s] the right to speech and private association" under the First Amendment. *Id.* ¶ 62. Finally, Plaintiffs assert that the CTA and FinCEN's final rule are unconstitutionally vague, and thus violate the Fifth Amendment's Due Process Clause. *Id.* ¶¶ 63-66. On February 15, 2023, Plaintiffs moved for summary judgment. ECF No. 23, ECF No. 23-1 ("Pls.' MSJ").

## LEGAL STANDARDS

"Federal courts are courts of limited jurisdiction[,]" meaning they "possess only that power authorized by [the] Constitution and statute." *United States v. Rivera*, 613 F.3d 1046, 1049 (11th Cir. 2010) (citation omitted). Accordingly, "a federal court cannot consider the merits of a case unless and until it is assured of its subject-matter jurisdiction." *Kamau v. Slate*, No. 4:21-cv-279, 2022 WL 511211, at *1 (N.D. Fla. Jan. 31, 2022). A plaintiff bears the burden of establishing the court's subject-matter jurisdiction. *S.C. v. Huntsville City Sch.*, 441 F. Supp. 3d 1228, 1231 (N.D. Ala. 2020). Where a plaintiff fails to carry that burden—*e.g.*, because the plaintiff lacks standing—dismissal is appropriate pursuant to Federal Rule of Civil Procedure 12(b)(1). *Murdock v. Birmingham Jefferson Cnty. Transit Auth.*, No. 2:18-cv-00808, 2020 WL 3470172, at *1 (N.D. Ala. June 25, 2020).

To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Mere "labels and conclusions" and "naked assertion[s] devoid of further factual enhancement" are not sufficient. *Id*. Rather, a court must disregard "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and determine whether the remaining "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Id.* at 679.

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## DISCUSSION

### I.    Plaintiffs Cannot Demonstrate that the CTA Exceeds Congress's Enumerated Powers.

#### A.    Plaintiffs Lack Standing to Assert their Claim.

Plaintiffs bear the burden of establishing standing, "an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action . . . ; and it must be likely that a favorable judicial decision will prevent or redress the injury."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  The "threatened injury must be certainly impending to constitute injury in fact," for allegations of "possible future injury do not satisfy . . . Art. III."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citation omitted).

An organization asserting standing in its own right (organizational standing) must adequately allege the standing requirements that apply to individuals.  *Nat'l All. for Mentally Ill, St. Johns Inc. v. Bd. of Cnty. Comm'rs of St. Johns Cnty.*, 376

F.3d 1292, 1295 (11th Cir. 2004). "[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020). A diversion of funds does not constitute an injury when that diversion results from an organization's own budgetary choices. *Samuels v. Fed. Hous. Fin. Agency*, 54 F. Supp. 3d 1328, 1334 (S.D. Fla. 2014).

"Ordinarily, of course, a litigant must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990). The Supreme Court has recognized a limited exception to this general rule, however, where "three important criteria are satisfied: The litigant must have suffered an 'injury in fact,' . . . ; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (citations omitted).

Additionally, under the separate doctrine of associational standing, an organization seeks to establish standing "as [a] representative[] of [its] members who have been injured in fact, and thus could have brought suit in their own right." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). An organization must therefore adequately demonstrate that "(1) its members otherwise have standing to sue in their own right; (2) the interests the plaintiff-association seeks to protect are

germane to the association's purpose; and (3) neither the claim asserted nor the relief requested must require the participation of the association's members." *Greater Atlanta Home Builders Ass'n, Inc. v. City of Atlanta*, 149 F. App'x 846, 848 (11th Cir. 2005).  Further, to demonstrate that its members have standing, an organization "must 'make specific allegations establishing that at least one identified member had suffered or would suffer harm.'" *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018) (citation omitted).

Plaintiffs have failed to demonstrate any type of standing, and the Court should dismiss their Complaint for lack of subject-matter jurisdiction.  Mr. Winkles asserts (but does not make any showing) that he and his wife are the sole shareholders of NSBA member Alabama Property Management, Inc., and that he "will be subject to the [CTA's] reporting requirements[.]"  Compl. ¶ 14; Pls.' MSJ at 4.  But "the mere fact that [he] is regulated by [the CTA] does not confer standing to bring this suit. Plaintiff must instead allege a concrete and particularized injury caused by" the statute.  *Lower E. Side People's Fed. Credit Union v. Trump*, 289 F. Supp. 3d 568, 579 (S.D.N.Y. 2018).  Notably, Mr. Winkles has already disclosed the information required by the CTA (*e.g.*, name, address, and date of birth) by adhering to other regulatory requirements, such as filing tax returns, passport forms, and bank

account applications.[3]   As a result, Mr. Winkles lacks standing to challenge the CTA's reporting requirements since "an independent source would have caused him to suffer the same injury." *Swann v. Sec'y, Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012); *see also Kaspersky Lab, Inc. v. DHS*, 311 F. Supp. 3d 187, 219 (D.D.C. 2018) ("[A] plaintiff cannot demonstrate redressability when its lawsuit challenges only one of two government actions that both independently produce the same alleged harm."), *aff'd*, 909 F.3d 446 (D.C. Cir. 2018).   Nor is Mr. Winkles injured by disclosing to the government information that the government itself provided to him, such as a passport number.  And it is no secret that Mr. Winkles is a beneficial owner of Alabama Property Management, Inc., as that information is readily available on the website of the Alabama Secretary of State, Ex. A, Att. 85, and Mr. Winkles himself has already disclosed that fact, both in connection with this lawsuit, Compl. ¶ 14, and on social media, Ex. A, Att. 86. *Swann*, 668 F.3d at 1288 ("[A] controversy is not justiciable when a plaintiff independently caused his own injury.").  Thus, a favorable decision would not redress his alleged injury of forced disclosure.

Plaintiffs' other allegations are likewise insufficient to demonstrate that Mr. Winkles has standing.  Plaintiffs raise the possibility that "FinCEN may share the

---

[3] *E.g.*, IRS, Form 1040, https://perma.cc/YR59-EBXP; Dep't of State, Application for a U.S. Passport, https://perma.cc/8BFM-XJKS; Ex. A, Att. 84 (State of Alabama's certificate of incorporation, requiring street address of principal office, name of registered agent, and name and street address of incorporator(s)); *see* 87 Fed. Reg. at 59,519 ("[D]isclosures of this type already occur regularly in a variety of circumstances."); *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 47 (1974) (noting IRS reporting requirements).

reported personal data of reporting companies" as authorized by the CTA, Compl. ¶¶ 23-25, 35, but they necessarily speculate that Mr. Winkles's information (or the information of any other NSBA member) will be shared at all, let alone inappropriately or in response to "a Chinese government request for information[,]" *id*. ¶ 35.  *Cf. Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1339 (11th Cir. 2021) (rejecting argument that plaintiff had standing based on allegation that he faced substantial risk of identity theft).[4]  Nor can Plaintiffs establish that Mr. Winkles has standing based on their allegation that "business owners may have to consult lawyers . . . to determine whether" the CTA applies.  Compl. ¶ 32.  As Mr. Winkles acknowledges that he "will be subject to the Act's reporting requirements[,]" *id*. ¶ 14, any money he spends to confirm that determination is a self-inflicted economic injury that does not confer standing, *cf. Tsao*, 986 F.3d at 1338.[5]

Plaintiffs have also failed to establish that NSBA has organizational standing. Plaintiffs allege that "NSBA's mission is to represent and protect the rights of its members who operate their small businesses in compliance with lawfully enacted

---

[4] FinCEN has published a notice of proposed rulemaking concerning access to beneficial ownership information.  87 Fed. Reg. 77,404 (Dec. 16, 2022).

[5] Plaintiffs claim that "[v]enue is proper in this Court under 28 U.S.C. § 1391(e)(3) because . . . Plaintiff Winkles resides in this District as do other officers and major shareholders of companies that are members of Plaintiff NSBA[.]"  Compl. ¶ 10.  Because Mr. Winkles lacks standing, and because Plaintiffs have failed to demonstrate beyond a conclusory allegation that NSBA's unnamed members reside in this District, *see id.*, venue is improper.  *Brown v. Regions Mortg. Corp.*, No. 1:11-cv-3716, 2012 WL 13013583, at *2 (N.D. Ga. Dec. 3, 2012), *report and recommendation adopted*, No. 1:11-cv-3716, 2012 WL 13013984 (N.D. Ga. Dec. 31, 2012). Dismissal is therefore also appropriate pursuant to Rule 12(b)(3).

government regulation[,]" and "a primary mission of NSBA is to provide its members with information and advice regarding legal and regulatory issues faced by small businesses[.]" Compl. ¶¶ 11, 13.  Accordingly, "provi[ding] . . . information, education, and assistance regarding legal and regulatory compliance issues faced by small businesses[,]" *id.* ¶ 36—specifically, compliance with the CTA—does not "impair [NSBA's] ability to engage in its projects[,]" *Jacobson*, 974 F.3d at 1250, but rather is part and parcel of those projects.  In other words, the resources allegedly spent are "very much in line with [NSBA's] core mission rather than a diversion of resources away from it." *Knowledge Ecology Int'l v. NIH*, No. 18-cv-1130, 2019 WL 1585285, at *6 (D. Md. Apr. 11, 2019); *see Movimiento Democracia, Inc. v. Johnson*, 193 F. Supp. 3d 1353, 1367 (S.D. Fla. 2016).

Nor do Plaintiffs demonstrate that NSBA has been or will be injured based on a "drain on the organization's resources" in response to the CTA.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  They have not provided any details about the "substantial costs" NSBA has allegedly incurred "in assisting its members in understanding how the Act applies to them and affects their businesses[,]" Compl. ¶ 13; *see id.* ¶ 36, such that it is impossible to draw inferences about the effect of the CTA on NSBA's operations.  *See Jacobson*, 974 F.3d at 1250 (plaintiff must "explain[] what activities [it] would divert resources away *from*"); *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) ("The mere fact that an organization

22

redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").  And their assertions concerning future costs, Compl. ¶¶ 13, 36, are unsupported and too speculative to satisfy Article III.  *Cf. Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998).   This theory assumes that: (1) third parties will have questions regarding the CTA; (2) those questions cannot be answered by the final rule or FinCEN's forthcoming guidance and outreach, *see* 31 U.S.C. § 5336(c)(11)(A)(iv); 87 Fed. Reg. at 59,548, 59,584; (3) of all the sources of information (*e.g.*, federal agencies, State entities, or private attorneys), members will choose to bring their questions to NSBA; and (4) NSBA will not receive any additional funding from any source, such that resources earmarked for other projects will need to be diverted to fielding such questions.  That chain of assumptions cannot support a finding of harm.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

Plaintiffs have similarly failed to demonstrate that NSBA can assert the rights of its members under either the third-party or associational standing doctrines.  With respect to the former, and as noted above, NSBA has not suffered a cognizable injury in fact.  Additionally, Plaintiffs have failed to provide any facts suggesting that NSBA has a sufficiently "close relation" to its members; *compare Singleton v. Wulff*, 428 U.S. 106, 115 (1976) (providing examples of a sufficiently close relationship, *e.g.*, that between married persons or between a doctor and patient).  Finally,

Plaintiffs have provided no reason to doubt that NSBA's members can independently and capably assert their own rights; while beneficial owners and applicants[6] may wish to keep secret their affiliation with certain legal entities, they may still seek to vindicate their rights without "nullify[ing]" those rights "at the very moment of [their] assertion." *NAACP v. Alabama*, 357 U.S. 449, 459 (1958); *see also Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *Associated Gen. Contractors of N. Dakota v. Otter Tail Power Co.*, 457 F. Supp. 1207, 1214 (D.N.D. 1978), *aff'd*, 611 F.2d 684 (8th Cir. 1979). This case is thus unlike *Alabama*, where the Supreme Court held that the NAACP had standing to sue on behalf of its members (not owners) to prevent disclosure of those members' names and addresses. 357 U.S. at 458-59; *see also Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 539 (6th Cir. 2021); *Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 194 (D.D.C. 2020) ("*NAACP* thus does not stand for the broad proposition that an organization automatically obtains Article III standing on behalf of its members anytime that a member would prefer to avoid identification—as Plaintiff appears to assert.").

Plaintiffs fare no better with respect to associational standing. To proceed with this theory, Plaintiffs must "name at least one member who can establish an actual or imminent injury." *Ga. Republican Party*, 888 F.3d at 1204. Yet the only

---

[6] Plaintiffs lack standing to challenge the CTA's provisions concerning applicants. Mr. Winkles and NSBA's members allegedly own or operate businesses (*i.e.*, are beneficial owners); none asserts an intent to file an application to form a corporation or similar entity. Compl. ¶¶ 11-14. Further, reporting companies formed before January 1, 2024 are exempt from the requirement to identify their company applicants. 31 C.F.R. § 1010.380(a)(b)(2)(iv).

NSBA member named by Plaintiffs is Mr. Winkles, who lacks standing for the reasons described above.  The vague references to other NSBA members allegedly subject to the reporting requirements, who "may have to consult lawyers," are similarly inadequate.  *See* Compl. ¶¶ 11-14, 32, 34.  Finally, NSBA has indicated that, in its view, its members have not in fact suffered any injury traceable to the CTA.  *See* Ex. A, Att. 56 at 2 ("[N]one of this reporting requirement is actually necessary because the information is already collected.").

**B.      Plaintiffs' Claim Fails on the Merits.**

**1.      The CTA is Authorized by the Government's Foreign Affairs and National Security Powers and the Necessary and Proper Clause.**

Plaintiffs assert that the CTA's imposition of reporting requirements exceeds Congress's Article I powers.  Compl. ¶¶ 41-50.  Their facial challenge focuses on the Commerce Clause.  *Id.* ¶¶ 3(ii), 4, 6, 7(ii)-(iii), 46-48; Pls.' MSJ at 11-23.  But courts "generally presume statutes to be constitutional[,]" *United States v. Davila-Mendoza*, 972 F.3d 1264, 1269 (11th Cir. 2020), and are not limited to considering whether a single provision of the Constitution serves as the basis for a lawful exercise of Congressional authority, *see Nat'l Fed'n of Ind. Bus. v. Sebelius*, 567 U.S. 519, 562 (2012) ("*NFIB*").  And because the CTA is a proper exercise of Congress's foreign affairs and national security powers (among other powers), Plaintiffs' theory should be rejected at the outset.  *See United States v. Bramble*, 103 F.3d 1475, 1480 (9th Cir. 1996).

25

The Constitution confers the power to regulate foreign affairs upon the federal government's political branches.  *See, e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020); *Chicago & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 109 (1948).  The same is true of matters to pertaining to national security, which "is the prerogative of the Congress and President."  *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017).  Additionally, the Constitution's Necessary and Proper Clause provides that "Congress shall have Power . . . [t]o make all Laws which shall be necessary and proper for carrying into Execution the [Article I, § 8] Powers, and all other Powers vested by th[e] Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. Const. art. I, § 8.  "[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, [courts] look to see whether the statute constitutes a means that is *rationally related* to the implementation of a constitutionally enumerated power."  *United States v. Comstock*, 560 U.S. 126, 134 (2010) (emphasis added).  Consequently, "Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs[,]" *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963), as well as national security policy, *Ullmann v. United States*, 350 U.S. 422, 436 (1956); *United States v. Ahmed*, 94 F. Supp. 3d 394, 414 (E.D.N.Y. 2015).

In enacting the CTA, Congress made specific findings that, among other things, "malign actors seek to conceal their ownership of corporations, limited

liability companies, or other similar entities in the United States to facilitate illicit activity, . . . harming the national security interests of the United States and allies of the United States." Pub. L. 116-283 § 6402(3), 134 Stat. at 4604. And Congress concluded that collecting beneficial ownership information "is needed to . . . protect vital Unite[d] States national security interests"; "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity"; and "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards[,]" *id.* § 6402(5), 134 Stat. at 4604, specifically those set by FATF, H.R. Rep. No. 116-227, at 11. The Executive Branch not only agreed with Congress about the utility of beneficial ownership information in addressing these concerns, 87 Fed. Reg. at 59,500-01, but also "committed to working with Congress on beneficial ownership legislation that would require companies to report adequate, accurate, and current BOI at the time of a legal entity's creation." *Id.* at 59,502; *see also id.* at 59,498-506 (discussing national security implications of access to such information); Ex. A, Att. 8-11, 16-17, 22, 26-49, 83 at 229-37.

The Court should thus conclude that there is a rational relationship between FinCEN's collecting limited beneficial ownership and applicant information and advancing the national security and foreign policy interests of the United States. *Cf. Elec. Bond & Share Co. v. SEC*, 303 U.S. 419, 437 (1938) ("Regulation requiring the submission of information is a familiar category. Information bearing upon

27

activities which are within the range of congressional power may be sought not only by congressional investigation as an aid to appropriate legislation, but through the continuous supervision of an administrative body.").  While Plaintiffs may disagree with Congress's and the Executive Branch's findings, Compl. ¶ 5, or believe that the nation's goals can be advanced in other ways, *id.* ¶¶ 5, 37-39; Pls.' MSJ at 33-34, the Court must defer to the political branches on these matters, not to advocacy groups or private citizens. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33 (2010); *Chicago & S. Air Lines*, 333 U.S. at 112; *see also Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (courts should defer to Congressional findings of fact).

### 2. The CTA is Authorized by the Interstate Commerce Clause.

The Constitution grants Congress the power to "make all Laws which shall be necessary and proper" to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]"  U.S. Const. art. I, § 8.  Specifically, Congress can (1) "regulate the channels of interstate commerce"; (2) "regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce"; and (3) "regulate activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005).  The CTA fits within each of these categories, and Plaintiffs have failed to "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (explaining that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully"); *see DA Mortg.,*

28

*Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007) (similar).

 ***Substantial Effect on Interstate Commerce.***  Congress rationally concluded that the ability of certain legal entities to withhold beneficial ownership and applicant information, "taken in the aggregate, substantially affect[s] interstate commerce[.]"  *Raich*, 545 U.S. at 22.  Congress found that "more than 2,000,000 corporations and limited liability companies are being formed under the laws of the States each year"; "money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection, and may layer such structures . . . across various secretive jurisdictions"; and that legislation requiring the collection of beneficial ownership information "is needed to . . . protect interstate . . . commerce[.]"  Pub. L. 116-283 § 6402(1), (4)-(5), 134 Stat. at 4604; *see* 87 Fed. Reg. at 59,498-506.

 Plaintiffs' arguments to the contrary are unpersuasive.  Plaintiffs first incorrectly assert that "[t]he CTA does not regulate commerce[,]" and instead regulates the "entirely ministerial act" of incorporation.  Compl. ¶¶ 7(ii), 46, 48; *see also* Pls.' MSJ at 13-23.  Not so.  The CTA requires that certain entities, which have availed themselves of States' incorporation laws, must also disclose discrete categories of information to the federal government.  31 U.S.C. § 5336(b).  It imposes no licensing requirement, and it does not "nullify, expand upon, or relax" State incorporation laws, Pls.' MSJ at 13, even if corporate formation is a necessary predicate to operation.  *See id.*; *see also Raich*, 545 U.S. at 18-22.

Nor can Plaintiffs advance their argument by vaguely asserting (without evidentiary citation) that "[a] large proportion of the CTA's coverage is . . . likely to include entities that do not engage in commerce or business at all, or that engage in strictly intrastate commerce[.]"  Compl. ¶ 47; *see id.* ¶¶ 2, 3(ii), 46, 47; Pls.' MSJ at 18-19.  At a minimum, Plaintiffs concede that many entities subject to the CTA do engage in interstate commercial activity—as they must, given that they allege that reporting companies include on-line retailers, software companies, and more than 32 million other entities, Compl. ¶¶ 2, 4, 12, 34.  Moreover, Plaintiffs—a group that advocates for small businesses and an individual who owns a corporation in Alabama, *id.* ¶¶ 11-14—have no standing to assert the rights of entities that purportedly do not engage in any commerce whatsoever.  *See* Part I.A, *supra*.

In any event, "*Raich* grants Congress substantial leeway to regulate purely intrastate activity (whether economic or not) that it deems to have the capability, in the aggregate, of frustrating the broader regulation of interstate economic activity." *United States v. Maxwell*, 446 F.3d 1210, 1215 (11th Cir. 2006); *accord Hodel v. Indiana*, 452 U.S. 314, 324 (1981); *see also, e.g.*, *N. Am. Co. v. SEC*, 327 U.S. 686, 706 (1946) (rejecting argument that "the ownership of securities is not in itself interstate commerce and hence may not be made the basis of federal legislation"). That standard is met here.  The CTA "is part of a comprehensive regulatory scheme" to address money laundering and the financing of terrorism.  *Maxwell*, 446 F.3d at 1216; *see* Pub. L. 116-283 §§ 6002, 6402, 134 Stat. at 4547, 4604; 166 Cong. Rec.

30

at S7309 (statement of Sen. Brown) (noting that "bill includes our comprehensive bipartisan reform of our anti-money laundering laws").  The scope and consequences of entities' withholding beneficial ownership and applicant information are well documented.  Pub. L. 116-283 § 6402(1), (4)-(5), 134 Stat. at 4604; *see also* 87 Fed. Reg. at 59,498-506 (shell companies have moved billions of dollars within the U.S. financial system).    And Congress sought to regulate activities that are "quintessentially economic[.]"  *Raich*, 545 U.S. at 25; *see* 87 Fed. Reg. at 59,501; *see also Groome Res. Ltd., LLC v. Par. of Jefferson*, 234 F.3d 192, 208 (5th Cir. 2000) (discussing breadth of "economic activity"); *United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997) ("Money laundering is a quintessential economic activity." (citation omitted)).

Thus, considering the "total economic impact of the" CTA, *Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1272 (11th Cir. 2007), and especially as Plaintiffs are asserting a facial challenge, it is immaterial whether, for some unspecified reason, certain unidentified reporting companies "are formed with the intent to seek 501(c) federal tax-exempt status but have not yet [done] so[,]" or are "local private social clubs that do not intend to seek 501(c) federal tax-exempt status."  Compl. ¶ 29.[7]  As the Eleventh Circuit has explained, "[w]hen Congress

---

[7] Such entities may also be exempt from the reporting requirements pursuant to 31 U.S.C. § 5336(a)(11)(B)(xxiii).  And any delay in seeking 501 status is a self-inflicted injury, as such organizations are also exempt.  *Id.* § 5336(a)(11)(B)(xix).

decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class[,]" and "the *de minimis* character of individual instances arising under that statute is of no consequence." *Ala.-Tombigbee Rivers Coal.*, 477 F.3d at 1272-73 (cleaned up); *see Raich*, 545 U.S. at 23 ("courts have no power 'to excise, as trivial, individual instances' of the class" (citation omitted)). Given the threat posed by shell companies whose beneficial owners and applicants are unknown, Congress rationally decided to regulate entities that have affirmatively sought formal corporate status.  31 U.S.C. § 5336(b).  That some such entities may not be engaged in any wrongdoing, interstate commerce, or any commerce whatsoever, does not render the CTA unconstitutional.[8]

**Channels of, and Things in, Interstate Commerce**.  "Congress, of course, has undoubted power under the commerce clause to impose relevant conditions and requirements on those who use the channels of interstate commerce so that those channels will not be conduits for promoting or perpetuating economic evils." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 99 (1946); *see also N. Am. Co.*, 327 U.S. at 705-06.  "Thus to the extent that corporate business is transacted through such

---

[8] Plaintiffs likewise cannot cast doubt on the constitutionality of the CTA by alleging that it does not "contain any limitations that would restrict reporting obligations to individuals or entities that are suspected of a crime or wrongdoing."  Compl. ¶ 30.  Plaintiffs overlook the fact, under the current regulatory framework, the government lacks the tools to adequately and efficiently identify those engaging in suspicious activity who hide behind shell companies.  87 Fed. Reg. at 59,504-06.  Moreover, Congress's authority is not limited to regulating wrongdoing.  *Maxwell*, 446 F.3d at 1217 (Congress can regulate "price and volume controls of an otherwise legal market"); *see also, e.g.*, *Goldberg v. Truck Drivers Loc. Union No. 299*, 293 F.2d 807, 815 (6th Cir. 1961).

channels, affecting commerce in more states than one, Congress may act directly with respect to that business to protect what it conceives to be the national welfare[,]" and "[i]t may prescribe appropriate regulations and determine the conditions under which that business may be pursued." *Am. Power & Light Co.*, 329 U.S. at 99-100; *see also United States v. Orito*, 413 U.S. 139, 144 (1973). Both the record and common sense indicate that entities constituting CTA reporting companies frequently utilize the channels of interstate commerce, including using telephones, engaging in ecommerce, sending goods by mail, or using banking channels to process credit card charges or initiate wire transfers. Pub. L. 116-283 §§ 6002, 6402, 134 Stat. at 4547, 4604; *see also* 87 Fed. Reg. at 59,498-06; 86 Fed. Reg. at 69,922-28; 166 Cong. Rec. at S7310 (statement of Sen. Brown) ("Human traffickers who exploit the misery of runaways in truckstops along major interstate highways in Ohio and across the country use the financial system to launder their profits."); Ex. A, Att. 29, 37, 39, 76; Compl. ¶ 12; *United States v. Ballinger*, 395 F.3d 1218, 1225-26, 1227 (11th Cir. 2005) (providing examples of channels of commerce and instrumentalities of interstate commerce). Congress, to prevent money laundering and other illicit activity, could therefore regulate these entities by requiring that they disclose limited beneficial owner and applicant information. *Cf. Shultz*, 416 U.S. at 32, 44-57 (upholding requirement that banks maintain certain records, including depositor information, and explaining that Congress "was not limited to any one particular approach to effectuate its concern that negotiable instruments moving in

33

the channels of . . . commerce were significantly aiding criminal enterprise").

The Court should reject Plaintiffs' remaining arguments. First, acknowledging that the CTA does not "create a federal entity formation process," they argue that "Congress is using this [reporting] requirement to circumvent the constitutional limits on its powers[.]" Pls.' MSJ at 21. Plaintiffs offer no factual or legal support for this theory of improper legislative purpose. Moreover, "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959). Second, Plaintiffs incorrectly assert that "Congress is imposing a penalty on millions of innocent State citizens' decision to associate and form a collective entity[.]" Pls.' MSJ at 22. The CTA does not penalize such individuals; rather, any penalties are reserved for those who willfully fail to comply with the statute's requirements. 31 U.S.C. § 5336(h). Finally, Plaintiffs' reliance on *NFIB*, Pls.' MSJ at 19, 23, is misplaced. The CTA does not "compel[] individuals to become active in commerce by purchasing a product," *NFIB*, 567 U.S. at 552, but regulates certain entities that have availed themselves of State incorporation laws. And, as the Eleventh Circuit has explained, *NFIB* did not disturb the analysis in *Raich*, which applies for the reasons stated above. *United States v. Parton*, 749 F.3d 1329, 1331 (11th Cir. 2014).

### 3.    The CTA is Authorized by the Foreign Commerce Clause.

The reporting provisions should also be upheld pursuant to the Foreign

Commerce Clause. "The plenary authority of Congress to regulate foreign commerce, and to delegate significant portions of this power to the Executive, is well established." *Shultz*, 416 U.S. at 59 (citations omitted). The Eleventh Circuit has "assume[d], without deciding, that the Foreign Commerce Clause has the same scope as the Interstate Commerce Clause." *Davila-Mendoza*, 972 F.3d at 1271. *But see Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979) ("[T]he Founders intended the scope of the foreign commerce power to be . . . greater" than the interstate commerce power.).

Congress expressly found that the CTA "is needed to . . . protect . . . foreign commerce[.]" Pub. L. 116-283 § 6402(5)(C), 134 Stat. at 4604. The record before the Court confirms that foreign actors are engaging in illicit activity by exploiting lax beneficial ownership reporting requirements within the United States. *E.g.*, 166 Cong. Rec. at S7310 (statement of Sen. Brown) (noting such activity by shell companies with "foreign owners from China, North Korea, and other countries"); 166 Cong. Rec. at H6932 (statement of Rep. McHenry) ("[B]ad actors and nation states, such as China and Russia, are becoming more proficient in using our financial system to support illicit activity."); *Beneficial Ownership: Fighting Illicit International Financial Networks Through Transparency: Hearing before the Senate Judiciary Comm.*, 115th Cong. (2018) (statement of Sen. Grassley) ("Bad actors from all over the world have come to the U.S. as their financial safe haven."); *see also* 87 Fed. Reg. at 59,498-99, 59,502-06; 86 Fed. Reg. at 69,924-27; Ex. A,

Att. 8-10, 32, 35-38, 76.  For the reasons stated above with respect to interstate commerce, this activity also implicates the channels and instrumentalities of foreign commerce, and has a substantial effect on the commerce of the United States with foreign nations and their citizens.  *Cf. United States v. Baston*, 818 F.3d 651, 668-69 (11th Cir. 2016) (holding Congress rationally concluded that sex trafficking is "part of an economic class of activities that have a substantial effect on commerce between the United States and other countries." (cleaned up)); *Ahmed*, 94 F. Supp. 3d at 415 n.9 ("Congress may regulate terrorist conduct affecting interstate and foreign commerce under" the Foreign Commerce Clause.).

> ### 4. The CTA is Authorized by the Necessary and Proper Clause and the Government's Taxing Authority.

Finally, the CTA's reporting requirement is a necessary and proper exercise of the government's authority to levy and collect taxes.  U.S. Const. art. I, § 8, cl. 1; *id.* art. XVI.  Just as "it is assuredly 'necessary and proper' . . . to the administration of that authority to impose income taxes on transactions according to their substance," *Richardson v. Comm'r*, 509 F.3d 736, 743 (6th Cir. 2007), so too is the collection of beneficial ownership information necessary and proper to ensure taxable income is appropriately reported.  *Cf. United States v. Barry*, No. 2:08-cr-56, 2009 WL 139874, at *3 (M.D. Fla. Jan. 20, 2009), *aff'd*, 371 F. App'x 3 (11th Cir. 2010).  Congress expressly recognized as much, as it drafted the CTA to allow "[o]fficers and employees of the Department of the Treasury [to] obtain access to

beneficial ownership information for tax administration purposes[.]"   31 U.S.C. § 5336(c)(5)(B); *see also* Ex. A, Att. 58, 74.

### 5.   The CTA Does Not Violate the Tenth Amendment.

The Court should likewise reject Plaintiffs' Tenth Amendment claim, relegated to a footnote.  Pls.' MSJ at 21-22 n.9.  Because, as discussed above, the CTA constitutes a permissible exercise of Congress's constitutional powers, Plaintiffs' Tenth Amendment claim necessarily fails.  *United States v. DeCay*, 620 F.3d 534, 542 (5th Cir. 2010).  Additionally, simply because the CTA imposes a reporting requirement on entities that have availed themselves of State incorporation laws does not indicate that the statute encroaches on States' authority.  *See Elec. Bond & Share Co.*, 303 U.S. at 426, 437.  That distinction resonates with the comments submitted by Secretaries of State and other State entities to FinCEN, which do not claim that the CTA amends existing State incorporation requirements. *See, e.g.*, Ex. A, Att. 51-52, 62.

Plaintiffs allege (but do not argue in their motion) that the CTA unlawfully encroaches on States' regulation of the "internal structuring of corporate entities[,]" because the CTA "ban[s] one or more indicia of ownership such as bearer shares." Compl. ¶ 6.  Plaintiffs appear to be referring to the CTA's provision that companies "formed under the laws of a State or Indian Tribe may not issue a certificate in bearer form evidencing either a whole or fractional interest in the entity."   31 U.S.C. § 5336(f).  That provision regulates certain types of legal entities, not States.  *Id.*  In

any event, Plaintiffs lack standing to challenge this provision, as Defendants have not implemented it, no Plaintiff has alleged an intention to issue such shares and, as Plaintiffs admit, "no State currently" authorizes such certificates.  Compl. ¶ 45.

Plaintiffs next point to 31 U.S.C. § 5336(d)(2), which provides that "[r]elevant Federal, State, and Tribal agencies, as determined by the Secretary of the Treasury, shall, to the extent practicable, and consistent with applicable legal protections, cooperate with and provide information requested by FinCEN for purposes of maintaining an accurate, complete, and highly useful database for beneficial ownership information."  Compl. ¶ 26.  FinCEN, however, declined to require that reporting companies submit beneficial ownership information to State authorities, which would then transmit that information to FinCEN.  87 Fed. Reg. at 59,559. Thus § 5336(d), as implemented, does not currently require any action on the part of States, and the Court lacks subject-matter jurisdiction to consider any claim regarding that provision.   Nonetheless, requiring States to provide limited information is consistent with the Tenth Amendment.  *See Printz v. United States*, 521 U.S. 898, 917-18 (1997); *Reno v. Condon*, 528 U.S. 141, 150 (2000); *see also Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1295 (M.D. Fla. 2009), *aff'd*, 451 F. App'x 862 (11th Cir. 2012).

Equally unavailing is Plaintiffs' assertion that "[t]he CTA commandeers State agencies by coercing States into giving notice to State filers of the CTA's reporting requirements and providing filers with a copy of the CTA filing form."  Compl.

¶ 49; *see id.* ¶ 26; Pls.' MSJ at 21-22 n.9.  To the contrary, the CTA provides funds to States that agree to (1) notify reporting companies of the requirements to disclose beneficial ownership and applicant information, and (2) provide a form, or a link to a form, created by the Secretary of the Treasury.  31 U.S.C. § 5336(e)(2), 5336(j). It has long been established that "Congress may, in the exercise of its Spending Clause authority, validly condition its grants of federal funds on a state's agreement to take, or refrain from taking, specified action, as long as the conditions are not so coercive as to negate the voluntariness of the state's agreement."  *Powers v. CSX Transp., Inc.*, 105 F. Supp. 2d 1295, 1301 (S.D. Ala. 2000); *see also S. Dakota v. Dole*, 483 U.S. 203, 206 (1987); *Benning v. Georgia*, 391 F.3d 1299, 1305 (11th Cir. 2004).  The provision challenged by Plaintiffs fits comfortably within that authority, particularly as § 5336(e)(2) "promote[s] the general welfare," is "unambiguous[,]" pertains to particular federal programs (*i.e.*, efforts to combat money laundering and terrorist financing), and the condition does not "violate other provisions of the Constitution."  *Benning*, 391 F.3d at 1305.

Plaintiffs have also failed to submit any evidence that "[b]ecause the States are the only agents capable of providing notice to entity formation filers at the time of formation, States are likely to feel compelled to provide the notice and the FinCEN filing form[.]"  Compl. ¶ 49; *see id.* ¶ 27.  By contrast, Plaintiff NSBA has recognized the importance of FinCEN's efforts to "work closely with the states both to inform companies about the new reporting requirement as well as ease compliance

by incorporating the new disclosures into existing familiar processes." Ex. A, Att. 56 at 3-4.  Consistent with that position, the record indicates that the government not only will conduct extensive outreach to stakeholders, 87 Fed. Reg. at 59,548, 59,584, but also has heeded State entities' burden-related concerns and adjusted implementation of the CTA accordingly, *id.* at 59,548, 59,557, 59,559.

## II.     The CTA Does Not Invade Plaintiffs' Right to Privacy.

### A.     Fourth Amendment

#### 1.     Plaintiffs Lack Standing to Assert their Claim.

"[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (cleaned up).  With respect to their Fourth Amendment claim, Plaintiffs have not established standing for the reasons set forth in Part I.A, *supra*. Additionally, they cannot show associational standing because their claim "require[s] a fact-intensive-individualized inquiry," *Rivell v. Priv. Health Care Sys., Inc.*, 887 F. Supp. 2d 1277, 1291 (S.D. Ga. 2012), specifically as to expectations of privacy—including consideration of whether any NSBA member has previously disclosed the information required to be reported, *see infra* Part II.A.2; *United States v. Segura-Baltazar*, 448 F.3d 1281, 1289 (11th Cir. 2006) ("These inquiries are highly fact-intensive.").

#### 2.     Plaintiffs' Fourth Amendment Claim Fails on the Merits.

As an initial matter, a Fourth Amendment claim fails if a plaintiff lacks "an

actual (subjective) expectation of privacy . . . that society is prepared to recognize as reasonable[.]" *Smith v. Maryland*, 442 U.S. 735, 740 (1979).  Beneficial owners and applicants have no privacy rights in the records of reporting companies containing such information as their names, dates of birth, and addresses.  *See United States v. Centennial Builders, Inc.*, 747 F.2d 678, 683 (11th Cir. 1984).  Further, Plaintiffs here have failed to establish a subjective expectation of privacy concerning the information required to be reported.  NSBA does not allege that it is subject to the reporting requirements, let alone that it seeks to conceal that information from FinCEN.  *See generally* Compl.  As noted above, Mr. Winkles can hardly claim that he has "exhibit[ed] an actual expectation of privacy" in this information, particularly insofar as he has already disclosed it publicly.  *Segura-Baltazar*, 448 F.3d at 1286; *see Katz v. United States*, 389 U.S. 347, 351 (1967).  And other than describing the information required to be reported under the CTA as "sensitive," *e.g.*, Compl. ¶¶ 52-53, 55-56,[9] Plaintiffs do not identify a single beneficial owner or applicant who can claim a subjective expectation of privacy, *see MA LEG Partners 1 v. City of Dallas*, 442 F. Supp. 3d 958, 966 n.19 (N.D. Tex. 2020).  On this basis alone, the Court should reject Plaintiffs' Fourth Amendment claim.

Nor is any expectation of privacy in this information objectively reasonable.

---

[9] Although Congress contemplated that certain beneficial ownership information might be "sensitive," 31 U.S.C. § 5336(h)(5)(A), that characterization merely indicates that FinCEN should exercise caution when it handles such information; it does not suggest that beneficial owners or applicants have a constitutional privacy interest in shielding the information from FinCEN itself.

"The lack of any legitimate expectation of privacy concerning the information . . . was assumed by Congress in enacting the" CTA. *United States v. Miller*, 425 U.S. 435, 442-43 (1976) (rejecting Fourth Amendment challenge to BSA's recordkeeping requirement).  That conclusion is confirmed by "inquir[ing] into the nature of the privacy interest asserted and the extent of governmental intrusion." *United States v. Hall*, 47 F.3d 1091, 1095 (11th Cir. 1995).  The CTA requires the reporting of information that "is sufficiently described and limited in nature[.]" *Shultz*, 416 U.S. at 67.  Some of that information is also required by "other government regulatory frameworks[,]" *MA LEG Partners 1*, 442 F. Supp. 3d at 965 (rejecting claim that Fourth Amendment protects "information such as deed holders, insurance carriers, and businesses"); *cf. United States v. Belcher*, 927 F.2d 1182, 1188 (11th Cir. 1991) (BSA requires disclosure of "the real party in interest to reportable currency transactions."), or is already available in government databases, *Jones v. Buckner*, 963 F. Supp. 2d 1267, 1277 (N.D. Ala. 2013); *see* Part I.A, *supra*.  And as Plaintiffs offer no evidence that beneficial owners or applicants have not previously disclosed the information at issue, they cannot otherwise establish a cognizable privacy interest.  *See Miller*, 425 U.S. at 443; *cf. Watts v. City of Miami*, No. 15-cv-21271, 2016 WL 8939143, at *6 (S.D. Fla. Feb. 22, 2016) (rejecting Fourth Amendment claim and noting, in the context of the Fourteenth Amendment, "[c]ourts have found that disseminating personal information including social security numbers, . . . driver's license numbers . . . , home addresses, and birth dates did not violate the

42

right to privacy").[10]

*Shultz* is again informative.   In that case, the plaintiffs challenged the regulations implementing the BSA's foreign and domestic reporting requirements, claiming in part that they violated the Fourth Amendment.  416 U.S. at 59-70.  With respect to the domestic reporting requirements in particular, the Supreme Court explained that "organizations engaged in commerce could be required by the Government to file reports dealing with particular phases of their activities."  *Id.* at 65.  Specifically "instructive" were the Court's prior pronouncements that "neither incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret[,]" and that "[e]ven if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest."  *Id.* at 65-66.  Given these considerations, as well as the role of the banks, the Court "ha[d] no difficulty . . . in determining that the Secretary's requirements for the reporting of domestic financial transactions abridge no Fourth Amendment right of the banks themselves."  *Id.* at 66.

Such reasoning confirms that, even if Plaintiffs can show sufficient expectations of privacy—which they have not—the CTA's reporting requirements

---

[10] Plaintiffs' concerns about the potential sharing of information, Compl. ¶¶ 54, 56; Pls.' MSJ at 25, are speculative and thus insufficient to carry their burden, *cf. Shultz*, 416 U.S. at 75-76.

are reasonable and thus accord with the Fourth Amendment.  A company that files articles of incorporation with a State, like a bank, "is not a mere stranger or bystander[,]" but is the very vehicle through which ownership or control is exercised, may retain income from transactions arranged by beneficial owners, and may already keep records of beneficial owners and applicants "for its own purposes."  *Id.*  Yet even if certain (unidentified) reporting companies did not already retain the necessary information, *see* Pls.' MSJ at 26,[11] "the information is sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce, so as to withstand the Fourth Amendment challenge[,]" *Shultz*, 416 U.S. at 67.  The CTA requires the disclosure of a limited amount of information that Congress and the Executive Branch agree is crucial to further the compelling law enforcement, national security, and foreign policy interests of the United States.  *E.g.*, 31 U.S.C. § 5336(b)(1)(F)(iv)(I); Pub. L. 116-283 § 6402, 134 Stat. at 4604; H.R. Rep. No. 116-227, at 10-12; 87 Fed. Reg. at 59,498-50; *see also, e.g.*, *Humanitarian Law Project*, 561 U.S. at 33-34 ("This litigation implicates the sensitive and weighty interests of national security and foreign affairs."); *Haig v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation.").  These interests heavily outweigh whatever minimal privacy interests

---

[11] Plaintiffs cite no evidence for their assertions regarding the availability of information.

might be present here, and Plaintiffs' Fourth Amendment challenge must therefore fail. *See Maryland v. King*, 569 U.S. 435, 448 (2013) (applying balancing test).

Alternatively, the Court may conclude that the reporting requirements are reasonable because they fall within the special needs exception to the warrant requirement of the Fourth Amendment. The CTA addresses a need "beyond the normal need for law enforcement[,]" *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 619 (1989)—that is, the advancement of U.S. national security and foreign policy interests, *see Klayman v. Obama*, 805 F.3d 1148, 1149 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc); *cf. Cassidy v. Chertoff*, 471 F.3d 67, 82 (2d Cir. 2006). Further, requiring FinCEN to obtain a warrant prior to gathering beneficial ownership information would be "impracticable[.]" *Griffin v. Wisconsin*, 483 U.S. 868, 876 (1987). The Executive Branch must often act quickly to prevent asset flight initiated by actors who can transfer funds instantaneously. 87 Fed. Reg. at 59,504-05. And in some instances, records of beneficial ownership information do not exist. *Id.* at 59,504.

Plaintiffs complain that the CTA applies "regardless of whether a company or its owners are suspected of wrongdoing." Pls.' MSJ at 26. But they cite no authority for the proposition that suspicion of wrongdoing is necessary to impose a reporting requirement; again, by that reasoning, reporting requirements for income tax, SEC disclosures, and bank deposits exceeding a certain dollar amount would be unconstitutional. *See Shultz*, 416 U.S. at 59-60 (noting that "reporting requirements

45

are by no means per se violations of the Fourth Amendment[,]" and "a contrary holding might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States").

Nor can Plaintiffs persuasively rely on *City of Los Angeles v. Patel*, 576 U.S. 409 (2015). Pls.' MSJ at 26-29. That case involved administrative searches of hotel guest records by police officers, not Congressionally mandated reporting requirements such as the one upheld in *Shultz*. *See Patel*, 576 U.S. at 412-13. Additionally, even if the reasoning of *Patel* applied here—and it does not—it would at most establish that reporting companies' customers, not beneficial owners or applicants, might have an expectation of privacy. *See id.* at 412 ("specified information concern[ed] guests[,]" not hotel owners). For the same reason, and because Plaintiffs offer no evidence of a privacy interest, the other cases Plaintiffs cite, Pls.' MSJ at 28-29, are inapposite, *see Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 484 (S.D.N.Y. 2019) ("Airbnb and HomeAway have a similar privacy interest in the data that New York seeks *as to their users*, which closely resembles the data as to hotel guests that Los Angeles sought in *Patel*." (emphasis added)); *Planned Parenthood of Sw. & Cent. Fla. v. Philip*, 194 F. Supp. 3d 1213, 1220 (N.D. Fla. 2016) (challenge to State law permitting examination of clinic's patients (not ownership of clinic), who had recognized privacy interests); *Mid-Fla Coin Exch., Inc. v. Griffin*, 529 F. Supp. 1006, 1019 (M.D. Fla. 1981) (State law permitting inspection of dealer's records regarding seller of metals (not ownership of dealer)).

### B.      Fifth Amendment

#### 1.      Plaintiffs Lack Standing to Assert their Claim.

Plaintiffs claim that the CTA's reporting requirements constitute "[c]ompelled [s]elf [i]incrimination" in "[v]iolation of the Fifth Amendment." Compl. at 30; *see* Pls.' MSJ at 31-32.  First, only reporting companies—not individual beneficial owners or applicants—must transmit beneficial ownership information to FinCEN.  31 U.S.C. § 5336(b)(1).  These companies have no right against self-incrimination, which "inures to the benefit of individuals, as opposed to entities like a corporation."  *Strategic Def. Int'l, Inc. v. United States*, 745 F. Supp. 2d 1214, 1234-35 (M.D. Fla. 2010); *see Shultz*, 416 U.S. at 55 ("Incorporated banks, like other organizations, have no privilege against compulsory self-incrimination[.]").  And as the CTA does not require beneficial owners or applicants to provide information or testimony directly to the government, Plaintiffs have not shown that their rights against self-incrimination are implicated.  *Centennial Builders, Inc.*, 747 F.2d at 683; *see also United States v. Mickens*, 926 F.2d 1323, 1331 (2d Cir. 1991) (holding individuals who "are not themselves compelled to report their transactions . . . may not complain that their fifth amendment rights were violated").[12]  Nor may reporting companies vicariously assert the right against self-

---

[12] Plaintiffs cannot escape this conclusion by relying on what they admit is outdated precedent. *See* Pls.' MSJ at 30-31.  Nor can they advance their argument by stating, without any evidence, that "the disclosure burden of the CTA falls on individual filers to disclose personal records[,]" *id.* at 31 n.11 (emphases omitted), particularly as the CTA imposes requirements on entities with a formal corporate status, *see Bellis v. United States*, 417 U.S. 85, 93-100 (1974).

incrimination.  *United States v. Boruff*, 870 F.2d 316, 319 (5th Cir. 1989).  No Plaintiff has standing to pursue this claim.

### 2.    Plaintiffs' Claim Fails on the Merits.

Plaintiffs' self-incrimination theory is also substantively flawed.  First, "there is no allegation in the complaint that any report which [a reporting company] was required to make would contain information incriminating" NSBA, Mr. Winkles, or any other member of NSBA.  *Shultz*, 416 U.S. at 75; *see also Battle v. Barton*, 970 F.2d 779, 781 (11th Cir. 1992) ("[A]n individual seeking to invoke successfully his Fifth Amendment privilege must be faced with 'substantial hazards of self-incrimination.'" (citation omitted)).    Second, Plaintiffs do not identify any proceeding implicating the right against self-incrimination, and can only speculate about such proceedings occurring in the future.  *See Knight v. Miami-Dade Cnty.*, 856 F.3d 795, 823 (11th Cir. 2017).  Third, just as the BSA's reporting requirements have been upheld against challenges arising from the self-incrimination clause, *United States v. Camarena*, 973 F.2d 427, 428 (5th Cir. 1992) (per curiam), so too should the CTA be upheld, as it is "a legitimate reporting requirement" that mandates disclosure regardless of an entity's purpose, and "does not require the reporting of information that would necessarily be criminal."  *Mickens*, 926 F.2d at 1331; *see United States v. Sanchez Vazquez*, 585 F. Supp. 990, 996 (N.D. Ga. 1984).

### III.   The CTA Does Not Violate Plaintiffs' First Amendment Rights.

### A.   Plaintiffs Lack Standing to Assert their Claims.

For the reasons explained in Part I.A, *supra*, Plaintiffs' theories of standing fail with respect to their First Amendment claim.  As to associational standing, individual beneficial owners and applicants would need to demonstrate that they, unlike Mr. Winkles, have not previously disclosed the information that they supposedly desire to keep secret.  *See Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1178 (11th Cir. 2009); *Minor I Doe ex rel. Parent I Doe v. Sch. Bd. for Santa Rosa Cnty.*, 264 F.R.D. 670, 688 (N.D. Fla. 2010).[13]

### B.   Plaintiffs' Claims Fail on the Merits.

***Compelled Speech***.  As an initial matter, Plaintiffs incorrectly assert that the CTA's reporting requirements constitute "compelled speech."  Compl. ¶¶ 7(iv), 61; Pls.' MSJ at 32-34.  This doctrine applies where the government compels an individual to publicly convey an ideological message, *see, e.g.*, *McClendon v. Long*, 22 F.4th 1330, 1336 (11th Cir. 2022) (doctrine applied where sheriff placed sign in front yards of sex offenders warning public not to trick or treat there), or certain factual information, *see, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S.

---

[13] In *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1366 (11th Cir. 1999), the Eleventh Circuit held that a corporation had standing to challenge an ordinance requiring disclosure of principal stockholders' names.  But the corporation was not asserting a theory that the ordinance drained its resources, or that it could represent individuals not before the court, as Plaintiff NSBA does here.  *Id.*  And nothing in the court's decision indicates that the corporation had previously disclosed the information required to be reported by the ordinance, as Mr. Winkles has.  *Id.*

781, 797-98 (1988) (statute requiring fundraisers to disclose financial information to potential donors); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (law requiring clinic to notify women that State provides certain services, including abortion).  Here, by contrast, "the requested information is not for publication, nor is it a matter of considerable controversy, such as compelling political, ideological, or religious speech."  *MA LEG Partners 1*, 442 F. Supp. 3d at 968.  Plaintiffs also cannot show that the disclosure requirement interferes with any message that they want to convey.  Moreover, given the law enforcement, national security, and foreign policy objectives of the CTA, the reporting of such information is "essential to the maintenance of effective government and orderly society[,]" *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring), such that the compelled speech doctrine is not implicated, *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) ("The IRS summons requires Sindel only to provide the government with information which his clients have given him voluntarily, not to disseminate publicly a message with which he disagrees."); *Doe v. Trump*, No. 8:20-cv-00858, 2020 WL 5492994, at *3 (C.D. Cal. Sept. 2, 2020) (compelled speech doctrine does not apply to IRS requirement that individual select filing status); *cf. McCann v. Texas*, No. 3:16-cv-335, 2017 WL 2799867, at *2 n.3 (S.D. Tex. June 27, 2017); *Morales v. Daley*, 116 F. Supp. 2d 801, 816 (S.D. Tex. 2000).  "If [FinCEN] cannot require [reporting] in this context because of the prohibition on compelled speech, it is difficult to see how any government could

have a regulatory system that requires applications." *MA LEG Partners 1*, 442 F. Supp. 3d at 968. Further, insofar as Plaintiffs claim that their information may become public, "[t]his inchoate concern is not enough to make this case one of compelled speech, such as *Wooley* [*v. Maynard*, 430 U.S. 705 (1977).]" *Morales*, 116 F. Supp. 2d at 816. Thus, rational basis review applies, *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011), and the CTA readily withstands that review as set forth above.

Plaintiffs argue that some form of heightened scrutiny applies to their compelled speech claim. Compl. ¶¶ 60-62; Pls.' MSJ at 33-34. That is incorrect for the reasons explained above. In any event, at most "exacting scrutiny," not strict scrutiny, would apply, *see Riley*, 487 U.S. at 798, and the CTA easily satisfies this standard. Plaintiffs agree that the government has a sufficiently important interest in national security, foreign policy, and anti-money laundering measures. Compl. ¶¶ 3, 5, 40. And they cannot dispute that there is a substantial relation between those interests and the collection of beneficial ownership and applicant information. *See, e.g.*, Pub. L. 116-283 §§ 6002, 6402(3)-(5), 134 Stat. at 4547-48, 4604; 31 U.S.C. § 5331; H.R. Rep. No. 116-227, at 10-11; 87 Fed. Reg. at 59,501, 59,547; Ex. A, Att. 22, 25, 28-37, 39-43, 46, 49, 75-81; *cf. Buckley v. Valeo*, 424 U.S. 1, 64-68 (1976). Additionally, the requirements are narrowly tailored to four discrete categories of information that are "highly useful," and none of which mandates disclosure of the purpose of the reporting company, or the identities of its clients,

customers, or employees.  *See generally* 31 U.S.C. § 5336; 166 Cong. Rec. at H6928, H6932 (statements of Rep. Luetkemeyer and Rep. McHenry) (noting that CTA minimizes burden on small businesses).

In support of their First Amendment claim, Plaintiffs also argue that "the CTA engages in overkill" and that "[t]he most logical way to achieve [the government's] goals would be to enhance the CDD [customer due diligence] rule or limit the CTA's reporting requirements to non-U.S. persons."  Pls.' MSJ at 33; *see* Compl. ¶ 60. Again, it is unclear what test Plaintiffs are applying, and they offer no support for the proposition that the Court should substitute Plaintiffs' national security and foreign policy views for those of the government.  Further, the record demonstrates the need to go beyond the CDD rule.  *E.g.*, 166 Cong. Rec. at S7312-13 (statement of Sen. Brown); 87 Fed. Reg. at 59,502, 59,504-05, 59,509, 59,558-59; Ex. A, Att. 4 at 13-14; Ex. A, Att. 36 at 2-3, Att. 76 at 8-15; *see also* 87 Fed. Reg. at 59,508, 59,548 (FinCEN will revise the CDD rule to conform to CTA).  Additionally, limiting reporting to "non-U.S. persons" would not address the activities of domestic criminals, or foreign criminals that conceal their identities behind U.S.-incorporated shell companies.  *See* 87 Fed. Reg. at 59,499-501; Ex. A, Att. 11-12, 22, 39.  And Plaintiffs do not explain how their proposal would bring the United States into compliance with FATF standards.  Pub. L. 116-283 § 6402(5), 134 Stat. at 4604; H.R. Rep. No. 116-227, at 11; Ex. 48 (discussing FATF requirement that countries collect beneficial ownership information, without regard to whether beneficial

owners reside outside that country).

Nor can Plaintiffs advance their argument by noting that "State laws providing for entity formation . . . reflect the States' respective judgments that the provision of such information is not a necessary or appropriate prerequisite of entity formation." Compl. ¶ 58. Congress, in the exercise of its distinctly federal powers, concluded that it was important that federal authorities have this information to deter criminal behavior and protect national security. State legislatures are not Congress, and Congress is not bound by State legislatures' differing opinions. Indeed, absence of, and lack of uniformity concerning, beneficial ownership disclosure requirements as part of the States' various incorporation processes is among the reasons Congress concluded the CTA was necessary to advance the government's compelling interests. Pub. L. 116-283 § 6402, 134 Stat. at 4604.

Finally, Plaintiffs claim that "individuals form State-law entities for lawful business and non-business purposes and often seek to protect their identities and privacy in so doing[,]" and that "bad actors . . . will either manipulate the mandatory disclosures or shirk them altogether[.]" Pls.' MSJ at 33. Plaintiffs have not submitted any admissible evidence supporting these points; rather, they only speculate that the United States' efforts will suffer from the same problems as the United Kingdom's. *Id.* In short, Plaintiffs fail to undermine the policy assessment made by Congress after years of careful study.

***Freedom of Association.*** Both Mr. Winkles and NSBA's members "operate

53

. . . businesses," Compl. ¶ 11; *see id.* ¶¶ 12-14, and "[a]ctivities and services that are primarily commercial rather than communicative do not qualify as expressive association that is protected under the First Amendment." *Edmondson v. Velvet Lifestyles, LLC*, No. 15-cv-24442, 2016 WL 7048363, at *10 (S.D. Fla. Dec. 5, 2016) (citation omitted); *see also, e.g.*, *City of Dallas v. Stanglin*, 490 U.S. 19, 24-25 (1989); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 631-40 (1984) (O'Connor, J., concurring in part and concurring in the judgment); *Rivers v. Campbell*, 791 F.2d 837, 840 (11th Cir. 1986). Accordingly, their freedom of association claim fails at the outset.[14]

Moreover, even if the Court were to hold that Plaintiffs have properly invoked the protection of the First Amendment's right to free association—and they have not—Plaintiffs' theory fails on the merits. The crux of Plaintiffs' argument is that the CTA "may deter or chill" individuals "from participating in the management" of a reporting company. Compl. ¶ 35; *see id.* ¶ 59; Pls.' MSJ at 35. But they offer no

---

[14] Plaintiffs' allegations of hypothetical non-commercial enterprises do not affect this conclusion. The CTA expressly exempts 501(c) organizations and political organizations meeting certain criteria. 31 U.S.C. § 5336(a)(11)(B)(xix)-(xx). And while Plaintiffs raise the possibility that the CTA will apply to a "local all-women's social club formed to discuss current health, reproduction rights, and sexual orientation issues in a confidential group setting[,]" Compl. ¶ 35, there is no evidence that such a social club is a member of NSBA or otherwise before the Court. And even if the CTA were to apply to such a club, that would only mean the club's beneficial owners and applicants would have to identify themselves to FinCEN; the CTA imposes no restrictions on the club's activities or membership, nor does it require that the club disclose the purpose of the organization (unlike, for example, when an entity files articles of incorporation with the State of Alabama, *see* Ex. A, Att. 84). The same is true of an entity that "hold[s] a family vacation property" and "an entity established . . . to protest Chinese government policies." Compl. ¶¶ 35, 59. In any event, isolated examples cannot suffice to prevail on a facial challenge. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

evidence that someone would hesitate to become part of the management of a company because that fact will be known to the federal government, which may use that information only for a limited set of purposes.    Plaintiffs' speculative, conclusory assertions "surely . . . [are]n't sufficient," *Gardner v. Mutz*, 962 F.3d 1329, 1341 (11th Cir. 2020).  *See Citizens United v. FEC*, 558 U.S. 310, 370 (2010) (as-applied challenge to a disclosure requirement can succeed only where there is a "reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed"); *Laird v. Tatum*, 408 U.S. 1, 13 (1972); *Ala. State Fed'n of Tchrs., AFL-CIO v. James*, 656 F.2d 193, 197 (5th Cir. 1981).

Further, assuming Plaintiffs can overcome this evidentiary deficiency, any infringement on their freedom of association is justified.  The Court need not apply exacting scrutiny, because the record does not establish that any reporting company before the Court is seeking to advance "political, economic, religious or cultural" beliefs, *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383-84 (2021); *see Ward v. Thompson*, No. 22-16473, 2022 WL 14955000, at *2 (9th Cir. Oct. 22, 2022), and the statute requires purely factual information about beneficial owners and applicants (not customers or donors) of entities that have chosen to seek corporate status.  Yet even if the Court were to apply exacting scrutiny, the CTA satisfies that standard for the reasons stated above.  *See also United States v. Benson*, 561 F.3d 718, 727 (7th Cir. 2009); *cf. Rivers*, 791 F.2d at 840.

***Freedom of Speech.***  Plaintiffs allege the CTA violates their right to free

speech.  *See* Compl. ¶¶ 57-62.  They do not separately brief this argument, and to the extent it duplicates their other First Amendment theories, it fails for the reasons described above.  Additionally, the Supreme Court has emphasized that "[d]isclosure requirements may burden the ability to speak, but they do not prevent anyone from speaking." *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010).  Consistent with that pronouncement, the CTA does not prevent any company from speaking or expressing its views on any subject.  *See generally* 31 U.S.C. § 5336.  Moreover, "[t]he public interest served by [the CTA] is of such a 'high order' that an assertion of first amendment rights do[es] not outweigh" the government's interests.  *See Kahn v. United States*, 753 F.2d 1208, 1217 (3d Cir. 1985); *cf. United States v. Stover*, 650 F.3d 1099, 1113 (8th Cir. 2011).[15]

## IV.    The CTA Accords with the Due Process Clause.

### A.    Plaintiffs Lack Standing to Assert their Claim.

As an initial matter, Plaintiffs' facial vagueness challenge, Compl. ¶¶ 63-66,

---

[15] *Lady J. Lingerie*—not cited by Plaintiffs—is inapposite.  In that case, an ordinance required applicants for adult establishments to disclose the names of individuals owning at least 10% of stock in the corporation.  176 F.3d at 1366.  The Eleventh Circuit concluded that the government interest in the ordinance was substantial, but "[did] not see a 'relevant correlation' or a 'substantial relation' between the names of principal stockholders and the harmful secondary effects of adult entertainment establishments."  *Id.*  Here, however, the government has established a substantial relation for the reasons discussed above.  Additionally, *Lady J. Lingerie* involved a licensing scheme for businesses that are "within the outer ambit of the First Amendment's protection," *Steel MMA, LLC v. Newsom*, No. 21-cv-49, 2021 WL 778654, at *3 (S.D. Cal. Mar. 1, 2021), whereas similarly expressive reporting companies are not before the Court, and reporting companies' ability to operate is not contingent upon compliance with the CTA's requirements.  Finally, the CTA's definition of beneficial owner is more targeted to identify individuals who exercise actual control of an entity.  *Compare Lady J. Lingerie*, 176 F.3d at 1366 *with* 31 U.S.C. § 5336(a)(3)(A); *see Tee & Bee, Inc. v. City of W. Allis*, 936 F. Supp. 1479, 1488 (E.D. Wis. 1996).

fails because it is untethered from any speech- or association-related concerns. *United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand."). Moreover, Plaintiffs who engage in conduct clearly addressed by a statute lack standing to challenge the statute's hypothetical applications to others as vague. *Parker v. Levy*, 417 U.S. 733, 756 (1974); *Case v. Ivey*, 542 F. Supp. 3d 1245, 1270 (M.D. Ala. 2021), *aff'd*, No. 21-12276, 2022 WL 2441578 (11th Cir. Jul. 5, 2022). Mr. Winkles admits the reporting requirement clearly applies to his business and that he is a beneficial owner, Compl. ¶ 14; he therefore lacks standing to assert this claim.

NSBA also lacks standing to bring a vagueness challenge. It has not argued that it is subject to the reporting requirement, and it also cannot assert associational standing because it has not shown that its members have standing in their own rights. It has put forth only one member plaintiff, Mr. Winkles, and as explained, the statute is not vague as applied to him. *Ga. Republican Party*, 888 F.3d at 1204.

### B.  Plaintiffs' Claim Fails on the Merits.

To state a void-for-vagueness claim, a plaintiff must show that the statute "does not define the . . . offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Diversified Numismatics, Inc. v. City of Orlando*, 949 F.2d 382, 386-87 (11th Cir. 1991). "[P]erfect clarity," however, is not required. *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir.

2018).  "[T]he degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982), and the Supreme Court has set forth several factors for courts to consider, including whether the statute: (1) is "economic regulation [] subject to a less strict vagueness test[,]" *id.* at 498; (2) turns on "a true-or-false determination," as opposed to "a subjective judgment," *United States v. Williams*, 553 U.S. 285, 306 (2008), thus reducing vagueness concerns; and (3) includes a scienter requirement, which "greatly weighs against" a void-for-vagueness claim, *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1148 (M.D. Ala. 2022) (Burke, J.).

Plaintiffs challenge as vague the CTA's definitions of "beneficial owner" and "applicant."  *See* Pls.' MSJ at 36-37.  The plain text of these definitions allows ordinary people to understand what the law requires: reporting companies must report individuals who exercise significant control over and/or have a significant financial stake in a company as well as individuals who register a company to do business.  31 U.S.C. § 5336(a)(2)-(3).  Courts have concluded similar statutory terms pose no concern.  *See Wacko's Too, Inc. v. City of Jacksonville*, 522 F. Supp. 3d 1132, 1162-63 (M.D. Fla. Mar. 1, 2021) (holding term "owner" not vague); *Keepers, Inc. v. City of Milford, Conn.*, 944 F. Supp. 2d 129, 156 (D. Conn. 2013) ("applicant" not vague), *aff'd in relevant part*, 807 F.3d 24, 38 (2d Cir. 2015).  Thus, the CTA's text clearly defines "what is prohibited and what is not," and is not vague on its face. *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1311 (11th Cir. 2009).

The CTA's nature confirms that conclusion.  First, it is an economic regulation subject to less scrutiny.  Second, "the statutory terms at issue . . . are quite different from the sorts of terms . . . [the Court] has struck down" as vague.  *Humanitarian L. Project*, 561 U.S. at 20.  The CTA's definitions turn on questions of fact, such as who owns what portion of a company—not subjective judgments, such as whether conduct is "annoying" or "indecent."  *Id.*  These determinations may be complicated for companies "that make decisions which increase the complexity of a company's operations, management, or financing[,]" 87 Fed. Reg. at 59,529-30, but that does not make the CTA vague, *Williams*, 553 U.S. at 306 (explaining statute not vague simply because "it may be difficult in some cases to determine whether [its] clear requirements have been met").  And the CTA provides for penalties only for "willful[]" violations.  *See* 31 U.S.C. § 5336(h)(1); *see* 87 Fed. Reg. at 59,515.

## C.    The FinCEN Rule Cures any Statutory Vagueness.

FinCEN's rule clarifies the CTA's already clear statutory definitions, curing any vagueness.  *Vill. of Hoffman Ests.*, 455 U.S. at 494 n.5 ("In evaluating a facial [vagueness] challenge to a [] law, a federal court must, of course, consider any limiting construction that a[n] . . . enforcement agency has proffered.").  For instance, Plaintiffs critique the definition of "substantial control" as "self-referential" and "meaningless," *see* Pls.' MSJ at 37 n.14, but ignore the sweep of the definition, 31 C.F.R. § 1010.380(d)(1)(i); 87 Fed. Reg. at 59,594.  By setting forth a "non-exhaustive list of examples" of the types of roles and authority indicative of

"substantial control," the rule helps "clarify the meaning of [that] term" and give regulated parties a clearer understanding of who is a "beneficial owner" under the statute. *United States v. Gundy*, 842 F.3d 1156, 1166 (11th Cir. 2016). That this list includes the phrase, "[h]as any other form of substantial control over the reporting company[,]" 31 C.F.R. § 1010.380(d)(1)(D); *see* Pls.' MSJ at 37 n.14, poses no issue; residual phrases are common, and courts routinely employ canons of interpretation to accord them additional meaning. *See Circuit City Stores v. Adams*, 532 U.S. 105, 114-15 (2001); *United States v. Stevens*, 559 U.S. 460, 474 (2010).[16]

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss or, in the alternative, for summary judgment, and deny Plaintiffs' motion.

Dated:  March 29, 2023                Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       DIANE KELLEHER
                                       Assistant Branch Director

---

[16] Plaintiffs demote their Ninth Amendment claims to a footnote.  Pls.' MSJ at 35 n.13.  To the extent it considers such claims, the Court should reject them because Plaintiffs "ha[ve] no private cause of action under the Ninth Amendment."  *C.S. v. Thomas*, No. 5:14-cv-01022, 2016 WL 2605531, at *6 (N.D. Ala. Apr. 8, 2016), *report and recommendation adopted*, 2016 WL 1746015 (N.D. Ala. May 3, 2016).  And "it is well established that 'the Ninth Amendment standing alone houses no constitutional guarantees of freedom.'"  *Jones v. Mnuchin*, 529 F. Supp. 3d 1370, 1376 (S.D. Ga. 2021).   Consequently, the Court need not separately address Plaintiffs' Ninth Amendment claims, which fail for the reasons described throughout this brief.  *Hightower by Dahler v. Olmstead*, 959 F. Supp. 1549, 1557-58 (N.D. Ga. 1996), *aff'd*, 166 F.3d 351 (11th Cir. 1998).

_/s/ Stuart J. Robinson_
STUART J. ROBINSON
Senior Counsel
TAYLOR N. PITZ
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Ave., Suite 7-5395
San Francisco, CA 94102
Tel: (415) 436-6635
Fax: (415) 436-6632
Email: stuart.j.robinson@usdoj.gov

_Counsel for Defendants_