FILED

2023 Apr-14  PM 01:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| NATIONAL SMALL BUSINESS UNITED, et al.,<br><br>      *Plaintiffs*,<br><br>   vs.<br><br>JANET YELLEN, in her official capacity as Secretary of the United States Department of Treasury, et al.,<br><br>      *Defendants.* | Case No. 5:22-cv-01448-LCB |

**BRIEF OF AMICI CURIAE FACT COALITION,
TRANSPARENCY INTERNATIONAL U.S., AND
MAIN STREET ALLIANCE IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE
CROSS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Table of Authorities ...................................................................................................... ii

Identity and Interests of *Amici Curiae* ....................................................................... 1

Introduction ................................................................................................................... 2

Argument ....................................................................................................................... 4

      I.     The CTA is a Critical Step Toward Curtailing the Use of Anonymous Companies for Illicit Activity. ....................................................................... 4

            A.     Prior to the CTA, law enforcement lacked sufficient tools to curb the abuse of anonymous companies ............................................... 5

            B.     The CTA provides the necessary tools to stop the exploitation of anonymous companies. ................................................................. 9

            C.     The CTA does not supplant the CDD Rule with inferior requirements. .. 11

      II.    The CTA's Reporting Requirements Are Neither Unusual Nor Unprecedented.  13

      III.   Legitimate Small Businesses Benefit from the CTA. ........................................... 14

Conclusion ................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dimanche v. Brown*,
    783 F.3d 1204 (11th Cir. 2015) .................................................................2

*Terrebonne v. Blackburn*,
    646 F.2d 997 (5th Cir. 1981) ....................................................................2

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S.Ct. 2111 (2022)..............................................................................14

**Statutes, Rules, and Regulations**

31 C.F.R. § 1010.230(d)(1).............................................................................8

31 U.S.C. § 5336....................................................................................9, 11, 12

Corporate Transparency Act, Pub. L. No. 116-283,
    134 Stat. 4604 (2021)................................................3, 10, 11, 12, 14

Beneficial Ownership Information Reporting Requirements, 86 Fed. Reg. 69,920
    (Dec. 8, 2021) ....................................................................................17

Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498
    (Sept. 30, 2022)............................................5, 6, 7, 8, 10, 12, 16, 17

**Other Authorities**

Ala. Law Enf't Agency, *Driver Pre-Application*, http://alabamadl.alea.gov/_/#4
    (last viewed Apr. 3, 2023)..................................................................13

Ala. State Bar, *Character and Fitness Questionnaire*,
    http://admissions.alabar.org/browseform.action?applicationId=1&formId=
    724 (last viewed Apr. 3, 2023)..........................................................13

FACT Coal., *Coalition Members*, https://thefactcoalition.org/about-us/coalition-
    members-and-supporters/ (last visited Mar. 30, 2023) ....................10

FACT Coal., *FACT Sheet: Small Businesses Are Harmed by Anonymous
    Companies* (Sept. 17, 2019), https://thefactcoalition.org/fact-sheet-small-
    businesses-are-harmed-by-anonymous-companies/ ........................15

FATF, *Anti-Money Laundering and Counter-Terrorist Financing Measures
    United States Mutual Evaluation Report* (2016), https://www.fatf-gafi.org/
    media/fatf/documents/reports/mer4/MER-United-States-2016.pdf...................11

FATF, *Who We Are*, https://www.fatf-gafi.org/en/the-fatf/who-we-are.html (last visited Mar. 30, 2023) .................................................................................10

Glob. Fin. Integrity, *Acres of Money Laundering:  Why U.S. Real Estate is a Kleptocrat's Dream* (2021), https://gfintegrity.org/wp-content/uploads/2021/08/Acres-of-Money-Laundering-Final-Version-2021.pdf .....................................................................................................9

Glob. Fin. Integrity, *The Library Card Project: The Ease of Forming Anonymous Companies in the United States* (2019), https://gfintegrity.org/wp-content/uploads/2019/03/GFI-Library-Card-Project.pdf ...............................6, 7

*Hearing on Outside Perspectives on the Collection of Beneficial Ownership Information Before the S. Comm. On Banking, Housing, & Urban Affs.*, 116th Cong. 6 (June 20, 2019) (statement of Gary Kalman, Exec. Dir., FACT Coal.), https://thefactcoalition.org/wp-content/uploads/2019/06/Gary-Kalman-SBC-20190620-Written-Testimony-FINAL.pdf .............................................................................16, 17

Huntsville-Madison Cnty Pub. Libr., *Register for a Library Card*, http://catalog.hmcpl.org/MyAccount/SelfReg (last viewed Apr. 3, 2023) .......................13

*Keeping Foreign Corruption Out of the United States: Hearing Before the S. Permanent Subcomm. on Investigations of the S. Committee on Homeland Sec. & Governmental Affs.* 111th Cong. (2010) ......................................................8

Letter from Sens. Sheldon Whitehouse et al., to FinCEN (May 5, 2021), https://www.whitehouse.senate.gov/imo/media/doc/Senators%20CTA%20Comment%20Letter%2005.04.2021.pdf .....................................................10

Press Release, U.S. Att'y's Off. for E.D. Va., *Security Contractors Plead Guilty to Illegally Obtaining $31 Million From Contracts Intended For Disadvantaged Small Businesses* (Mar. 18, 2013), https://www.justice.gov/usao-edva/pr/security-contractors-plead-guilty-illegally-obtaining-31-million-contracts-intended .................................15

Press Release, U.S. Att'y's Off. for S.D. Fla., *Nine Year Sentence for Alabama Man Convicted of Defrauding Military Sub-Contractor* (Mar. 2, 2015), https://www.justice.gov/usao-sdfl/pr/nine-year-sentence-alabama-man-convicted-defrauding-military-sub-contractor .................................15

Press Release, U.S. Immgr. & Customs Enf't, *Former Colorado Police Officer Sentenced for Selling Counterfeit Denver Broncos Merchandise* (Jan. 25, 2017), https://www.ice.gov/news/releases/former-colorado-police-officer-sentenced-selling-counterfeit-denver-broncos .................................16

Small Bus. Majority, *Small Business Owners Support Legislation Requiring Transparency in Business Formation* (Apr. 4, 2018),

https://smallbusinessmajority.org/our-research/government-accountability/small-business-owners-support-legislation-requiring-transparency-business-formation ...................................................15

Thomas Pietschmann et al., U.N. Off. on Drugs & Crime, *Estimating Illicit Financial Flows Resulting from Drug Trafficking and Other Transnational Organized Crimes* (2011), https://www.unodc.org/documents/data-and-analysis/Studies/Illicit_financial_flows_2011_web.pdf ...................................................2

U.S. Dep't of Just., *Financial Action Task Force Report Recognizes U.S. Anti-Money Laundering and Counter-Terrorist Financing Leadership, but Action is Needed on Beneficial Ownership* (Dec. 1, 2016), https://www.justice.gov/archives/opa/blog/financial-action-task-force-report-recognizes-us-anti-money-laundering-and-counter ...................................................3, 6

U.S. Dep't of Treasury, *National Strategy for Combatting Terrorist and Other Illicit Financing* (2022), https://home.treasury.gov/system/files/136/2022-National-Strategy-for-Combating-Terrorist-and-Other-Illicit-Financing.pdf ...................................................5, 8

U.S. Dep't of Treasury, *Treasury Strategic Plan 2022-2026* (2022), https://home.treasury.gov/system/files/266/TreasuryStrategicPlan-FY2022-2026.pdf ...................................................3

U.S. Small Buss. Admin, *Frequently Asked Questions* (2012), https://www.sba.gov/sites/default/files/FAQ_Sept_2012.pdf ...................................................16

Emile van der Does de Willebois et al., World Bank, *The Puppet Masters: How the Corrupt Use Legal Structures to Hide Stolen Assets and What to Do About It* (2011), https://openknowledge.worldbank.org/server/api/core/bitstreams/e80259c9-d3ca-5d16-adef-fec02a3989dd/content ...................................................2, 6

Janet Yellen, Sec'y, U.S. Dep't of the Treasury, Remarks at the Summit for Democracy (Dec. 9, 2021), https://home.treasury.gov/news/press-releases/jy0524 ...................................................3

Janet L. Yellen, Sec'y, U.S. Dep't of the Treasury, Remarks on Anti-Corruption as a Cornerstone of a Fair, Accountable, and Democratic Economy at the Summit for Democracy, (Mar. 28, 2023), https://home.treasury.gov/news/press-releases/jy1371 ...................................................5

## IDENTITY AND INTERESTS OF *AMICI CURIAE*

*Amici* are transparency organizations and a small business association that advocate for increased transparency in the global financial system and for policies that benefit small businesses.  *Amici* submit this brief to defend the Corporate Transparency Act's beneficial owner reporting requirements.

The **Financial Accountability & Corporate Transparency ("FACT") Coalition** is a non-partisan alliance of more than 100 state, national, and international organizations promoting policies to build fair and transparent global financial systems and to combat money laundering, terrorist financing, and illicit finance.  Financial crimes and related misconduct are often facilitated by the use of legal entities owned and controlled by individuals whose identities are hidden.  Such entities are frequently used to hide and launder illicit proceeds.  The Corporate Transparency Act of 2021, which the FACT Coalition worked to help enact, is designed to eliminate entities with anonymous ownership from operating within U.S. borders by requiring those entities to identify and disclose information about their beneficial owners.  The FACT Coalition therefore has an interest in defending the Corporate Transparency Act's beneficial owner reporting requirements.

**Transparency International U.S.** is part of the largest global coalition dedicated to fighting corruption, partnering with businesses, governments, and citizens to promote transparency and develop and implement effective measures to tackle and deter corruption. Anonymous companies are frequently used to facilitate corruption and launder its proceeds across the world.  The Corporate Transparency Act, which Transparency International U.S. helped to enact, will help prevent the use of anonymous companies to facilitate corruption by requiring covered entities to identify and report information regarding their beneficial owners.

1

Transparency International U.S. therefore has an interest in defending the Corporate Transparency Act's beneficial owner reporting requirements.

**Main Street Alliance** is a small business membership organization that advocates for and engages with small businesses around issues that matter the most for businesses and their employees.  MSA believes that small businesses are harmed when they are forced to compete with illegitimate businesses that commit fraud and other crimes through the use of anonymous shell corporations.  Requiring corporations to identify the real beneficial owners of the legal entity will help law enforcement agencies to prevent such crimes, thereby reducing harms to legitimate small businesses. MSA therefore has an interest in defending the Corporate Transparency Act's beneficial owner reporting requirements.

## INTRODUCTION

Anonymous corporations play a central role in global money laundering and corruption. According to the World Bank and the United Nations Office on Drugs and Crime, anonymous companies were used in over 70 percent of grand corruption cases they reviewed to either carry out the corrupt activity or to hide the proceeds of it.[1]  These funds both flow from and sustain illicit activities—from human and drug trafficking to evasions of U.S. sanctions by Russian oligarchs and the Iranian Government—that threaten U.S. national security and harm ordinary Americans.  Despite the severity of the problem, fewer than 1 percent of global illicit financial

---

[1] *See* Emile van der Does de Willebois et al., World Bank, *The Puppet Masters: How the Corrupt Use Legal Structures to Hide Stolen Assets and What to Do About It*, (2011), *available at* https://openknowledge.worldbank.org/server/api/core/bitstreams/e80259c9-d3ca-5d16-adef-fec02a3989dd/content. The Court may take judicial notice of the various intergovernmental and agency reports cited throughout this brief.  *Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports." (quoting *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. 1981)).

flows are seized annually.[2]  The United States in particular is arguably "the best place to hide and launder ill-gotten gains" because of the ease with which individuals can conceal their identities when forming and using U.S. companies.[3]  Further, the U.S. Treasury Department estimates that illicit funds equaling at least 2 percent of U.S. GDP flow through the U.S. financial system every year.[4]

To address this critical challenge, Congress enacted the Corporate Transparency Act ("CTA") of 2021 with strong bipartisan support and widespread endorsement across the political spectrum.  In so doing, Congress found that the Act was necessary to protect U.S. national security interests and to bring the United States into compliance with international standards for combatting money laundering.[5]  The CTA accomplishes those goals by requiring companies and similar covered entities to identify their beneficial owners at the time of formation or registration in the United States and to provide updates as ownership information changes.  As explained in detail below, these minimal disclosures yield substantial benefits to everyday Americans, including small business owners.

---

[2] Thomas Pietschmann et al., U.N. Off. on Drugs & Crime, *Estimating Illicit Financial Flows Resulting from Drug Trafficking and Other Transnational Organized Crimes* 7 (2011), https://www.unodc.org/documents/data-and-analysis/Studies/Illicit_financial_flows_2011_web.pdf.

[3] Janet Yellen, Sec'y, U.S. Dep't of the Treasury, Remarks at the Summit for Democracy (Dec. 9, 2021), *available at* https://home.treasury.gov/news/press-releases/jy0524; *see also* U.S. Dep't of Just., *Financial Action Task Force Report Recognizes U.S. Anti-Money Laundering and Counter-Terrorist Financing Leadership, but Action is Needed on Beneficial Ownership* (Dec. 1, 2016), *available at* https://www.justice.gov/archives/opa/blog/financial-action-task-force-report-recognizes-us-anti-money-laundering-and-counter (describing the United States as a "safe haven" for individuals looking to conceal their identities through the use of anonymous shell corporations).

[4] U.S. Dep't of Treasury, *Treasury Strategic Plan 2022-2026* 23 (2022), *available at* https://home.treasury.gov/system/files/266/TreasuryStrategicPlan-FY2022-2026.pdf.

[5] Corporate Transparency Act, Pub. L. No. 116-283, § 6402(5), 134 Stat. 4604 (2021).

The Plaintiffs in this case disagree with the general consensus that the CTA was a vital upgrade of American anti-money laundering laws.  Overstating the costs to small businesses and downplaying the Act's contributions, Plaintiffs suggest that the legislation cannot survive rational basis review of various constitutional claims because the Act is "not a rational means to achieve its stated goals."  Pls.' Mem. Law Supp. Mot. Summ. J. ("Pls.' MSJ") at 2, 33.  Among other things, Plaintiffs assert that the CTA weakens the preexisting legal framework for collecting beneficial ownership information, represents an unprecedented intrusion into privacy rights, and will impose thousands of dollars of unwarranted costs on small businesses.

None of this is true.  The CTA is a historic anti-money laundering step that Congress correctly understood would strengthen the ability of law enforcement—and the U.S. national security and intelligence communities—to curtail the use of anonymous entities to commit crimes.  Moreover, the CTA's reporting requirements are neither unusual, nor unprecedented.  In fact, most states collect more information when granting public library cards than is required under the CTA.  Finally, the CTA benefits small business owners by protecting them from unfair and fraudulent competition, while imposing minimal costs.

Plaintiffs' arguments to the contrary do not withstand scrutiny.  The Court should therefore reject Plaintiffs' constitutional claims and grant Defendants' Motion to Dismiss or, in the alternative, their Cross-Motion for Summary Judgment.

## ARGUMENT

**I.      The CTA is a Critical Step Toward Curtailing the Use of Anonymous Companies for Illicit Activity.**

Plaintiffs argue that "the CTA is not a rational means to achieve its stated goals," Pls.' MSJ at 1, because the Act "does little to effectively combat financial crime and is inferior to . . . existing" reporting requirements.  Compl. ¶ 37.  The Court should reject these arguments.

Contrary to Plaintiffs' assertions, Congress has found—consistent with years of research from United States agencies and intergovernmental bodies—that the CTA will significantly strengthen law enforcement, national security, and intelligence efforts.  In fact, as the Secretary of Treasury Janet Yellen recently explained, the CTA is "the single most significant" step the United States has taken to date to curb the abuse of anonymous entities to commit financial and other crimes.[6]

### A.    Prior to the CTA, law enforcement lacked sufficient tools to curb the abuse of anonymous companies.

Anonymous companies are entities owned or controlled by individuals whose identities are hidden.  That anonymity is often used to hide and launder the proceeds of domestic and international crimes, including fraud, embezzlement, various other corruption crimes, and the trafficking of humans, drugs, and arms.[7]  Such crimes not only distort markets, they also "victimize[] ordinary Americans."[8]  For example, anonymous entities have been used to make "real estate purchases . . . with the proceeds of foreign corruption that price American buyers out" and to move "cash proceeds from fentanyl sales . . . that fuel the drug epidemic in the United States."[9]  Anonymous entities are also used to commit fraud that harms legitimate small businesses.  In one recent example, an individual in Florida pled guilty in 2021 to using anonymous companies to steal $24 million in COVID-19 relief money from the Paycheck

---

[6] Janet L. Yellen, Sec'y, U.S. Dep't of the Treasury, Remarks on Anti-Corruption as a Cornerstone of a Fair, Accountable, and Democratic Economy at the Summit for Democracy, (Mar. 28, 2023), *available at* https://home.treasury.gov/news/press-releases/jy1371.

[7] Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498, 59,500 (Sept. 30, 2022) (to be codified at 31 C.F.R. pt. 1010).

[8] U.S. Dep't of Treasury, *National Strategy for Combatting Terrorist and Other Illicit Financing* 2 (2022), https://home.treasury.gov/system/files/136/2022-National-Strategy-for-Combating-Terrorist-and-Other-Illicit-Financing.pdf [hereinafter "2022 National Strategy"].

[9] *Id.*

Protection Program established by the CARES Act—money that was intended to ensure that small business owners were able to continue paying their employees during the pandemic.[10]

Anonymous companies likewise undermine United States foreign policy and national security efforts.  As explained in a recent rulemaking that implements the CTA, foreign nationals frequently rely on anonymous companies to evade U.S. sanctions.  For example, "in March 2021, the Department of Justice charged 10 Iranian nationals with running a nearly 20-year-long scheme to evade U.S. sanctions on the Government of Iran by disguising more than $300 million worth of transactions—including the purchase of two $25 million oil tankers—on Iran's behalf through front companies in California, Canada, Hong Kong, and the United Arab Emirates."[11] That scheme relied on the use of "more than 70 front companies."[12]  Similarly, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have attempted to use U.S. and non-U.S. shell companies to evade sanctions imposed on Russia" in response to that country's unlawful invasion of Ukraine.[13]

The abuse of anonymous entities has been prevalent in the United States, which is regarded as "a safe haven for criminals . . .  looking to disguise their identities for nefarious purposes"[14] and is home to more corporations than any other jurisdiction.[15]  Studies have also found that anonymous corporations created in the United States are likewise used more often to

---

[10] 87 Fed. Reg. at 59,499.

[11] *Id.* at 59,503.

[12] *Id.* at 59,504.

[13] *Id.* at 59,498.

[14] U.S. Dep't of Just., *supra* note 3.

[15] Glob. Fin. Integrity, *The Library Card Project: The Ease of Forming Anonymous Companies in the United States* 1 (2019), *available at* https://gfintegrity.org/wp-content/uploads/2019/03/GFI-Library-Card-Project.pdf.

facilitate corruption than entities formed in any other country.[16]  These statistics are explained by the ease with which anonymous companies and other entities can be created or registered in the United States, along with the lack of a centralized database of information about who beneficially owns these entities.

Indeed, prior to the enactment of the CTA, the ownership data available to law enforcement was limited to information collected by states when corporations are created and—beginning in 2018—information reported under Treasury's recently promulgated Customer Due Diligence ("CDD") Rule, which requires companies to report their beneficial ownership information if and when they choose to open accounts at certain regulated financial institutions.[17] Contrary to Plaintiffs' assertions that existing reporting requirements are sufficient, Compl. ¶ 5; Pls.' MSJ at 2-3, neither source of information is adequate to bring anonymous companies out of the shadows.

With respect to information collected by states, nearly all of these jurisdictions fail to require companies to identify their beneficial owners at the time of formation.[18]  In fact, a 2019 analysis by the U.S.-based anti-money laundering think tank Global Financial Integrity revealed that in all 50 states "a person needs to provide far more personal information to a state to obtain a library card than to create a company" that can be used to facilitate tax evasion, money laundering, fraud, and corruption.[19]  Most public libraries require proof that the applicant is the same person who will ultimately control and use the card, including photo identification and

---

[16] Emile van der Does de Willebois et al, *supra* note 1, at 34, 121 tbl. B3 (reviewing 128 cases of "grand corruption" that were facilitated by shell corporations and finding that U.S. corporations were used more often than corporations formed in any other country).

[17] 87 Fed. Reg. at 59,500.

[18] *The Library Card Project*, *supra* note 15, at 4.

[19] *Id.* at 3.

documentation to verify the applicant's address, such as a utility bill.[20]  In contrast, none of the 50 states requires a company to report who ultimately owns or controls the company.[21]

As for the CDD Rule, the reported beneficial ownership information—and its availability to law enforcement—is limited in several critical ways.  First, the information collected by the CDD Rule "is not reported to the Government[] and is not immediately available to law enforcement, intelligence, or national security agencies."[22]  Second, the CDD Rule's definition of "beneficial owner" is underinclusive because it requires companies to report only those individuals who hold 25 percent or more of the equity interest.  31 C.F.R. § 1010.230(d)(1).  This limitation is significant—federal prosecutors have long identified bad actors who were not the official owner of record of a U.S. entity, yet exercised control over its operations.[23]  The CDD Rule—unlike the CTA—therefore "omi[ts] . . . persons that have substantial control of a reporting company . . . with the foreseeable consequence of allowing illicit actors to easily conceal their ownership or control of legal entities."[24]

Third, the CDD Rule only collects beneficial ownership information from those companies that *choose* to open accounts with certain covered financial institutions and only as of the date the entity opens an account—not when it is formed.  31 C.F.R. § 1010.230(b)(1).  As the Treasury Department explained in the 2020 National Strategy for Combatting Terrorist and Other Illicit Financing, the "lack of a requirement to collect beneficial ownership information at

---

[20] *Id.* at 4.

[21] *Id.*

[22] 87 Fed. Reg. at 59,505.

[23] *See, e.g.*, *Keeping Foreign Corruption Out of the United States: Hearing Before the S. Permanent Subcomm. on Investigations of the S. Committee on Homeland Sec. & Governmental Affs.* 111th Cong. (2010) (case study involving Teodoro Obiang who never owned yet nevertheless exercised control over California entities formed by his legal counsel).

[24] 87 Fed. Reg. at 59,562.

the time of company formation" was one of "the most significant vulnerabilities in the United States exploited by illicit actors."[25]  Moreover, many entities do not open accounts in the United States—especially if their beneficial owners are from another country—and are therefore not subject to the CDD Rule.  This oversight allows anonymous entities to—among other things— purchase U.S. real estate by wiring cash to a U.S. account held by the relevant real estate firm. While the CDD Rule would require the bank to conduct collect beneficial ownership information from the real estate firm itself—which holds the account—the bank would not be required to collect information from the anonymous entity that is purchasing the real estate.[26]  The CDD Rule therefore left pronounced gaps in the fence it sought to erect around the U.S. financial system.

**B.      The CTA provides the necessary tools to stop the exploitation of anonymous companies.**

Faced with the significant vulnerabilities left in place by state requirements and the CDD Rule, Congress enacted the CTA.  The statute provides law enforcement with the tools it previously lacked by requiring companies in the U.S. to report their beneficial ownership information directly to the Financial Crimes Enforcement Network ("FinCEN"), a bureau within the Treasury Department that is tasked with combatting financial crimes.  31 U.S.C. § 5336(b)(1).  Going beyond the scope of the CDD Rule, the CTA requires such information at the time of formation, registration, or—for entities that predate the CTA's enactment—within 2 years of the law coming into effect.  *Id.*  The CTA also makes that information available to law

---

[25] U.S. Dep't of Treasury, *National Strategy*, *supra* note 8, at 12.

[26] *See* Glob. Fin. Integrity, *Acres of Money Laundering:  Why U.S. Real Estate is a Kleptocrat's Dream* 6-7 (2021), *available at* https://gfintegrity.org/wp-content/uploads/2021/08/Acres-of-Money-Laundering-Final-Version-2021.pdf (explaining that real estate purchases are frequently used as a money laundering vehicle).

enforcement under secure protocols, *id.* § 5336(c)(2), and defines the term "beneficial owner" to include not only those individuals who hold 25 percent or more of ownership interests, but also individuals who exercise substantial control over the entity, *id.* § 5336(a)(3).

These data collection requirements are widely regarded as a critical step towards curtailing the use of anonymous companies to facilitate crime.  As the text of the CTA itself explains, "[f]ederal legislation providing for the collection of beneficial ownership information for corporations . . . is needed to protect vital United States national security interests; protect interstate and foreign commerce; [and] better enable . . . law enforcement efforts to counter money laundering . . .  and other illicit activity."[27]  These conclusions are consistent with remarks made by Senators Whitehouse, Grassley, Wyden, and Rubio, who have explained that the "CTA marked the culmination of a years-long effort in Congress to combat money laundering, international corruption, and kleptocracy[.]"[28]  The long campaign to bring the CTA into existence was also joined by a wide array of other stakeholders, including the Treasury Department,[29] various national security and law enforcement agencies,[30] and more than 130 organizations across the political spectrum that endorsed the legislation.[31]

The CTA is also consistent with international standards established by the Financial Action Task Force ("FATF").  Composed of 39 countries, the FATF is an intergovernmental body created to develop international standards for legal and regulatory measures—including

---

[27] Corporate Transparency Act § 6402(5), 124 Stat. at 4604.

[28] Letter from Sens. Sheldon Whitehouse et al., to FinCEN (May 5, 2021), *available at* https://www.whitehouse.senate.gov/imo/media/doc/Senators%20CTA%20Comment%20Letter%2005.04.2021.pdf.

[29] 87 Fed. Reg. at 59,500.

[30] *Id.*

[31] FACT Coal., *Coalition Members*, https://thefactcoalition.org/about-us/coalition-members-and-supporters/ (last visited Mar. 30, 2023).

beneficial ownership information requirements—that can effectively combat money laundering, terrorist financing, and other threats to the international financial system.[32]  Prior to the CTA's enactment, the FATF specifically identified the lack of beneficial ownership information requirements as a "fundamental gap" in the United States' anti-money laundering regime.[33]  And in the text of the CTA itself, Congress explained that the legislation was designed to "bring the United States into compliance with international [anti-money laundering] standards."[34]

### C.   The CTA does not supplant the CDD Rule with inferior requirements.

Notwithstanding this generally accepted knowledge, Plaintiffs argue that the CTA undermines law enforcement efforts because the Act will "supplant existing beneficial ownership reporting requirements under the CDD Rule" with "inferior" reporting requirements.  Compl. ¶¶ 37-38.  In Plaintiffs' view, the CTA will weaken law enforcement efforts because—unlike the CDD Rule—the CTA "requires no supporting documentation, no review of information, and no third-party monitoring or reporting to FinCEN."  *Id.* ¶ 39.

This attempt to second-guess Congress's judgment fails for two reasons.  First, the CTA is designed to *complement*, not *supplant*, the CDD Rule.  To that end, Congress expressly directed the Treasury Secretary to collect information under the CTA "in a form and manner that ensures the information is highly useful in . . . facilitat[ing] the compliance of the financial institutions with . . . customer due diligence requirements under applicable law."  31 U.S.C. § 5336(b)(1)(F)(iv).  While Congress directed the Treasury Secretary to "revise the [CDD] rule" to

---

[32] FATF, *Who We Are*, https://www.fatf-gafi.org/en/the-fatf/who-we-are.html (last visited Mar. 30, 2023).

[33] FATF, *Anti-Money Laundering and Counter-Terrorist Financing Measures United States Mutual Evaluation Report* 4 (2016), *available at* https://www.fatf-gafi.org/media/fatf/documents/reports/mer4/MER-United-States-2016.pdf.

[34] Corporate Transparency Act § 6402(5)(E), 134 Stat. at 4604.

"bring the rule into conformance with" the CTA,[35] Congress was explicit that "nothing in this section may be construed to authorize the Secretary . . . to repeal the requirement that financial institutions identify and verify beneficial owners of legal entity customers under [the CDD Rule]."[36]  Plaintiffs' concerns that "the CTA will likely reduce the role of financial institutions . . . in combatting financial crimes," Compl. ¶ 5, are therefore misplaced.  And, as explained above, the CTA will generally make data collection efforts more robust by expanding the definition of "beneficial owner" and by collecting such information at the time of formation or registration.  *Supra* Part I(B).  In other words, the CTA adds law enforcement tools; it does not detract from the existing framework.

Second, Plaintiffs are incorrect to assert that the CTA is inferior because it "requires no supporting documentation" and "no review of information."  Compl. ¶ 39.  As Plaintiffs acknowledge, Compl. ¶ 20, the CTA *does* require such documentation in the form of a "unique identifying number from an acceptable identification document," 31 U.S.C. § 5336(b)(2)(A), such as a United States passport; a state identification document; a driver's license; or a foreign passport.[37]  Moreover, FinCEN's implementing regulations make clear that the bureau will review the submitted documentation for accuracy and authenticity.  To begin, the regulations require applicants to "specify what jurisdiction issued the identification document" precisely so that FinCEN can "ensure that the identifying number can be identified as unique and valid."[38]  Likewise, the rule requires applicants to submit an image of the document to "help confirm the accuracy of the reported unique identification number" and to make it "harder to provide false

---

[35] *Id.* § 6403(d)(1).

[36] *Id.* § 6403(d)(2)(B).

[37] 87 Fed. Reg. at 59,519.

[38] *Id.*

identification information."[39]  To the extent Plaintiffs believe that FinCEN will be less equipped to "review[], vet[], and verify[]" such information than "compliance staff of covered financial institutions," Compl. ¶ 38, they offer no support for that argument.

## II.   The CTA's Reporting Requirements Are Neither Unusual Nor Unprecedented.

Plaintiffs are likewise incorrect in asserting that the CTA's data collection is an "unprecedented intrusion into individual privacy rights," Pls.' MSJ at 23, with "no obvious analogues in the existing laws of all fifty States," Compl. ¶ 33.  Here, the CTA requires entities who seek to avail themselves of a government service—*i.e.*, incorporation—to disclose information about their beneficial owners before accessing that service.  Both federal and state law are replete with similar requirements that applicants for other government services disclose information about the applicant's identity.

In Alabama, for example, a driver's license applicant must provide her full name, date of birth, Social Security Number, telephone number, and e-mail address.[40]  Likewise, an aspiring attorney who wishes to sit for the Alabama Bar Exam must provide—among other things—her name, Social Security Number, other names used in the past, date of birth, marital status, and residences for the preceding 10 years.[41]  Similarly, applying for a library card with the Huntsville-Madison County Public Library (among many others) requires providing the applicant's first and last name, date of birth, address, and contact information.[42]  *See also* Defs.'

---

[39] *Id.*

[40] Ala. Law Enf't Agency, *Driver Pre-Application*, http://alabamadl.alea.gov/_/#4 (last viewed Apr. 3, 2023).

[41] Ala. State Bar, *Character and Fitness Questionnaire*, http://admissions.alabar.org/browseform.action?applicationId=1&formId=724 (last viewed Apr. 3, 2023).

[42] Huntsville-Madison Cnty Pub. Libr., *Register for a Library Card*, http://catalog.hmcpl.org/MyAccount/SelfReg (last viewed Apr. 3, 2023).

Br. Supp. Mot. Dismiss at 45 (noting that the federal government imposes similar reporting requirements for income tax, SEC disclosures, and bank deposits exceeding a certain amount). These examples make clear that there is nothing controversial about requiring individuals— much less corporate entities—to disclose identifying information in order to avail themselves of government services, such as the ability to create or register a legal entity.

Plaintiffs nevertheless insist that the CTA is unprecedented because none of the 50 states require newly formed or registered corporations to report their beneficial owners. Compl. ¶ 33. When looking for prior examples, however, the question is not whether the states previously collected the exact information that Congress now seeks under the CTA. Rather, the question is whether the federal or state governments have collected similar information in similar circumstances. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2132 (2022) (explaining that "analogical reasoning . . . requires a determination of whether the two regulations are 'relevantly similar'"). Both levels of government clearly have, as demonstrated by the examples above. Moreover, to the extent the CTA's reporting requirements are novel in the specific context of disclosures by newly created or registered corporate entities, it is because Congress has exercised its considered judgment that existing state disclosure requirements were insufficient to combat money laundering and other financial crimes.[43]

## III.    Legitimate Small Businesses Benefit from the CTA.

Plaintiffs find no more success in their attempt to assert that the "benefits of the CTA do not justify the burdens it imposes on small business owners," Compl. ¶ 37, which Plaintiffs characterize as "profound and injurious," *id.* ¶ 32. Small business owners disagree.

---

[43] Corporate Transparency Act § 6402(2) (noting that states do not require beneficial ownership information); *id.* § 6402(5) (finding that federal legislation requiring such information is "needed . . . to counter money laundering . . . and other illicit activity").

In a 2018 poll conducted while Congress was considering the CTA, more than three-quarters of small business owners expressed support for legislation requiring businesses to divulge their owners' true identities at the time of formation.[44]  In the same survey, 84 percent of small business owners said that the use of anonymous companies to win contracts or obtain government funding was a problem.[45]  In addition to facilitating unfair competition, anonymous companies can also harm small businesses by undermining supply chains, creating difficulties in finding responsible subcontractors, and providing cover for fraud.[46]

The fears entertained by the small business owners who answered this survey are not hypothetical, nor are they limited to schemes by foreign powers and global cyberscammers, as Plaintiffs would have it.  Pls.' MSJ at 33 (suggesting that Congress should have "limit[ed] the CTA's reporting requirements to non-U.S. persons").  In 2015, a man from Dothan, Alabama was sentenced to nine years in prison for defrauding a government contractor through his anonymous company.[47]  Similarly, in Virginia, two executives pled guilty to creating an anonymous company that they used to fraudulently secure $31 million in federal government contracts.[48]  And in Colorado, four men used a network of more than 20 shell companies to

---

[44] Small Bus. Majority, *Small Business Owners Support Legislation Requiring Transparency in Business Formation* (Apr. 4, 2018), *available at* https://smallbusinessmajority.org/our-research/government-accountability/small-business-owners-support-legislation-requiring-transparency-business-formation.

[45] *Id.*

[46] *See* FACT Coal., *FACT Sheet: Small Businesses Are Harmed by Anonymous Companies* (Sept. 17, 2019), https://thefactcoalition.org/fact-sheet-small-businesses-are-harmed-by-anonymous-companies/.

[47] Press Release, U.S. Att'y's Off. for S.D. Fla., *Nine Year Sentence for Alabama Man Convicted of Defrauding Military Sub-Contractor* (Mar. 2, 2015), *available at* https://www.justice.gov/usao-sdfl/pr/nine-year-sentence-alabama-man-convicted-defrauding-military-sub-contractor.

[48] Press Release, U.S. Att'y's Off. for E.D. Va., *Security Contractors Plead Guilty to Illegally Obtaining $31 Million From Contracts Intended For Disadvantaged Small Businesses* (Mar. 18,

finance an illicit sports merchandise counterfeiting ring.[49]  These are merely a few examples of the enormous costs faced by legitimate businesses every year as a result of crimes facilitated by anonymous entities.[50]  By supplying law enforcement with the means to prevent such fraud, the CTA benefits—rather than harms—legitimate small businesses.

Rather than acknowledge the CTA's benefits, Plaintiffs overstate the Act's costs, claiming that small businesses will be forced to pay "thousands of dollars to attorneys to navigate the statute's labyrinthine reporting requirements."  Compl. ¶ 34.  As Plaintiffs tell it, small business owners need to consult attorneys to determine whether they qualify for exemptions and to identify the beneficial owners of their businesses.  *Id.*

These fears are misplaced.  The U.S. Small Business Administration reports that approximately 78 percent of all businesses in the United States are non-employer firms, meaning that there is only one person in the enterprise.[51]  FinCEN estimates that such entities will spend approximately $85 to prepare and submit an initial report to FinCEN.[52]  As the bureau points out, such costs are "comparable to (and in some cases less than) the fees that states charge for

---

2013), *available at* https://www.justice.gov/usao-edva/pr/security-contractors-plead-guilty-illegally-obtaining-31-million-contracts-intended.

[49] Press Release, U.S. Immgr. & Customs Enf't, *Former Colorado Police Officer Sentenced for Selling Counterfeit Denver Broncos Merchandise* (Jan. 25, 2017), *available at* https://www.ice.gov/news/releases/former-colorado-police-officer-sentenced-selling-counterfeit-denver-broncos.

[50] *See id.* ("Trafficking counterfeit goods is the second-largest illicit trade activity, valued at roughly $250 billion annually.").

[51] U.S. Small Buss. Admin, *Frequently Asked Questions* (2012), https://www.sba.gov/sites/default/files/FAQ_Sept_2012.pdf; *see also Hearing on Outside Perspectives on the Collection of Beneficial Ownership Information Before the S. Comm. On Banking, Housing, & Urban Affs.*, 116th Cong. 6 (June 20, 2019) (statement of Gary Kalman, Exec. Dir., FACT Coal.), *available at* https://thefactcoalition.org/wp-content/uploads/2019/06/Gary-Kalman-SBC-20190620-Written-Testimony-FINAL.pdf.

[52] 87 Fed. Reg. at 59,549.

creating a limited liability company, which vary from $40 to $500."[53]  And while entities with more complex beneficial ownership structures may need to consult attorneys for an initial filing, only "4.9 percent of reporting companies will have a 'complex structure.'"[54]  These numbers are consistent with past experience in countries that have implemented similar laws.  In the United Kingdom, which maintains an analogous public register of companies' real owners, the average number of owners per business is 1.13, and the most common number of owners is one.[55]  An analysis of the directory showed that more than 99 percent of businesses listed fewer than six owners.[56]

Plaintiffs' suggestion that "*many* reporting companies" will have difficulty identifying their beneficial owners is therefore misleading.  Compl. ¶ 34 (emphasis added).  Moreover, for those entities that do have more complex ownership structures, FinCEN has explained that such companies "chose their structures recognizing that costs associated with legal and tax advice and other filing and compliance obligations might be higher as a result."[57]  From a practical standpoint, then, it is difficult to see how owners with the resources to afford professional assistance (e.g., lawyers, accountants, and others) when intentionally establishing a complex ownership structure would simultaneously lack the resources to identify and report their companies' beneficial owners.

---

[53] *Id.*

[54] *Id.*

[55] *Hearing on Outside Perspectives on the Collection of Beneficial Ownership Information*, *supra* note 51, at 5.

[56] *Id.*

[57] Beneficial Ownership Information Reporting Requirements, 86 Fed. Reg. 69,920, 69,936 (Dec. 8, 2021).

**CONCLUSION**

The CTA provides law enforcement an invaluable tool to fight domestic and global money laundering, and it does so without imposing unreasonable costs on small businesses. Through a *de minimis* disclosure at the time of a company's formation or registration in the U.S., the CTA marginalizes bad actors, shores up national security interests, and creates a fairer marketplace for legitimate competition.  The Act represents a massive step forward in the United States' fight against money laundering, to the benefit of small business owners who have much to lose without the Act's protections.

Plaintiffs' arguments to the contrary—and their related assertions that the CTA cannot survive rational basis review because the CTA is not a rational means of achieving Congress's goals—are wrong.  The Court should therefore deny Plaintiffs' motion and grant Defendants' Motion to Dismiss or, in the alternative, Cross Motion for Summary Judgment.

Dated: April 14, 2023

/s/ J. Elliott Walthall
JAMES F. BARGER JR.
(ASB-2336-M76B)
J. ELLIOTT WALTHALL
(ASB-0967-E58W)
FROHSIN BARGER &amp; WALTHALL
100 Main Street
Saint Simons Island, Georgia 31522
Tel: 205.933.4006
Fax: 205.933.4008

Respectfully submitted,

/s/ Kristen P. Miller
Kristen Miller (D.C. Bar No. 229627)*
Will Bardwell (D.C. Bar No. 90006120)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
wbardwell@democracyforward.org
kmiller@democracyforward.org
slev@democracyforward.org

*Counsel for Amici Curiae*

* admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of April 2023, I electronically served a copy of the foregoing document on all counsel of record by filing it with the Court via CM/ECF, in accordance with Local Rule 5.6.

Dated: April 14, 2023

<div style="margin-left: 50%;">

*s/ Kristen P. Miller*
Kristen P. Miller

*Counsel for Amici*

</div>