FILED

2023 May-02  PM 04:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

NATIONAL SMALL BUSINESS UNITED D/B/A/ THE NATIONAL SMALL BUSI-NESS ASSOCIATION, *et al.*

                    Plaintiffs.

JANET YELLEN, *et al.*

                    Defendants.

Case No. <u>5:22-cv-01448</u>

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS, OR, IN THE ALTERNATIVE, CROSS-MOTION
<u>FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION ..................................................................................................1

I.   Plaintiffs Have Standing to Assert All Their Claims. ...........................2

    A.   The CTA's Requirement to Disclose Personal Information to FinCEN Absent Suspicion of Wrongdoing for Future Law Enforcement Is an Injury-in-Fact. ...................3

    B.   Winkles Has Standing to Sue......................................................5

    C.   The NSBA Has Standing to Sue. ................................................8

II.   Congress Does Not Have Constitutional Power to Enact the CTA. .....................................................................................14

    A.   The CTA Is Not Authorized by Unenumerated Foreign Affairs and National Security Powers and the Necessary and Proper Clause. ...................................................15

    B.   The CTA Is Not Authorized by the Taxing Power on Its Own or in Conjunction with the Necessary and Proper Clause......................................................................19

    C.   The CTA Is Not Authorized by the Commerce Clause............22

III.   The CTA Violates Plaintiffs' Constitutional Rights. ..........................32

    A.   Fourth Amendment ..................................................................32

    B.   Fifth Amendment .....................................................................35

    C.   First Amendment......................................................................37

IV.   The CTA Is Unconstitutionally Vague. ..............................................39

CONCLUSION ..................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Afroyim v. Rusk*, 378 U.S. 253 (1967) ......................................................18

*Airbnb, Inc. v. City of New York*, 373 F.Supp.3d 467 (S.D.N.Y 2019)..................37

*Bellis v. United States*, 417 U.S. 85 (1974) ............................................36

*Bond v. United States*, 564 U.S. 211 (2011) ...........................................12

*Boyd v. United States*, 116 U.S. 616 (1886) ...........................................37

*Brown v. Walker*, 161 U.S. 591 (1896)....................................................16

*Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) ...........................*passim*

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) .........................34, 35

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) .................................37

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .............................7, 8

*Common Cause/Ga. v. Billups*, 554 F.3d 1340 (11th Cir. 2009).....................8, 9, 11

*Davis v. FEC*, 554 U.S. 724 (2008) .....................................................2, 8

*FEC v. Cruz*, 142 S.Ct. 1638 (2022)..................................................5, 7, 8

*Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ...........................................................8, 9, 11

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477 (2010)...............................................................24

*Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250 (11th Cir. 2012)...........................................................11

*Ga. Republican Party v. SEC*, 888 F.3d 1198 (11th Cir. 2018) ..............11

*Gonzales v. Raich*, 545 U.S. 1 (2005)..............................................*passim*

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................8

*Helvering v. Mitchell*, 303 U.S. 391 (1938).........................................................21

*Jacobson v. Fla. Sec'y of State*, 974 F.3d. 1236 (11th Cir. 2020) ...........................8

*Jinks v. Richland County*, 538 U.S. 456 (2003).................................................16, 17

*Katz v. United States*, 389 U.S. 347 (1967) .....................................................32, 33

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) ......................................17, 18

*Kolender v. Lawson*, 461 U.S. 352 (1983)..............................................................41

*Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358 (11th Cir. 1999) .........................................................................................................38, 39

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) [*Lujan II*] ..........................3, 5

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) [*Lujan I*].............................2, 5

*M'Culloch v. Maryland*, 17 U.S. 316 (1819).........................................................25

*Mackenzie v. Hare*, 239 U.S. 299 (1915)..............................................................18

*Nat'l Fed'n of Ind. Bus. (NFIB) v. Sebelius*, 567 U.S. 519 (2012) .......19, 24, 30, 31

*Olmstead v. United States*, 277 U.S. 438 (1928) ...................................................35

*Perez v. Brownell*, 356 U.S. 44 (1958) .................................................................18

*Seminole Tribe of Fla v. Fla*, 517 U.S. 44 (1996) ................................................22

*Smith v. Maryland*, 442 U.S. 735 (1979) ........................................................32, 33

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ..........................................................2

*Swann v. Sec'y, Ga.*, 668 F.3d 1285 (11th Cir. 2012) .............................................7

*Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) ...............................12

*Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332 (11th Cir. 2021) .........................................................................................................7

*Ullmann v. United States*, 350 U.S. 422 (1956) ....................................................16

*United States v. Barry*, No. 2:08-cr-56, 2009 WL 139874 (M.D. Fla.
    Jan. 20, 2009), *aff'd*, 371 F. App'x 3 (11th Cir. 2010)........................................20

*United States v. Batson*, 818 F.3d 651 (11th Cir. 2016)..........................................22

*United States v. Comstock*, 560 U.S. 126 (2010)...............................................15, 20

*United States v. Davila-Mendoza*, 972 F.3d 1264 (11th Cir. 2020).......................22

*United States v. Lopez*, 514 U.S. 549 (1995)................................................23, 24, 30

*United States v. Morrison*, 529 U.S. 598 (2000) ......................................1, 23, 24, 30

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ........................................25

*Warth v. Seldin*, 422 U.S. 490 (1975).......................................................................5, 13

*Wickard v. Filburn*, 317 U.S. 111 (1942) .............................................................29, 30

## Constitutional Provisions

U.S. Const., Art. I, § 8 ...............................................................................*passim*

U.S Const. Article III, § 1 ...................................................................................17

## Statutes and Rules

12 U.S.C. § 1955(a) ............................................................................................36

18 U.S.C. § 371 ...................................................................................................20

18 U.S.C. § 513(c) ..............................................................................................20

18 U.S.C. § 514 ...................................................................................................20

21 U.S.C. §§ 801–904 .........................................................................................29

26 U.S.C. § 7203..................................................................................................20

28 U.S.C. § 1367(d) .............................................................................................16

31 U.S.C. § 5336....................................................................................................1

31 U.S.C. § 5336(a)(3)(A) ...................................................................................39

31 U.S.C. § 5336(a)(11) ............................................................36

31 U.S.C. § 5336(c)(5)(B) ..........................................................21

31 U.S.C. § 5336 n. (5)(A) .........................................................14

Ala. Code § 10A-1-2.01 (2022) ..................................................38

Bank Secrecy Act, Pub. L. No. 91-508, 84 Stat. 1114-24 (1970)
("BSA") (codified as amended in scattered sections of 12 U.S.C., 18
U.S.C., and 31 U.S.C.) .......................................................*passim*

Comprehensive Drug Abuse Prevention and Control Act of 1970
("CSA"), Pub. L. No. 91-513, Title II, 84 Stat. 1236 .....................*passim*

Corporate Transparency Act ("CTA"), Publ. L. No. 116-283, 134 Stat.
4604. (2021) ...................................................................*passim*

Fed R. Civ. Proc. 56(e) ...............................................................3

## Regulations

31 C.F.R. pt. 1010 .......................................................................2

81 Fed. Reg. 29398 (May 11, 2016) ...........................................24

81 Fed. Reg. 29399 (May 11, 2016) ...........................................24

87 Fed. Reg. 59250 (Sept. 30, 2022) ......................................2, 40

87 Fed. Reg. 59498 (Sept. 30, 2022) ...........................................2

## Others/ Miscellaneous

Joseph J. Angell & Samuel Ames, A TREATISE OF PRIVATE
    CORPORATIONS AGGREGATE 45-46 (Charles C. Little & James
    Brown eds., 2d rev. ed. 1861) (1843) ...................................26

Webster's Third New Int'l Dictionary 720 (1966) ....................30

# INTRODUCTION

The Government does not even try to show that the Corporate Transparency Act ("CTA") is consistent with the text and original meaning of the Constitution related to corporate entity formation by the States. *See* Pltfs' Mot. at 11-17 (explaining how entity formation was a core State sovereign power). The Government also does not deny that the CTA is unprecedented in requiring people who use these State processes—and who are not suspected of having done anything wrong—to disclose personal information for the federal government to use in future criminal investigations and prosecutions.

Although the Government relies on the political branches' pronouncement that these measures are justified to fight money laundering and terrorism funding, courts cannot defer to Congressional findings if Congress does not have the constitutional power to enact a law based on them. *See United States v. Morrison*, 529 U.S. 598, 614 (2000) ("[T]he existence of congressional findings is not sufficient, by itself, to sustain the constitutionality" of challenged legislation). And, as the Supreme Court doctrine shows, the text and original meaning of the Constitution cannot sustain the Government's claim that an enumerated Article I power, or supposed unenumerated foreign affairs or national security powers, justify the CTA.

Moreover, the CTA's forced compilation of personal information, including an image of a photo ID, *see* 87 Fed. Reg. 59498, 59250 (Sept. 30, 2022), absent any

suspicion of wrongdoing to create a Financial Crimes Enforcement Network ("Fin-CEN")-curated virtual lineup of entity owners and applicants violates the First, Fourth, Fifth, Ninth, and Tenth Amendments.

## I. Plaintiffs Have Standing to Assert All Their Claims.

In an effort to head off judicial review of this unprecedented federal over-reach, the Government repeatedly rests on untenable claims that Plaintiffs Isaac Winkles and NSBA lack standing to bring these claims.  A plaintiff has standing to sue when it has "(1) suffered an injury in fact, (2) that is fairly traceable to the chal-lenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).  An imminent threat of injury suffices.  *See Davis v. FEC*, 554 U.S. 724, 734 (2008) ("A party facing prospective injury has standing to sue when the threatened injury is real, immediate, and direct.").  On a motion to dismiss, the Court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) [*Lujan I*].  "In response to a summary judgment motion, however, the plaintiff . . . must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment mo-tion, will be taken as true."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) [*Lujan II*] (citing Fed R. Civ. Proc. 56(e)).

The Government avers that: (1) Plaintiffs' specific allegations do not state a qualifying injury-in-fact; or alternatively, (2) Plaintiffs have not introduced sufficient evidence to show that there is no genuine issue of material fact about the standing allegations.  The Government is wrong on both counts.  The Complaint alleges a concrete and particularized injury-in-fact: the injury caused to Plaintiffs by the required disclosures of personal information for FinCEN to store in a law-enforcement database without any suspicion of wrongdoing.  Moreover, Plaintiffs did not present standing-related evidence with their opening motion for summary judgment only because they did not then know that the Government would dispute those allegations.  Declarations by Winkles and NSBA setting forth specific facts about their alleged injury are included as Exhibits A and B this Memorandum of Law, and, as the Supreme Court law has directed, "for purposes of the summary judgment motion . . . will be taken to be true." *Lujan II*, 504 U.S. at 561.[1]

### A.   The CTA's Requirement to Disclose Personal Information to Fin-CEN Absent Suspicion of Wrongdoing for Future Law Enforcement Is an Injury-in-Fact.

The Government's standing argument misstates Plaintiffs' alleged injury from the CTA.  The Government frames Plaintiffs' injury as forced disclosure of personal

---

[1] The Government does not represent that its statement of facts is undisputed as the Court's initial order contemplates, and so its statement is not to be taken as true for the purpose of these motions.

information.  Its theory is that because Plaintiff Winkles already turned over to the Government or made public the personal information the CTA requires his company to report to FinCEN (*e.g.*, in applying for a passport or paying taxes), the CTA will not impose a new injury on him.  To the extent Plaintiff NSBA's associational standing is based on allegations that an identified NSBA member will suffer injury-in-fact, the Government says NSBA also lacks standing.  *See* Defts' Mot. at 24-25.

In fact, Plaintiffs' injury is not mere forced disclosure of personal information.  Rather, the injury arises from the CTA's requirement to report personal information *to FinCEN*, for long-term storage in its database, for potential access by state, federal, and foreign *law-enforcement and intelligence agencies* in investigating and prosecuting future crimes.

This understanding of injury-in-fact is set forth in the Complaint.  The Complaint alleges, for instance, that Winkles "will be subject to the Act's reporting requirements to give his sensitive personal information *to FinCEN*." Compl. ¶ 14 (emphasis added); *see also id.* at ¶ 12 (stating that NSBA's member companies object to "the CTA's unconstitutional command" to "turn over 'sensitive' personal information to the federal government" about entities formed under State laws).  The Complaint further alleges that the CTA does not "restrict reporting obligations to individuals or entities that are suspected of a crime or wrongdoing." *Id*. ¶ 30.  The Complaint also alleges that the CTA would violate Plaintiffs' privacy rights because

4

it "was enacted for the purpose of harvesting 'sensitive' personal information from individuals to create a database for law enforcement purposes by FinCEN and other United States and foreign law-enforcement and intelligence agencies." *Id.* ¶ 52. These "general allegations" amply show "specific facts that are necessary to support the claim" of a concrete and particularized injury-in-fact that the CTA causes Plaintiffs. *Lujan I*, 497 U.S. at 889.

Moreover, with respect to summary judgment, Plaintiffs' declarations herein set forth specific facts to support the Complaint's allegations. "For standing purposes, [federal courts] accept as valid the merits of [plaintiffs'] legal claims." *FEC v. Cruz*, 142 S.Ct. 1638, 1647 (2022). *See also Lujan II*, 504 U.S. at 561 (courts must take sworn facts as true for summary judgment on standing); *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.").

**B.    Winkles Has Standing to Sue.**

In his declaration, Winkles states that he "strongly object[s] to supplying my personal information to FinCEN for inclusion in its law enforcement database just because I am a small business owner." Isaac Winkles' Declaration ("Winkles Decl.") (attached hereto as Exhibit B), ¶ 8.  He testifies: "I do not want FinCEN employees to have access to my birthdate, address, or personal identification numbers, and I do not want this information to be shared with other governments, including other state

governments, federal agencies, and foreign governments." *Id.*  He further states that he "rel[ies] on the idea that when I form an entity under Alabama law," his "information will remain private as Alabama law allows," and that he will not have to "provide additional personal information to . . . the federal government that has nothing to do with forming that entity in the first place." *Id.* ¶ 9.  Winkles testifies that although he believes the federal government does not have "the right to treat me as criminal suspect just because I set up a lawful corporate entity in Alabama, he will "feel compelled to turn over the required information because I do not want to go to jail or pay fines of thousands of dollars." *Id.* ¶ 11.

The case the Government will likely make in its prospective reply brief to these sworn facts will almost certainly be unavailing.  It will surely claim that Winkles suffered no injury-in-fact because the Government issued him his passport number, he "already disclosed" his beneficial ownership of APM in this lawsuit and on social media, and his ownership information is "readily available on the website of the Alabama Secretary of State." Defts' Mot. at 20.  All those considerations are irrelevant.  The point is not merely that Winkles must disclose this information.  The point is that he must disclose the information *for FinCEN*'s *law-enforcement database*, without any present suspicion of wrongdoing.

The Government implies that Winkles' claim of injury is premised on speculation that his information may be shared with government officials, *see* Defts' Mot.

at 21, but that is also incorrect.  Winkles' injury stems from having his personal information turned over to FinCEN for its database to which state, federal, and foreign officials have access.  There is nothing speculative about the fact that Winkles' personal information will go into FinCEN's database once he is forced to comply with the CTA reporting requirements.[2]

Furthermore, there is no support for the Government's contention that there is no traceability or redressability "'when a plaintiff independently caused his own injury'…[because] a favorable decision would not redress his alleged injury of forced disclosure."  Defts' Mot. at 20 (citing *Swann v. Sec'y, Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012)).  As explained above, Plaintiffs' alleged injury is not disclosure itself but disclosure to FinCEN, which is traceable to the CTA and redressable by a court order enjoining it.  *See FEC v. Ted Cruz for Senate*, 142 S.Ct. 1638, 1647 (2022) (holding that "an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application").  In *FEC v. Cruz*, the Supreme Court explicitly distinguished *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), which the Government cites as support for its assertion

---

[2] Thus, Winkles is not claiming injury from a *risk* that his information will be leaked or accessed by law enforcement.  Accordingly, the Eleventh Circuit's finding in *Tsao v. Captiva MVP Rest. Partners, LLC*, that class-action plaintiffs lacked standing because there was "no 'substantial risk' of identity theft" from a data breach, is inapposite.  *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d. 1332, 1343 (11th Cir. 2021).

that Plaintiffs lack standing. *Id.*; *and see* Defts' Mot. at 23.  The plaintiffs in *Clapper*, the *FEC* Court explained, "could not show that they had been or were likely to be subjected to [the challenged Government] policy in any event."  142 S.Ct. at 1647. By contrast, like Cruz in *FEC*, Plaintiffs' "injuries are directly inflicted by the [federal agency]'s threatened enforcement of the provisions they now challenge."  *Id.*

### C.    The NSBA Has Standing to Sue.

Plaintiff NSBA also has standing because it has alleged and shown injury both on its own behalf (organizational standing) and on behalf of its members (associational standing).  The Supreme Court has upheld the organizational plaintiff's standing based on a "drain on the organization's resources."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  The Eleventh Circuit has affirmed that "resource *diversion* is a concrete injury" that establishes organizational standing.  *Jacobson v. Fla. Sec'y of State*, 974 F.3d. 1236, 1250 (11th Cir. 2020) (emphasis in original). Thus, the Eleventh Circuit found that organizations had standing to challenge a Florida voting law because they would have had to "divert personnel and time" from other activities "to educating volunteers and voters on compliance." *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008); *see also Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (finding the NAACP had standing to challenge a Georgia voting law because it was "actively

involved in voting activities and would divert resources from its regular activities to educate and assist voters in complying with" that law).

The Complaint's allegations and the specific facts stated in the NSBA's attached declaration meet these standards.  The Government correctly quotes the Complaint's allegation that the "NSBA's mission is to represent and protect the rights of its members who operate their small business in compliance with lawfully enacted government regulation[,]"  Defts' Mot. 21-12 (quoting Compl. ¶ 11).  But here, the NSBA alleges that the CTA is *not* "lawfully enacted."   Hence, the Government is wrong to argue that "the resources allegedly spent" on informing members about the CTA "are very much in line with NSBA's core mission rather than a diversion of resources away from it."  *Id*. at 22 (citation and quotation marks and brackets omitted).  NSBA's diversion of its resources is functionally identical to the diversion of NAACP resources that gave rise to standing in *Browning* and *Billups*: an organization is challenging a statute as unlawful and would divert resources from activities it would otherwise pursue if the statute were upheld.

The Complaint alleges that "NSBA has already incurred and will continue to incur substantial costs in assisting its members in understanding how the Act applies to them and affects their businesses." Compl. ¶ 13.  The Complaint also alleges that "[a]n important service NSBA offers to its membership is its provision of information, education, and assistance regarding legal and regulatory compliance issues

faced by small businesses.  To serve faithfully the needs and interests of its membership, NSBA has already been—and will continue to be forced to devote its own scarce resources to assisting members in understanding how the CTA applies to them, how it will affect their business, and what they must do to comply."  Compl. ¶ 36.  The Government does not deny these allegations will establish standing if true but asserts that Plaintiffs do not "*demonstrate* that NSBA has been or will be injured" in this way.  Defs' Mot. at 22 (emphasis added).

To the extent that the Government demands evidence of these points, NSBA's declaration filed with this Memorandum of Law provides it.  According to Todd McCracken, NSBA's CEO, the "NSBA regularly counsels small businesses on federal requirements, often because such businesses do not have the expertise to navigate these requirements on their own and do not have the resources to hire outside advisors."  Todd McCracken's Declaration ("McCracken Decl.") (attached hereto as Exhibit A) ¶ 7.  The NSBA estimates that "many—and likely the majority—of [its] members" are not even aware of the CTA's reporting requirements, which may affect an estimated eighty percent of its members "owned by U.S. persons that have fewer than 20 full-time employees and less than $5,000,000 in gross receipts or sales." *Id.* ¶¶ 9, 12.  Thus, the "job of notifying members will itself consume NSBA resources," and compromise its "ability to provide our members with the necessary guidance" and "result in fewer opportunities for NSBA to educate and train member

companies on other topics, such as raising capital; finding, training and retaining workers; complying with employment laws; and protecting themselves, their customers, and employees from a range of cyber-security threats." *Id.* ¶ 12.   This testimony, which must be taken as true for summary judgment purposes, establishes NSBA's standing.  *See Browning*, 522 F.3d at 1166 ("These resources would otherwise be spent on registration drives and election-day education and monitoring."); *Common Cause/Ga.*, 554 F.3d at 1350 (resources would have to be diverted "from 'getting voters to the polls' to helping them obtain acceptable photo identification"); *Ga. Latino All. for Human Rights v. Governor of Ga.,* 691 F.3d 1250, 1260 (11th Cir. 2012) (immigration advocacy group "cancelled citizenship classes to focus on" increased inquiries about a new law).

NSBA also has associational standing because Winkles, the beneficial owner of an NSBA member, has injury-in-fact for the reasons explained above, as do other beneficial owners of NSBA member entities.  To allege associational standing, a complaint "must make specific allegations establishing that at least one identified member had suffered or would suffer harm."  *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018) (internal quotation marks and citation omitted). The Complaint here alleges that NSBA "joins in those objections [against the CTA's requirement to turn over personal information] on behalf of its members across the nation."  Compl. ¶ 12.  NSBA has at least 16 member entities in the Northeastern

Division of this District including Winkles' company, and "the vast majority of these entities will be subject to the CTA's reporting requirements." McCracken Decl. ¶ 11. McCracken further explains that NSBA's "members frequently file to form new entities according to their operational needs, and therefore would be subject to the CTA's reporting requirements regarding applicants as well as those regarding beneficial owners. Others may currently have existing companies but intend to file applications to form other entities for different purposes." *Id.* ¶ 9. Winkles, for his part, "anticipate[s] forming other Alabama entities over the next few years," triggering the CTA's applicant and beneficial owner reporting requirements for himself as well. Winkles Decl. ¶ 6.

The Government is correct that a litigant must show standing for each cause of action it brings and each form of relief it seeks. *See Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017). But Plaintiffs have established their standing to bring each of their claims. The Government does not challenge Plaintiffs' standing to bring their claim that Congress lacks constitutional power to enact the CTA, presumably because the Supreme Court has held that state citizens have standing to raise claims that the Government has infringed upon State sovereignty. *See Bond v. United States*, 564 U.S. 211, 222 (2011) ("An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws cause injury that is

concrete, particular, and redressable.").  Plaintiffs' injury of forced disclosure to Fin-CEN of personal information for law enforcement and the burden of making these disclosures, as explained above, establishes their standing to bring all their claims regarding their individual rights.  The Government, at times, seems to conflate analysis of standing with analysis of the merits of those constitutional claims, for instance in discussion of the reasonable expectation of privacy.  *See, e.g.*, Defts' Mot. at 41.  But standing and the merits are discrete inquiries.  *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.").

In sum, the Government does not and cannot deny that if the CTA is implemented, it will require Winkles' company and other NSBA members to give applicant and beneficial owner personal information to FinCEN to keep in its database for law enforcement purposes.  That is the injury the Plaintiffs have pleaded and sworn to, and it establishes their standing.[3]  Because this injury would be traceable to the CTA's implementation on January 1, 2024, and January 1, 2025, an order from this Court declaring the CTA unconstitutional and enjoining its enforcement would

---

[3] The Government's assertion that venue is improper is also unavailing.  *See* Defts' Mot. at 21 n.5. That conclusion turns on the argument that Winkles lacks standing and so necessarily fails if this Court holds that he does have standing.

redress the threat of injury by eliminating the CTA reporting requirement before it comes into effect.

## II.    Congress Does Not Have Constitutional Power to Enact the CTA.

With no clear single answer to the fundamental question in this case, the Government offers no less than four candidates for the constitutional power it says might have authorized Congress to enact the CTA: (1) Unenumerated "Foreign Affairs and National Security Powers and the Necessary and Proper Clause;" Defts' Mot. at 25-28; (2) the Interstate Commerce Clause, *id.* at 28-34; (3) the Foreign Commerce Clause, *id.* at 34-36; and (4) the "Necessary and Proper Clause and the Government's Taxing Authority," *id*. at 36-37.  None of the theories is valid.[4]

---

[4] As a threshold matter, the Government tries to deflect the question of constitutional power by asserting that the CTA does not actually "alter or amend any State incorporation law." Defts' Mot. at 2.  The Government's theory is that the CTA leaves State entity formation laws intact and only requires that State entities report the personal information of their beneficial owners and applicants to FinCEN. This is an unpersuasive distinction. The CTA grafts a mandatory personal information disclosure requirement above and beyond State entity formation laws that entities must comply with, or else their beneficial owners or applicants pay fines or go to federal prison, as the Government concedes.  *See* Defts' Mot. at 34 ("The CTA . . . regulates certain entities that have availed themselves of State incorporation laws.")  Thus, in practical terms, the CTA is indistinguishable from a federal general incorporation law declaring such reporting a condition of entity formation in the States contrary to what any State laws may require.  *Cf.* 31 U.S.C. § 5336 note (5)(A) (providing that the CTA's reporting requirement "is needed to . . . set a clear, Federal standard for incorporation practices").  Such a law would undoubtedly violate the Constitution's commitment to protecting the State's core sovereign power to charter entities, and so should the CTA, which accomplishes that very same result through post-formation compelled disclosure imposed on State entities.

**A.      The CTA Is Not Authorized by Unenumerated Foreign Affairs and National Security Powers and the Necessary and Proper Clause.**

Critically, the Necessary and Proper Clause does not authorize Congress to pass a law unrelated to a specifically enumerated power under the Constitution. The Supreme Court has instead "made clear that, in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, [it] look[s] to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally *enumerated* power." *United States v. Comstock*, 560 U.S. 126, 134 (2010) (emphasis added). *See also Gonzales v. Raich*, 545 U.S. 1, 22 (2005).

These precedents contradict the Government's theory that the Necessary and Proper Clause grants Congress legislative authority to enact a statute rationally related to *unenumerated* foreign-affairs and national-security powers. *See* Defts' Mot. at 26.   It is unclear how the Government compelled disclosure of the personal information of millions of Americans who form domestic entities without any foreign connections could even conceivably falls within a "*foreign"* affairs power.   And if the Government could compel disclosures under some sort of unenumerated national-security power, it could justify any law on that basis and effectively enjoy a general police power that belongs only to the States under our Constitution.   But the

precedents cited by the Government do not support its reliance on either of these two unenumerated powers in any event.

First, in *Ullmann v. United States*, 350 U.S. 422 (1956), the Supreme Court upheld the Immunity Act, which authorizes a U.S. attorney to order the testimony of a national-security witness before a grand jury upon promise of immunity, including in State prosecutions.  The Court upheld the reach of the Immunity Act into State court as well as federal court prosecutions because it had "already, *in the name of the Commerce Clause*, upheld a similar restriction on state court jurisdiction, and we can find no distinction between the reach of congressional power with respect to commerce and its power with respect to national security."  *Ullmann*, 350 U.S. at 436 (emphasis added) (citing to *Brown v. Walker*, 161 U.S. 591, 606-07 (1896)).

*Ullmann* thus does not stand for a general invocation of the Necessary and Proper Clause to effectuate unenumerated national security power.  It rather establishes Congress's power under the Necessary and Proper Clause to constrain state courts to enable administration of justice in federal courts, *as to matters which it undoubtedly has power to regulate under the enumerated powers provided by the Commerce Clause*.  The Supreme Court unanimously confirmed this understanding of the Necessary and Proper Clause in *Jinks v. Richland County*, 538 U.S. 456, 465 (2003), when it upheld the constitutionality of 28 U.S.C. § 1367(d)'s provision tolling State statutes of limitations for cases in which a federal court declines to exercise

supplemental jurisdiction.  The Supreme Court held the statute to be a valid exercise of the Necessary and Proper Clause because it was "necessary and proper for carrying into execution Congress's" *enumerated* "power '[t]o constitute Tribunals inferior to the supreme Court,' U.S. Const., Art. I, § 8, cl. 9, and to assure that those tribunals may fairly and efficiently exercise '[t]he judicial Power of the United States,' U.S Const. Art. III, § 1." *Jinks*, 538 U.S. at 461.

Second, in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), the Supreme Court invalidated statutes divesting the U.S. citizenship of persons who fled the country to avoid military service during war or national emergency for lack of adequate procedural safeguards under the Fifth and Sixth Amendments.   The Court reasoned that Congress had constitutional power to enact the statutes in the following passage:

> The powers of Congress to require military service for the common defense are broad and far-reaching, for while the Constitution protects against invasions of individual rights, it is not a suicide pact.  Similarly, Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs.  Latitude in this area is necessary to ensure effectuation of this indispensable function of government.  *Id.* at 159-60.

It is clear from context that the Court understood the Necessary and Proper Clause to grant Congress authority to enact statutes divesting U.S. citizenship for evading military service to implement Congress's several *enumerated* powers to "require military service for the common defense," *id.* at 159, namely, the powers to

"declare War," to "raise and support Armies," to "provide and maintain a Navy," and "to make Rules for the Government and Regulation of the land and naval Forces."  U.S. Const. Art. I, § 8.

The two cases the Court in *Mendoza-Martinez* cited in support of the "broad power under the Necessary and Proper Clause" to regulate foreign affairs, *see* 372 U.S. at 159 n.13, also provide no succor to the Government's theory.  In *Mackenzie v. Hare*, the Supreme Court relied on unenumerated but "implied, necessary, or incidental" powers of sovereignty to uphold a statute stripping a female U.S. citizen of her citizenship for marrying a foreigner and did not mention the Necessary and Proper Clause at all.  *Mackenzie v. Hare*, 239 U.S. 299, 311-12 (1915).  Whereas the other case the *Mendoza-Martinez* Court cited, *Perez v. Brownell*, 356 U.S. 44 (1958), might otherwise have supported the Government's theory, the Supreme Court later overruled that decision stripping a person of U.S. nationality for voting in a foreign election and explicitly rejected the theory the Government repackages here: "*Our Constitution limits the Government to those powers specifically granted or those that are necessary and proper to carry out the specifically granted ones*."  *Afroyim v. Rusk*, 378 U.S. 253, 257 (1967) (emphasis added); *see also id.* at 268 ("*Perez v. Brownell* is overruled.").

**B.    The CTA Is Not Authorized by the Taxing Power on Its Own or in Conjunction with the Necessary and Proper Clause.**

Congress has an enumerated power to "lay and collect Taxes," U.S. Const., Art. I, § 8, but the CTA cannot be justified as a "necessary and proper exercise" of the Taxing Power as the Government asserts. Defts' Mot. at 36. First, the CTA cannot be justified under the Taxing Power itself. *Nat'l Fed'n of Ind. Bus. (NFIB) v. Sebelius*, 567 U.S. 519 (2012), is the key precedent. There, the Supreme Court upheld the individual insurance mandate of the Affordable Care Act under Congress's Taxing Power, acknowledging that whether a payment is labeled a "penalty" as opposed to a "tax" does not "determine whether the payment be viewed as an exercise of Congress's taxing power." *Sebelius*, 567 U.S. at 564. But none of the factors that the *NFIB* Court deployed to conclude that the individual mandate was a tax pertain to the CTA's "civil penalty" for willful failure to report: (1) the CTA does not specify that the penalty be "paid into the Treasury" by "taxpayer[s]" when filing tax returns; (2) there is no exclusion for persons earning below threshold incomes; (3) the amount of the penalty is fixed ($500 per day up to $10,000), not variable according to such "familiar factors as taxable income, number of dependent, and joint filing status;" (4) the penalty is not "found in the Internal Revenue Code and enforced by the IRS;" and (5) the payments are not "expected to raise about $4 billion per year." *Id.* at 563-64.

Second, the CTA cannot be justified under the Necessary and Proper Clause as a statute "that is rationally related to the implementation of" the Taxing Power. *United States v. Comstock*, 560 U.S. at 134.  The one case the Government cites involved *pro se* criminal defendants who grossly underreported tax income in multiple years and sought to pay taxes with a counterfeit instrument purportedly issued by the United States challenging statutes making it unlawful: (1) to conspire to defraud the United States (by lying to the IRS), 18 U.S.C. § 371; (2) to counterfeit a U.S. Government-issued instrument, 18 U.S.C. § 513(c) & § 514; and (3) to willfully fail to pay taxes, 26 U.S.C. § 7203.  *See United States v. Barry*, No. 2:08-cr-56, 2009 WL 139874, at *1 (M.D. Fla. Jan. 20, 2009), *aff'd*, 371 F. App'x 3 (11th Cir. 2010). The court found "ample authority" for the statutes in the Spending Clause (including the Taxing Power), the Commerce Clause, the Necessary and Proper Clause, and the Sixteenth Amendment.  *Id.* at *3.  The facts and statutes in *Barry* are so far afield of the CTA that it lends no support to the Government's assertion that "the collection of beneficial ownership information [is] necessary and proper to ensure taxable income is appropriately reported."  Defts' Mot. at 36.

The last item the Government presents to support its "necessary and proper exercise of the government's authority to levy and collect taxes" argument is the CTA provision that "[o]fficers and employees of the Department of the Treasury may obtain access to beneficial ownership information" in FinCEN's database "for

tax administration purposes."  31 U.S.C. § 5336(c)(5)(B).   Presumably, the idea is that Treasury officials can search FinCEN's database for tax-related administrative purposes, such as to cross-check personal information submitted to the IRS in tax returns.  But the CTA, as the Government repeatedly reminds us in its brief, is a law enforcement and national security statute "to curb money laundering and terrorist financing."  Defts' Mot. at 1; s*ee also id.*  (The CTA aims to "disincentivize these bad actors from exploiting the U.S. financial system").  The CTA, on its face, is obviously designed to do much more than tax or prevent tax evasion.

If Congress were to limit use and access of the FinCEN database to tax collection purposes, it might be justified under the Necessary and Proper Clause as rationally related to the Taxing Power.  *Cf. Helvering v. Mitchell*, 303 U.S. 391, 399 (1938) (holding that "the Government relies primarily upon the disclosure by the taxpayer of the relevant facts" in assessing income taxes and so may impose sanctions "[t]o ensure full and honest disclosure" and "to discourage fraudulent attempts to evade the tax").  But instead, the CTA allows sharing with state and international governments and other federal agencies for purposes that have nothing to do with collecting taxes or discouraging tax evasion; the Government does not even try to show how such sharing is rationally related to levying and collecting *U.S. federal taxes* pursuant to the Taxing Power.  Indeed, the Government presents no findings or evidence to indicate that "tax administration purposes" were anything other than

21

an afterthought to afford in-house access to FinCEN's super-database without judicial process.  In any event, as explained above, the Government has presented no credible legal authority to support its claim that the Taxing Power plus the Necessary and Proper Clause can somehow justify the CTA.  That is unsurprising because the CTA is indubitably a statute for gathering and storing personal information for broader law enforcement purposes, not for ensuring the effective levying and collecting of federal taxes.

### C.   The CTA Is Not Authorized by the Commerce Clause.

The main event, of course, is the Commerce Clause, which cannot justify Congress's power to enact the CTA.  The Government tries to separate the interstate component of the Clause from its foreign component, but it is a single provision declaring that Congress has power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. Art. I, § 8, and the Eleventh Circuit has adopted the view that the interstate and foreign commerce components have the "same scope."  *United States v. Davila-Mendoza*, 972 F.3d 1264, 1271 (11th Cir. 2020) (quoting *United States v. Batson*, 818 F.3d 651, 668 (11th Cir. 2016)); *see also Seminole Tribe of Fla v. Fla*, 517 U.S. 44, 63 (1996) (presuming Congress's power to abrogate State sovereign immunity under the Indian Commerce Clause and the Interstate Commerce Clause were congruent).  Neither of these components can justify the CTA.

Plaintiffs focused in their opening brief on showing that entity formation was a "core sovereign power" of the States that the text and original meaning of the Constitution—including the Commerce Clause—did not upset and which the Tenth Amendment affirmed. *See* Pltfs' Mot. at 11-17. The Government does not challenge that history and instead seeks refuge solely in precedents that it says can justify the CTA. Those precedents hold that Congress has power under the Commerce Clause to regulate: (1) use of the channels of interstate commerce; (2) persons or things in interstate commerce; and (3) economic or commercial activities that "substantially affect" interstate commerce, even if they are intrastate. *Gonzales v. Raich*, 545 at 16-7 (2005); *United States v. Morrison*, 529 U.S. at 609-14 (2000); *United States v. Lopez*, 514 U.S. 549, 558-9 (1995). Consequently, deciding whether the CTA is authorized by the Commerce Clause boils down to analysis of key Supreme Court decisions under this three-pronged test.

The Government relies primarily on two cases in which the Supreme Court upheld Congress's power to enact statutes under the Commerce Clause: (1) *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) (certain recordkeeping and reporting provisions of the Bank Secrecy Act); and (2) *Gonzales v. Raich*, 545 U.S. 1 (2005) (Controlled Substances Act provisions as applied to home-grown medicinal marijuana). On the other side, there are three key decisions in which the Supreme Court declined to uphold Congress's power to enact statutes under the Commerce Clause:

23

(1) *United States v. Lopez*, 514 U.S. 549 (1995) (the Gun-Free Safety Zone Act banning handguns within 1,000 feet of schools); (2) *United States v. Morrison*, 529 U.S. 598 (2000) (the private right of action provision of the Violence Against Women Act); and (3) *Nat'l Fed'n of Ind. Bus. (NFIB) v. Sebelius*, 567 U.S. 519 (2012) (the Affordable Care Act's individual insurance mandate).  The former set of cases does not establish the CTA's constitutionality; the latter set refutes it.

At the outset, courts should tread carefully when assessing Congress's power under the Commerce Clause to enact unprecedented statutes, particularly when the statutes are alleged to encroach upon core sovereign powers.   "'[T]he most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent' for Congress's action."  *Sebelius*, 567 U.S. at 549 (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010)).  And despite the Government's suggestions that the CTA is part of a preexisting federal legal framework to address money laundering and anti-terrorism financing, it is a transformative law: this is the first time the federal government will collect personal information about the owners of a State entity simply because it was formed, absent any suspicion of wrongdoing or sense of the entity's activities or if it even engages in any activities.   In fact, FinCEN's original mandate was limited to banks and financial institutions—an industry with a long history of federal regulation pursuant to the BSA. *See* 81 Fed. Reg. 29398, 29399 (May 11, 2016).  The CTA would effect

a dramatic expansion of FinCEN's role and power, well beyond the limited aims for which the unit was created within the Treasury Department.

The CTA does not limit its requirement to report ownership and applicant information to State entities that *use* the "channels of interstate commerce" or *engage in commercial or economic activities* that "substantially affect interstate commerce," which would strengthen the case for its constitutionality.  *See, e.g., United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (holding that when "[t]he Federal Government allows [artificial entities] the privilege of engaging in interstate commerce," it may impose reporting requirements upon aspects of those activities). Accordingly, the Government's arguments are necessarily that either: (1) a State entity is a "thing" in interstate commerce the instant it is formed, regardless whether it has actually used interstate commerce channels or engaged in any activities, much less economic activities ,that substantially affect interstate commerce; and/or (2) entity formation itself is a commercial activity that "substantially affects" interstate commerce, and so the CTA's reporting requirement is a permissible Commerce Clause regulation.  *See* Defts' Mot. at 29-34.

Both propositions fly in the face of the reality that entity formation was widely accepted as a core State sovereign power when the Constitution was adopted. *See M'Culloch v. Maryland*, 17 U.S. 316, 358 (1819) (explaining that a "state can create a corporation, in virtue of its sovereignty, without any specific authority for that

purpose"); Joseph J. Angell & Samuel Ames, A TREATISE OF PRIVATE CORPORA-

TIONS AGGREGATE 45-46 (Charles C. Little & James Brown eds., 2d rev. ed. 1861)

(1843) (characterizing State power to "create corporations" as "so clear, so generally

admitted, and [s]o long and so often claimed and exercised, that it is unnecessary to

offer any argument or authorities for its support").   The Government presents *no*

evidence that Congress could have used its Commerce Clause power to enact a

proto-version of the CTA in the late eighteenth century or nineteenth century be-

cause there is none.   Nor, despite the intervening expansion of Commerce Clause

jurisprudence, do modern Supreme Court decisions support the Government's two

theories of Commerce Clause power, including *Shultz* and *Raich*, the two cases that

appear most favorable to the Government.

### 1.    *Shultz* and the Channels of Interstate and Foreign Commerce

At issue in *Shultz* were provisions of the Bank Secrecy Act ("BSA") and its

regulations prescribing: (1) recordkeeping requirements for federally insured banks

and financial institutions (including photocopying bank checks and personal checks

over $100, and keeping photocopies or microfilm of letters of credit over $5,000 and

foreign funds transfers or extensions of credit over $10,000); and (2) reporting re-

quirements regarding large foreign and domestic financial transactions. *See* 416 U.S.

at 32-40.   With respect to the reporting requirements, any person engaging in a for-

eign transaction over $5,000 had the duty to report; banks had the duty to report for

domestic financial transactions over $10,000.  *See id*. at 35-40.  The purpose of the BSA recordkeeping requirements was to aid in law enforcement, but, unlike the CTA, Congress recognized "that such required records would 'not be made automatically available for law enforcement purposes (but could) only be obtained through existing legal process.'"  *Id.* at 27.  Willful violations of both the BSA recordkeeping and reporting requirements were punishable by civil and criminal penalties.  *See id.* at 35-36, 41.

The Court discussed the issue of Commerce Clause power with respect to the BSA's recordkeeping requirements.  The *Shultz* Court held that Congress had power under the Commerce Clause "to effectuate its concern that *negotiable instruments moving in the channels of [interstate and foreign] commerce* were significantly aiding criminal enterprise" by requiring the photocopying and retention of "certain negotiable instruments by the bank upon which they were drawn."  *Id.* at 46 (emphasis added).  The Court continued: "Congress could have closed the channels of commerce entirely to negotiable instruments had it thought that so drastic a solution were warranted."  *Id.*

As applied to the CTA, *Shultz* thus supports the proposition that Congress could require State entities to provide the Government with owner and applicant information if those entities "move[d]" in the channels of interstate or foreign commerce.  *Id.*  Congress could even pass a statute "clos[ing] the channels of commerce

entirely" to State entities that did not report this information if "it thought that so drastic a solution was warranted." *Id.* What *Shultz* does *not* stand for is the idea that Congress has Commerce Clause power to compel disclosure based solely on the fact of State-law entity formation. In fact, the *Shultz* Court presumed that Congress did *not* have Commerce Clause power to regulate a negotiable instrument—which is, after all, a State-law contract—until it moved in the channels of interstate or foreign commerce. Nothing the *Shultz* Court said suggests that it would have upheld the BSA recordkeeping requirement if it had required checkwriters to keep copies of signed checks, regardless of whether the checks are cashed or deposited. Indeed, *Shultz* actually compels the conclusion that the CTA is unconstitutional in its presumption that Congress could not regulate state-law contracts under the BSA (like state-law entities under the CTA) until they entered the channels of, or engaged in activities in, interstate or foreign commerce.

2.   ***Raich* and Local "Economic" Activities that "Substantially Affect" Interstate Commerce**

*Gonzales v. Raich* is also unhelpful to the Government. The issue in *Raich* was the constitutionality of the Controlled Substances Act ("CSA") as applied to locally grown and used medicinal marijuana permitted under California law. The Court described the CSA as "a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of five classes of 'controlled substances.'" *Gonzales v. Raich*, 545 U.S. at 24.

The Supreme Court framed the constitutional issue as "whether Congress' power to regulate interstate markets for medicinal substances encompasses the portions of those markets that are supplied with drugs produced and consumed locally." *Id.* at 9. Put this way, the Court concluded that the similarities between this case and *Wickard v. Filburn*, 317 U.S. 111 (1942), were so "striking" that "[w]ell-settled law" controlled its "answer." *Id.* at 2, 9. *Wickard* involved the question whether Congress could enact a federal statute regulating wheat grown by a commercial farmer to feed his own livestock. The *Raich* Court reasoned:

> Just as the Agricultural Adjustment Act was designed to control the volume [of wheat] moving in interstate and foreign commerce [to]…control the market price, a primary purpose of the CSA is to control the supply and demand of controlled substances in both lawful and unlawful drug markets. In *Wickard*, we had no difficulty concluding that Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions. Here too, Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would similarly affect price and market conditions.

*Id.* at 18-19 (internal citations omitted).

The *Raich* Court held that "[t]hus, as in *Wickard*, when it enacted comprehensive legislation to regulate the interstate market in a fungible commodity, Congress was acting well within its authority to 'make all Laws which shall be necessary and proper' to 'regulate Commerce . . . among the several States.' U.S. Const. Art. I, § 8." *Id.* at 22. In response to the argument that locally growing and using medicinal marijuana were neither "commercial" nor "economic" activities, the

Court held that by contrast to the activities "at issue in *Lopez* [possessing handgun near school] and *Morrison* [domestic violence against women], the activities regulated by the CSA are quintessentially economic. 'Economics' refers to 'the production, distribution, and consumption of commodities.'" *Id.* at 25 (quoting Webster's Third New Int'l Dictionary 720 (1966)).

The Government has no basis to maintain that *Raich* controls this case. *See, e.g.*, Defts' Mot. at 34 ("*NFIB* did not disturb the analysis in *Raich*, which applies for the reasons stated above."). First, the CTA is not an enactment where Congress is, as in *Raich* and *Wickard*: (1) trying to regulate intrastate production of a fungible commodity for which there are large interstate markets; and (2) needs to regulate private production and use to regulate interstate markets effectively. Second, the CTA is not a "comprehensive framework" for regulating a sprawling domain like drugs (CSA) or banking and financial institutions (BSA) over which the federal government has traditionally exercised robust oversight. Third, to the extent that the Commerce Clause precedents required intrastate "economic" activities that substantially affect interstate commerce, the mere act of forming an entity is not an "economic" activity as *Raich* defined it—" the production, distribution, and consumption of commodities." Rather, as the National Association of Secretaries of State clarified, "State business entity formation processes are ministerial in nature." Pltfs' Mot. at 19 & n. 7; *see also id.* at 18-20.

30

Faced with the difficulty of justifying the CTA under the precedents including *Schultz* and *Raich*, the Government resorts to a different argument.  It asserts that even if mere entity formation is not a channel of interstate commerce or an economic activity that substantially affects interstate commerce, "[b]oth the record and common sense indicate that entities constituting CTA reporting companies frequently utilize the channels of interstate commerce, including using telephones, engaging in ecommerce, sending goods by mail, or using banking channels to process credit card chargers or initiate wire transfers."  Defts' Mot. at 33.  The Supreme Court rejected this type of inferential reasoning in *NFIB v. Sebelius*, when the Government asserted that "[e]veryone will eventually need health care at a time and to an extent they cannot predict," justifying the individual insurance mandate under the Commerce Clause as a prepayment of sorts.  567 U.S. at 547.  The Supreme Court reasoned: "we have never permitted Congress to anticipate [economic or commercial] activity itself in order to regulate individuals not currently engaged in commerce."  *Id.* at 557.  This Court should similarly reject the Government's theory that the CTA is justified under the Commerce Clause because many State entities will use the channels of interstate commerce or engage in commercial or economic activities affecting interstate commerce in the future.

To sum up, none of the Government's four theories of constitutional power to enact the CTA is persuasive.   The reality that the States have enjoyed sovereign

power to incorporate since the Founding should decidedly tip the scale against this unprecedented federal enactment's constitutionality.

## III. The CTA Violates Plaintiffs' Constitutional Rights.

The CTA's reporting requirements also violate Plaintiffs' privacy rights under various provisions of the Constitution discussed in the opening brief.  *See* Pltfs' Mot. at 23-35.  Plaintiffs here will only briefly address key points in response to arguments the Government raised as to the Fourth, Fifth, and First Amendment claims.  *See* Defts' Mot. at 40-46 (Fourth); 47-48 (Fifth); 49-56 (First).

### A. Fourth Amendment

The Government is correct that the "lodestar" Fourth Amendment decision is *Katz v. United States*, 389 U.S. 347 (1967), where the Supreme Court held that government agents violated the Fourth Amendment by attaching an electronic listening device to the outside of a public phone booth.  *Smith v. Maryland*, 442 U.S. 735, 740 (1979).  The *Katz* Court held that attaching the listening device "violated the privacy upon which he justifiably relied while using the telephone booth."  389 U.S. at 353. The *Katz* test as applied to the CTA, is: (1) whether persons who are beneficial owners or applicants of State entities (like Plaintiff Winkles and the beneficial owners of Plaintiff NSBA's members) expect privacy from federal government intrusion with respect to their personal information when they form the entities; and (2) whether

"society is prepared to recognize" that expectation as "reasonable." *Smith*, 442 U.S. at 740 (citing *Katz*, 389 U.S. at 351, 361).

The Government contends that Plaintiffs have not established the first prong of the *Katz* test, asserting that "Mr. Winkles can hardly claim that he has 'exhibit[ed] an actual expectation of privacy' in this information, particularly insofar as he has already disclosed it publicly." Defs' Mot. at 41. But as explained in detail above regarding standing, the privacy interest the Plaintiffs are asserting is not mere compelled disclosure. It is compelled disclosure to FinCEN's database, for access by state, federal, and foreign law-enforcement and intelligence agencies. The Government cannot simultaneously maintain that the very point of the CTA is to collect personal information that individuals seek to keep private from the Government yet also assert that Plaintiffs do not have an actual expectation of privacy.

Consequently, the real Fourth Amendment issue here is whether the expectation of privacy against turning over personal information to FinCEN's database is, under the second prong of the *Katz* test, objectively reasonable. On this point, the Government repeats the mantra that because beneficial owners and plaintiffs like Winkles have "previously disclosed the information at issue, they cannot otherwise establish a cognizable privacy interest." Defs' Mot. at 42. That is off the mark. The critical question is this: would society recognize that individuals who are beneficial owners of (or applicants for) entities formed under State law have a reasonable

expectation of privacy against being forced to have the entities give their personal information to FinCEN for long-term storage in a database that affords potential access to state, federal, and foreign law-enforcement and intelligence agencies without any present suspicion of wrongdoing?

The existing case law does not provide a ready answer to this question because the kind of technology that allows the Government to create this kind of digital "mug book" did not previously exist. *Shultz*, for instance, involved the recordkeeping requirement that banks *photocopy* or *microfilm* checks and loan instruments, which could "not be made…available for law enforcement purposes [but could] only be obtained through existing legal process." *Shultz*, 416 U.S. at 27 (internal citations omitted). The FinCEN database is a whole different animal: a sprawling database of State entity-related names, birthdates, addresses, and identification numbers, of tens of millions of individuals (most of whom will be law-abiding U.S. persons) that federal and foreign law-enforcement and intelligence agencies can access without even going "through existing legal [processes]." *Id.*

A more apt Supreme Court precedent involving newer technology is *Carpenter v. United States*, 138 S. Ct. 2206 (2018). The Supreme Court in *Carpenter* held that the government violated the Fourth Amendment when it accessed cell-phone locational data held by third-party cell-service providers without first obtaining a search warrant. *See id.* at 2223. In so doing, the Court reasoned that people have a

reasonable expectation of privacy regarding their cell-phone locational data, even though it was plainly provided to those providers.  The Government's argument here – that the Plaintiffs have already disclosed or made public the personal information of which the CTA compels disclosure—is identical to the argument about objective expectation of privacy the Government made in *Carpenter* that the Supreme Court decisively rejected.  The Court's reasoning for why it turned back the Government's arguments speaks directly to this case:

> As Justice Brandeis explained in his famous dissent [in *Olmstead*], the Court is obligated – as "[s]ubtler and more far-reaching means of invading privacy have become available to the Government"—to ensure that the "progress of science" does not erode Fourth Amendment protections. *Olmstead v. United States*, 277 U.S. 438, 473-474 (1928).  Here the progress of science has afforded law enforcement a powerful new tool to carry out its important responsibilities.  At the same time, this tool risks Government encroachment of the sort the Framers, after consulting the lessons of history, drafted the Fourth Amendment to prevent.

*Id.* at 2223 (internal case citation and quotation marks omitted).

## B.    Fifth Amendment

The Government asserts that: (1) corporations do not enjoy the Fifth Amendment privilege against self-incrimination; (2) the CTA's reporting requirements should be upheld because analogous BSA requirements have been upheld; and (3) the privileged cannot be invoked based on speculative future proceedings.  *See* Defts' Mot. at 47-48.  The CTA's reporting obligations apply to "reporting companies," 31 U.S.C. § 5336(a)(11), which do not have Fifth Amendment self-

incrimination rights as the Government says, but the CTA's penalties provisions apply to any "person" who "willfully" fails to report owner or applicant personal information for FinCEN's law-enforcement database. *Id.* § 5336(h)(3). Because imprisonment is one of the penalties the CTA specifies, "person" in the statute does not appear to include a corporate entity. By contrast, the BSA's recordkeeping requirement, as explained above, provides that records can only be obtained for law enforcement purposes by resort to "existing legal process" and also states that its civil penalties apply to natural persons and entities. *See* 12 U.S.C. § 1955(a) (providing for penalties for partners, directors, officers, or employees "if such person [who violates regulations] is a partnership, corporation, or other entity").

The upshot is that the BSA is distinguishable and the Fifth Amendment self-incrimination privilege is in play because the CTA requires entity reporting of personal information that are not corporate records (*e.g.*, a passport number) and penalizes the individual, not the entity. *See Bellis v. United States*, 417 U.S. 85, 93 (1974) (explaining that the Fifth Amendment privilege against self-incrimination does not apply when "the records demanded are the records of the organization *rather than those of the individual*.") (emphasis added). Finally, as to the Government's claim that the Fifth Amendment does not apply because there is no actual threat of an enforcement proceeding presenting a risk of self-incrimination, the CTA enables the Government to gather information from individuals for law enforcement purposes

36

*without any basis at all* (much less an ongoing proceeding) and thus imposes a greater—not a lesser—burden to privacy interests.  The statute should not pass constitutional muster because it falls in a gray area where "the fourth and fifth amendments run almost into each other."  *Boyd v. United States*, 116 U.S. 616, 630 (1886).[5]

## C.   First Amendment

Whether under the doctrinal rubric of compelled speech, freedom of association, or freedom of speech, Plaintiffs' First Amendment claim is simply this: Congress cannot pass a law "abridging the freedom of speech" and of association by making individuals who form State entities give their personal information to FinCEN via those entities to store in its law-enforcement database.  U.S. Const. amend.

---

[5] *Shultz* distinguished *Boyd* but did not overrule it—*Boyd* is not "outdated precedent," Defts' Mot at. 47 n.12.  *See Schultz,* 416 U.S. at 61-68 (noting that "the *Boyd* Court recognized that the Fourth Amendment does not prohibit all requirements that information be made available to the Government" and holding that requiring persons to report large financial transactions "which take place across national borders" and banks to report "abnormally large transactions in currency" are permissible).  The bottom line is that the relevant inquiry, whether under the Fourth or Fifth Amendment, is a fact-driven balancing of the government's need for the information and the privacy interests of the party whose information is collected.  That is why *City of Los Angeles v. Patel*, 576 U.S. 409 (2015) is relevant, despite the Government's arguments to the contrary.  *Compare* Pltfs' Mot. at 26-29 *with* Defts' Mot. at 44-46.  The ordinance struck down in *Patel* permitted police to access hotel registers recording guests' personal information "outside the judicial process" to assist in law enforcement against criminal activities.  *Patel*, 576 U.S. at 419.  The CTA similarly affords federal and foreign law enforcement and intelligence agencies access to a database kept by FinCEN populated by personal ownership and applicant information that the CTA requires State entities to disclose to assist in law enforcement against criminal activities.  The only difference is that new technology obviates the need for physical inspection: the government can now request and store all the personal information itself.  *See, e.g., Airbnb, Inc. v. City of New York*, 373 F.Supp.3d 467, 482-83 (S.D.N.Y 2019) (Fourth Amendment applies to ordinance requiring Airbnb to report hosts' personal information to city officials).

I; *see* Pltfs' Mot. at 32-35.  Forming an entity is intrinsically an exercise of freedom of association whether for business or any other "lawful purpose," Ala. Code § 10A-1-2.01 (2022); the CTA "abridges" that freedom by compelling formed State entities to disclose owner and applicant information to FinCEN.  Indeed, the Eleventh Circuit's holding in *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358 (11th Cir. 1999) compels the conclusion that the CTA's forced disclosure violates the First Amendment.  The Eleventh Circuit applied "exacting scrutiny" to an ordinance requiring "corporate applicants for adult business licenses to disclose the names of principal stockholders"—persons who owned at least 10% of the corporation.  *Id.* at 1366.  The Court conceded that the government's interest in regulating the crime and seediness that adult businesses spawned as secondary effects was "substantial" but did not find a "relevant correlation' or a substantial relation between the names of the stockholders and the harmful secondary effects."  *Id.*

*Lady J. Lingerie* controls here.  The CTA's disclosure requirement similarly targets the "secondary effects" of financial crimes that State entities allegedly facilitate and thus warrants and fails exacting scrutiny.  The Government's arguments to the contrary, *see* Defts' Mot. at 56 n.15, are unavailing: (1) small businesses like Plaintiffs are as worthy of First Amendment protection as adult businesses; (2) the CTA does not target disclosure of information of persons who exercise "actual control" of an entity, as witness the inclusion of "applicant" and the expansive definition

38

of "substantial control" detailed below; and (3) even if reporting companies can still operate without complying with the CTA, the overhang of fines and prison for owners and applicants is a serious burden on the non-complying entity.

## IV.   The CTA Is Unconstitutionally Vague.

If nothing else, this Court should declare the CTA vague in violation of the Fifth Amendment Due Process Clause.  The critical terms of the CTA's reporting requirement are "beneficial owner" and "applicant."  The Plaintiffs explained in their opening brief the convoluted statutory definition of those terms and the failure of the regulations to cure them.  *See* Pltfs' Mot. at 36-38 & 37 n.14.  In particular, the chain of definitions regarding who qualifies as a beneficial owner is Kafkaesque: an individual who "directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise" exercises "substantial control" over an entity is a beneficial owner.  31 U.S.C. § 5336(a)(3)(A).  Consider a multi-generational family small-business entity of the sort that is common in our country.  Which family members does the CTA require to be reported as beneficial owners, that is, who "indirectly" through "any relationship or otherwise" exercises "substantial control" of the business?  The key obviously is "substantial control."  What does that mean?  The regulations say that it includes many things, including consideration of who has "substantial influence over important company matters." 87 Fed. Reg. 59498, 59594 (Sept. 30, 2022).  "Substantial control" also includes "any other form of substantial

control" over the company. *Id.* at 59595. But what does "substantial" mean? Neither statute nor regulations answer that question.

Fear not, the Government urges. "By setting forth a *non-exhaustive list of examples* of the types of roles and authority indicative of substantial control, the rule helps clarify the meaning of that term and gives regulated parties a clearer understanding of who is a beneficial owner." Defts' Mot. at 59-60 (internal quotation marks, citation, and brackets omitted) (emphasis added). A "non-exhaustive list of examples" is surely convenient for the Government, which can maximize its discretion in defining "substantial control" and expanding its dragnet. But for ordinary people like Isaac Winkles (or Franz Kafka) who must comply with the CTA, the message of "non-exhaustive list" is an Orwellian message: "if in doubt, report to Big Brother." This is not a law that defines what is required "with sufficient definiteness that ordinary people can understand what conduct is prohibited" and sets "minimal guidelines to govern law enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). The Court should strike down the law for this reason too.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion to dismiss or, in the alternative for summary judgment.

Dated: May 2, 2023

Respectfully submitted,

s/ Thomas Lee

_____

Thomas Lee*
Terence Healy*
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 837-6000
thomas.lee@hugheshubbard.com
terence.healy@hugheshubbard.com

Kenyen Brown*
HUGHES HUBBARD & REED LLP
1775 I Street, N.W.
Washington, D.C., 20006-2401
Telephone: (202) 721-4600
kenyen.brown@hugheshubbard.com
*admitted pro hac vice

John C. Neiman, Jr.
MAYNARD NEXSEN
1901 Sixth Avenue North
Suite 1700
Birmingham, AL 35203
Telephone: (205) 254-1000
jneiman@maynardNexsen.com

*Attorneys for Plaintiffs*