

FILED

2023 May-03  PM 06:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

NATIONAL SMALL BUSINESS )
UNITED d/b/a/ the NATIONAL SMALL )
BUSINESS ASSOCIATION, *et al.* )
)
          Plaintiffs, )
)
   v. )
)
JANET YELLEN, *et al.* )
)
          Defendants. )

Case No.  <u>5:22-cv-01448</u>

# MEMORANDUM OF LAW IN OPPOSITION TO
# <u>BRIEF OF AMICI CURIAE FACT COALITION,</u>
# <u>TRANSPARENCY INTERNATIONAL U.S., AND MAIN STREET</u>
# <u>ALLIANCE</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

ARGUMENT .....................................................................................1

I.    Judicial Notice of the "Facts" *Amici* Present is Unwarranted. ............... 1

II.   The CTA Is Not a Vital, Effective, or Even a Rational Means of
      Fighting Money Laundering. ......................................................... 3

      A.    The CTA Is Overkill Because Most State Entities Are
            Formed and Used for Lawful Purposes. ....................................3

      B.    The CDD Rule Is the Rational Way to Address Money
            Laundering; Any Shortcomings It Exhibits Are Self-
            Inflicted Wounds.........................................................5

      C.    The CTA Is Not Compelled by FATF International
            Standards. ...............................................................9

      D.    If the CTA is as Potent a Law Enforcement Tool as *Amici*
            Say, then It Violates Plaintiffs' Constitutional Privacy
            Rights. ...................................................................11

III.  *Amici* Present No Evidence That "Legitimate Small
      Businesses" Will Benefit from the CTA......................................... 11

IV.   The CTA Is an Unprecedented Expansion of FinCEN's Power
      and Will Result in Greater Expansions If Upheld. ................................. 15

CONCLUSION ..................................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) ...............................................6, 7, 9

*Dimanche v. Brown*, 783 F.3d. 1204 (11th Cir. 2015) ..........................................1, 2

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) .........................13

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*,
    561 U.S. 477 (2010)..........................................................................................15

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022) ...........................15

*Nat'l. Fed. of Independent Business v. Sebelius*, 567 U.S. 519 (2012)...................15

*Olmstead v. United States*, 277 U.S. 438 (1928) (Brandeis, J.,
    dissenting) ........................................................................................................18

*Terrebonne v. Blackburn*, 646 F.2d 997 (5th Cir. 1981) .......................................1, 2

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021)...............................................14

**Statutes and Rules**

31 U.S.C. § 5336(11)(B)(xix) .................................................................................17

Fed. R. Evid. 201(b)(2) .........................................................................................2, 3

**Regulations**

31 C.F.R. § 1010.230 (2016) ...................................................................................5

**Others/ Miscellaneous**

Financial Action Task Force [FATF], *International Standards on
    Combating Money Laundering and the Financing of Terrorism &
    Proliferation*, at 10, FATF, Paris, France (2012-2013)..................................9, 10

Global Financial Integrity, *Acres of Money Laundering: Why U.S.
    Real Estate is a Kleptocrat's Dream* (Aug. 4, 2021)...........................................9

## INTRODUCTION

*Amici* assert that the CTA is (1) "vital" to fighting international money laundering, (2) will actually help—not hurt—small businesses, and is (3) neither "unusual, nor unprecedented." Amici Br. At 4. But these assertions—as unsupported as they are inaccurate—have little relevance to the legal questions of constitutional power and individual rights at issue here.

No one suggests that fighting money laundering is not a worthy goal. But good intentions do not authorize Congress to trump the sovereign powers of States, the constitutional limitations on congressional power, and individual constitutional rights. The CTA is not a panacea that will somehow end money laundering as *amici* seem to believe, and the entities that the statute covers are not the engines of money laundering and international crime *amici* fear. The CTA thus tramples on the rights of both the States and their citizens while realizing no meaningful impact in preventing the type of criminal activity it was intended to address.

## ARGUMENT

### I.     Judicial Notice of the "Facts" *Amici* Present is Unwarranted.

*Amici* incorrectly assert that the "Court may take judicial notice of the various intergovernmental and agency reports cited throughout this brief." Amici Br. At 2 n.1. In support of this assertion, they rely on *Dimanche v. Brown*, 783 F.3d. 1204, 1213 n.1 (11th Cir. 2015), quoting *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. 1981) ("Absent some reason for mistrust, courts have not hesitated to take

judicial notice of agency records and reports."). But those cases involved judicial notice of "a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" pursuant to Fed. R. Evid. 201(b)(2). The court in *Dimanche* took judicial notice of the fact that there were 43 colonels in the Florida Department of Corrections ("FDOC") for 48 prisons, a fact that "can be accurately and readily determined from public reports prepared" by the FDOC. 718 F.3d at 1213 n.1. In *Terrebonne*, the court took judicial notice of pardon or commutation rates for Louisiana state prisoners in 1977-78 and 1978-79 as found at page 46 in the official "La. Dep't of Corrections, Statistical Report: 1977-78, 1878-79 (1979)." 646 F.2d at 1000 n. 4.

The factual assertions of *amici* here—many of which are merely conclusory and some of which are "supported" by amicus Fact Coalition *citing to itself*—are different. They are not numerical data from government documents. They are, instead, subjective analyses set forth in materials prepared by international and domestic advocacy groups, non-profits, and researchers.[1] Unlike the indisputable factual points memorialized in the government documents in *Dimanche* and *Terrebonne*, these materials do not meet the Rule 201(b)(2) standard of "a fact that is not subject

---

[1] *See, e.g., The Puppet Masters: How the Corrupt Use Legal Structures to Hide Stolen Assets and What to Do About It* (2011), cited at Amici Br. 2 n.1, 7 n.16, and *The Library Card Project: The Ease of Forming Anonymous Companies in the United States* (2019), cited at Amici Br. 6-8 nn. 15, 18–21.

to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2). Consequently, but for a handful of factual assertions on undisputed subjects based on sound sources (*e.g.*, the Financial Action Task Force's official statement of "*Who We Are*," Amici Br. at 10-11 & 11 n. 32; official instructions to apply for an Alabama's driver's license, *id.* at 13 & 13 n. 40; the Alabama State Bar's requirements to sit for the Alabama bar examination, *id.* at 13 & 13 n. 41; and official instructions to apply for a Huntsville-Madison County public library card, *id.* at 13 & 13 n. 42), this Court should not take judicial notice under Rule 201(b)(2) of *amici*'s myriad factual assertions based on dubious sources.

## II.  The CTA Is Not a Vital, Effective, or Even a Rational Means of Fighting Money Laundering.

Although *amici*'s policy arguments are largely beside the point, they are not persuasive in any event. *Amici* have an unrealistic view of the CTA and what it can accomplish, and an unduly negative view of corporate entities formed by States and the costs the CTA would impose on them and society at large.

### A.  The CTA Is Overkill Because Most State Entities Are Formed and Used for Lawful Purposes.

*Amici* argue that the CTA is vital legislation because "anonymous companies" are "often used to hide and launder the proceeds of domestic and international crimes, including fraud, embezzlement, various other corruption crimes, and the

trafficking of humans, drugs, and arms." Amici Br. at 5. They recite examples of misconduct facilitated by anonymous companies: (1) "real estate purchases" made with the proceeds of foreign corruption and "fentanyl sales"; (2) theft of "$24 million in COVID-19 relief money"; and (3) use of United States and foreign "front companies" by Iranians and Russians to evade U.S. sanctions. *Id.* at 5-6.

*Amici* thus imply that the entities that the CTA will reach are similar roving engines of fraud and deception. But *amici* present no evidence confirming this implication. Nor could they. To the contrary, the vast majority of entities that the CTA will force to turn over sensitive personal owner and applicant information to a federal law-enforcement database will be operated by law-abiding U.S. persons, like the 65,000 small businesses and entrepreneurs who are members of the NSBA. *See* Declaration of Todd McCracken ("McCracken Decl.") (Ex. A to Pltff's Reply Br.), ¶ 4. And if *amici* believe that corrupt foreign officials, drug dealers, Iranian oil smugglers, and Russian gangsters will have all the U.S. entities of which they have "substantial control" accurately report their names, addresses, birthdates, and valid identification numbers to FinCEN for its law-enforcement database, *amici* are either willfully blind or blissfully naïve. *See, e.g.,* U.K DEP'T OF BUSINESS, ENERGY, AND INDUSTRIAL STRATEGY, IMPACT ASSESSMENT, CORPORATE TRANSPARENCY AND COMPANIES HOUSE REGISTER REFORM (2022) (government ministry study of U.K. official database of "persons of substantial control" of British companies reporting

the database to be unreliable, subject to fraud, and populated by fake reporting).[2] The persons and entities engaged in such illicit activities will never report their true ownership structure.  The CTA thus will have no effect on the bad actors posited by *amici*, while its burdens will be borne disproportionately by law-abiding American citizens like Plaintiffs.

> **B.    The CDD Rule Is the Rational Way to Address Money Laundering; Any Shortcomings It Exhibits Are Self-Inflicted Wounds.**

The obvious and direct way to fight money laundering and the financing of terrorism and other crimes is to monitor and regulate the flow of money itself.  That is exactly what FinCEN's current 2016 Customer Due Diligence Rule ("CDD Rule") achieves.  It requires banks and financial institutions to verify the identities of the beneficial owners of entities opening accounts with them, monitor accounts for suspicious transactions, and perform risk assessments of suspicious accounts.  *See* 31 C.F.R. § 1010.230 (2016).  The CDD Rule is appropriately tailored because a State corporate entity cannot launder money if it does not engage in any commercial activities, open a bank account, send or receive funds or other assets, or otherwise use the channels of interstate and foreign commerce.  Yet the CTA, in contrast, would

---

[2] The U.K. Government Report may be accessed at: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1057767/corporate-transparency-and-register-reform-white-paper-impact-assessment.pdf.

subject such a newly-formed activity-less entity to its reporting requirements, sup-posedly for the sake of fighting money laundering.

*Amici* make three arguments as to why the CDD Rule is inadequate and the CTA is needed.  None of them is persuasive.

First, *amici* say, "the information collected by the CDD Rule is not reported to the Government and is not immediately available to law enforcement, intelli-gence, or national security agencies."  Amici Br. at 8 (citation, internal quotation marks, and brackets omitted).  But to the extent that this is a shortcoming of the CDD Rule, that is not a reason to adopt the CTA, which sweeps into its ambit numerous entities that do not pose any risk of money laundering.  It is instead a reason for Congress to change the CDD Rule.  There is no doubt that Congress has the consti-tutional power to amend the CDD Rule to require banks and covered financial insti-tutions to report account-opening entity beneficial ownership information to Fin-CEN.  *See Cal. Bankers Ass'n. v. Shultz*, 416 U.S. 21, 46 (1974) (upholding Con-gress's power under the Commerce Clause to require banks to keep records and re-port financial transactions "to effectuate its concern that negotiable instruments moving in the channels of [interstate and foreign] commerce were significantly aid-ing criminal enterprise").

Congress could have changed the CDD Rule and tasked FinCEN with com-piling a database of beneficial owner information for bank accountholders.  Instead,

it legislated in uncharted territory by enacting the CTA to create a FinCEN database of State entity owner information that *amici* imply would be "immediately available to law enforcement, intelligence, or national security agencies," as if that were a good thing.  Amici Br. at 8.  *Amici* wrongly treat the present form of the CDD Rule as somehow immutable, creating a false sense of urgency that the CTA is critical to fight the scourge of money laundering.  It is not.  Congress can direct the DCC Rule be amended to overcome any perceived shortcomings.

*Amici* next argue the CTA is needed because "the CDD Rule's definition of 'beneficial owner' is underinclusive inasmuch as it requires companies to report only those individuals who hold 25 percent of more of the equity interest."  Amici Br. at 8.  "The CDD Rule—unlike the CTA—therefore omits… persons that have substantial control of a reporting company."  *Id.* (internal quotation marks and brackets omitted).  But regardless, that is a reason to amend the CDD Rule, not to enact an unprecedented (and constitutionally suspect) statute.  The CDD Rule can be changed to define "beneficial owner" more broadly, and Congress under *Shultz* clearly has the power to do so.  Furthermore, even if the CDD Rule's use of 25 percent ownership as the threshold is too narrow from a policy perspective,[3] it is at least easy

---

[3] The CDD Rule allows covered financial institutions to "establish a lower percentage threshold for beneficial ownership (*i.e.*, one that regards owners of less than 25 percent of equity interests as beneficial owners) based on their own assessment of risk in appropriate circumstances." 81 Fed. Reg. 19398, 29410 (May 11, 2016); *see* 31 C.F.R. § 1010.230 (2016).

enough for ordinary people to understand.  By contrast, as Plaintiffs explain, the CTA's broader definition of "substantial control" is so broad and ambiguous as to be unconstitutionally vague.  *See* Pltfs' Reply Br. at 39-40.

*Amici*'s third argument is that "the CDD Rule only collects beneficial ownership information from those companies that *choose* to open accounts with certain covered financial institutions and only as of the date the entity opens an account—not when it is formed."  Amici Br. at 8.  But *amici* do not explain why a law enacted to fight money laundering should apply to the act of entity formation in a way that includes entities that do not have any capacity to launder money through bank accounts or financial institutions.  *Amici* also claim that the CTA is needed because "many entities do not open accounts in the United States—especially if their beneficial owners are from another country—and are therefore not subject to the CDD Rule."  *Id.* at 9.  But if an entity does not open a United States bank account because it is a foreign entity, then it will not be subject to the CTA's reporting requirements either.

*Amici* suggest the CDD Rule is also inadequate because anonymous entities that wish to launder money through a purchase of "U.S. real estate" can avoid reporting their beneficial ownership under the CDD Rule by simply "wiring cash to a U.S. account held by the relevant real estate firm."  *Id.*  This may be a real policy problem, but again it is a reason to change the CDD Rule, not a *justification* for the

CTA under the Constitution.  There is no question that Congress has the constitutional power to specify or clarify that any real estate firm handling funds that are necessarily transmitted through the channels of interstate or foreign commerce is a "covered financial institution" for purposes of the CDD Rule, such that it must track the beneficial ownership of the entity that made the real-estate purchase.  *See Shultz*, 416 U.S. at 46.  But the very source *amici* cite as support confirms that FinCEN itself is to blame for the cavernous real-estate loophole in the CDD:

> Ironically, it was the U.S. Financial Crimes Enforcement Network (FinCEN) granting real estate professionals a 'temporary exemption' from compliance as a 'financial institution,' that created some of the loopholes that today allow kleptocrats, hostile governments, drug traffickers, and human rights abusers to launder their money in U.S. real estate.  This 'temporary' exemption has since gone on for two decades, and hinders the development of any further legislative efforts to target other gatekeepers.

Global Financial Integrity, *Acres of Money Laundering: Why U.S. Real Estate is a Kleptocrat's Dream* at 4 (Aug. 4, 2021) (cited at Amici Br. At 9 n. 26).

### C.    The CTA Is Not Compelled by FATF International Standards.

*Amici* erroneously argue that the CTA is necessary to bring the United States into compliance with what they claim to be "international standards established by the Financial Action Task Force ("FATF")."  Amici Br. At 10-11.  The very first recommendation in the FATF International Standards is that countries deploy a "risk-based approach" to ensure that anti-money laundering measures are "commensurate with the risks identified."  Financial Action Task Force [FATF], *International*

*Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation*, at 10, FATF, Paris, France (2012-2013) ("FATF International Standards").[4]  The CDD Rule is risk-based, while the CTA is not.  The CDD Rule compels banks to identify, monitor, and develop risk profiles of account-holder entities.  The CTA, on the other hand, requires reporting by any covered State entity of the personal information of beneficial owners or applicants, and its 24 exceptions to the requirement are, on their face, not cued to risk.  *See* Complaint ¶¶ 19, 38.

Moreover, the FATF International Standards provide that a country may legislate transparency of entity beneficial owners "through either a register of beneficial ownership *or an alternative mechanism*."  FATF International Standards at 22 (emphasis added).  The CDD Rule is just such an alternative mechanism.  Indeed, the relevant interpretative note states that "[c]ountries should decide, on the basis of risk, context and materiality what form of registry *or alternative mechanisms* they will use." *Id.* at 92-93 (emphasis added).  A "registry," *i.e.*, a CTA type entity-ownership database, is an option, not a requirement, under the FATF International Standards.  No treaty of other pertinent law requires the United States to be in compliance with the FATF International standards in any event, but it is already in compliance by virtue of the "alternative mechanism" of the 2016 CDD Rule.

---

[4] The FATF International Standards (updated Feb. 2023) are available for download at: https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%202012.pdf.coredownload.inline.pdf.

**D.    If the CTA is as Potent a Law Enforcement Tool as *Amici* Say, then It Violates Plaintiffs' Constitutional Privacy Rights.**

Many of *amici*'s policy arguments demonstrate a total lack of awareness of the individual liberties that are at stake in this context.   *Amici* tout the supposed superiority of the CTA, by contrast to the CDD Rule, on the premise that FinCEN's CTA-enabled database is "immediately available to law enforcement, intelligence, or national security agencies." Amici Br. at 8 (internal citation omitted).   *Amici* further assert that "the CTA adds law enforcement tools" and that FinCEN will check "submitted documentation" including an image of an identification document for "accuracy and authenticity."   *Id.* at 12.   If all this is true, then the CTA marks an unprecedented incursion on the constitutional privacy rights of the persons whose information FinCEN has collected and analyzed.   These people have *done nothing wrong*—entity formation is not in itself a criminal activity.   *Amici* would sacrifice the presumption of innocence and the freedom of individuals to associate together to form an entity in their inquisitorial zeal to root out the evil of "anonymous corporations."

**III.    *Amici* Present No Evidence That "Legitimate Small Businesses" Will Benefit from the CTA.**

The NSBA was formed in 1937 and has been advocating for America's small business community since that time.   It is proud to have more than 65,000 small-businesses as actual members.   The NSBA speaks for the interests of small

businesses in this country, and its members flatly reject the preposterous notion that the benefits of the CTA to small businesses justify its considerable burdens.  *See* McCracken Decl., ¶¶ 4-7.  *Amici* provide no actual support for their contention otherwise.  They cite "an Internet survey of 500 small business owners nationwide."[5] *See* Amici Br. at 14-15.  Such flimsy evidence hardly warrants consideration (and is undeserving of judicial notice as explained above), but it is telling nonetheless.  The two relevant poll questions were:

> 7.  Some have used shell companies to fraudulently win contracts or obtain government set-asides reserved for small businesses. Would you say these practices are a major problem, a minor problem, or not a problem?

> 8. **Some people** say that requiring small business to list the true identities of their owners would benefit small businesses by protecting them from contract fraud and giving them fair access to government set-asides.

> **Other people** say that requiring listing of business owners' identities places an unnecessary burden on businesses and would stifle business creation.

> Do you think it would be a benefit or a burden for small businesses such as yours to disclose the true identity of their owners?

"Opinion Poll: Small Business Owners Support Legislation Requiring Transparency in Business Formation," Small Business Majority, at 5 (2018) (emphasis in original).

---

[5] *See* "Opinion Poll: Small Business Owners Support Legislation Requiring Transparency in Business Formation," Small Business Majority (Apr. 4, 2018), cited at Amici Br. at 15 n.44, and available at: Microsoft Word - 040418-Corporate-Ownership-Disclosure-Poll.docx (smallbusinessmajority.org)

It is a wonder that only 84 percent of the Small Business Majority poll's respondents (the reported poll numbers actually tabulate to 85 percent) reported that using "shell companies to fraudulently win" government contracts was a problem. As to Question 8, the specific issue was whether it would benefit or burden small businesses that seek government contracts or set-asides to "list the true identities of their owners."  The question asked about "listing" true identities in the process of applying for a government contract or set-aside, which is an eminently reasonable means of preventing theft or fraud against the government.  Thus, it is hardly a surprise that 77 percent of respondents found that it was a "benefit."  Of course honest small businesspersons, which the vast majority of American small business operators are, would perceive a benefit in making it harder for cheaters to win government contacts or set-asides.

As a general matter, polls tell us nothing about the meaning of the Constitution. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2278 (2022) ("The Judicial Branch derives its legitimacy, not from following public opinion, but from deciding by its best lights whether legislative enactments of the popular branches of Government comport with the Constitution.") (citation and internal quotation marks omitted).  But a far more apt poll would have included the following question, which was absent from the poll *amici* have cited:

> Do you think it would burden small businesses to report owners' names, birthdates, addresses, and identification numbers to the federal government's

> financial intelligence unit and update any changes, so that the intelligence unit can maintain a database that state, federal, and foreign law-enforcement and intelligence agencies may access without any suspicion of wrongdoing?

Plaintiffs expect that most respondents would answer "yes" to that question.

Amici also allege that the costs of complying with the CTA are not that high (citing FinCEN's estimate of $85 per initial report) and that most State entities are single-owner entities and so reporting will be a cinch. Amici Br. at 16-17. If nothing else, amici's arguments establish—albeit unintentionally—that Plaintiffs have suffered a redressable injury and thus that the Government is wrong to deny that they have standing to bring these claims. As the Supreme Court recently explained, even "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." Uzuegbunam v. Preczewski, 141 S. Ct. 792, 802 (2021).

Yet the cost to Plaintiffs and others from the CTA is far from nominal. Like FinCEN, amici do not explain how the $85 estimate was derived, which, in any event, only applies to initial reports. The only reliable evidence included in the record of this case is in NSBA's CEO Todd McCracken's testimony, where McCracken explains that the CTA will impose a considerable burden on small businesses in terms of time, work, and resources when accounting for the costs of consulting lawyers and other advisors. See McCracken Decl. ¶ 7 ("The NSBA regularly counsels small businesses on federal requirements, often because such businesses do not have

the expertise to navigate these requirements on their own and do not have the re-
sources to hire outside advisors."). Regardless, if Congress exceeded its Article I
powers by enacting the CTA or if the CTA violates individual constitutional rights
to privacy, the matter of cost will be largely relevant: there is no *de minimis* excep-
tion to the Constitution.

### IV.   The CTA Is an Unprecedented Expansion of FinCEN's Power and Will Result in Greater Expansions If Upheld.

As the Supreme Court has warned, "'the most telling indication of [a] severe
constitutional problem . . . is the lack of historical precedent' for Congress's action."
*Nat'l. Fed. of Independent Business v. Sebelius*, 567 U.S. 519, 549 (2012) (quoting
*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477,
505 (2010)). And "this is the first time the federal government will collect personal
information about the owners of a State entity simply because it was formed, absent
any suspicion of wrongdoing or sense of the entity's activities or if it even engages
in any activities." Pltfs' Reply at 24. *Amici* proclaim that the "CTA is a historic
anti-money laundering step," but at the same time somehow maintain that the
"CTA's reporting requirements are neither unusual, nor unprecedented." Amici Br.
at 4. *Amici* is right about the former point, but wrong on the latter.

*Amici* start off promisingly enough, citing Supreme Court precedent "explain-
ing that 'analogical reasoning . . . requires a determination of whether the two regu-
lations are 'relevantly similar.'" Amici Br. at 14 (citing *N.Y. State Rifle & Pistol*

*Ass'n v. Bruen*, 142 S.Ct. 2111, 2132 (2022)).  Their examples of supposed precedents for the CTA, however, involve regulations that are decidedly not "relevantly similar" to this "historic" statute.  *Amici* assert that "the CTA requires entities who seek to avail themselves of a government service—*i.e.*, incorporation—to disclose information about their beneficial owners before accessing that service."  Amici Br. at 13.  They say that there are many laws "with similar requirements that applicants for other government services disclose information about the applicant's identity," like Alabama's requirements for a driver's license and sitting for the bar examination, and Huntsville-Madison County Public Library's requirements for getting a library card.  *Id.*

*Amici* skip over the critical fact that unlike those provisions, in the CTA, the federal government requires disclosures as to a process—entity formation by the States—that the federal government does not itself administer.  And *amici* skip over the just-as-critical fact that neither the Alabama Department of Public Safety, nor the Alabama Bar, nor the Huntsville-Madison Public Library System compile citizens' information for a law-enforcement database that can be shared with the Chinese government.  Plaintiffs' proffered analogues are not "relevantly similar" to the CTA in any meaningful or instructive way.

It is not clear if *amici* realize the enormity of what they are claiming—that this feature of the CTA is "neither unusual, nor unprecedented."  Amici Br. at 4.

What if Congress, after findings that lawyers facilitated money laundering, passed the Lawyer Transparency Act ("LTA") requiring everyone who passed the Alabama Bar Examination, regardless of whether they practice law or not, to report their names, birthdates, addresses, identification numbers, and bar numbers to FinCEN to populate a database that can be accessed by state, federal, and foreign law-enforcement and intelligence agencies investigating and prosecuting money laundering, terrorism, and other national security threats?  What if Congress, after finding that some non-profit organizations were conduits for terrorism, revoked the CTA exemption for entities with 501(c)(3) tax-exempt status, *see* 31 U.S.C. § 5336(11)(B)(xix), and required every non-profit entity incorporated under State law (including *amici*) to report the name, birthdate, address, and ID of any person with "substantial control" over the organization to FinCEN?  What if Congress passed a Medical Doctor Transparency Act ("MTA") collecting personal information for a national drug law-enforcement database of state-licensed medical doctors after finding some doctors abused their drug prescription privileges to sell drugs?  It is hard to see how these hypothetical statutes would not be "relevantly similar" to the CTA under *amici*'s analysis.

*Amici*'s presumption—that the federal government has constitutional power to collect personal information from people who form an entity (or obtain a license or a library card) under State law, to build a federal law-enforcement database that

federal and foreign law-enforcement and intelligence agencies can access to fight money laundering and financial crimes—is preposterous and fundamentally mistaken.  If the unprecedented CTA is upheld as constitutional, it will set a precedent that will not only lead to creeping disenfranchisement of individual constitutional privacy rights but also chip away at the sovereign powers of the States.

## CONCLUSION

All parties and law-abiding persons share *amici*'s commitment to fighting money laundering and financial crime.  But as Justice Brandeis warned, "the greatest dangers to liberty lurk in the insidious encroachment by men of zeal, well-meaning but without understanding."  *Olmstead v. United States*, 277 U.S. 438, 471, 479 (1928) (Brandeis, J., dissenting).  Congress must use other means to achieve these ends.  The CTA is unconstitutional.

Dated: May 3, 2023          Respectfully submitted,

s/ Thomas Lee

Thomas Lee*
thomas.lee@hugheshubbard.com
Terence Healy*
terence.healy@hugheshubbard.com
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 837-6000
Fax: (212) 422-4726
*admitted pro hac vice

Kenyen Brown*
HUGHES HUBBARD & REED LLP
1775 I Street, N.W.
Washington, D.C., 20006-2401
Telephone: (202) 721-4600
Fax: (202) 721-4646
kenyen.brown@hugheshubbard.com

John C. Neiman, Jr.
MAYNARD NEXSEN
1901 Sixth Avenue North
Suite 1700
Birmingham, AL 35203
Telephone: (205) 254-1000
jneiman@maynardnexsen.com

*Attorneys for Plaintiffs*