FILED

2023 Nov-30  AM 11:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

1         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ALABAMA
2            NORTHEASTERN DIVISION

3

4

5  NATIONAL SMALL BUSINESS UNITED,  *
          Plaintiff,         *  5:22-cv-1448-LCB
6                            *  November 20, 2023
  vs.                    *  Huntsville, Alabama
7                            *  10:00 a.m.
  YELLEN, ET AL.,           *
8          Defendant.         *
  *******************************

9

10

11          TRANSCRIPT OF MOTION HEARING
      BEFORE THE HONORABLE LILES C. BURKE
12        UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23  Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
  pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
24   and Procedures Vol. VI, Chapter III, D.2.  Transcript
          produced by computerized stenotype.
25

***CHRISTINA K. DECKER, RMR, CRR***
Federal Official Court Reporter
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                              <u>APPEARANCES</u>

2

        <u>FOR THE PLAINTIFFS</u>:
3       John C Neiman, Jr
        MAYNARD NEXSEN, PC
4       1901 Sixth Avenue North, Suite 1700
        Suite 1700
5       Birmingham, AL 35203
        205-254-1000
6
        Thomas Lee
7       HUGHES HUBBARD & REED LLP
        310 East 15th Street #2A
8       New York, NY 10003
        347-324-6000
9       Thomas.lee@hugheshubbard.com

10

11      <u>FOR THE DEFENDANT</u>:
        Stuart J Robinson
12      U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
        Federal Programs Branch
13      450 Golden Gate Ave., Suite 7-5395
        San Francisco, CA 94102
14      415-436-6635
        Stuart.j.robinson@usdoj.gov
15
        Taylor Pitz
16      DEPARTMENT OF JUSTICE
        Civil
17      1100 L Street NW
        Washington, DC 20005
18      202-305-5200
        Taylor.n.pitz@usdoj.gov

19

20

21      <u>COURTROOM DEPUTY</u>:  Stephanie P. Tolen

22

23

24      <u>COURT REPORTER</u>:  Christina K. Decker, RMR, CRR

25

**P R O C E E D I N G S**

1
2          (In open court.)

3          THE COURT:  Good morning.

4          (In chambers:)

5          THE COURT:  So just before we get started, I wanted to

6     disclose something to the parties.  I don't think it matters,

7     but I would rather put it out there, anyway.

8          So probably a year, two years ago, a guy I know in

9     Huntsville named Ken Rivenbark, who owns an antique store down

10    the street that I've bought from before, I think he was on the

11    board of this National Small Business Association.

12         And he mentioned something to me while I was in there,

13    Hey, I think we might be filing something in Huntsville.  Does

14    that create a conflict for any of the judges?  Because he knows

15    several.  And I said it could.  I can't think of any.  I guess

16    it depends on what you file, you know, et cetera, et cetera, et

17    cetera.  And he said at the time, Well, I am about to get off

18    that board, anyway, so that's what I'm going to do.

19         And so maybe a month later, I was in there, and he said,

20    Well, if they file anything, I have just resigned from the

21    board.

22         So I put that out to y'all.  I don't have any outside

23    relationship with him other than I just buy stuff in his store.

24    I have never been in his home.  But I do want you to know that.

25         And I didn't know ahead of time what he was filing -- what

1  this group was filing or what it was.

2      But does that create any questions for anybody or

3  thoughts?

4          MR. ROBINSON:  Not for defendants, Your Honor.

5          MR. NEIMAN:  Not for plaintiffs.

6          THE COURT:  I wanted to make sure everybody knew that,

7  because it's better to err on the front than the end.

8          (End of in-chambers conference.)

9          THE COURT:  All right.  Court calls National Small

10  Business United vs. Yellen.

11      I would ask the attorneys please to identify themselves

12  for the record and who they represent.

13          MR. NEIMAN:  Good morning, Your Honor.  My name is

14  John Neiman.  I am from the Maynard Nexsen firm in Birmingham.

15  And I'm here representing the plaintiffs, Mr. Isaac Winkles,

16  and the National Small Business Association.

17          MR. LEE:  Good morning, Your Honor.  My name is Thomas

18  Lee of the Hughes Hubbard & Reed Law Firm in New York.  And I

19  also represent plaintiffs Isaac Winkles and the National Small

20  Business Association.

21          MR. ROBINSON:  Good morning, Your Honor.  Stuart

22  Robinson from the Department of Justice on behalf of the

23  defendants.

24          MS. PITZ:  Good morning, Your Honor.  Taylor Pitz from

25  the Department of Justice on behalf of the defendants.

1          THE COURT:  Got it.

2      So it seems like maybe instead of me just letting

3  everybody get up and give long arguments covering a multitude

4  of issues, that we might organize this a little bet better, and

5  just kind of go back and forth on maybe each issue.

6      And probably the logical issue to begin with might be

7  standing.

8      Does anybody have a suggested order they might want to

9  take these arguments in?

10          MR. NEIMAN:  Your Honor, that certainly makes sense to

11  me.  Mr. Lee is going to make our presentation regarding

12  standing.  I will largely be focusing on the merits issues.

13      I don't know whether it makes more sense for Mr. Lee to go

14  first since --

15          THE COURT:  Well -- I'm sorry.  Go ahead.  Go ahead.

16          MR. NEIMAN:  We are the plaintiffs.  We filed the

17  first motion, but defendants are the ones who raised standing.

18          THE COURT:  Right.  Right.

19      And so I would say probably let the Department start on

20  standing.  And then he can maybe hand the bat to you for the

21  next arguments after that.

22      So just for time management, you know, how much time would

23  the government need for each of these arguments?  We can break

24  it down by standing, and then by individual amendment.

25          MR. ROBINSON:  Your Honor, I think collectively we

```
 1   would like the opportunity to present over a 30-minute time
 2   period, give or take, depending on what the plaintiffs present,
 3   as well.  But we think we can cover all of the issues within
 4   that time frame.
 5            THE COURT:  You can cover all of the issues in
 6   30 minutes.
 7            MR. ROBINSON:  I think so, Your Honor.  I think the
 8   briefings speak to a lot of these issues.
 9            THE COURT:  It does.  Well, that would be fantastic.
10       All right.  So we will just kick off on standing.
11            MR. NEIMAN:  Your Honor, let me just say my
12   presentation is a bit longer than 30 minutes just on the
13   merits.  I can certainly streamline.  And if the Court wants me
14   to rest on briefing on certain issues, I am more than happy to
15   do that, but I am not quite where the government is.
16            THE COURT:  I expected to hear 45 to 50 per side.  And
17   so if you need a little longer, that's fine.
18       I mean, I would say if we're out of here by 11:30, 11:45,
19   we're doing fine, so...
20       All right.  All yours.
21            MR. ROBINSON:  Thank you, Your Honor.
22       And in terms of our division of labor, with the Court's
23   permission, I would like to cover standing and the Article 1
24   arguments.  And my colleague, Ms. Pitz, will be covering the
25   other --
```

1          THE COURT:  Perfectly fine.

2          MR. ROBINSON:  Thank you.

3      Good morning again, Your Honor.

4          THE COURT:  Good morning.

5          MR. ROBINSON:  The Corporate Transparency Act

6  represents a culmination of a decades-long effort by the

7  political branches to address a key vulnerability in the U.S.

8  financial system:  The ability of foreign and domestic actors

9  to establish corporate entities, hide their involvement in

10 those entities, and facilitate less activity through those

11 entities.

12      Since the early 2000s, law enforcement agencies, national

13 security experts, and our international partners have urged the

14 United States to shore up this deficiency by collecting

15 information on beneficial owners and applicants at the time of

16 formation.  The CTA does just that.  And in doing so, carries

17 on the longstanding tradition that, once formed, corporate

18 entities are subject to federal laws.

19      In light of the Congress's findings in the legislative

20 record, plaintiffs simply cannot show that the CTA could never

21 be applied in a constitutional manner, which is the burden they

22 carry for their facial challenge.

23      The Court need not reach those issues because no plaintiff

24 before the Court has standing to assert their claims.  I will

25 begin with Mr. Winkles.

1          It is undisputed that Mr. Winkles has already disclosed
2     the information required by the CTA both publicly and to
3     government entities.  In their briefing, plaintiffs' standing
4     arguments focus on the idea that Mr. Winkles's injury arises
5     from the requirement to report personal information not to the
6     government generally, but specifically to the Financial Crimes
7     Enforcement Network, also known as FinCEN.
8          That, of course, is inconsistent with the allegations of
9     the complaint, which is not limited to FinCEN.  And I would
10    refer the Court to complaint paragraphs 3, 7, 8, 12, and other
11    paragraphs.  That pleading cannot be amended through their
12    briefing.
13         But even if it were able to be amended, plaintiffs don't
14    explain why that distinction makes any difference.  That is,
15    why injury turns on the specific recipient of previously
16    disclosed information within a unitary executive branch.
17         For similar reasons, there's no traceability or
18    redressibility.  To the extent Mr. Winkles is concerned about
19    information being disclosed, enjoining the CTA won't make
20    secret the information he has already published, again both
21    publicly and reported to the government.
22         I would emphasize, Your Honor, that plaintiffs are not
23    asserting injury based on the risk of disclosure outside of
24    FinCEN.  That's at their reply page 7 and note 2.
25         And to the extent that plaintiffs are relying primarily on

1   the Ted Cruz for Senate case for standing, that case is

2   inapposite.  It did not consider standing to challenge a

3   recording requirement for previously disclosed information.

4   And standing was based on economic harm.

5        Additionally, the Supreme Court recognized in that case

6   the ability of a party to establish standing by subjecting

7   himself to a statute's requirements; in other words, standing

8   for tester cases.

9        That's not true here.  There is no indication that

10  Mr. Winkles disclosed the information in order to bring that --

11  or record any information, or to bring a lawsuit.  He

12  independently disclosed it.

13       NSBA also lacks standing.  In terms of organizational

14  standing, they cannot claim an injury based on a need to engage

15  in activity that is consistent with its primary mission and

16  regular operations.

17       Mr. McCracken's declaration at paragraph 5 says that NSBA

18  exists to provide guidance and data on how to navigate

19  government regulations, educational programming regarding

20  federal regulations, and periodic training for members.

21       Paragraph 7 talks about now NSBA regularly counsels small

22  businesses on federal requirements.  That is exactly what they

23  aim to do here, with respect to the CTA.

24       In order to establish organizational standing, there must

25  be some impairment of an organization's ability to engage in

1    its projects because of a forced diversion or resources.

2    There's not a sufficient showing of resource diversion here.

3        Mr. McCracken's declaration at paragraph 12 is the closest

4    they get, talking about an education campaign, about the CTA

5    that will result in fewer opportunities to educate and train

6    companies on other topics.

7        But in light of the precedent that we cite, it is simply

8    insufficient.  The declaration doesn't describe that campaign

9    in detail, doesn't explain why NSBA must spend more hours than

10   usual following a change in policy affecting small businesses,

11   doesn't identify a time period for other projects, or why

12   specifically they can't be accomplished, and, importantly, does

13   not account for the outreach efforts of FinCEN.

14       THE COURT:  Do you want to address the affidavit issue

15   and what the requirements under Lujan are?

16       MR. ROBINSON:  Sure.

17       At the motion to dismiss stage, there's a much more

18   lenient standard to establish standing.  But at the motion for

19   summary judgment stage, there must be -- it's much more

20   exacting scrutiny.  And conclusory allegations are not -- or

21   vague allegations are insufficient even if accepted as true to

22   establish standing for Article 3.  I think that's clear, not

23   just on Lujan, but the other cases we cite, as well.

24       So even accepting, you know, the words that Mr. McCracken

25   has provided in his declaration, it doesn't mean that those are

1    sufficient to establish injury for Article 3 purposes in a

2    motion for summary judgment stage.

3         And the cases that the plaintiffs cite I think are helpful

4    comparisons.  The Browning case had evidence that the

5    organization will spend many more hours than it otherwise would

6    have.

7         There was proof of actual ability to conduct specific

8    projects during a specific time period that will be frustrated

9    by the statute's enforcement.

10        In Billups, at pages 350 to 51, there was testimony about

11   specific number of planned projects and information about

12   expenses.  Here there's no comparable that was with specificity

13   in the McCracken declaration.

14        To the extent SBA is relying on an associational standing

15   theory, that fails because Mr. Winkles himself does not have

16   standing.

17        To the extent that that theory rests on the 16 unnamed

18   member entities that Mr. McCracken references at paragraph 11

19   in his declaration, that also is insufficient.  By that

20   declaration's own admission, not all of those member entities

21   are subject to the CTA.  There's been no discussion in the

22   declaration about whether those entities have previously

23   disclosed information or not disclosed information required by

24   the CTA.

25        And perhaps most importantly, in the Georgia Republican

1  Party case, the Eleventh Circuit made clear that for

2  associational standing, there must be named members, not

3  unnamed members to proceed.

4       Finally, Your Honor, to the extent that plaintiffs are

5  arguing standing based on potential compliance costs -- and

6  here I think the closest they get is Winkles's declaration

7  paragraph 10.  This is, at best, a vague and conclusory

8  allegation.

9       Mr. Winkles says that he needs to hire additional help to

10 comply with the requirements, but does not explain why costs

11 are even necessary -- costs are necessary or even likely.

12      And the cases we cite, Interstate and Aaron Private Clinic

13 Management, explain that these types of threadbare assertions

14 of additional costs are inadequate.

15      If the Court has no further questions, that's all we have

16 on standing.

17           THE COURT:  Plaintiffs?

18           MR. LEE:  Your Honor, I was wondering if my colleague

19 Mr. Neiman could make a short introductory remark before I talk

20 about the standing argument.

21           THE COURT:  That's fine.

22           MR. NEIMAN:  Thank you, Your Honor.

23      Let me say at the start it's an honor to be across the

24 aisle in this case from the attorneys who represent the United

25 States through Main Justice.  I think they have done an

admirable job defending the statute that's no doubt important
to the federal government.

It's also, I'm willing to concede, a statute that is
clearly very well intentioned, just as the Violence Against
Women Act that was struck down in the Supreme Court's decision
in Morrison was well intentioned, and just as the Gun-Free
School Zones Act that was struck down in the Supreme Court's
decision in Lopez was undoubtedly well intentioned.

What those Supreme Court decisions show, however, is that
even the best of intentions from Congress can't justify a
statute that crosses the constitutional lines.  They can't
justify instances of Congress throwing outside the strike zone.

And as to the issues that the Corporate Transparency Act
is designed to address, there are other ways for Congress to
address those issues.  Congress can pass laws that combat money
laundering and terrorism that actually fall within Congress's
enumerated powers.  Congress can pass laws that achieve these
goals without intruding on the constitutional rights of
ordinary Americans like my client, Mr. Winkles, a realtor here
in Huntsville.  Congress can't, however, try to achieve those
roles through one of these -- a statute that crosses the
relevant constitutional lines here.

Now, Mr. Lee is going to address Mr. Robinson's arguments
on standing.  But I thought it would be helpful at the outset
to offer up four points of background that I think help

1  illustrate our legal arguments, both on the merits, but also

2  what Mr. Lee is about to tell you on standing.

3      I've put together a slide declaration that, if I can get

4  Mr. Lee to administer for me, and if I can get it put up on the

5  screen today.  It's largely just materials that are in the

6  record already, but points of background that I wanted to

7  highlight for the Court.

8      So, Tom, if you can, turn to my next slide.

9      The first point of background that I would emphasize at

10 the outset is that the action that the Corporate Transparency

11 Act regulates by the plain terms of the statute, it's not a

12 commercial or economic action.  And we actually see the

13 government conceding as much in its briefing, its sur-reply to

14 the Court.

15     So to walk the Court through the key parts of the statute

16 in that regard, up on the screen now is 5336(b)(1).  It states

17 that the point of regulation here is something that the statute

18 refers to as a reporting company.  That's the entity that must

19 provide the sensitive information about beneficial owners to

20 this law enforcement database.

21     Tom, if you can, turn to my next slide.

22     This is 5336(a)(11) in the definitional section of the

23 statute.  It defines reporting company in a really important

24 way.  It says that it's a corporation or LLC that's created by

25 the filing of a document with a secretary of state or a similar

```
1    office under the law of the state or Indian tribe.

2         That's important because that act of filing, which is, as

3    Mr. Robinson said today, deals with the time of formation of

4    one of these entities, that act is a governmental act,

5    administerial act, and not in and of itself an act of engaging

6    in commerce.

7         So once we get to the merits, I will talk a little bit

8    more about that point.  But it's crucial to the discussion of

9    the Commerce Clause.

10        My second point, by way of background, is that the statute

11   really does require disclosure of sensitive personal

12   information.

13        So, Tom, if you can turn to slide 4.

14        This is all the more clear because of what the regulations

15   implemented by the agency FinCEN here say.  So here's what the

16   statute says.  This is 5336(b)(2).

17        It requires the reports that come in from the reporting

18   company to show, among other things, the names, dates of birth,

19   addresses, and critically for present purposes, the ID number

20   that appears on an ID, such as a passport or a driver's

21   license.

22        One thing that we referenced in our briefs, but that I

23   would really like to emphasize today is that the final rule

24   adopted by the agency here, FinCEN, interpreted and is

25   implementing that requirement in a way that actually requires a
```

1  digital image, a photocopy of the ID card as part of the

2  package that comes in from the reporting company.

3      Third point by way of background is that although the

4  statute on its face requires these reports to come in from the

5  companies, the statute achieves that goal by compelling

6  individuals to give up the information under threat of

7  prosecution.

8      So a few weeks ago, we filed a notice of supplemental

9  authority with the Court containing some guidance that FinCEN

10 had just issued about small businesses' compliance with the

11 statute.  This guidance says, among other things -- let me grab

12 my notes really quickly.

13     So the guidance responds to a question about what happens

14 if my company is unable to report the BOI, the Beneficial

15 Ownership Information, in the required time frame.

16     The answer is really telling.  So the first paragraph says

17 that a person -- a person, not the company -- may be subject to

18 civil or criminal penalties when that happens.

19     And the following paragraph explains that an individual

20 who qualifies as a beneficial owner may refuse to provide

21 information to the company, knowing that it would lead the

22 company to not be able to comply with the reporting mandate

23 under the statute.

24     The guidance from FinCEN says in that circumstance the

25 individual may be prosecuted if the individual says I don't

1 want to hand over the image of my driver's license, my date of

2 birth, and the like.  That's going to be important both with

3 respect to Mr. Lee's arguments on standing, but also with

4 respect to the merits of our arguments on the Fourth Amendment.

5 　　　　One fourth and final background point is that although the

6 government has suggested that there's no injury in fact to my

7 clients, like Mr. Winkles, FinCEN itself in the same discussion

8 of the final rule has admitted that there is.  So all the

9 parties cited the federal register notice that announced that

10 FinCEN had adopted a final rule.

11 　　　　One thing that was discussed in the briefs that may not be

12 as apparent as I would like it to be is that in that notice,

13 FinCEN engaged in a fairly detailed and thorough analysis about

14 the compliance costs that companies would have to sustain in

15 order to comply with the statute.

16 　　　　So on the screen is Table 2 from that analysis.  It says

17 that for a company with a simple structure, compliance costs

18 will be $85.  For one with an intermediate structure,

19 compliance costs are $1,350.  And then for one with a complex

20 structure, projected compliance costs are over $2,600.

21 　　　　That same document, which is one that I should add, that

22 the government put into the record as attached to its motion

23 for summary judgment.  There's another table projecting what

24 continuing compliance costs will be for companies when

25 beneficial ownership changes in those companies.  And there

```
 1  will be other, I would suggest, less tangible injuries
 2  associated with the privacy concerns that we've raised.
 3      So those are the four background points that I'm hoping
 4  frame both our argument on the standing and the merits.  And
 5  with that in mind, I will hand the podium over to Mr. Lee.
 6          THE COURT:  I do have a question before you leave.
 7      So one thing I'm not clear on, maybe you can clear it up
 8  for me, is how is this funded for, you know, secretaries of
 9  state and things like that in this process?  What's the
10  funding?  I see references to a funding, you know, to help pay
11  for some of these things, but it's not clear to me what that
12  is.
13          MR. NEIMAN:  So I don't believe that there would be
14  any costs to the secretaries of state associated with the
15  company's act of reporting itself.  That all comes through the
16  individuals and then the companies.
17      The costs that the secretary of state would sustain would
18  be associated, I guess, with notifying companies that they have
19  this obligation.
20      As I understand it -- Mr. Lee knows more about this than I
21  do.  But as I understand it, that obligation is tied to
22  congressional appropriations that would go to the states.
23      As of last check -- and I will defer also to Ms. Pitz and
24  Mr. Robinson about whether this has changed.  As of last check,
25  Congress had not issued that appropriation.  I believe that
```

 1  means a secretary of state don't have a formal obligation under

 2  the statute to provide that notification right now.

 3      But I believe, unless there's something that's not readily

 4  apparent to me right now, that would be the only --

 5           THE COURT:  So if that notification is not given,

 6  what's the practical effect of that?

 7           MR. NEIMAN:  Well, it may mean that they're certainly

 8  absent notification from -- or an educational program from the

 9  NSBA and other organizations, there won't necessarily be notice

10  beyond the fact that the law has been passed and is being

11  implemented by FinCEN that individuals and companies have this

12  obligation to file these reports.

13           THE COURT:  Got it.

14           MR. NEIMAN:  Thank you.

15           THE COURT:  Uh-huh.

16           MR. LEE:  Good morning, Your Honor.  May it please the

17  Court.

18      Before I talk about standing, in reference to your last

19  question to Mr. Neiman, Your Honor, in the statute it does talk

20  about authorization of appropriations.  This is at Section 6509

21  of the statute.  And says there are authorized to be

22  appropriated to FinCEN for each of the three fiscal years

23  beginning on the effective date of the regulations such sums as

24  may be necessary to carry out this section, including

25  allocating funds to the states.

1          I believe -- and, again, it's for the government -- I

2     believe that they have not actually authorized a specific

3     amount.  That may be an error.  I mean, the government would

4     know better than I do.

5          The other part of the answer to the question is the

6     penalties for willful violations.  And I suppose if you can

7     imagine a situation in which the states, you know, you have got

8     a filer who doesn't actually know because the states would be

9     the front line of defense to notify the people.  I mean, maybe

10    perhaps that would implicate whether or not the violation was

11    willful.  So that's one thing that might be an implication of

12    that.

13         I'm going to talk about the constitutional standing of

14    Mr. Winkles and NSBA to bring this suit.

15         And the government has basically challenged their standing

16    alleging that the CTA does not impose an injury in fact on

17    either Mr. Winkles nor NSBA.  Mr. Winkles and Mr. McCracken,

18    the CEO of NSBA, are actually in the courtroom with us today.

19         And I think that it's -- we argue in our briefs that the

20    right way to read binding Supreme Court Eleventh Circuit

21    precedence is that both Mr. Winkles and NSBA have standing.

22         There are three requirements of constitutional standing --

23    injury in fact, traceability, and redressibility.  The

24    government doesn't seriously contest traceability or

25    redressibility.  And that's because the injury plaintiffs Isaac

Winkles and NSBA have pled and shown is directly traceable to
the reporting requirements in the CTA.  And a court order
enjoining the CTA from coming into effect will redress that
injury.  So it really does boil down to injury.

And the government makes essentially three types of
arguments.  And to some extent, it's based on how to read the
relevant cases.  And so I am going to walk us through their
arguments.

First, in their opening motion to dismiss, or in the
alternative motion for summary judgment, the government argued
that Mr. Winkles and NSBA did not make a showing of standing
and that we didn't also allege standing.

And I will just turn to the complaint at page -- at
allegation 14, which was one of the allegations that
Mr. Robinson did not read.  We said, open quotations, Winkles
will be subject to the acts and reporting requirements to give
his sensitive personal information to FinCEN.

So we actually do explicitly articulate this idea that
it's turning the information over to FinCEN that's the alleged
injury.

Now, let's try figure out exactly what the claim of injury
that Mr. Winkles and NSBA allege and have shown.  Let's start
with Isaac Winkles.

He and his wife are the sole shareholders in a real estate
company here in Huntsville.  He set up two Alabama S

1   corporations -- Isaac Winkles, Inc., and Alabama Property

2   Management, which is a member entity of plaintiff NSBA.

3       And the CTA will require his companies to turn over his

4   name, address, birth date, and a unique identifying number from

5   acceptable identification, such as an unexpired U.S. passport,

6   an Alabama driver's license.  And the regs also require him to

7   upload a digital image of that ID.  If his companies willfully

8   do not do this, Mr. Winkles himself can be fined up to $10,000

9   or imprisoned for two years.

10      And this information must be turned over to FinCEN, the

11  Department of Treasury's financial intelligence unit, which

12  will keep it in a database that can be accessed by federal,

13  state, and foreign law enforcement intelligence agencies.

14      We believe that there are two sorts of injury in fact that

15  this reporting requirement CTA causes to Isaac Winkles.  First,

16  I will call it the wallet injury.

17      By the government's own estimate is that it will cost him

18  $85.14 to comply with the reporting requirements of the CTA.

19  That's his time, his money that he could be using to run his

20  business.  And wallet injury, according to Supreme Court

21  precedence, clearly counts.

22      Recently, the Supreme Court in the Preczewski case, which

23  involved Gwinnett College across the border in Georgia, said a

24  dollar is enough.  And so wallet injury is clearly present here

25  in the amount of $85.14.

1          The trickier question is the privacy injury.  And we might
2     also call this the digital mug-book injury, or the digital
3     database injury.
4          As I said, Your Honor, the CTA requires Isaac to give his
5     name, birth date, address, and active ID number, including an
6     image of his ID to FinCEN for its law enforcement database,
7     when he or his wife have done nothing wrong, and there's no
8     suspicion that he has done anything wrong.
9          Now, we think either wallet injury or digital mug-book
10    injury is sufficient for constitutional standing.  And the
11    government really doesn't have an answer to the wallet injury
12    point because, well, those are their own financial cost
13    estimates.  It's FinCEN itself that says that it will cost
14    $85.14 to comply with the CTA.
15         But as to the privacy or digital mug-book injury, the
16    government's basic point, which Mr. Robinson emphasized, is
17    that he has already disclosed this information to the IRS to
18    file his taxes, to Alabama to get his driver's license, and to
19    the state department to get his passport.  Plus, his website
20    lists Isaac as the owner of Alabama Property Management on
21    social media.
22         And so the government says he can't claim any injury to
23    his privacy interests by having to turn over this information
24    to FinCEN.  But as we alleged, and as his declaration shows,
25    the privacy interest and injury is that FinCEN is putting his

1    information into a digital mug book for future law enforcement
2    use without any specific suspicion of wrongdoing.
3         By contrast to the factual context that the government
4    raises, Mr. Winkles is not actually getting anything, like a
5    passport or driver's license in return for turning over the
6    information, and the image of his photo ID.  Nor is the
7    government asking for the information to levy taxes or any
8    other legitimate regulatory interests in the present for which
9    he's submitting the information.
10        Indeed, when the government does ask for sensitive
11   personal information, Congress has legislated strict guidelines
12   limiting the use of that data solely for the regulatory
13   purpose, not for broader law enforcement purposes.
14        Now, Amicus Transparency International argued in support
15   of the government that the CTA is just like the Huntsville
16   Madison County Public Library's requirement for getting a
17   library card.  Yes, Huntsville Madison County may have
18   legitimate interest in getting Isaac's name and address because
19   they need to know who to charge overdue fees for if the book is
20   overdue.  But just because a county resident gives that
21   information doesn't mean the library cardholder doesn't have a
22   privacy interest as against turning over that information for
23   database that may be accessed by state, federal, or foreign law
24   enforcement or intelligence agencies.
25        Now, let's talk about injury to the NSBA.  NSBA is an Ohio

1  nonprofit mutual benefit association with 65,000 small business

2  entity members in all 50 states.  Sixteen of those member

3  entities have addressed zip codes that are in the Northern

4  Eastern District of -- Northern District of Alabama, including

5  ten in Huntsville proper.

6       NSBA also has two sorts of injuries that the CTA causes so

7  that they qualify from a constitutional standing perspective.

8  And, Your Honor, I talked about wallet injury and digital

9  mug-book injury.

10      Now, in the case of an organization, as Mr. Robinson

11 indicates, the Supreme Court precedence say an organization can

12 have two types of injury.  One is association injury, and the

13 other is organizational injury.

14      The way associational injury works is if a member has

15 standing, the organization has standing.  And because

16 Mr. Winkles has standing, and it is actually his company,

17 Alabama Property Management, that is the NSBA member, then NSBA

18 has standing on an associational theory.

19      There's one exception by the Fifth Amendment that

20 Mr. Neiman will talk about when we get to the bill of rights

21 provisions.

22      The government focused -- so, anyway, associational injury

23 depends on whether or not Mr. Winkles and his company have

24 injury.  So if they have injury, then on his associational

25 injury theory, NSBA has injury, too.

1         Organizational injury, which is where the government

2    spends more of its energy and briefing space -- if, Your Honor,

3    if you could allow me to approach the bench, I copied out for

4    your convenience the critical case, which is Florida State

5    Conference of the NAACP vs. Browning.  And I made four copies

6    for opposing counsel, your law clerk and yourself, Your Honor.

7         So organizational injury is tricky.  I mean, the critical

8    Supreme Court case is Havens vs. Coleman.  And the idea of

9    organizational standing is that if an organization is forced to

10   divert its resources because of the requirements of a new law,

11   then it has standing as an organization.  That's the Havens

12   case by the Supreme Court.

13        The Eleventh Circuit actually has especially favorable law

14   on this aspect of organizational standing for diversion of

15   resources, which explains why I think the government's

16   distinction of the relative case law is not persuasive.

17        The Eleventh Circuit has held that if an organization has

18   to divert -- open quotation, divert personnel and time because

19   of a new statute's requirements that fall within its purview,

20   then that counts.  That's the Browning case at page 1153.

21        Now, Mr. McCracken the CEO of NSBA's declaration plainly

22   states that once the CTA comes into effect, open quotation,

23   given the finite resources of the association, closed

24   quotation, CTA were, open quotation, will necessarily result in

25   fewer opportunities for NSBA to educate and train member

1  companies on raising capital, finding training, and retaining

2  workers complying with employment laws and protecting

3  themselves, their customers, and their employees from a range

4  of cyber security threats, closed quotations.

5      Now, if you look at the Browning case, Browning involved a

6  Florida law concerning matching.  And the idea was that in

7  order to register for voting, you have to -- the person who's

8  doing the registration has to check your ID and your social

9  security number against a list that they have had.

10     And so the NAACP challenged this new law and said, look,

11 this is actually susceptible to discrimination.  There are a

12 lot of circumstances in which, for example, you might have

13 registered under a maiden name, and it's not a match because

14 now you're -- you have a married name on your identification,

15 or you might not know your social security number.

16     And so the NAACP argued to try to enjoin enforcement of

17 the law that, you know, we are going to have to -- we are going

18 to have to take away from voter registration drives and all

19 these other kinds of activities because we're going to have to

20 be in a situation where we're going to have to help people

21 understand how they may meet these matching requirements when

22 they go to register for voting.  And the Eleventh Circuit

23 clearly said that that was okay.

24     Now, if you read the opinion carefully, there is -- it's

25 pretty clear that our allegations and our facts, to the extent

1    that Browning is good law, clearly compel the conclusion that

2    NSBA has organizational standing.

3         And a couple of specific quotations from Browning that

4    line up to what Mr. Robinson said, and I respectfully submit

5    that operate against his conclusions, if you look at page 1165,

6    about ten lines down.

7         Moreover -- this is citing favorably -- the Court held

8    that the fact that the added costs has not been estimated and

9    may be slight does not affect standing, which requires only a

10   minimal showing of injury.  Later on, what about the idea that

11   the allegations made -- or, strike that -- not the allegations,

12   but the statements in the declaration are too fuzzy, too

13   anticipatory.

14        Browning says, if you look at page 1166 in the handout,

15   the second column, about 14 lines down, it says, costs

16   unrelated to the legal challenge are different and do qualify

17   as injury whether they are voluntarily incurred or not.  The

18   Court expressly held that when a drain on the organization's

19   resources arises from the organization's need to counteract the

20   defendant's assertedly legal practices, that drain is simply

21   another manifestation of the injury to the organization's

22   non-economic goals.

23        That is precisely what NSBA's arguing.  The CTA is

24   unlawful.  And Mr. Neiman, my friend in law school, our

25   classmate, will make the argument as to why.  But if it is

1  unlawful, the NSBA will have to expend resources and divert

2  them from other measures such as cyber security, protection

3  initiatives, to inform people about the requirements of what

4  they believe is an unlawful law.  So that's organization

5  injury.

6       Your Honor, Mr. Robinson didn't really talk -- I don't

7  want to spend too much of your time on this other argument that

8  they make in their briefs that basically you have to have

9  injury on a claim-by-claim basis.

10      And that law is rather complicated.  It involves cases --

11  the critical cases is a case called City of Los Angeles vs.

12  Lyons, which involved a situation in which --

13          THE COURT:  I will note we're 35 minutes in and we

14  haven't had their arguments on standing.  If you want to wrap

15  up real quick, I will let you, but we are going to blow through

16  all our time here if we are not careful.

17          MR. LEE:  I understand, Your Honor.  So I will rest --

18  I think I have sufficiently addressed Mr. Robinson's arguments

19  as he made them today.

20          THE COURT:  All right.

21      All right.  I will give you a one-minute bite at the apple

22  if you want it.

23          MR. ROBINSON:  I will take it, Your Honor.  Thank you.

24      Thank you, Your Honor.  Just to briefly address a couple

25  of Mr. Lee's points.

1          The $85 number that he has referenced is an average for

2    simple structures.  And probabilistic reasoning is insufficient

3    to demonstrate Article 3 injury.  And so while it may be on

4    average a cost that's incurred, it does not establish that

5    Mr. Winkles himself is likely to incur any costs, and,

6    therefore, has not established standing.

7          This idea of digital privacy is not one that appears

8    anywhere in the briefing, and is somewhat new.  I will note

9    that Attachment 86 has a picture of Mr. Winkles on his LinkedIn

10   profile.

11         I don't think Mr. Winkles can deny that state or federal

12   entities already have a picture of him, whether in a passport

13   or in a driver's license.  And his declaration certainly does

14   not establish any concern of injury based on that theory.

15         Finally, in terms of organizational standing, one critical

16   distinction that I'll emphasize beyond what I have already

17   mentioned before between this case and others cited by

18   plaintiffs is that here, FinCEN, the agency charged in planning

19   the statute is itself is engaged in tremendous efforts to

20   educate and reach out to the public.

21         To the extent Mr. McCracken is talking about undertaking

22   that education campaign once the law comes into effect, I would

23   refer the Court to the Cousins case, which casts doubt on

24   whether injury is certainly impending, noting that is not

25   reasonable to infer the questions regarding a new law will

1  continue indefinitely, or that an organization will have to

2  continue to divert resources to creating educational materials

3  if the law is not changed.

4       Thank you, Your Honor.

5            THE COURT:  Gotcha.

6       I misspoke when I said we haven't heard your arguments.

7  We heard your arguments.  I wanted to hear your rebuttal.

8       You will figure this out about me.  I always allow

9  everybody a second bite at the apple at the end just to cover

10 very briefly.

11      So, anyway, let's get on, then, into the meat of your

12 argument.  Is that going to be you, Mr. Neiman?  Mr. Lee?  Or

13 will you split it up?

14           MR. NEIMAN:  This will be me.

15           THE COURT:  All you.

16      Okay.  So why don't you lead by telling me what you think

17 your strongest arguments are.

18           MR. NEIMAN:  Great.

19      Well, thank you, Your Honor.  And let me fudge a little

20 bit by saying I'm equally enamored with our enumerated powers

21 argument, what Mr. Robinson referred to as our Article 1

22 arguments and also our Fourth Amendment argument.

23      If I don't get time to address the others today, I will be

24 sad, but those are the two that I really would like to focus

25 the Court's attention on and spend time on today.

| | |
|---|---|
| 1 | THE COURT:  All right.  And why don't you just lay out |
| 2 | for me the order you want to take these individual arguments |
| 3 | in.  I am going to let you speak on all the issues, you know, |
| 4 | as long as we can keep it within a reasonable time. |
| 5 | MR. NEIMAN:  Would it make sense for me to address the |
| 6 | Article 1 slash enumerated powers argument, then let |
| 7 | Mr. Robinson respond at that point in time and then -- |
| 8 | THE COURT:  That's the way I would like to do it is |
| 9 | just issue by issue, point, counterpoint.  I think it will flow |
| 10 | a lot better. |
| 11 | MR. NEIMAN:  I agree. |
| 12 | Now, the enumerated powers argument is multifaceted, in |
| 13 | the sense that the government has relied on several different |
| 14 | aspects of the Constitution, in terms of Congress's |
| 15 | authorization to pass a statute. |
| 16 | So I will not only be addressing the Commerce Clause, but |
| 17 | also the taxing power and foreign affairs, and the like.  But I |
| 18 | would suggest I will do that, then let Mr. Robinson respond, |
| 19 | and we can move forward. |
| 20 | THE COURT:  Good with you, Mr. Robinson? |
| 21 | MR. ROBINSON:  Yes, Your Honor. |
| 22 | THE COURT:  All right.  Here we go. |
| 23 | MR. NEIMAN:  So, Your Honor, the Supreme Court in the |
| 24 | Affordable Care Act case, NFIB vs. Sibelius, wrote that the |
| 25 | most telling indication of a severe constitutional problem with |

 1   a federal statute is the lack of historical precedent for

 2   Congress's action.

 3        So one thing that's telling, when it comes to really both

 4   the enumerated powers and Fourth Amendment issue here, is that

 5   we really are on novel ground.  Congress has never enacted any

 6   statute quite like the Corporate Transparency Act, extending

 7   the reach of the federal government into the state governmental

 8   entity formation process.

 9        The reason the statute's unconstitutional generally fall

10   into three buckets:  The enumerated powers, the privacy issues,

11   and, finally, the vagueness.

12             THE COURT:  Out of curiosity, are there any other like

13   cases pending in other jurisdictions?

14             MR. NEIMAN:  I'm certainly aware of none, Your Honor.

15   Mr. Robinson and Ms. Pitz would probably be able to answer that

16   question even more definitively than I would.

17             THE COURT:  Got it.

18             MR. NEIMAN:  The most fundamental argument we make

19   deals with the fact that this statute's not within Congress's

20   enumerated powers.

21        The government begins its brief by focusing not on any

22   powers specifically enumerated in the Constitution, but rather

23   on powers that the government refers to as the foreign affairs

24   power, the government calls the national security power.

25        There are at least two problems with their reliance on

 1  those unenumerated powers.

 2      The first is that it's simply erroneous to say that

 3  Congress has the power to act in a way that affects Americans'

 4  lives internally as to domestic issues, even if no enumerated

 5  power authorizes Congress to do so.

 6      If you look at the Supreme Court decisions that the

 7  government cites in its motion for summary judgment or its

 8  brief in support, generally those laws could be grounded or

 9  were expressly grounded on some enumerated power.

10      So when Congress banned the sale of weapons to Bolivia in

11  the Curtiss-Wright case, that enactment would have been well

12  justified by the Foreign Commerce Clause.  Likewise, when

13  Congress stripped certain Americans of their citizenship for

14  going into other countries and abating the draft in that way,

15  in Kennedy vs. Mendoza Martinez, Congress had ample power to do

16  so, in light of the numerous provisions in Article 1 that give

17  Congress power to regulate the military in numerous ways.

18      So it's simply not the law that Congress can rely on some

19  unenumerated power to regulate Americans' internal lives in the

20  way that the CTA effectuates.  And Congress can't do that --

21  rely on some unenumerated power solely to bring U.S. policy

22  into alignment with the policy preferences of foreign

23  governments.  It also can't do that and rely on unenumerated

24  power merely for the sake of promoting national security.

25  There needs to be a tie to an enumerated power.

1          A second problem with the reliance on foreign

2   affairs/national security interests is that even if those --

3   the case law discussing those issues would allow Congress to

4   regulate in some way purely external to the United States in a

5   way that's consistent with, say, the acts of sovereigns,

6   according to the law of nations, as some of these cases

7   suggest, this statute doesn't operate in this way.

8          The statute affects millions of ordinary Americans who are

9   not going to set foot outside the country, in terms of the way

10  that they're administering these reporting companies.

11  Mr. Winkles, for example, is a realtor here in Huntsville, that

12  Congress can't justify a statute that regulates him in this way

13  based on some unenumerated notion of foreign affairs or a

14  national security.  There needs to be some grounding in an

15  enumerated power like the tax clause or the Commerce Clause.

16         So unless the Court has questions about those issues, I

17  will turn to one of those enumerated powers, the taxing power.

18         I'll just say a few words about that.  This power can't be

19  the authority for this particular statute, the Corporate

20  Transparency Act.  It may well be that the Corporate

21  Transparency Act may help prevent tax fraud.  But by its plain

22  terms, it is directed at activities that are far broader and

23  more expansive than simply tax fraud or other taxing related

24  issues.

25         The congressional findings say that this criminal law

enforcement database is necessary to combat terrorism financing
and money laundering.  The database it creates is accessible to
all federal agencies, not just the IRS.

    Now, if the statute itself were limited to the IRS, if the
statute were limited to dealing with the enforcement of tax
laws, it would be a different statute.  And the analysis of the
taxing power as authority for the statute would be quite
different and much more favorable to the government.  But the
CTA is simply not that statute.

    The government suggests that in making that argument,
we're conceding that the CTA isn't facially unconstitutional.
We're conceding that it's constitutional as applied to the
enforcement of tax laws.  But that's not what we're saying at
all.

    We're saying that if Congress were to pass this different
statute that were limited to the IRS and tax law enforcement,
then the government's argument that that was a tax power
statute would be much more persuasive and much more valid.  But
because the CTA is not that statute, the government can't rely
on the taxing power.  The main event here has to be the
Commerce Clause.

    So with that in mind, Your Honor, I will turn to the
Commerce Clause, unless the Court has questions for me about
the tax issue.

    All right.  So let me turn to the main event, the Commerce

1  Clause.  The government has made a critical concession on page
2  11 of its sur-reply.
3      So if -- Tom, if I can get you to queue up slide number 8.
4      So on page 11, the government says as follows:  Defendants
5  have not argued, the government has not argued as plaintiffs,
6  we suggested, that entity formation itself is a commercial
7  activity that substantially affects interstate commerce.  That
8  concession really should end the Commerce Clause analysis here.
9      The statute on its face regulates only this activity that
10 the government concedes to be noncommercial.  The entity
11 formation process is really no different from many other
12 licensing processes that the states and local governments have
13 long had exclusive domain over.
14     The government doesn't really dispute that these sorts of
15 processes have been the exclusive domain of the states since
16 the founding.  Our motion for summary judgment noted historical
17 evidence that James Madison tried to get a provision into the
18 Constitution that would have allowed the federal government to
19 get into the entity formation area specifically.  That
20 provision was roundly rejected.  And the statute itself
21 recognizes that the process it's regulating is one that's
22 controlled by the states.
23     Tom, if you can turn to slide number 3 for me.
24     Remember, the language of the statute defining reporting
25 company defines it as an entity that is created by the filing

1   of a document with a secretary of state or similar office under

2   the law of a state or Indian tribe.  Not an entity that has

3   registered with the federal government in any way.

4        With all those things in mind, the government has fallen

5   back on a couple of U.S. Supreme Court cases that mark sort of

6   the outer limits of Congress's Commerce Clause authority --

7   Wickard v. Filburn from the New Deal era, as well as the more

8   recent Gonzales vs. Raich.

9        The government has also understandably relied on recent

10  Eleventh Circuit precedence, applying both Wickard and Raich to

11  statutes like the Endangered Species Act, as well as the

12  federal prohibition on a child pornography.

13       Those cases generally stand for the proposition that I am

14  going to put up on the screen.

15       Tom, it is at slide 9.

16       This is Judge Tjoflat in the Eleventh Circuit child

17  pornography case.  The statement of law is this:  Thus, where

18  Congress comprehensively regulates economic activity, it may

19  constitutionally regulate interstate activity, whether economic

20  or not, so long as the inability to do so would undermine

21  Congress's ability to implement effectively the overlying

22  economic regulatory scheme.

23       On that premise, the Supreme Court upheld the application

24  of the general federal prohibition on marijuana possession,

25  Cannibis possession, as to Cannibis that was grown for a single

1 individual's use and didn't cross state lines.  That was Raich.

2      On the same premise, Judge Tjoflat in the Maxwell case

3 upheld the application of the general federal prohibition on

4 possession of child pornography as to the possession of child

5 pornography that did not cross state lines, what he referred to

6 as the intrastate possession of child pornography.

7      I understand why the government is quoting this language.

8 I would quote it if I were in their position, as well.  But

9 these statutes and these cases are simply not like the

10 Corporate Transparency Act in this case.

11      In each of those cases, the challenger had to concede that

12 there was an application of those statutes at issue that

13 touched on interstate commercial activity.

14      In the Raich case, the marijuana statute undoubtedly

15 regulated and prohibited interstate sales of marijuana.

16 Likewise, in the pornography case decided by the Eleventh

17 Circuit, that statute on its face regulated interstate

18 distribution and sale of child pornography.

19      The CTA is quite different.  It's directed solely at this

20 creation of entities by the state process, which the government

21 has said it does not believe to be economic activity at all.

22 That process is governmental.  It's administerial.  And that is

23 the focal point of the regulation here.

24      The most the government can say about interstate commerce

25 here is that some of these entities that are formed under state

1    law eventually will engage in interstate commerce after the

2    formation process.  That's not enough.

3         On that rationale, Congress could regulate almost any

4    state licensing process under the Commerce Clause and the

5    theory that the people who got the licenses eventually would

6    engage in interstate commerce.  So Congress could require

7    disclosures of anyone who gets a marriage license or marriage

8    certificate under state law on the theory that many couples

9    eventually will cross state lines, go on honeymoons, or the

10   like.

11        That is not how the Commerce Clause works.  And the

12   Affordable Care Act, NFIB vs. Sibelius, makes that clear.  The

13   majority wrote there that the Court has never permitted

14   Congress to anticipate economic activity in order to regulate

15   individuals who are not currently engaged in commerce.  That's

16   what the CTA is doing.

17        Now, Mr. Lee and I recognize, and Mr. Winkles and

18   Mr. McCracken recognize that we're walking in to the Court

19   today and making a significant ask, asking the Court to

20   invalidate a federal statute under the Commerce Clause and is

21   outside Congress's authority.  But there really is no

22   precedence for the CTA in this regard.  Congress really did

23   throw outside the strike zone.  And Congress really did walk

24   over the lines that are set out in Supreme Court precedent.

25        I can answer any questions the Court has about the

1  Commerce Clause or any other issue related to enumerated
2  powers.
3       If not, I am glad to turn the podium over to Mr. Robinson.
4            THE COURT:  All right.  Mr. Robinson.
5            MR. ROBINSON:  Thank you, Your Honor.
6       Your Honor, I might take these arguments a little bit out
7  of turn, and start with Mr. Neiman's most recent one on the
8  Commerce Clause, with the Court's permission.
9       If I could just take a step back and note that since the
10 1930s, the Supreme Court has made clear that Congress can
11 regulate corporate entities whose structures pose risks to the
12 national interest.  I would refer the Court to the American
13 Power Case, page 100 to 101; the North American Company case at
14 pages 706 to 07; Electric Bond case; and the Shultz case.
15      Just to set a little of the table there, in American Power
16 vs. SEC, the Supreme Court affirmed orders requiring
17 disillusion of sub-holding companies because the corporate
18 structure unreasonably complicated the bond and share system.
19      In Northern American Company, the Supreme Court held that
20 agencies can require -- an agency can require holding companies
21 to dispose of security holdings because the evil that may
22 result from the business structure.
23      Just as those statutes did not regulate the act of forming
24 the corporate entities, but rather the operation of those
25 entities, so, too, does the CTA not regulate mere corporate

1 formation, but, rather, the operation of certain corporate

2 entities that have availed themselves of certain state laws.

3      I would, again, North American Company at page 607.  And

4 I'm quoting.  The fact that an evil may involve a corporation's

5 business structure does not detract from the power of Congress

6 under the Commerce Clause to promulgate rules in order to

7 destroy that evil.

8      A few decades later in Shultz, the Supreme Court said that

9 corporations have a collective impact upon society from which

10 they derive the privilege of acting as artificial entities.

11 The federal government allows them the privilege of engaging in

12 interstate commerce.  Favors from the government also carry

13 with them an enhanced measure of regulation.

14      Further confirming that the CTA does not regulate entity

15 formation is the fact that in our voluminous record there is no

16 indication, certainly not one pointed out by the plaintiffs,

17 where secretaries of state or other state officials have

18 indicated in any way that the CTA encroaches on their authority

19 to grant licenses, to dictate what terms of corporate formation

20 are required under state law, or anything similar along those

21 lines.

22      The fact is, is that the CTA regulates commercial

23 activity.  The exemptions from the reporting requirement at

24 xxiii, which exempt 501(c) organizations, political

25 organizations, organizations that are not engaged in business

1  activity or not owned by foreign owners and meet other criteria

2  shows that this is appropriately tailored towards entities that

3  have commercial aims and not other types of organizations that

4  are not even before the Court.

5      Congress also found expressly the CTA requirements are

6  needed to protect interstate commerce, at Section 6402(5)(C).

7  That entities involved in commercial activity intentionally

8  conduct transactions that cause various secretive

9  jurisdictions.  And concealment of ownership information

10 facilitates federal crimes such as money laundering, fraud and

11 the financing of terrorism.

12     The record shows that there is more than a rational basis

13 for these findings, and, accordingly, the Court must defer to

14 them under Supreme Court precedent such as Hodel.

15     This is very unlike a situation where a couple is getting

16 a marriage license.  Getting a marriage license is not economic

17 activity.  The operation of corporate entities is

18 quintessentially economic activity.

19     If we need further indicia of that, we can see that

20 there's the movement of billions of dollars by shell companies

21 and foreign companies who operate without disclosing beneficial

22 ownership and application -- and applicant information.  But

23 the shielding of that information threatens the United States'

24 financial system as a whole.  And it's immaterial that many

25 reporting companies are not engaging in any wrongdoing.

1          What I think the plaintiffs are often getting at, whether
2     in terms of their Commerce Clause argument or the national
3     security and foreign affairs argument is a question of fit.
4     They want something that's much more narrowly tailored to, you
5     know, for example, to corporate entities that engage in
6     commerce and are suspected of engaging in wrongdoing.
7          But the means chosen by Congress must be reasonably
8     adapted to the end permitted by the Constitution.  Reasonably
9     adapted, not narrowly tailored.
10         The Supreme Court has never required Congress to legislate
11    with scientific exactitude.  When Congress decides the total
12    instance or practice poses a threat to the national market, it
13    may regulate the entire class.
14         In terms of the Maxwell case that plaintiffs reference,
15    again that is aimed at purely interstate activities.  That's a
16    secondary argument.  Our argument is not that the CTA regulates
17    purely interstate activity.  But even if it did, our point is
18    that Congress can regulate that activity if it can frustrate --
19    if it's concerned about frustrating a broader regulation of
20    interstate activity.
21         And under that criteria set out in Maxwell and other
22    cases, that would certainly be true.  The CTA is part of a
23    comprehensive regulatory scheme.  A statement of Senator Brown
24    actually refers to it as comprehensive.  The scope and
25    consequences of withholding beneficial ownership and applicant

1   information are clear.  These corporate entities are engaged in
2   again, quintessential economic activity.  And it's part of a
3   broader regulation.
4        If there are no questions for me, Your Honor, on the
5   Commerce Clause, I can turn to the national security and
6   foreign affairs.
7        Thank you.
8        Mr. Neiman placed some emphasis on whether these powers
9   are enumerated or unenumerated in the Constitution.  I would
10  first refer the Court to the Bancoult decision at 433, a D.C.
11  circuit case, which explains in an extensive list of
12  constitutional provisions, entrust foreign affairs and national
13  security powers to the political branches, including Article 1,
14  Section 8, Clause 1, which is providing for the common defense,
15  and Clause 3, regulating commerce with foreign nations.
16       That argument also simply can't be reconciled with cases
17  such as Ullmann and Curtiss-Wright.  In fact, Curtiss-Wright at
18  length rejected this idea that when it comes to foreign
19  affairs, this distinction between enumerated and unenumerated
20  is dispositive.
21       To the contrary, the distinction is based on preserving
22  the relationship between the federal government and the states.
23  And when it comes to the foreign affairs, it is the federal
24  government that has much broader authority than just simply
25  what is enumerated in the Constitution.

1      So that's -- I think addresses that aspect of the
2  argument.
3      Again, to the extent Mr. Neiman is saying that the CTA is
4  not narrowly tailored, that it affects some people who are not
5  engaged in foreign commerce, does not have any connection to
6  foreign commerce, I think that demands too much.  Again, the
7  test is reasonable adaptation, a rational basis.  And given
8  Congress's findings, it's more than met here.
9      Again, the CTA was enacted to ensure compliance with
10  international standards related to anti-money laundering and
11  the countering the financing of terrorism.  Those are set by
12  the Financial Action Task Force.  Section 6402(5)(E) is
13  Congress's finding on that aspect.
14      Back in 2006, FATF raised concerns about the adequacy and
15  accuracy of beneficial ownership information of corporate
16  entities formed under state law.  The United States was rated
17  as noncompliant in a peer review by FATF in 2016.  And the CTA
18  is a direct response to this criticism.
19      CTA is also needed, as Congress found, to protect against
20  national security threats arising from the anonymous misuse of
21  corporate entities, including misuse that's been tied to
22  sanctions evasion, weapons proliferation, the financing of
23  terrorism, drug trafficking, and corruption.
24      Again, these facts are undisputed in the record.  What
25  plaintiffs are concerned about is the fit, but the fit is one

1  of just a rational basis.

2        Does the Court have any questions on --

3            THE COURT:  I don't.

4            MR. ROBINSON:  Oh, and I can just add NFIB simply

5  doesn't apply here, Your Honor.

6        The CTA does not compel individuals to become active in

7  commerce by purchasing a product, which is what the Supreme

8  Court was concerned about in that case.  Corporate entities

9  already engage in commerce, and, therefore, are subject to

10  regulation.  Again, dating back to the 1930s and 1940s.

11        And also I would refer the Court to the Rivers decision of

12  the Eleventh Circuit.  And based on that, I think it's fair to

13  conclude that reporting companies have opted into the group of

14  regulated entities by filing documents of incorporation, which

15  is unlike the uninsured and NFIB.

16        Morrison and Lopez also again did not concern economic

17  activity.  Lopez did not even include any congressional

18  findings, whereas here we are talking about the operation of

19  corporate entities with a documented evil that results from the

20  shielding of beneficial ownership information.

21        I think the fact that the plaintiffs are raising a facial

22  challenge makes it very difficult to say that it's

23  unconstitutional, in light of Congress's taxing authority.  And

24  Congress has the authority under the necessary and proper

25  clause, as well, to legislate to ensure that taxable income is

```
1   properly reported, including through disclosure requirements.

2           THE COURT:  Does any state currently require entities

3   to provide beneficial owner information?

4           MR. ROBINSON:  I don't know the answer to that

5   question, Your Honor.

6       I know that the FATF report indicated there was a severe

7   deficiency in this case.  Even if there were some, it is not

8   collected in a timely way, necessarily.  It's not collected in

9   a centralized database.  It doesn't necessarily capture all the

10  beneficial owners or applicants who might be subject to the

11  CTA.

12      One other point on the taxing authority, Your Honor.  I

13  note that the Shultz decision --

14          THE COURT:  Y'all are absolutely terrible estimators

15  of time, by the way.

16          MR. ROBINSON:  I apologize, Your Honor.

17      The Shultz decision and the Hodel decision have very

18  helpful comparisons to legislative history that was found to

19  confirm a rational basis for Congress's findings and concerns.

20  In Shultz especially, those congressional testimonies and

21  hearings indicated exactly the type of concerns that are at

22  issue here, including the concern about money laundering and

23  tax run.

24      Thank you.

25          THE COURT:  What issue do you want to take up next,
```

1    Mr. Neiman?

2            MR. NEIMAN:  The Fourth Amendment, if that would be

3    all right.

4        So in talking about the Commerce Clause, Your Honor, I

5    spoke of the lines that the jurisprudence draws and Congress

6    throwing outside the strike zone.  The Fourth Amendment claim

7    looks quite similar.  Let me start with the lines that the case

8    law draws.

9        If any of us were to walk outside this courtroom today,

10   and on the steps, an officer were to stop us and ask us for our

11   names, our dates of birth, our addresses, and a copy of our

12   license, if the officer didn't have reasonable suspicion or

13   probable cause to stop us, we would have a constitutional right

14   to say, respectfully, no, sir, or, no, ma'am, no thank you, and

15   the Constitution would preclude the officer from arresting us

16   for declining that invitation.

17       The Supreme Court held as much in a case called Brown vs.

18   Texas, decided in 1979.  Those are the lines the case law

19   draws.  And the CTA goes beyond them on a federal level.

20       Once again, we find ourselves on novel ground.  The states

21   haven't done anything quite like this.  Neither has Congress.

22   But the --

23           THE COURT:  Would it matter if the states had done

24   something like this previously?

25           MR. NEIMAN:  Well, I think that it would matter

1  because a challenge might have been brought to such a statute,

2  and the courts would have decided whether that statute violated

3  the Fourth Amendment.

4      I do think that the states would have a little more leeway

5  in this regard, with respect to the Fourth Amendment, because

6  this is the state's program, right?  And so the state could say

7  as a condition of participating in our program, this formation

8  program, we are going to ask you entity formation -- the

9  individuals who either own the entities or trying to form the

10 entities are going to ask you to waive your Fourth Amendment

11 rights.

12     But that's another problem with this particular exercise

13 of a federal power, is that the federal government doesn't

14 control the program here.  And it never asked any of these

15 entities or these people to waive their Fourth Amendment rights

16 as a condition of being a part of this state program.

17     So how does the CTA throw outside the strike zone here?

18 It effectuates an unreasonable warrantless search.  It does so

19 critically for the purposes of assembling this database that's

20 all about criminal investigation and criminal prosecution.  And

21 it does so with respect to people and entities that the

22 government admits it has no suspicion have committed any

23 wrongdoing.

24     I'm relatively starved to point you to a precedent that

25 deals with a statute of this sort, Your Honor.  But the one

that I think is most on point and most helpful is a case out of
the Eastern District of New York dealing with Airbnb that we
cited in a couple of times in our brief.  There the Court
enjoined -- the district court enjoined a New York City
ordinance that compelled an airbnb to turn over certain
information regarding its customers.

There are a couple of things about that opinion that I
think are very noteworthy and helpful to the assessment of the
Fourth Amendment issues here.

The first is that the opinion quite thoroughly and quite
convincingly explains that disclosures of this sort amount to
searches for the purpose of the Fourth Amendment.  For the
Fourth Amendment to apply, you don't have to have a police
officer actually walking onto a premises, or conducting a
bodily search of somebody.  Compelled disclosure can be a
Fourth Amendment search.

The other aspect of the Eastern District's analysis in
Airbnb that's helpful and insightful is about the role that the
end goal of criminal law enforcement plays here.  That statute
in those circumstances had some civil aspects that led the
Court to engage in a looser Fourth Amendment analysis.  But the
Court noted that, in the context of criminal investigations,
the analysis is a lot easier.  The balances normally tip
towards the requirement of probable cause and a warrant under
the Fourth Amendment.

1          THE COURT:  And specifically what was that information

2    sought about Airbnb customers?

3          MR. NEIMAN:  So the information sought by the New York

4    City ordinance dealt with, I guess the identity of the airbnb

5    customers.  I don't want to make too many representations on

6    that front, Your Honor.  But it was about the identity of those

7    persons.  And the statute was designed or the ordinance was

8    designed to figure out who was subletting basically their

9    apartments for airbnbs in violation of a New York law.

10         So I imagine it was the addresses, and perhaps some

11   information about the extent to which those people had engaged

12   in those transactions.

13         The difference, in terms of this statute involving

14   criminal law enforcement database explains why this isn't a

15   special needs case.  Special needs cases turn on the

16   government's need to conduct searches and seizures for reasons

17   that don't deal with criminal law enforcement.

18         The government can require suspicionless drug testing of

19   people who work for the railways because the government has an

20   interest in making sure that the railways remain safe.

21         This case is different.  The entire theory of the statute

22   is that everyone who owns or applies to own or run one of these

23   reporting companies is a potential criminal.  And when the

24   government conducts these searches, requires these disclosures

25   for the purposes of enforcing criminal law, it has to obtain a

1  warrant.  At the very least, it needs reasonable suspicion.

2       Now, the justification that the agency has given for the

3  need to bypass the warrant requirement here just highlights how

4  contrary the statute is to the basic assumptions of the Fourth

5  Amendment.

6       Tom, if you can turn to slide number 10 for me.

7       This is a discussion in the Federal Register notice of the

8  final rule, in which FinCEN says that the reason why we're

9  requiring disclosure here is effectively that the Fourth

10 Amendment normal requirements are just too inconvenient.

11      So if you look at the column on the left side of the

12 slides, the former director of FinCEN noted that, ultimately,

13 if you are trying to figure out who the beneficial owners are,

14 you have to do things like witness interviews, obtain search

15 warrants.  And the director said that takes an enormous amount

16 of time; thus, justifying the statute and the rule.

17      I'm not sure you will ever see a more direct statement by

18 someone who works for a federal agency that the reason for a

19 statute is to get around the normal requirements of the Fourth

20 Amendment.

21      Now, the government responds that people like Mr. Winkles

22 don't have a reasonable expectation of privacy in this

23 information because it's already been disclosed to certain

24 entities in some form or fashion.  To a certain extent, that's

25 wrong on the facts.

1          Recall that FinCEN's rule requires a disclosure of the

2    image of a driver's license, or a similar ID.  Those images are

3    not floating around on Mr. Winkles's LinkedIn page, for

4    example.

5          But I think more fundamentally that's not the way to

6    analyze the Fourth Amendment.  I revealed my name to the Court

7    when we started today.  Someone can figure out my address

8    pretty easily by looking at court records.  But that doesn't

9    mean I can walk outside the courthouse today and the police can

10   demand this information from me for criminal law enforcement

11   purposes without a warrant, without reasonable suspicion.

12         The government also cites the third-party doctrine, which

13   is discussed in the Carpenter case.  But it also isn't on

14   point.  That doctrine deals with the government's ability to

15   obtain records and such from third parties to whom the

16   individual has disclosed that information voluntarily.

17         Recall that's not the way the statute works.  I mean,

18   first of all, it requires disclosure directly from the company.

19   But there's a direct line between the individual and the

20   government in this regard, because, as FinCEN's analysis

21   indicated, the discussion I showed you at the outset, the -- an

22   individual can be held criminally responsible if they do not

23   turn the information over to the company that makes the

24   disclosure.  So the third-party doctrine simply has no

25   application here.

1          With that, we believe that also the statute is due to be

2    enjoined under the Fourth Amendment.  We would ask the Court to

3    do so.  I'm happy to answer any questions the Court may have

4    about that claim.

5               THE COURT:  I am zero and one at enjoining statutes at

6    the Eleventh Circuit this year.

7               MR. NEIMAN:  Well, I hope you remain undaunted.

8               THE COURT:  All right.  Government.

9               MS. PITZ:  Good morning, Your Honor.  May it please

10   the Court.

11              THE COURT:  Good morning.

12              MS. PITZ:  To begin, one thing I want to emphasize

13   with respect to all of plaintiffs' claims under the bill of

14   rights is that plaintiffs contend the statute on its face

15   violates these constitutional provisions.  That means they must

16   show that there's no set of circumstances under which the

17   statute could be applied validly.  They have fallen short of

18   doing so.  And even if one could imagine particular

19   circumstances that might pose a closer question, those

20   questions are not presently before the Court and do not justify

21   invalidating the statute on its face.

22         Turning to the Fourth Amendment.  The one thing I really

23   would like to reiterate to the Court is that the Supreme Court

24   has consistently stated the ultimate touchstone of the Fourth

25   Amendment is reasonableness.  There can be little doubt that

1  the CTA's reporting requirements are reasonable.

2       The statute requires merely that reporting companies

3  provide four discrete pieces of information:  Legal name, date

4  of birth, residential or business address, and the unique

5  identifying number from an accepted identification document.

6       These pieces of information are frequently required in

7  other regulatory context, such as filing tax returns, passport

8  forms, and bank account applications.  This information is also

9  frequently disclosed in day-to-day transactions.

10       As amici highlight, this information may be required to

11  apply for a library card.  Personally, I provide much of this

12  information every time I enter a D.C. public pool.

13       Simply put, the reporting requirement is not an unduly

14  intrusion into an individual's privacy, and is entirely

15  reasonable, particularly in light of the government interest

16  the CTA represents.

17       And even looking to the Katz test, the framing employed in

18  the parties' brief and referenced by the parties' arguments

19  here today, the CTA may not even implicate Fourth Amendment

20  protections.

21       The plaintiffs before the Court have not demonstrated

22  subjective expectation of privacy in beneficial ownership

23  information, and SBA does not allege that it's subject to the

24  reporting requirements.  And Mr. Winkles has already disclosed

25  publicly the beneficial ownership information he seeks to

```
 1   protect now.

 2        But regardless, any expectation of privacy is not

 3   objectively reasonable.  Under Eleventh Circuit and Supreme

 4   Court case law, a plaintiff cannot claim a legitimate

 5   expectation of privacy in information that has been exposed to

 6   the public.  So that's the United States vs. Segura-Baltazar

 7   case cited in our briefs.

 8        As is the case with Mr. Winkles, information -- this type

 9   of information is publicly disclosed in many contexts.

10        Plaintiffs rely on Carpenter, but that reliance is

11   misplaced.  That case dealt with cell phone location

12   information, information that amounts to a detailed log of a

13   person's movements over several years.  That's qualitatively

14   different than the types of information required by the

15   reporting requirement.

16        This is a discrete reasonable amount of information that

17   agencies are requesting.  It does not involve, as the Supreme

18   Court referenced it, information like CSLI, that its depth,

19   breadth, and comprehensive reach and inescapable and automatic

20   nature of its collection.  The Court there was obviously

21   concerned with a completely different type of information than

22   what the reporting requirement today represents.

23        Although plaintiffs today focus on the Airbnb opinion, I

24   would like to draw a few points of distinction from the

25   Patel -- City of Los Angeles vs. Patel case cited in our
```

1  briefs.  There, the Court was considering similar reporting

2  requirement -- or not reporting requirement, but administrative

3  search.

4      But in contrast there, the special needs exemption was not

5  appropriate.  That was -- in that case, the Court considered a

6  hotel registry that required hotels in the city to make

7  publicly available or available for inspection to the L.A.P.D.

8  significantly more information that was more akin to

9  indiscriminate rummaging into the records of hotels and guests.

10     So there, the information at issue was name and address,

11  and in some cases, photo ID.  But it also requested information

12  such as the number of guests that were staying with a party,

13  the make, model, and year of any vehicle the party had on the

14  premises, the date and time of arrival, scheduled departure,

15  assigned room number, rate charged, amount collected, method of

16  payment.  In some cases, credit card information.

17     By contrast here, again, I just want to reiterate it's

18  just the four discrete pieces of information.  And, again, that

19  case considered a city municipal code, whereas by contrast

20  here, the CTA is a congressionally mandated reporting

21  requirement, which focuses on the national security interests

22  of the United States.

23     So the balancing that should be conducted into whether or

24  not, even assuming Your Honor would be inclined to find the CTA

25  is a search under the Fourth Amendment, the balancing here

```
 1   looks very different.  It's these important national security
 2   interests against a very minimal intrusion.
 3        And under the Supreme Court's case Maryland vs. King, the
 4   balancing here clearly tilts in the government's favor.
 5        If Your Honor has no further questions, I will turn it
 6   back over to the plaintiffs.
 7            MR. NEIMAN:  Your Honor, we've raised three additional
 8   claims -- Fifth Amendment, First Amendment, and vagueness.
 9        The Fifth Amendment and First Amendment arguments resemble
10   in many ways the Fourth Amendment argument that Ms. Pitz and I
11   have been discussing.
12        I think that we have adequately briefed those two issues.
13   And in the interest of time, I would suggest I could move
14   directly to the vagueness arguments at this point in time.
15            THE COURT:  That's fine.
16            MR. NEIMAN:  I would just say just one sentence about
17   those two claims before I let them go.
18        On the Fifth Amendment, one of the government's arguments
19   is that companies don't have privilege against
20   self-incrimination, and, therefore, the Fifth Amendment doesn't
21   apply here.
22        Our response to that is the guidance that we have shown to
23   you today, where the government says that if the information is
24   not revealed by the individual, the individual will be
25   prosecuted.  So the rights we are seeking to vindicate in that
```

1    claim are Mr. Winkles's rights, not the company's.

2         On the First Amendment issue, I would refer the Court to

3    the Lady J. case out of the Eleventh Circuit.  We believe

4    that's squarely on point and applies not only to adult

5    businesses, but all businesses that have an expressive

6    component such as Mr. Winkles.

7         The final claim here, unless the Court has questions about

8    those issues, is -- stems from the vagueness of the statutory

9    definitions that purport to establish whose sensitive

10   information has to be disclosed for this database.

11        Tom, if you would, pull up slide 11 for me.

12        So 5336(a)(3) defines beneficial owner, the key term here,

13   in two ways:  The principal or the first stop for the statute

14   here is to define beneficial owner as anyone who exercises

15   substantial control over the entity.  The statute doesn't limit

16   the number of beneficial owners there may be, and, thus, the

17   number of people who may be deemed to exercise substantial

18   control.  So the statutory definition is not just about who

19   owns equity in the company, it's about primarily, first and

20   foremost, the people who exercise substantial control.

21        That term is not a term of art in corporate practice.

22   It's a novelty to corporate law.  And FinCEN's attempt to give

23   it more definition in the regulations has just exacerbated the

24   problem.

25        So slide 12, Tom.

1        FinCEN's recent guidance to small businesses about what

2   substantial control means.  It parrots the regulation, the

3   final rule that FinCEN implemented here.  It defines

4   substantial control as someone who meets any of four general

5   criteria:  Senior officers, individuals with authority to

6   appoint or remove officers, and then critically, for number

7   three and four, the individual is a, quote, unquote, important

8   decision maker, or the individual has, quote, any other form of

9   substantial control.

10       Who falls in the third and fourth provisions of this

11   guidance is really anyone's guess, including, I would suggest,

12   FinCEN's consultants who work with the company.  It's unclear

13   whether they exercise substantial control -- in-house attorneys

14   who are not the general counsel, in-house accountants, just

15   talented employees whose success tends to be central to the

16   company.  Will those people need to hand over their driver's

17   license images to the database?

18       We can't really know, in light of what FinCEN tells us

19   about the -- what this language means, and especially the

20   fourth prong.

21       So next slide, Tom.

22       This shows FinCEN's guidance about how this catch-all

23   works.  It refers to it as a catch-all.  And it says, this

24   includes any other form of substantial control over the

25   reporting company.  Control exercised in new and unique ways,

1  FinCEN tells us, can still be substantial.

2      I think here the agency has made as compelling an argument

3  as any as to why the very heart of the statute, its definition

4  of who has to provide the evidence or the information is

5  unconstitutionally vague.  I think they're saying substantial

6  control means substantial control.  The statute is circular in

7  that way.

8      The government can't get around this problem by responding

9  that it will prosecute only -- and statute allows for

10  prosecution only of willful violations of the statute.  It's

11  not clear what willful will mean in this context.

12      And the statement that the government will only prosecute

13  willful violations will be little comfort to the numerous

14  individuals who are trying to determine whether they are

15  required to provide this information to the government under

16  threat of criminal prosecution.

17      So like the other concerns I've raised today, this

18  vagueness problem renders the statute unconstitutional.  We

19  would ask the Court to enjoin it by January 1st, 2024, the

20  first effective date that the statute will become effective.

21      Thank you.

22          THE COURT:  Uh-huh.  Government?

23      Mr. Neiman, have you ever done any research in to what a

24  principal is under Alabama's Ethics Act?

25          MR. NEIMAN:  Long ago, Your Honor.  Fortunately, I

```
 1    haven't had to look at that in some time.
 2             THE COURT:  Similar argument.
 3        Go ahead.
 4             MS. PITZ:  Thank you.
 5        First I want to respond to a few things that plaintiffs
 6    have said today.
 7        First, regarding four Fifth Amendment right against
 8    self-discrimination claims, yes, the government's position is
 9    that companies themselves don't have a Fifth Amendment right
10    against self-incrimination.  And really, if you focus on the
11    core of that right, it is the right about who must not be
12    compelled to actually provide the evidence.
13        And here, the report that is being made goes from the
14    government -- or, excuse me -- goes directly from the reporting
15    company to the government.  And, therefore, that is the
16    relevant production of information for which the Fifth
17    Amendment self-incrimination rate should be considered.
18        But even setting aside from that -- excuse me --
19    apologies.  But even setting that aside, plaintiffs haven't
20    shown here that any report necessarily contains incriminating
21    information, much less that every or many reports would be
22    likely to contain incriminating evidence.  Plaintiffs
23    repeatedly state throughout their briefs most entities are
24    lawful.  Indeed, in response to amici, they specifically argue
25    the CTA is overkill because most state entities are formed and
```

1  used for lawful purposes.

2       Providing four pieces of basic identifying information in

3  connection with a lawful state entity cannot, then, create a

4  risk of substantial hazard, or real and appreciable risk of

5  self-incrimination sufficient to support a facial challenge.

6       Moving to their First Amendment arguments, first I would

7  like to point out it's not clear at all from the record what

8  type of expressive conduct Mr. Winkles or his entity is engaged

9  in.  And, regardless, it's not clear that all reporting

10 companies are engaged in expressive conduct subject to First

11 Amendment protection.

12      The lady lingerie is distinguishable for the reasons that

13 we cite in our brief.  There, the statute specifically

14 considered whether the ordinance at issue applied to lingerie

15 shops showcasing nude dancing.  That is conduct the Eleventh

16 Circuit has expressly found to be expressive and deserving of

17 First Amendment protection.  Plaintiffs cite no authority for

18 the proposition that any entity anywhere doing business or not

19 is necessarily engaged in expressive conduct.

20      And second, here, unlike the ordinance at issue in lady

21 lingerie or Lady J, there's obviously a relevant correlation

22 and substantial relation between the disclosure that FinCEN is

23 asking for here and the secondary harmful effects there.  That

24 counseled against upholding the statute.  But here that balance

25 tilts in the government's favor.

1       Finally, turning to plaintiffs' due process claims.

2  Importantly, plaintiffs do not contend that the CTA is vague

3  with respect to Mr. Winkles.

4       And the case, the Ivey case out of the Middle District of

5  Alabama, plaintiffs lack standing to challenge a statute's

6  hypothetical application to others as vague.  Here, Mr. Winkles

7  is not disputing that he understands he has a substantial -- he

8  is a beneficial owner.  His company has a reporting

9  requirement.  He will be required to turn over that

10 information.  He, therefore, is not in a position to challenge

11 the vagueness of the statute as applied to others.

12      But, in any event, the CTA's definitions are not

13 unconstitutionally vague.  And the plain text allows ordinary

14 people to understand what the law requires.  And courts have

15 concluded similar statutory terms don't pose a constitutional

16 concern.

17      We also would emphasize contrary to what plaintiffs argue

18 that the scienter requirement here does help to ensure that the

19 requirements of due process are satisfied under the CTA.  And

20 the CTA does specifically define willfully.  But individuals

21 are reporting companies are only subject to penalties for

22 willful violations.  And willfully is defined as voluntary,

23 intentional, violation of a known legal duty.

24      So that will ensure that even in instances in which there

25 may be a close case, companies are -- or penalties will only be

```
 1   imposed where conduct is found to be willful.
 2        And, lastly, to respond to plaintiffs' points regarding
 3   the catch-all provision, many courts have upheld that catch-all
 4   provisions in other statutes where the other defining criteria
 5   provide guidance as to how to interpret the catch-all category,
 6   they do not run afoul of due process.  One case the Court might
 7   look to is Roy vs. City of Monroe, 950 F.3d 245.  And in that
 8   case the Court upheld a similar catch-all provision.
 9        If Your Honor has no other questions, I will turn it back.
10            THE COURT:  I may have some on this.
11            MS. PITZ:  Okay.
12            THE COURT:  So can you put your -- that reg back up
13   that defined --
14            MR. LEE:  All right, Judge.  You said the reg, right?
15            THE COURT:  That's it right there.
16        So if I am looking at Section 3 and 4, an individual is an
17   important decision maker, that seems wide open to me --
18   literally wide open.
19        A company could have -- you know, if you have got a
20   company that's got a thousand people in it, you could have a
21   hundred of them who are an important decision maker on
22   different issues.  Would that include, then, everybody who's
23   the head of a local office and makes decisions for that office?
24   Would it include the person who's their deputy?  That seems
25   like a really wide-open term to me.
```

1        Do you want to give me some more guidance on where courts

2   in similar cases specifically something that would point say,

3   hey, that's okay?

4        MS. PITZ:  I'm not sure I have a specific citation

5   response, but I'm happy to respond to that question.

6        Your Honor, I would like to emphasize once again

7   plaintiffs have brought a facial challenge.  So even if you can

8   hypothetically imagine certain scenarios in which perhaps it

9   maybe would be a closer call.  Maybe there would be an issue

10  deciding who effects substantial control over an entity.

11       The challenge today is that there is no world in which --

12  or, excuse me -- there is no valid application of the statute

13  as to anyone where it would be clear.  And here it's very

14  obvious, as even the plaintiff before the Court, Mr. Winkles,

15  the application of the statute is clear and can be understood

16  by ordinary people.

17       Further --

18       THE COURT:  I practiced law for some years before a

19  judicial career.  And I think back, there were three attorneys,

20  and then, you know, probably ten other employees in our office.

21  Everybody in that office would have been an important decision

22  maker on some issue.  Everybody.

23       MS. PITZ:  All of them?

24       THE COURT:  Everybody.  On an important decision -- on

25  some decision, on some issue, everybody in that office would

1   have been.  That looks awfully worrisome to me.

2         MS. PITZ:  But if that's the case, Your Honor,

3   respectfully, if you are able to decide today that clearly

4   those individuals, every one of them would have been an

5   important decision maker, the question is not whether that's

6   inappropriate.  It's whether that's sufficiently definite that

7   we know they must provide information.

8         THE COURT:  I guess I would say they would be an

9   important decision maker on some key issue.  So I would out of

10  fear just report all of them.  But this reg doesn't say what is

11  an important decision maker.

12      So I guess my point is that I would fear everybody would

13  just default to reporting everybody because they don't know

14  what that's really calling for.

15        MS. PITZ:  Well, I would respond that the agency is

16  doing a lot to clarify who -- how to apply these definitions.

17  In particular, plaintiffs have included as with their notice of

18  supplemental authority the attachment of the small entity

19  compliance guide.  And that really walks through --

20        THE COURT:  Yeah.  Again, I don't think that what the

21  agency wants or what the statute is asking for would be the

22  scenario I just gave you, where everybody in my office is a

23  decision maker.  I think they would want it at a higher level.

24  But that's very unclear.  It's very, very unclear.

25        MS. PITZ:  Well, in such a circumstance, perhaps, a

 1  particular company would be in a position to bring an

 2  as-applied challenge.  But here today, we have a facial

 3  challenge.  And even if you can imagine particular

 4  circumstances that might pose closer questions, the statute as

 5  a whole permits ordinary people to understand what it requires.

 6  And that is all that due process requires, with respect to

 7  vagueness.

 8          THE COURT:  If there were no punishment clause to any

 9  of this, I think I would agree with you.

10      All right.  Anything else you want to say about this?

11          MS. PITZ:  No.  I would just once again emphasize that

12  the scienter requirement would prevent against, you know -- if

13  you are concerned about criminal applications as to vagueness,

14  once again, it's willful and intentional violation by a known

15  legal duty I believe is what I quoted.  And so if there's some

16  type of uncertainty, that could be grounds against penalties.

17  And so the scienter requirement further ensures the

18  requirements of due process are met here.

19      Thank you.

20          THE COURT:  Mr. Neiman, do you want to take another

21  bite at the apple?  Mr. Lee?

22          MR. LEE:  If I may take rebuttal time, Your Honor.  I

23  will be brief.  I was taught never to keep people from lunch.

24      So I am just going to be very quick, Your Honor, and start

25  with this point of vagueness and standing related.

1          NSBA certainly has standing because they're going to have

2     to talk to their member entities about precisely the type of

3     issue that you have identified, with respect to the guidance as

4     it goes out that all of the small businesses will have to

5     comply with.

6          And with respect specifically to individual decision

7     maker, I mean, my law firm is planning a holiday party.  There

8     is a committee.  And a holiday party is actually a really big

9     event.  Do we have to have everyone who's on the committee

10    reported as an individual decision maker, with respect to this

11    kind of guidance?

12         And so in reality, it's so vague that a good faith --

13    someone who wants to in good faith comply with this

14    requirement, it's almost impossible to do that.  And it's

15    particularly people who, like our clients, who really want to

16    comply with the law that will try hardest, whereas the bad

17    faith compliance people, precisely the people that the

18    government wants to target, they're not going to pay any

19    attention to things like this.

20             THE COURT:  What of her argument that the scienter

21    requirement swallows the problem?

22             MR. LEE:  Yes, Your Honor.  I mean, at the point of

23    compliance, people, regardless of the fact that they may have

24    the shelter of the scienter requirement, all of the member

25    entities will seek to comply, and NSBA will devote resources to

 1  making sure that they're in full compliance with the law.  So
 2  regardless of whether or not there's a scienter -- they are not
 3  going to say, well, make a good faith effort to figure out who
 4  all your individual decision makers are, and if you don't
 5  identify everyone, you will only be punished if you are
 6  willful.  I mean, that's just not the way the NSBA is going to
 7  operate.  So to the extent that the scienter is sort of a safe
 8  harbor, I don't think it's going to change very much the way my
 9  clients are going to have to deal with this reg.
10      I will say with regards to the as-applied, the critical
11  case is City of Chicago vs. Morales, which is a Supreme Court
12  decision from 1999.  And although some of the justices thought
13  that the Salerno as-applied challenge went -- applied to a
14  vagueness challenge.  That involved the anti-gang loitering
15  ordinance in Chicago.
16      The latest Supreme Court pronouncement on this topic was
17  that because the problem with vagueness is just is both notice
18  to the public that are going to have to comply and the
19  discretion it affords to the enforcer that the as-applied
20  standard of Salerno, the one that says you have to strike --
21  you have to -- it has to be valid and invalid in all its
22  applications does not apply.
23      One point about the reasonableness -- reasonable
24  expectation of privacy.  As we said in the complaint, and as we
25  said in our briefing, the claim is when somebody sets up a

1    small business entity, they expect to turn over data.  And as

2    you pointed, Your Honor, I can verify that no state currently

3    requires beneficial ownership information, particularly of the

4    nature that FinCEN does as a condition of setting up an entity.

5         I mean, we have certain expectations when we turn over

6    information to the government.  And whether it's a library card

7    or a driver's license.  And if you turn it over, for example,

8    to the IRS to file taxes, the Financial Information Privacy Act

9    ensures that the government will actually use that information

10   strictly for the purposes that you're turning it over for.

11        And so the idea that it's going to be put into some

12   galactic database that law enforcement and intelligence,

13   including foreign intelligence agencies, with no required

14   resort to judicial process can access at some point if they

15   feel that they want to, then that's the problem that we're

16   really complaining about.  And I think both as a subjective and

17   objective matter, I think that Mr. Winkles and NSBA members

18   have a reasonable expectation of privacy with respect to that.

19        The third point about powers, the constitutional powers.

20   I think one point that the government doesn't really answer in

21   our briefing is, as strange as it may seem to us today, at the

22   founding of the United States and the framing of the

23   Constitution, the power to charter entities -- and entities

24   were not necessarily exclusively business entities.  As we say

25   in our first brief, in fact, a lot of entities were villages,

1   public entities, building canals, building roads, building
2   turnpikes.  That was considered a fundamental state sovereign
3   power.

4        Now, that is -- regardless of how the 1930s -- post 1930s
5   Commerce Clause precedence had proceeded, the government has
6   pointed to nothing in the record, no cases that suggest that
7   there has been any sense in which the reconstruction and other
8   amendments somehow rebalanced that specific allocation of
9   original sovereign power to the states, to charter corporations
10  and entities.  And so that's why we make this argument that
11  entity formation is something that is outside even the Commerce
12  Clause powers.

13       With regards to the precedence, the government's best case
14  is the Shultz case, and that involves bank records.  But as we
15  point out in our reply brief, that particular holding targets
16  negotiable instruments moving in the channels of interstate
17  commerce.  And it says Congress could have closed the channels
18  of commerce entirely to negotiable instruments.

19       Well, negotiable instruments also include a check that's
20  been -- it's essentially a state law contract.  So if a check
21  has been endorsed, but you put it in your desk drawer, that is
22  a negotiable instrument.  But it's that movement in interstate
23  commerce that the Bank Secrecy Act regulates.

24       It doesn't require you, if you have endorsed a check and
25  you put it in your desk drawer to turn over that record to the

1  government.  That's effectively what our argument amounts to.

2  If the government were to enact a statute saying that, look,

3  once that entity moves in interstate commerce, then you are

4  subject to the reporting requirement.  That would presumably be

5  okay under the Shultz authority, but not the CTA as it's

6  currently framed, Your Honor.

7      As a conclusion, I will just say the reason why no one

8  else challenges this statute is because there are a lot of

9  carve-outs to it.  And I think as often happens in this digital

10  world, something comes along, we have -- fortunately on small

11  businesses -- and I think that part of the issue is there are

12  so many carve-outs and exceptions that people aren't really --

13  this statute isn't on their radar screen.  And that's why our

14  particular clients are concerned about it, Your Honor.

15      If there are no further questions.

16          THE COURT:  All right.  Let's take a five-minute

17  break.  I may have some questions after that.  I may not.  But

18  we will gather back in five minutes.

19          (Recess.)

20          THE COURT:  All right.  I think we are wrapped up.

21  Good arguments, ladies and gentlemen.

22      I will get something as quick as I can.  It won't be

23  tomorrow, but we will get to work on it.

24      Safe travels.

25          (Whereupon, the above proceedings were concluded at

1    12:13 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                                CERTIFICATE

2

3

4          I certify that the foregoing is a correct

5     transcript from the record of proceedings in the

6     above-entitled matter.

7

8

9

10

11                                                    11-29-2023

12     Christina K. Decker, RMR, CRR              Date

13     Federal Official Court Reporter

14     ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25