

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NATIONAL SMALL BUSINESS UNITED, d/b/a the NATIONAL SMALL BUSINESS ASSOCIATION,** *et al.*, | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 5:22-cv-1448-LCB** |
| **JANET YELLEN, in her official capacity as Secretary of the Treasury,** *et al.*, | ) ) ) ) ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

The late Justice Antonin Scalia once remarked that federal judges should have a rubber stamp that says STUPID BUT CONSTITUTIONAL. *See* Jennifer Senior, *In Conversation: Antonin Scalia*, New York Magazine, Oct. 4, 2013. The Constitution, in other words, does not allow judges to strike down a law merely because it is burdensome, foolish, or offensive. Yet the inverse is also true—the wisdom of a policy is no guarantee of its constitutionality. Indeed, even in the pursuit of sensible and praiseworthy ends, Congress sometimes enacts smart laws that violate the Constitution. This case, which concerns the constitutionality of the Corporate Transparency Act, illustrates that principle.

When Congress passed the 2021 National Defense Authorization Act, it included a bill called the Corporate Transparency Act ("CTA"). Although the CTA made up just over 21 pages of the NDAA's nearly 1,500-page total, the law packs a significant regulatory punch, requiring most entities incorporated under State law to disclose personal stakeholder information to the Treasury Department's criminal enforcement arm.

By requiring these disclosures, Congress aimed to prevent financial crimes like money laundering and tax evasion, which are often committed through shell corporations. Broadly defined, a shell corporation is a legal entity with no (or minimal) employees, customers, business, or assets. Although shell corporations serve many legitimate purposes, it's also possible to disguise the identity of interested individuals and the flow of money by layering shell companies on top of each other, "such that each time an investigator obtains ownership records for a domestic or foreign entity, the newly identified entity is yet another corporate entity, necessitating a repeat of the same process[.]" Pub. L. 116-283 § 6402(4).

Yet corporate formation includes far more than for-profit enterprise. Each year, the States grant formal status to millions of entities that can and do serve "any lawful purpose," including benefit corporations, non-profits, holding companies, political organizations, and everything in between.

With that in mind, this case presents a deceptively simple question: Does the Constitution give Congress the power to regulate those millions of entities and their stakeholders the moment they obtain a formal corporate status from a State? The Government thinks so. While it acknowledges that Congress "can exercise only the powers granted to it," the Government says that the CTA is within Congress' broad powers to regulate commerce, oversee foreign affairs and national security, and impose taxes and related regulations.

The Government's arguments are not supported by precedent. Because the CTA exceeds the Constitution's limits on the legislative branch and lacks a sufficient nexus to any enumerated power to be a necessary or proper means of achieving Congress' policy goals, the Plaintiffs are entitled to judgment as a matter of law. As a result, the Court **GRANTS** the Plaintiffs' motion for summary judgment and **DENIES** the Government's motion to dismiss and alternative cross-motion for summary judgment.

## I.    Background

*Plaintiffs.* Plaintiff National Small Business Association is "an Ohio non-profit corporation that represents and protects the rights of small businesses across the United States," including "over 65,000 businesses and entrepreneurs located in all 50 states." (Doc. 39-2 at 1-2). The NSBA's stated purpose is "to advocate for its

members" and their employees, and "to provide its members guidance and data on how to navigate government regulations." *Id.* at 2.

Plaintiff Isaac Winkles is an NSBA member and owner of two small businesses, one of which "is a small family business with 3 full-time employees and annual turnover of under $20 million." (Doc. 39-3 at 1-2).

***Procedural Background.*** The Treasury Department's criminal-enforcement bureau, the Financial Crimes Enforcement Network ("FinCEN"), issued a final rule implementing the CTA on September 29, 2022, slated to go into effect on January 1, 2024. 87 Fed. Reg. 59498 (Sept. 30, 2022) (codified at 31 C.F.R. § 1010.380). Six weeks later, Plaintiffs sued the Treasury Department, along with Treasury Secretary Janet Yellen and Acting Director of FinCEN Himamauli Das in their official capacities, alleging that the CTA's mandatory disclosure requirements exceed Congress' authority under Article I of the Constitution and violate the First, Fourth, Fifth, Ninth, and Tenth Amendments. (Doc. 1). The parties agreed that the case could be resolved on dispositive motions without discovery, so the parties cross-moved for summary judgment in early 2023, with the Government simultaneously moving to dismiss. (Docs. 23 & 24). In the following months, the parties and amici exchanged hundreds of pages of briefing, and oral argument on the parties' motions was held in November 2023.

*The Operation of the Corporate Transparency Act.* As always, "[o]ur analysis begins and ends with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 553 (2014), and the text of the CTA is wide-ranging in scope. The CTA regulates "reporting company[ies]," defined as "corporation[s], limited liability company[ies], or other similar entit[ies]" that are either "(i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe, or (ii) formed under the law of a foreign country and registered to do business in the United States." 31 U.S.C. § 5336(a)(11)(A). The CTA exempts twenty-four kinds of entities from its reporting requirements, including banks, insurance companies, and entities with more than twenty employees, five million dollars in gross revenue, and a physical office in the United States. § 5336(a)(11)(B).

In total, FinCEN estimates that the CTA applies to 32.6 million currently existing entities and 5 million new entities formed each year from 2025 to 2034. Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at, 59,549. The CTA requires these millions of entities to disclose the identity and information of any "beneficial owner." § 5336(b)(1)(A). A beneficial owner is defined as "an individual who . . . (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity," with some exceptions for children, creditors, and a few others. § 5336(a)(3). The definition of

"substantial control" is as vague as it sounds—although it includes some clear categories like "senior officer[s]," FinCEN's regulations "clarify" that a person with substantial control also includes someone who "[h]as any other form of substantial control over the reporting company" besides those listed. 31 C.F.R. § 1010.380(d)(1)(i)(D).

For new entities incorporated from January 1, 2024, onward, the CTA requires them to disclose the identity and information of both Beneficial Owners and "Applicants," defined as "any individual who files an application to form a corporation, LLC, or other similar entity under the laws of a State or Indian Tribe; or registers [a foreign entity] to do business in the United States." 31 U.S.C. § 5336(a)(2).

Reporting entities must give FinCEN a Beneficial Owner or Applicant's full legal name, date of birth, current address, and identification number from a driver's license, ID card, or passport. § 5336(a)(1), (b)(2)(A). Under the final rule, reporting entities are also required to submit an image of the identifying document. 31 C.F.R. § 1010.380(b)(1)(ii)(E). If any of that information changes, the reporting company must update FinCEN, 31 U.S.C. § 5336(b)(1)(D), and FinCEN retains Applicant and Beneficial Owner information on an ongoing basis for at least five years after the reporting company terminates. § 5336(c)(1).

The CTA's disclosure requirements aren't toothless, either: knowing or willful violations carry serious civil and criminal penalties. A willful provision of false or fraudulent beneficial ownership information or failure to report "complete or updated beneficial ownership information to FinCEN" by "any person" is punishable by a $500 per day civil penalty and up to $10,000 in fines and 2 years in federal prison, § 5336(h)(1), (3)(A); a knowing and unauthorized disclosure or use of beneficial ownership information by "any person" is punishable by a $500 per day civil penalty, along with a $250,000 fine and 5 years in federal prison, § 5336(h)(2), (3)(B); and a knowing and unauthorized use or disclosure while violating another federal law "or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period" by "any person" is punishable with a $500,000 fine and 10 years in federal prison, § 5336(h)(3)(B)(ii)(II).

Crucially (at least for standing purposes), these severe penalties apply to individuals, not reporting entities. For starters, a disembodied corporate entity cannot be sentenced to federal prison. Beyond that, although the CTA does not define "person," it *does* define both "United States person" (§5336(a)(14)) and "Foreign person" (§5336(a)(7)) to include corporations, partnerships, and trusts, and uses those terms in other provisions. *See* § 5336(a)(11)(B)(xx). Yet the statute does not use those terms in its penalty provisions, so the statute can be read only to penalize individual beneficial owners and applicants, not reporting entities.

The ultimate result of this statutory scheme is that tens of millions of Americans must either disclose their personal information to FinCEN through State-registered entities, or risk years of prison time and thousands of dollars in civil and criminal fines.

## II.    Legal Standards

Although the Government requested summary judgment as an alternative to its motion to dismiss, summary judgment is the most appropriate means for resolving this case. The parties have waived discovery and agreed that this case can be "resolved through dispositive motions." (Doc. 16 at 3). Furthermore, when there are no genuine issues of material fact and "the only issues before the Court are pure questions of law," disposition of the case by summary judgment is particularly appropriate. *Maxim Crane Works, L.P. v. Zurich Am. Ins.,* 11 F.4th 345, 350 (5th Cir. 2021) (cleaned up); *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011) ("When the only question a court must decide is a question of law, summary judgment may be granted.").

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted if "there is no genuine dispute as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Because there are no disputed issues of fact here, the Court need only decide which parties are entitled to judgment as a matter of law.

8

## III.    Discussion

The Court's opinion is in two parts. First, the Court considers its own jurisdiction, looking mainly to the Plaintiffs' standing. Having found that Winkles is a regulated party and a member of the NSBA, and that the NSBA has associational standing as a result, the Court concludes that both Plaintiffs have standing to bring their constitutional claims.

With standing out of the way, the Court then addresses the Government's proffered justifications for the CTA's constitutionality—that the CTA falls within the ambit of the Commerce, Taxing, and Necessary and Proper Clauses, along with Congress' foreign affairs and national security powers. After a close look at each of these putative justifications, the Court concludes that the CTA is not authorized by the Constitution.

### A.    Standing

The first order of business is to make sure the Court has jurisdiction to decide the merits of this case. Article III, § 2 of the U.S. Constitution confines the federal judicial power to "cases" and "controversies," and an "essential and unchanging part of the case-or-controversy requirement of Article III" is the requirement that a plaintiff have standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy the "irreducible constitutional minimum of standing," *id.*, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly

traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008).

According to the Government, neither Plaintiff has standing to bring this suit: Winkles, it suggests, has failed to show a concrete and particularized injury, while NSBA has failed to support its claim to organizational, third-party, or associational standing. Neither argument is persuasive.

### 1.    Plaintiff Isaac Winkles

Winkles has standing to challenge the CTA's beneficial owner provisions because the compelled disclosure of Winkles' sensitive personal information to FinCEN is a concrete, imminent injury that is traceable to the government, and redressable by a favorable decision. The Government does not dispute that the CTA will require Winkles, as the beneficial owner of at least one reporting entity, to submit his beneficial owner status and information to FinCEN. As a result, because Winkles has "challeng[ed] the legality of government action" and is undisputedly the "object of the action," there is "little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62.

The Government disagrees. In its view, Winkles' injuries aren't traceable to the CTA or redressable by a favorable decision because he has already disclosed at least some of the required information while complying with other regulatory

requirements, like "tax returns, passport forms, and bank account applications." (Doc. 24-1 at 19-20). The Government also argues that Winkles isn't injured by disclosing government-provided information like a passport number to the government. *Id.* at 20.

Yet federal subdivisions like FinCEN must still follow standard judicial procedures to obtain even federally provided information without an express authorization like the CTA's. And although the Government says that disclosure to FinCEN is no big deal because it's "no secret" that Winkles is the beneficial owner of at least one company, *id.*, the Government never explains why it needs to compel Winkles to disclose beneficial owner information at all if that information is so easily discovered by other means. After all, FinCEN already compels banks and other financial institutions to obtain nearly identical information from State entity customers and provide it to FinCEN. *See* 31 C.F.R. § 1010.230(a) (requiring "covered financial institutions" to "identify and verify beneficial owners of legal entity customers.").

The Government's standing arguments miss the mark for an additional reason: the injury to Winkles is not disclosure itself, but disclosure to FinCEN, the Treasury Department's criminal enforcement division. The mandatory disclosure of personal information to FinCEN for law-enforcement purposes satisfies the injury requirement for Winkles' First, Fourth, and Fifth Amendment claims, since courts

"accept as valid the merits of [the non-movant's] legal claims" for standing purposes when deciding a motion for summary judgment, *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022), and Winkles has alleged that the CTA requires disclosure of "sensitive personal information to FinCEN for law enforcement purposes." (Doc. 1 at 4); *see also id.* at 11 ("Winkles will be subject to the Act's reporting requirements to give his sensitive personal information to FinCEN."); and *id.* at 12-14, 21 (describing the injury as disclosure to FinCEN). Thus, the Court "must assume" that the CTA violates constitutional "right[s] we must assume [Winkles] has." *Cruz*, 596 U.S. at 298.

Winkles also has standing to challenge the CTA's applicant disclosure requirement. Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996), Winkles is obligated "to demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). In a pre-enforcement challenge like this one, the injury-in-fact requirement is met when the plaintiff "alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution" under that statute. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (internal quotation marks omitted).

Here, Winkles has submitted sworn testimony that he has "formed [other Alabama entities] in the past," and he "anticipate[s] forming other Alabama entities

over the next few years." (Doc. 39-3 at 2). Because the CTA would impose serious criminal penalties on Winkles for non-compliance with the CTA's applicant disclosure requirements, "it is not necessary that [Winkles] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). And because there is no doubt the CTA will be applied with its full force, "the plaintiffs' fear of prosecution [is] not imaginary or wholly speculative." *Susan B. Anthony List*, 573 U.S. at 160 (internal quotation marks omitted). As a result, Winkles has standing to challenge the CTA's applicant provisions because they present Winkles with a choice between compliance and felony prosecution. (Doc. 35-3 at 3) (Winkles' Affidavit: "[i]f I do not comply with these rules, I understand that I may face fines and even imprisonment.").

Finally, Winkles' standing to challenge the CTA's applicant and beneficial owner provisions on First, Fourth, and Fifth Amendment grounds gives him standing to challenge the CTA as a congressional overreach. Although "[i]ndividuals have no standing to complain simply that their Government is violating the law," Winkles "is a party to an otherwise justiciable case or controversy," and is therefore allowed "to object that [his] injury results from disregard of the federal structure of our Government." *Bond v. United States*, 564 U.S. 211, 225-26 (2011).

### 2.    National Small Business Association

The Government attacks NSBA's standing on three fronts, asserting that the NSBA lacks organizational, third party, and associational standing. When it comes to federal jurisdiction, however, standing on one leg is as good as standing on three. Because Winkles is a member of the NSBA and has standing as an individual, the NSBA has associational standing.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right." *Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203 (11th Cir. 2018). "[O]rganizations can assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). That said, organizations can't merely allege that a member has standing—instead, "an organization must make specific allegations establishing that at least one identified member has suffered or will suffer harm." *Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203 (11th Cir. 2018) (cleaned up).

NSBA has done so here. Winkles has standing on his own and has been a dues-paying member of the NSBA since 2021. (Doc. 39-2 at 4; Doc. 39-3 at 2). Furthermore, "the interests at stake are germane to the [NSBA]'s purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't*

*Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). As a result, the NSBA has satisfied the requirements of associational standing.

Having determined that both Winkles and the NSBA have standing to challenge the CTA, the Court next considers whether Congress had the authority to enact it.

### B.    Constitutionality of the CTA

The powers of the federal government are expressly enumerated in the Constitution. *McCulloch v. Maryland,* 4 Wheat. 316, 405 (1819). To protect individual liberty, the Founders also drafted the Constitution to ensure "separation and independence of the coordinate branches of the Federal Government," which "prevent[s] the accumulation of excessive power in any one branch." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). Within the green pastures of its enumerated powers, however, Congress may frolic with "great latitude." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).

Still, because enumeration itself "presupposes something not enumerated," Congress cannot range wherever it pleases. *Gibbons v. Ogden*, 9 Wheat. 1, 195 (1824). It's as simple as *expressio unius est exclusio alterius*: "The Constitution's express conferral of some powers makes clear that it does not grant others. And the federal government 'can exercise only the powers granted to it.'" *NFIB*, 567 U.S. at 534-35 (quoting *McCulloch*, 4 Wheat. at 405).

To be sure, a "[p]roper respect for a coordinate branch of the government requires that [a court] strike down an Act of Congress only if the lack of constitutional authority to pass the act in question is clearly demonstrated." *Id.* at 538 (cleaned up). But appropriate judicial deference to Congressional action ends at the borders of the Constitution, because "there can be no question that it is the responsibility of [the courts] to enforce the limits on federal power by striking down acts of Congress that transgress those limits." *Id.* After all, a law "beyond the power of Congress" is "no law at all." *Nigro v. United States*, 276 U.S. 332, 341 (1928).

The Government offers three sources of constitutional authority for Congress' enactment of the CTA. First, the Government argues that Congress has the power to enact the CTA under its foreign affairs powers. That is so, the Government says, because the political branches have plenary power to conduct foreign affairs, and Congress' motivating interest in curbing foreign money laundering and other malign foreign influences places the CTA under the aegis of those powers. Second, the Government argues that Congress has the power to enact the CTA via its Commerce Clause authority. Because many State entities engage in activities that qualify as or affect "commerce," the argument goes, the act of corporate formation itself is enough to invoke Congress' Commerce powers. Finally, the Government asserts that the CTA is a necessary and proper exercise of Congress' taxing power, since one

purpose of the FinCEN database created by the CTA is to assist in efficient tax administration.

### 1.     Foreign Affairs & National Security

The Government first turns to Congress' extensive powers over foreign affairs and national security and the Necessary and Proper Clause. The Government's theory is this: In enacting the CTA, "Congress concluded that collecting beneficial ownership information 'is needed to . . . protect vital Unite[d] States national security interests'; 'better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity'; and 'bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards.'" (Doc. 24-1 at 27) (quoting Pub. L. 116-283 § 6402(5)).

And because the Executive Branch agrees with Congress about the "necessity" of the CTA, says the Government, "there is a rational relationship between FinCEN's collecting limited beneficial ownership and applicant information and advancing the national security and foreign policy interests of the United States." *Id.* The Government also contends that the Court should defer to the political branches' policy determination that compliance with international financial standards is best achieved through the CTA, and that the CTA is within Congress' foreign affairs and national security powers because foreign parties use domestic

17

shell companies to harm the United States' interests. (Doc. 40 at 8). Not only that, but "the Court *must* defer to the political branches on these matters, not to advocacy groups or private citizens." *Id.* at 28 (emphasis added).

The Government is absolutely right to say that courts should defer to the political branches on matters of policy. As a matter of first principles, "[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). This is so not only because foreign policy "should be undertaken only by those directly responsible to the people whose welfare they advance or imperil," but because "the Judiciary has neither aptitude, facilities nor responsibility" for those policies. *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948). Thus, judicial deference to the political branches is most stringently required in the arena of foreign affairs.

All the same, the Court's "deference in matters of policy cannot . . . become abdication in matters of law," and its "respect for Congress's policy judgments thus can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed." *NFIB*, 567 U.S. at 538. As already explained, "[o]ur constitution limits the government to those powers specifically granted or those that are necessary and proper to carry out the specifically granted ones." *Afroyim v. Rusk*, 387 U.S. 253, 257 (1967). Of course, Congress' foreign affairs

powers are different from its domestic powers in at least one important way: the enumerated powers limitation "is categorically true only in respect of our internal affairs." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 315-16 (1936).

In any event, Congress is bound by the Constitution's enumerated powers limitation here, because incorporation is an internal affair. It is blackletter law that "[c]orporations are creatures of state law." *Cort v. Ash*, 422 U.S. 66, 84 (1975), *abrogated on other grounds by Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 (1979). In fact, "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987) (holding that federal securities law did not preempt state law regulating corporate takeovers).

At the Constitutional Convention of 1787, both James Madison and Thomas Pinkney proposed granting powers of incorporation to the federal government. 2 M. Farrand, *Records of the Federal Convention of 1787*, at 325 (1911). The defenders of these proposals made similar arguments to those the Government makes in defense of the CTA. James Wilson, for instance, claimed that federal incorporation was "necessary to prevent a State from obstructing the general welfare." *Id.* at 615. Even so, these proposals were rejected outright. *Id.* at 616. Although the Founders "were aware that leaving business regulation primarily to the individual states might cause friction within the overall American economy[, t]hey were more reluctant . . .

to allow concentrations of economic power, which they visualized as a government-sponsored monopoly, and therefore chose" to leave incorporation to the States. Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 Ohio St. L.J. 1037, 1041 (1986).

Apart from quasi-public corporations like the Tennessee Valley Authority and Amtrak (which were formed by acts of Congress), the Founders' deliberate choice to leave general incorporation to the States has gone unchanged, even at times when calls for federal incorporation were at a fever pitch and Congress was perhaps most willing to upset the balance of state and federal power. For instance, Congress rejected twenty bills to establish federal incorporation between 1903 and 1914 alone. *Id.* at 1049.

To be sure, the CTA is not a direct regulation of corporate formation. There are no preemption or commandeering concerns here, *contra* (Doc. 23-1 at 21 n.9), because the CTA does not establish general federal incorporation or force States to demand beneficial owner and applicant information as a filing requirement for incorporation; rather, the CTA is a federal reporting requirement imposed on entities that voluntarily incorporate. Thus, the operative question in light of "[t]he underlying assumptions of our dual form of government," *Kelly v. Robinson*, 479 U.S. 36, 49 n.11 (1986) (citation omitted), is whether Congress' Foreign Affairs powers justify the CTA's regulation of "creatures of state law," which are ordinarily

20

within the sovereign purview of the States. *Cort*, 422 U.S. at 84. In this case, the answer is no.

The Supreme Court's unanimous decision in *Bond v. United States* is instructive. 572 U.S. 844 (2014). In *Bond*, a woman inflicted "irritating" but ultimately harmless chemical burns on her husband's mistress. *Id.* at 861. For that, Bond was prosecuted and convicted for violating the Chemical Weapons Convention Implementation Act of 1998, which "ma[d]e it a federal crime for a person to use or possess any chemical weapon, and . . . punishe[d] violators with severe penalties." *Id.* at 848. The Chemical Weapons Act implemented the international Convention on Chemical Weapons "pursuant to the Federal Government's constitutionally enumerated power to make treaties." *Id.*

On appeal, the Supreme Court overturned Bond's conviction, ruling that the Chemical Weapons Act did not "reach purely local crimes." *Id.* at 860. Instead, the Court held that because "our constitutional structure leaves local criminal activity primarily to the States," courts "have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach." *Id.* at 848. Thus, absent a clear indication from Congress, the Court concluded that Congress' treaty powers did not extend to Bond's "unremarkable" and "purely local" offense. *Id.*

Although *Bond*'s central question was one of statutory (rather than Constitutional) interpretation, the logical parallels between *Bond* and this case are obvious. For starters, Congress' treaty and foreign affairs powers are closely related. And like local criminal law, corporate formation has always been the province of the States. So although the CTA does not directly interfere with or commandeer State incorporation practices, the CTA still "convert[s] an astonishing amount of traditionally local . . . conduct into a matter for federal enforcement, and involve[s] a substantial extension of federal police resources." *Id.* at 863 (internal quotation marks omitted).

The CTA also cannot be justified as necessary and proper to carry out Congress' foreign affairs powers. When Congress invokes the Necessary and Proper Clause, it must "involve[] exercises of authority derivative of, and in service to, a granted power." *NFIB*, 567 U.S. at 560. This is a showing the Government has failed to make. Instead, the Government seems to argue that regulation of purely internal affairs may be necessary and proper to effectuate Congress' foreign affairs powers if foreign actors (or enough foreign actors) participate in those internal affairs to illicit ends.

The Court can find little support in history or precedent for that position. The *only* support, in fact, seems to be the CTA's congressional findings, including the finding that "malign actors seek to conceal their ownership of [corporate] entities in

the United States to facilitate illicit activity, . . . harming the national security interests of the United States and allies of the United States." (Doc. 24-1 at 26-28) (quoting Pub. L. 116-283 § 6402(3)). The Government offers these findings as proof that the CTA is "rationally related to the implementation of a constitutionally enumerated power" and thus is a necessary and proper exercise of Congress' foreign affairs powers. *Id.* at 26 (citing *United States v. Comstock*, 560 U.S. 126, 134 (2010)). But the CTA's congressional findings are not enough to conclude that a regulation in the purely domestic arena of incorporation is an "exercise[] of authority derivative of, and in service to" Congress' foreign affairs powers, especially in light of the States' historically exclusive governance of incorporation. *NFIB*, 567 U.S. at 560.

The Government also asserts that the Necessary and Proper Clause "extends not only to Article I, § 8 powers, but to 'all other Powers vested by th[e] Constitution in the Government of the United States, or in any Department or Officer thereof,'" (Doc. 40 at 11) (citing U.S. Const. art. I, § 8, cl. 18), but never explains what "other Powers" it could invoke in the arena of foreign affairs to justify the CTA. Instead, the Government cites Congress' finding that the CTA is needed to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards." (Doc. 24-1 at 27) (citing Pub. L. 116-283 § 6402(5)(E)).

Compliance with international standards may be good policy, but it is not enough to make the CTA "necessary" or "proper." As admirable as Congress' goals may be, this Court's only job is to consider whether the CTA follows the Constitution, not whether it is good policy. *See Lester v. United States*, 921 F.3d 1306, 1318 (11th Cir. 2019) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)) (courts must "'say what the law is,' not what it should be."). The law is clear on this much: the Necessary and Proper Clause, "gives Congress authority to 'legislate on that vast mass of incidental powers which must be involved in the constitution,'" but "it does not license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated." *NFIB*, 567 U.S. at 559 (quoting *McCulloch*, 4 Wheat. at 411, 421).

The Government's reading of the Necessary and Proper Clause is far afield from that principle. It would sanction almost any exercise of Congressional power given the existence of a relevant international standard. Read that way, the Necessary and Proper Clause would give Congress carte blanche to do as it pleases, allowing it to "reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it." *NFIB*, 567 U.S. at 560; *see also Bond*, 572 U.S. at 877-78 (Scalia, J., concurring) (reasoning that Congress' general foreign affairs powers cannot "come[] with no implied subject matter limitations,"

otherwise "the possibilities of what the Federal Government may accomplish, with the right [international standard] in hand, are endless and hardly farfetched.").

Given the limits on Congress' authority under the Necessary and Proper Clause, *Bond* yields an unavoidable conclusion: the CTA is not authorized by Congress' foreign affairs powers, because those powers do not extend to purely internal affairs, especially in an arena traditionally left to the States. Nor can Congress look to international standards or agreements to extend those powers, no matter how praiseworthy the policy goal, because "no agreement with a foreign nation," formal or informal, "can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." *Reid v. Covert*, 354 U.S. 1, 16 (1957). As a result, this Court must look somewhere other than Congress' foreign policy powers to justify the CTA.

### 2.   Commerce Clause

The Government also says that the CTA is within Congress' power under the Commerce Clause and the Necessary and Proper Clause. In relevant part, the Constitution gives Congress the "Power . . . To regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. As for the power to regulate foreign commerce, "jurisprudence addressing Congress's positive Foreign Commerce Clause power is sparse," and "the Supreme Court has never clearly articulated the bounds of the positive foreign commerce power." *United*

*States v. Davila-Mendoza*, 972 F.3d 1264, 1270 (11th Cir. 2020). That said, the Court "assume[s], without deciding, that the Foreign Commerce Clause has the same scope as the Interstate Commerce Clause," *id.* at 1271, so the analysis is identical.

Although "the path of" Commerce Clause jurisprudence "has not always run smooth . . . it is now well established that Congress has broad authority under the Clause." *NFIB*, 567 U.S. at 549. The Supreme Court has identified "three broad categories of activity that Congress may regulate under its commerce power." *United States v. Morrison*, 529 U.S. 598, 608 (2000).

In the Government's view, the CTA's regulations fit squarely within all three categories: (1) the channels of interstate and foreign commerce, (2) the instrumentalities of, and things and persons in, interstate and foreign commerce, and (3) activities that have a substantial effect on interstate and foreign commerce. (Doc. 24-1 at 28); *see Morrison*, 529 U.S. at 609. For brevity's sake, and in line with the Government's arguments, the Court addresses the channels and instrumentalities of commerce as a single category.

a)   *Channels and Instrumentalities of Commerce*

First, the Government says the CTA is a valid regulation of the channels and instrumentalities of commerce because "[b]oth the record and common sense indicate that entities constituting CTA reporting companies frequently utilize the

channels of interstate commerce." (Doc. 24-1 at 33). Yet this argument can't be reconciled with the plain text of the CTA.

It is "well-settled" that Congress has the power to regulate "those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature." *United States v. Orito*, 413 U.S. 139, 144 (1973). The channels of commerce are "interstate transportation routes through which persons and goods move." *United States v. Ballinger*, 395 F.3d 1218, 1225 (11th Cir. 2005) (quoting *Morrison*, 529 U.S. at 613 n.5). These transportation routes "include highways, railroads, navigable waters, and airspace, as well as telecommunications networks, and national securities markets." *Id.* at 1225-26 (cleaned up and collecting cases).

Congress can also "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558 (1995). Unlike channels of commerce, instrumentalities of commerce make the conduct of interstate commerce possible—typically "the people and things themselves moving in commerce, including automobiles, airplanes, boats, and shipments of goods," along with "pagers, telephones, and mobile phones." *Ballinger*, 395 F.3d at 1226 (cleaned up and collecting cases).

The plain text of the CTA does not regulate the channels and instrumentalities of commerce, let alone commercial or economic activity. The CTA applies to

"reporting companies," defined (with a list of exceptions) as entities "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11). The CTA then mandates that those entities report information about their beneficial owners and applicants to FinCEN. *Id. §* 5336(b)(1)-(2)(A). The word "commerce," or references to any channel or instrumentality of commerce, are nowhere to be found in the CTA. *See* 31 U.S.C. § 5336.

The Government points to the Supreme Court's decisions in *California Bankers Ass'n v. Shultz* and *American Power & Light Co. v. Sec. & Exch. Comm'n* to prove that reporting entities "frequently use the channels of commerce[, so] Congress can impose conditions on that use." (Doc. 40 at 13). The Government reads those cases too broadly.

In *Shultz*, banks and bank customers sought to enjoin the enforcement of reporting and record keeping requirements authorized by the Bank Secrecy Act and promulgated by the Treasury Department. *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 25-26 (1974). First, the *Shultz* plaintiffs challenged the Treasury Department's requirement that banks maintain copies of each check for more than $100, as well as "extension[s] of credit in an amount exceeding $5,000 except those secured by

interest in real property," as well as any "advice, request, or instruction . . . regarding the transfer of funds, currency, or other money or credit in amounts exceeding $10,000 to a person, account, or place outside the United States." *Id.* at 34.

Second, the *Shultz* plaintiffs challenged the BSA's requirement that "anyone connected with the transportation into or out of the country of monetary instruments exceeding $5,000 on any one occasion" must report the transaction. In tandem, they also challenged the BSA's grant of authority to the Treasury Secretary "to prescribe regulations requiring residents and citizens of the United States, as well as nonresidents in the United States and doing business therein, to maintain records and file reports with respect to their transactions and relationships with foreign financial agencies." *Id.* at 36-37.

Third, the *Shultz* plaintiffs challenged the Treasury Secretary's requirement "that financial institutions file" a report "for each deposit, withdrawal, exchange of currency, or other payment or transfer 'which involves a transaction in currency of more than $10,000.'" *Id.* at 39.

*Shultz* is not on point for two reasons. First, *Shultz* did not address Congress' constitutional authority to enact the Bank Secrecy Act, only "the Act's asserted violation of specific constitutional prohibitions," the First, Fourth, and Fifth Amendments. *Id.* at 30, 44. Second, *Shultz* also illustrates the CTA's over-

inclusiveness problem: unlike the challenged disclosure requirements in *Shultz*, the CTA regulates most State entities, not just entities that move in commerce.

The reporting and record-keeping requirements at issue in *Shultz* were upheld largely because they governed negotiable instruments and money *actually* moving in foreign and interstate commerce. As the *Shultz* Court concluded, Congress "was not limited to any one particular approach to effectuate its concern that negotiable instruments moving in the channels of [interstate] commerce were significantly aiding criminal enterprise." *Id.* at 46. Further, the BSA's requirements were imposed on banks, not bank customers, because "Congress recognized that the use of financial institutions, both domestic and foreign, in furtherance of activities designed to evade the regulatory mechanisms of the United States, had markedly increased." *Id.* at 38.

In sum, *Shultz* doesn't stand for the principle that Congress may regulate an entire class whenever some sub-class engages in commerce; *Shultz* affirms that Congress may regulate a class's use of the channels and instrumentalities of commerce based on the activities of a sub-class. That is why Congress "could have made the transmission of the proceeds of any criminal activity by negotiable instruments *in interstate or foreign commerce* a separate criminal offense . . . [or] required that each individual engaging in the sending of negotiable instruments

*through the channels of commerce* maintain a record of such action." *Id.* at 47 (emphasis added). But that is as far as *Shultz* goes.

*American Power & Light Co. v. Sec. & Exch. Comm'n* further proves the point. 329 U.S. 90 (1946). There, two public utility holding companies challenged congressional authority to enact the Public Utility Holding Act, which authorized the Securities and Exchange Commission to require holding companies and their subsidiaries to ensure that their structure "d[id] not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders." *Id.* at 97. Both plaintiffs in *American Power & Light* were part of the same corporate structure, composed of an umbrella corporation, five sub-holding companies (including the plaintiffs), and 237 "direct and indirect subsidiaries." *Id.* at 95-96. This "vast system embrace[d] utility properties in no fewer than 32 states from New Jersey to Oregon and from Minnesota to Florida, as well as in 12 foreign countries." *Id.* at 98.

The Supreme Court affirmed the constitutionality of the act, noting first that the challenged statute was "directed solely to public utility holding company systems that use[d] the channels of interstate commerce." 329 U.S. at 100. The Court held that:

> Congress, of course, has undoubted power under the commerce clause to impose relevant conditions and requirements *on those who use the channels of interstate commerce* so that those channels will not be conduits for promoting or perpetuating economic evils. Thus *to the*

> *extent that corporate business is transacted through such channels*,
> affecting commerce in more states than one, Congress may act directly
> with respect to that business to protect what it conceives to be the
> national welfare. It may prescribe appropriate regulations and
> determine the conditions under which that business may be pursued.

*Id.* at 99-100 (emphasis added) (citations omitted).

Thus, the Government misses the mark when it argues that the Commerce Clause allows Congress to regulate an entire class just because *some* members of the class use the channels and instrumentalities of commerce. The shared principle between *Shultz* and *American Power & Light Co.* is that Congress may "regulate the channels and instrumentalities of commerce . . . to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature." *United States v. Ballinger*, 395 F.3d 1218, 1226 (11th Cir. 2005) (affirming Congressional power to prohibit destruction of religious property "in or affect[ing] interstate or foreign commerce."). The Commerce Clause thus allows Congress to regulate "commerce to the extent of forbidding and punishing the use of such commerce," but no further. *Brooks v. United States*, 267 U.S. 432, 436 (1925) (emphasis added).

These cases also illustrate how easily Congress could have written the CTA to pass constitutional muster. For instance, nothing in *Shultz* or *American Power & Light Co.* would bar Congress from imposing the CTA's disclosure requirements on State entities as soon as they engaged in commerce, or from prohibiting the use of

interstate commerce to launder money, "evade taxes, hide . . . illicit wealth, and defraud employees and customers." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,501. Indeed, Congress has already done so in countless other statutes. *See, e.g.*, 18 U.S.C. § 1343 (criminalizing the communication of information "in interstate or foreign commerce" for the purpose of wire fraud).

But that is not what the CTA does. Because the CTA doesn't regulate the channels and instrumentalities of commerce or prevent their use for a specific purpose, it cannot be justified as a valid regulation of those channels and instrumentalities.

### b) *Substantial effect on Interstate and Foreign Commerce*

The Government also says that the CTA is within Congress' commerce power because "Congress rationally concluded that the ability of certain legal entities to withhold beneficial ownership and applicant information, taken in the aggregate, substantially affects interstate commerce." (Doc. 24-1 at 29) (cleaned up). Indeed, Congress has broad Commerce Clause power "extend[ing] to activities that have a substantial effect on interstate commerce," including "activities that do so only when aggregated with similar activities of others." *NFIB*, 567 U.S. at 549 (internal quotation marks omitted).

In brief, this "substantial effects" doctrine allows Congress to regulate purely intrastate, non-economic activity that (1) has a substantial effect on interstate commerce in the aggregate, when (2) the regulation is in the service of a comprehensive statute that regulates commercial activity on its face, and (3) regulation of the non-economic, non-commercial activity is necessary to make the broader regulation effective. Yet even under this expansive doctrine, the Commerce Clause does not extend far enough to sanction the CTA.

First, the *future* activities of state entities are not enough to invoke Congress' "substantial effects" commerce powers. Even a near certainty of future conduct is insufficient—"[t]he Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *NFIB*, 567 U.S. at 557. Congress may "anticipate the effects on commerce of an economic activity," but it has never been "permitted . . . to anticipate that activity itself in order to regulate individuals not currently engaged in commerce." *NFIB*, 567 U.S. at 549. The Supreme Court's commerce-clause jurisprudence has always "involved preexisting economic activity." *Id.*

If future activities are off the table, a substantial effects justification for the CTA is limited to two possibilities: either (1) entity formation itself is a commercial activity that substantially affects interstate commerce, or (2) the fact that "many entities subject to the CTA *do engage* in interstate commercial activity" is enough

34

to extend the Commerce power to a regulation of incorporated entities. (Doc. 24-1 at 30) (emphasis added). The Government wisely hangs its hat on the latter option and concedes that "[i]t is the activities of these entities, not the mere fact that they submitted documents to a Secretary of State, that implicates the Commerce Clause and permits Congress to exercise its authority." (Doc. 40 at 12).

That brings us to the central question: Does Congress have authority under the Commerce Clause to regulate non-commercial, intrastate activity when "certain entities, which have availed themselves of States' incorporation laws, use the channels of commerce, and their anonymous operations substantially affect interstate and foreign commerce?" (Doc. 40 at 11). The Supreme Court's Commerce Clause decisions all point to the same conclusion: No.

For starters, "the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent' for Congress's action." *NFIB*, 567 U.S. at 549. The Court cannot find, and the parties have not identified, any other State or federal law like the CTA. The Government correctly points out that Congress routinely requires entities to submit information to the government without a suspicion of wrongdoing, but the cases it cites in support are not on point. (Doc. 40 at 11) (citing *Helvering v. Mitchell*, 303 U.S. 393, 399 (1938) (upholding statute criminalizing tax evasion as an exercise of Congress' enumerated taxing power); and *Elec. Bond & Share Co. v. SEC*, 303 U.S. 419, 432-33, 437 (upholding public utility holding

company regulation where petitioners conceded that their corporate structure and operations "involve[d] continuous and extensive use of the mails and instrumentalities of interstate commerce.")).

Furthermore, "[i]n addition to being a historical anomaly," *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2202 (2020), the CTA runs into trouble because it is not a facial regulation of commercial activity, a hallmark of valid substantial effects legislation. *United States v. Morrison*, 529 U.S. 598, 613 (2000). As already noted, the Government concedes that "submitt[ing] documents to a Secretary of State" does not "implicate[] the Commerce Clause." (Doc. 40 at 12). Thus, the Government's real argument is that the connection between the act of incorporation and the activities Congress sought to curb through the CTA is strong enough to "permit[] Congress to exercise its authority." *Id.* But the connection between incorporation and criminal activity is far too attenuated to justify the CTA. Indeed, if such an attenuated connection were enough, Congress' commerce powers would be functionally limitless.

The Supreme Court's decision in *United States v. Morrison* is helpful on this point: Congress, it said, can validly regulate intrastate activity where the regulated activity is "economic in nature." *Morrison*, 529 U.S. at 613. The *Morrison* Court considered a challenge to a provision of the Violence Against Women Act that "provide[d] a federal civil remedy for the victims of gender-motivated violence"

without requiring "a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action." *Morrison*, 529 U.S. at 601-02, 606 (2000).

In defense of the law, the government asserted that it fell within Congress' substantial effects commerce power, arguing that "gender-motivated violence affect[ed] interstate commerce by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; [and] by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." *Morrison*, 529 U.S. at 615 (cleaned up).

The *Morrison* Court rejected the government's substantial effects justification, in large part because "the but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce" would expand Congress' power far beyond constitutional boundaries. *Id.* The chief indicator of this excessive attenuation was that "[i]f accepted, [the government's] reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *Id.*

The *Morrison* Court also observed that although there is no "categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases," the Supreme Court has "upheld Commerce Clause regulation of intrastate

activity only where that activity is economic in nature." *Id.* at 613. And because "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity," the Court concluded that aggregation of effects was not permissible. *Id.*

Finally, as the Supreme Court later explained, the cause of action created by the Violence Against Women Act at issue in *Morrison* was "unconstitutional because . . . it did not regulate economic activity." *Raich*, 545 U.S. 1, 25 (distinguishing *Morrison*). *Morrison* thus established a "clear pattern of analysis" for Commerce Clause cases: "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.*

In *Gonzalez v. Raich*, the Supreme Court applied *Morrison*'s "clear pattern of analysis" in upholding the federal regulation of purely intrastate manufacturing and possession of marijuana. *Id.* In *Raich*, individuals who used medical marijuana, which was legal under California law, challenged the enforcement of the Controlled Substances Act after federal agents destroyed a plaintiff's personal cannabis plants. *Id.* at 6-7. Among other things, the *Raich* plaintiffs challenged the CSA as a violation of the Commerce Clause "to the extent it prevent[ed] them from possessing, obtaining, or manufacturing cannabis for their personal medical use." *Id.*

Unlike the Plaintiffs here, the *Raich* plaintiffs did "not dispute that passage of the CSA, as part of the Comprehensive Drug Abuse Prevention and Control Act, was well within Congress' commerce power." *Id.* at 15. Instead, they asserted a

"limited," as-applied claim that "the CSA's categorical prohibition of the manufacture and possession of marijuana as applied to the intrastate manufacture and possession of marijuana for medical purposes pursuant to California law exceeds Congress' authority under the Commerce Clause." *Id.*

On those narrow grounds, the *Raich* Court held that the CSA was a valid exercise of Congress' commerce power because, unlike the domestic violence at issue in *Morrison*, growing marijuana even in small amounts was a "quintessentially economic" activity, defined as "the production, distribution, and consumption of commodities." *Id.* at 25-26 (citation omitted). Thus, "[b]ecause the CSA . . . directly regulate[d] economic, commercial activity . . . *Morrison* cast[] no doubt on its constitutionality." *Id.* at 26.

Leaning on the legislative purpose of the CTA, the Government asserts that *Raich* governs here because Congress similarly sought to regulate "quintessentially economic" activities through the CTA. (Doc. 24-1 at 31). Such activities include the "use [of] shell companies to evade taxes, hide . . . illicit wealth, and defraud employees and customers," as well as money laundering. Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,501. The Court agrees that "it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity." *United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997).

Even so, the Government has conceded that the act of incorporation is not enough to invoke the Commerce power, so it runs into the same problem here as it does elsewhere—the plain text of the CTA does not regulate the quintessentially economic activities the Government asserts or require entities to engage in those activities to be regulated. As repeatedly shown, incorporation is "in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Lopez*, 514 U.S. at 567.

Here, as in *Morrison*, "the but-for causal chain from" incorporation "to every attenuated effect upon interstate commerce" is too attenuated to be justified under the Commerce Clause. *Morrison*, 529 U.S. at 615. Courts may not "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. Thus, "[n]o matter how inherently integrated" corporate formation is with the activities of those entities, "they are not the same thing: They involve different transactions, entered into at different times, with different" parties. *NFIB*, 567 U.S. at 558 (internal quotation marks omitted). Because "[t]he proximity and degree of connection between" the formation of an entity and its activities is too attenuated, "[s]uch a law cannot be sustained under a clause authorizing Congress to 'regulate Commerce.'" *Id.*; *see also Morrison*, 529 U.S. at 616 n.6 (noting that "the but-for causal chain must have its limits in the Commerce

Clause area"). Indeed, such a permissive "view of causation . . . would obliterate the distinction between what is national and what is local in the activities of commerce." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 554 (1935).

The Government also justifies the CTA as a "general regulatory statute bearing a substantial relation to commerce." (Doc. 40 at 11-12) (citing *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1273 (11th Cir. 2007)). It is true that Congress has "substantial leeway to regulate purely intrastate activity (whether economic or not) that it deems to have the capability, in the aggregate, of frustrating the broader regulation of interstate economic activity." *United States v. Maxwell*, 446 F.3d 1210, 1215 (11th Cir. 2006). Congress' "substantial leeway" includes the "aggregation of economic effects . . . where the federal action in question is 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" *Alabama-Tombigbee Rivers Coal.*, 477 F.3d at 1272 (quoting *Lopez*, 514 U.S. at 561).

There are three problems with this argument. First, the "comprehensive regulatory scheme" framework does not apply to a "single-subject statute whose single subject is itself non-economic." *Maxwell*, 446 F.3d at 1216 n.6 (noting that appellant was "challeng[ing] a component of a broader regulatory scheme whose subject [was] decidedly economic."). The CTA is just such a statute. As already

shown, it is not enough that some sub-class of entities engage in illicit, commercial, or economic activity. Nor are legislative statements that the CTA is a "comprehensive bipartisan reform of . . . anti-money laundering laws" enough to make it so. (Doc. 24-1 at 30-31) (quoting 166 Cong. Rec. S7289, S7309 (Dec. 9, 2020) (statement of Sen. Brown)).

Rather, unlike a "constitutionally 'comprehensive'" statute that "regulate[s] an entire market for a commodity," the CTA regulates entities, owners, and applicants that incorporate an entity with their state, an "isolated, discrete act[]" like the statutes "that were the subject of regulation in *Lopez* and *Morrison*." *Maxwell*, 466 F.3d at 1217 n.7. In other words, incorporation is a single, discrete action far closer to "possession of a gun in a school zone or gender-motivated violence" than a general regulation of controlled substances. *Id.* at 1216 n.6.

Second, the Government's argument misses that the "essential part of a larger regulation" analysis typically comes into play when assessing whether an exercise of the Commerce power is necessary and proper, not whether the exercise itself is within Congress' Commerce power. *See NFIB*, 567 U.S. at 558-59 (treating the Commerce Clause and Necessary and Proper Clause analyses as distinct inquiries). The "comprehensive regulatory scheme" analysis "poses a problem for . . . as-applied challenge[s], because when a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under

that statute is of no consequence." *Alabama-Tombigbee Rivers Coal.*, 477 F.3d at 1272 (quotation marks omitted). But the Government's argument fails to explain how this principle applies in the context of the facial challenge here, besides its repeated assertions that Congress need only use means that are "rationally related" to its commerce power. (Doc. 24-1 at 26) (citing *Comstock*, 560 U.S. at 134).

Once again, these arguments simply do not address the fact that the CTA does not regulate economic or commercial activity on its face. More than that, the Government's core cases on this point all involve statutes that did facially regulate commerce. *See, e.g.*, *Raich*, 545 U.S. at 15 (noting that there was no "dispute that passage of the CSA . . . was well within Congress' commerce power."); *Maxwell*, 446 F.3d at 1212 (rejecting as-applied challenge to 18 U.S.C. § 2252A(a)(5)(B), which prohibits possession or access to child pornography that is "transported [or produced] using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means").

Third, the Government's argument that the CTA is necessary and proper to carry out a legitimate exercise of Congress' commerce powers fails because the CTA is far from essential. *Alabama-Tombigbee Rivers Coal.*, 477 F.3d at 1272. FinCEN's 2016 Customer Due Diligence rule requires "covered financial institutions" to "identify and verify beneficial owners of legal entity customers." 31 C.F.R. § 1010.230(a). And how does the CDD rule define a "legal entity customer?" As "a

corporation, limited liability company, or other entity that is created by the filing of a public document with a Secretary of State or similar office, a general partnership, and any similar entity formed under the laws of a foreign jurisdiction that opens an account," unless the entity fits into one of sixteen exemptions, eight fewer than the CTA. *Id.* § 1010.230(e)(1)-(2).

The CDD rule defines beneficial owner broadly as well: "Each individual . . . who owns, directly or indirectly, 25 percent or more" of the entity; has "significant responsibility to control, manage, or direct a legal entity," including "a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer)" and "[a]ny other individual who regularly performs similar functions." *Id.* § 1010.230(d)(1)-(2).

To be clear, FinCEN's CDD rule and the CTA provide FinCEN with nearly identical information, but the CDD rule does so in a constitutionally acceptable manner. *See Shultz*, 416 U.S. at 49 (approving similar bank record-keeping requirements). Even the CTA itself acknowledges the similarity. *See* 31 U.S.C. § 5336(b)(1)(F) (requiring the Secretary of the Treasury to promulgate regulations that "collect [beneficial owner and applicant] information . . . in a form and manner that ensures the information is highly useful in . . . confirming beneficial ownership information provided to financial institutions." (emphasis added); *see also* Pub. L.

116-283 § 6402 (6)(B) "It is the sense of Congress that . . . [collection of] beneficial ownership information . . . [will] confirm beneficial ownership information provided to financial institutions.").

Even at the outer limits of the Necessary and Proper Clause, the practical similarities between these two regulations make it hard to justify a conclusion that "failure to regulate" corporate entities upon formation would "leave a gaping hole" in Congress' fight against illicit corporate activity and money laundering. *Raich*, 545 U.S. at 22; *cf. NFIB*, 567 U.S. at 619 (Ginsburg, J., concurring in part) (reasoning that the ACA's individual insurance mandate was necessary and proper because "[w]ithout the individual mandate . . . guaranteed-issue and community-rating requirements would trigger an adverse-selection death spiral in the health-insurance market").

Finally, as our analysis began with the text, so too does it end with it. *Octane Fitness*, 572 U.S. at 553. And the text of the CTA is missing a crucial component of valid substantial effects legislation: it "has no express jurisdictional element which might limit its reach to a discrete set of [activities] that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562; *see also* 31 U.S.C. § 5336. The inclusion of a jurisdictional hook is standard operating procedure for Commerce Clause legislation for good reason—it "precludes any serious challenge to the constitutionality of [a] statute as beyond the Commerce

power, because it guarantees 'a legitimate nexus with interstate commerce.'" *Goodwin*, 141 F.3d at 400 (quoting *Lopez*, 514 U.S. at 561).

The absence of a jurisdictional hook from the CTA is even more mystifying because Congress knows how to include one when it wants to. So commonplace are these jurisdictional phrases that, for purposes of statutory interpretation, courts assume that "Congress uses different modifiers to the word 'commerce' in the design and enactment of its statutes." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001). When Congress legislates pursuant to its Commerce Clause authority, "[t]he phrase 'affecting commerce' indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause," while "the general words 'in commerce' and the specific phrase 'engaged in commerce' are understood to have a more limited reach." *Id.*

There are many examples of this principle, including a recent Eleventh Circuit case which upheld 18 U.S.C. § 231(a)(3), a statute "which prohibits impeding law enforcement officers during a civil disorder affecting interstate commerce." *United States v. Pugh*, 90 F.4th 1318 (11th Cir. 2024). Other examples abound—for instance, Congress has set wage and hour requirements for "[e]nterprise[s] engaged in commerce or in the production of goods for commerce," 29 U.S.C. § 203(s)(1), and imposed registration requirements on "any person engaged in the business of manufacturing gambling devices, if the activities of such business in any way affect

46

interstate or foreign commerce." 15 U.S.C. § 1173(a); *see also Ballinger*, 395 F.3d at 1229 (collecting statutes).

Faced with the loud silence of the text, the Government argues that Congress *meant* to regulate interstate and foreign commerce in the CTA: "The CTA is authorized based on the undisputed facts that certain entities, which have availed themselves of States' incorporation laws, use the channels of commerce, and their anonymous operations substantially affect interstate and foreign commerce." (Doc. 40 at 11); *see also id.* (citing to Congressional findings and legislative history); and (Doc. 24-1 at 29) (citing Congressional findings that the "collection of beneficial ownership information is needed to protect interstate commerce.") (cleaned up).

In any event, what Congress intended to do is not the Court's animating concern, because "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Of course, the presumption that Congressional action is constitutional gives the CTA a significant head start. *United States v. Ruggiero*, 791 F.3d 1281, 1284 (11th Cir. 2015). And yet even with that head start, "the most formidable argument[s] concerning the statute's purposes c[an] not overcome the clarity [found] in the statute's text." *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012). Congress, for good or ill, "says in a statute what it means and means in a statute what it says." *Carcieri v. Salazar*, 555 U.S. 379, 392 (2009).

As for appeals to congressional findings, "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Morrison*, 529 U.S. at 614 (cleaned up). On the contrary, "[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." *Lopez*, 514 U.S. at 557 n.2, (alteration in original) (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S., 241, 273 (Black, J., concurring)). And congressional findings lose their weight in the face of the Government's failure to articulate limiting principles for its Commerce Clause arguments, which makes "the concern . . . that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seem[] well founded." *Morrison*, 529 U.S. at 615. As a result, "Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that [courts] have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers." *Id.*

All the same, maybe Congress' omission of a jurisdictional hook from the CTA was just inartful drafting. No matter, "it is beyond [the Court's] province to rescue Congress from its drafting errors, and to provide for what we might think is

the preferred result." *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) (cleaned up); *see also Arizona v. Mayorkas,* 143 S. Ct. 478, 479 (2022) (Gorsuch, J., dissenting) (observing that federal courts are "court[s] of law, not policymakers of last resort."). Because "[i]t is emphatically the province and duty of" this Court to interpret the law, not write it, the Court cannot amend the CTA to include a jurisdictional hook. *Marbury*, 5 U.S. at 177. Only Congress can do that.

Because the CTA does not regulate commerce on its face, contain a jurisdictional hook, or serve as an essential part of a comprehensive regulatory scheme, it falls outside Congress' power to regulate non-commercial, intrastate activity.

### C.    Taxing Power & Necessary and Proper Clause

The Court turns finally to the Government's argument that the CTA is justified by Congress' taxing power and the Necessary and Proper Clause.

The Government first argues that Plaintiffs have conceded the CTA may be a proper application of Congress' taxing power, and so their facial challenge must fail. (Doc. 40 at 14) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). That is a misreading of Plaintiffs' brief, which said that "[i]f Congress were to limit use and access of the FinCEN database to tax collection purposes, it might be justified under the Necessary and Proper Clause as rationally related to the Taxing Power." (Doc. 39

at 21). That statement does not amount to a concession that the CTA might actually be a valid exercise of the taxing power.

Moving on, the Plaintiffs do not dispute Congress' power to levy taxes. *See* U.S. Const. Art. I, § 8, cl. 1; amend. XVI. And although the CTA's civil penalties, like all civil penalties, "yield[] the essential feature of any tax" by "produc[ing] at least some revenue for the Government," the Government does not claim that the CTA's civil penalties are a tax. *NFIB*, 567 U.S. at 564. Nor could it, since revenue production is necessary but not sufficient to qualify a government action as a tax. Under *NFIB*'s "functional approach," the CTA's civil penalties are not a tax: they are not paid into the Treasury and have no income thresholds; the penalty amounts are fixed rather than variable; the penalties are not "found in the Internal Revenue Code and enforced by the IRS"; and the penalties are imposed only on those who "knowingly" or "willfully" violate the law, and "[s]uch scienter requirements are typical of punitive statutes," not taxes. *Id.* at 564-66.

Instead, the Government posits that "the collection of beneficial ownership information is necessary and proper to ensure taxable income is appropriately reported," and that Congress recognized this relationship by "draft[ing] the CTA to allow '[o]fficers and employees of the Department of the Treasury [to] obtain access to beneficial ownership information for tax administration purposes[.]'" (Doc. 24-1 at 36-37) (quoting 31 U.S.C. § 5336(c)(5)(B)). In other words, the CTA's

regulations are constitutional because they are sufficiently "incidental" to the taxing power. *McCulloch*, 4 Wheat. at 418.

Although the relationship between disclosure provisions and the taxing power is "well recognized," (Doc. 40 at 15), the cases relied on by the Government illustrate that providing access to the CTA's database for tax administration purposes is not enough to establish a sufficiently close relationship here. *See Helvering*, 303 U.S. at 399 (noting that tax return disclosure requirements are an exercise of the taxing power itself); *Kramer*, 2008 WL 313827, at *3 (holding that a federal occupational tax and registration requirement for gun manufacturers, dealers, and importers was a "legitimate exercise[] of Congress' taxation power").

As previously discussed, the Necessary and Proper Clause will not justify an act of Congress unless it "involve[s] exercises of authority derivative of, and in service to, a granted power." *NFIB*, 567 U.S. at 560. Thus, Congress' broad authority under the Necessary and Proper Clause depends on the force and vigor of Congress' enumerated powers for its existence. Put plainly, "[w]hen the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain." *Comstock*, 560 U.S. at 150 (Kennedy, J., concurring); *but see* Randy E. Barnett, *The Original Meaning of the Necessary and Proper Clause*, 6 U. PA. J. CONST. L. 183, 186 (2003) (stating that

the Founders believed the Clause "did not go 'a single step beyond the delegated powers.'").

The chain here is weak indeed. It would be a "substantial expansion of federal authority" to permit Congress to bring its taxing power to bear just by collecting "useful" data and allowing tax-enforcement officials access to that data. *NFIB*, 567 U.S. at 560. Read that way, the Necessary and Proper Clause would sanction any law that provided for the collection of information useful for tax administration and provided tax officials with access. All Congress would have to do to craft a constitutional law is simply impose a disclosure requirement and give tax officials access to the information.

That kind of unfettered legislative power "is in no way an authority that is 'narrow in scope,' or 'incidental' to the exercise of the commerce power." *Id.* (citations omitted). Thus, "even if" the CTA's provisions were "necessary," "such an expansion of federal power is not a 'proper' means for making those [policy goals] effective." *Id.*

## IV.  CONCLUSION

The Corporate Transparency Act is unconstitutional because it cannot be justified as an exercise of Congress' enumerated powers. This conclusion makes it unnecessary to decide whether the CTA violates the First, Fourth, and Fifth Amendments.

For these reasons, the Plaintiffs are entitled to summary judgment as a matter of law. The Court **GRANTS** the Plaintiffs' Motion for Summary Judgment (Doc. 23) and **DENIES** the Defendant's Motion to Dismiss or Alternative Cross Motion for Summary Judgment (Doc. 24). The Court will separately issue a final judgment.

      **DONE** and **ORDERED** March 1, 2024.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE